IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRIS CORPORATION,
a Delaware corporation,

      Plaintiff,

vs.                                 Case No. 6:07-CV-1819-ORL-28 KRS

FEDERAL EXPRESS
CORPORATION, a Delaware
corporation,

      Defendant.

_____/

FEDERAL EXPRESS
CORPORATION,

      Counter-Plaintiff,

vs.

HARRIS CORPORATION,

      Counter-Defendant.

_____/

<u>PLAINTIFF'S MOTION AND MEMORANDUM OF LAW
TO EXCLUDE TESTIMONY OF DEFENDANT'S TECHNICAL EXPERT
ALBERT HELFRICK</u>

Plaintiff/Counter-Defendant, Harris Corporation ("Harris") through its undersigned counsel, hereby moves this Court to exclude the proposed expert testimony of Defendant's identified technical expert, Dr. Albert Helfrick, and in support thereof, states as follows:

<u>BACKGROUND</u>

This is an action for patent infringement of patents ("the patents-in-suit") which

S:\AIMDOCS\HARELE\0061650\K75248.DOC

claim systems and methods for wirelessly transmitting data between an aircraft and ground based equipment after the aircraft has landed.  The vast majority of the patents currently in suit are part of a family of patents relating back to U.S. Patent 6,047,165 ("the '165 patent").

Defendant Federal Express Corporation ("FedEx") has submitted the report of its technical expert to testify as to patent invalidity and infringement.  However, the opinions of Dr. Helfrick are due to be excluded due to his failure to understand and apply proper legal standards to his analysis.  Plaintiff seeks the Court exercise its gate keeping power to exclude the inadmissible testimony of Dr. Helfrick.

<u>LEGAL STANDARD</u>

In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court rejected the previous rule of law requiring "general acceptance" of a  theory to be admissible.  Instead, the Court looked to Rule 702, F.R.E., to address the admissibility of expert testimony.  The *Daubert* Court held that the court is to act as a "gatekeeper" and determine whether expert testimony should be presented, consistent with Rule 702. *Daubert* addressed the admissibility of scientific testimony and identified a nonexclusive list of criteria a court might use in assessing proffered expert testimony.  *Id.* at 594-595. In 1999, the Supreme Court again spoke on the issue of expert testimony in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The *Kumho Tire* Court expanded *Daubert* to provide that the trial judge's general "gate-keeping" obligation applies not only to testimony based upon "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.  The Court held that a trial court may consider one or more specific factors identified in *Daubert* to determine that testimony's reliability.  *Id.* at

2

140.  The Court warned that "[w]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, … the trial judge must determine whether the testimony has a "reliable basis in the knowledge and experience of the [relevant] discipline.'"  *Id.* at 149.  Rule 702  now provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principals and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702, F.R.E.

As part of its gate-keeping role under Rule 702, a court is tasked with reviewing the proffered expert opinion testimony prior to submitting it to the trier of fact.  This function "inherently requires the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702.  *United States v. Frazier*, 387 F.3d 1244, (11th Cir. 2004) (en banc), *citing McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).  Requirements for the admission of expert testimony in light of *Daubert* are well known.  Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue.  *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted).   There are thus three discrete inquiries:

qualifications, relevance, and reliability.  *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate.").  The burden of establishing these three requisites lies with the proponent of the evidence.  *United States v. Frazier*, 387 F.3d at 1260.  The expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.* The evidence must "concern[s] matters that are beyond the understanding of the average lay person....  Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262-63.

A witness relying solely on experience must still offer reliable opinions--merely being an "expert" is not enough. *Id.* at 1261. The trial court's gate-keeping function requires more than simply "taking the expert's word for it."  *Frazier*, 387 F.3d at 1261. A witness who is unable to offer a basis for conclusions does not assist the trier of fact and should be excluded.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002).

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94.  "Notably, ... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702

analysis." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293, n. 7 (11th Cir. 2005).

Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1222 (11th Cir. 2005). Moreover, "[t]he Daubert requirement that the expert testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis -- means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."). "Thus, a trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained." *Cook v. Sheriff of Monroe County*, 402 F.3d at 1111, citing *Frazier*, 387 F.3d at 1266.

<u>DR. ALBERT HELFRICK'S OPINIONS SHOULD BE EXCLUDED</u>

Dr. Albert Helfrick, FedEx's proposed technical expert, submitted an expert report addressing infringement and invalidity of the patents-in-suit. Harris does not

dispute Dr. Helfrick's technical qualifications in the field.   Instead, Dr. Helfrick's methodology and unsupported conclusions are the subject of this motion.   Dr. Helfrick either did not understand or failed to apply the proper standards necessary for opinions as to validity and infringement.   For instance, Dr. Helfrick improperly used <u>different</u> definitions of the same claim terms in order to reach the requested opinion on invalidity and noninfringement.   While Courts do not require that a technical expert be a lawyer or an expert on the law, in order to offer an opinion that has any level of reliability, a technical expert must understand and apply the appropriate standards consistently when forming and conveying their opinions.   *See McClain v. Metabolife*, 401 F.3d at 1245 ("any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.")

     a.   <u>Dr. Helfrick Improperly Analyzed Construed The Patent Claims</u>
         <u>To Render An Opinion Consistent With His Client's Goals</u>

There are two steps one must take to analyze patent infringement: the first step is defining the "scope and meaning of the patent claims asserted;" the second step is to compare the properly construed patent claims to the allegedly infringing device "to determine whether all of the claim limitations are present either literally or by a substantial equivalent."   *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1351 (Fed. Cir. 2001).   During deposition, Dr. Helfrick explained how he skipped the first step:

> Q.   Well, let me back up.   Let's talk generally about the process that you undertook in addressing the infringement issues in your opinion.  Can you tell me your understanding of the process that you -- or the analysis that you have to go through to determine whether there's infringement.

A.   Okay.  You take a claim and analyze whether the system -- the infringing system does actually perform -- you know, do what the claim cites, if it actually does that.

Q.  Is that the only step you performed, was --

A.   Well, of course, if it's a method, you know, then we talk about, does it, you know, perform the same function or does it meet all the elements of a claim?

Q.   Are there any other steps you undertook in determining whether there was infringement in this case?

A.  I think that's pretty much it in this case.

(Deposition of Albert Helfrick taken on March 2, 2009, hereinafter referred to as

"Exhibit A", p. 72, ln. 12-p. 73, ln. 5).

Notably absent from Dr. Helfrick's description of his methodology is any reference to claim construction, a necessary step in an infringement analysis. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d at 1351.  If Dr. Helfrick omitted this fundamental step during his infringement analysis, it necessarily undermines any reliability of his opinion.  *See McClain v. Metabolife*, 401 F.3d at 1245.

The reason Dr. Helfrick chose to skip the first step is obvious. To arrive at his opinions, he construed the same claim terms narrowly for his infringement "analysis" and broadly to conclude the claims are invalid.  The law does not permit such gamesmanship. The claims call for the ground based (as opposed to aircraft based) portion of the system to be physically located at an airport.  (Deposition of Robert Swanson taken December 17, 2008, "Exhibit B", p. 44, lns. 10-21).  In the context of infringement, where a narrow claim definition best serves FedEx's interests, Dr. Helfrick offered a contorted and unsupportable definition for the term "airport based" by changing the claim term to "airport proper," and defining it using post 9/11 security measures (unsupported by the

7

claims and implemented years after the patent issued) as some undefined area within airport security fences and checkpoints:

> Q.   Okay.  Let's start with Claim 1.  Why doesn't the FedEx system, prior to the September 26, 2008 modification, infringe Claim 1 of the 165 patent?
>
> A.   Claim 1 talks about an airport-based archival data store.  The server that is the archival data store for the FedEx system is not at an airport proper.
>
> Q.   Do you recall from the testimony of Robert Swanson that he testified that the airport-based -- that the 727 server is located on property owned by Memphis Airport?
>
> A.   It is my understanding that the property is owned by the Memphis Airport.
>
> Q.   But you contend that although it's on airport property, it's not an airport-based component?
>
> A.   Correct.
>
> Q.   Tell me what your definition is for airport-based archival data store?
>
> A.   I attempted to find an FAA definition of an airport.  And lacking that, it is my opinion that there is a clear line of demarcation to what is an airport, and that would be signified by fences, security checks, security cameras, etc., and according to my conversation with those who work in the building where the server is located and the deposition of Swanson, that this server is outside the airport proper.
>
> * * *
>
> Q.   Let me go back to your definition again, because maybe I'm -- I may just be a little slow here. Tell me again your definition for airport based as to relates to either airport-based archival data store or airport-based processor.
>
> A.   In my opinion, airport based means on the airport proper; that is to say that you would have -- in that area you would have access to flights, to other equipment required for operation of an airport.

(Exhibit A, p. 47, ln. 4-p. 48, ln. 5; p. 52, ln. 21-p. 53, ln. 4).

Based on the arbitrary and unsupported definition of "airport based," (or "airport proper") Dr. Helfrick takes the position that FedEx does not infringe certain claims.

(Exhibit A, p. 47, ln. 4-p. 48, ln. 5).  Of course, nothing within the patents themselves provides any support for Dr. Helfrick's narrow and arbitrary definition.  Proper claim construction principles dictate that claim terms are defined as one of skill in the art would have understood them at the time of the invention.  *See Cohesive Tech., Inc. v. Waters Corp.*, 543 F.3d 1351, 1360 (Fed. Cir. 2008).  Instead, Dr. Helfrick admits that his definition is in the context of post 9/11 security measures, established more than six years after the invention. (Exhibit A, p. 54, ln. 1-p. 55, ln. 4).  Dr. Helfrick then conceded that many smaller airports would necessarily be excluded from his contrived definition of "airport based," meaning even "airport proper" would not fall within his definition. (Exhibit A, p. 62, ln. 23-p. 63, ln. 21).

When the focus of Dr. Helfrick's opinion shifts to invalidity and a broad definition best suits FedEx's goals, Dr. Helfrick disregards his earlier definition of the term "airport based."  Rather than the unreasonably narrow (and improper) definition Dr. Helfrick uses for "airport based" in the context of infringement, Dr. Helfrick simply treats the presence of the term "airport based" in the claims as irrelevant to his analysis of anticipation, defining "airport based" now as "land based":

> Q.   And where is the airport-based communication network in the Airbus digital telemetry paper?
>
> A.   If you look at the block diagram, Figure 4, Page 19-4, it shows a ground station.  It made reference to the ground station.  I admitted that it doesn't say at an airport.  However, I believe that the one at Toulouse is, in fact, at the airport, which they call the master station.
>
> Q.   And your belief that one of these stations is at the airport, is that sufficient to meet the standard for finding that these claims are invalid due to anticipation?
>
> A.   Where one physically puts the antenna for the communications network, airport or not airport, really doesn't matter.  But I think one is, in fact, at an airport.

S:\AIMDOCS\HARELE\0061650\K75248.DOC

Q.   Didn't you tell me earlier that the basis for many of your non-infringement positions is whether there's a security fence around property that's called an airport?

A.   Yes.

Q.   And now you're telling me that where you put the antenna, whether it's on an airport or not, doesn't really matter?

MR. ANDERSON:  Object to the form.

A.   For its function, it doesn't matter.

(Exhibit A, p. 183, ln. 24-p. 184, ln. 24).

Assuming Dr. Helfrick construed the claims for the purposes of opining on infringement and invalidity, Dr. Helfrick's incongruent positions on the term "airport based" with respect to infringement and invalidity are the product of faulty and improper application of claim construction principles.  "The same claim construction governs for validity determinations as for infringement determinations."  *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1324 (Fed. Cir. 2006), citing *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed. Cir. 2001).  Rather than taking consistent positions on claim construction, Dr. Helfrick crafted his varied claim constructions and contrived opinions on infringement and invalidity to achieve the outcome his client desired.  This position is supported by Dr. Helfrick's own sworn testimony:

Q.   In your role as an expert witness in this case, do you understand that the claims at issue are all presumed to be valid?

A.   But the goal in many cases is to overturn that validity.  So therefore, if one is trying to question validity, one can't presume that it's valid, unless I don't understand it.

* * *

Q.   And when you said the goal is to overturn validity, that's the goal of your

10

representation in this litigation?

MR. ANDERSON:  Object to the form.

A.   As I said, my part in this investigation is to provide expert opinion.  And if it involves validity of claims, then that is what -- I would then provide expert opinion for that purpose.

Q.   And as part of providing your opinion, you did not presume that the claims at issue are valid?

A.   The claims at issue, are you talking specifically 045 or --

Q.   I'm talking about all of the claims at issue in this case.

A.   No.  I provided my opinion on obviousness and definiteness.  And therefore, if I come to the conclusion that claims should be found invalid, obviously I didn't presume they were valid.

 (Exhibit A,  p.166, ln. 22-p. 167, ln. 3; p. 168, lns. 1-18).

Dr. Helfrick admits the goal of his analysis was to render the opinion that his client desired.  But as the Eleventh Circuit has noted, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result."  *Rink v. Cheminova, Inc*., 400 F.3d at 1293, n. 7.  Within the same testimony Dr. Helfrick also admits another obvious misunderstanding of patent law.  Issued patents are statutorily presumed to be valid.  *See* 35 U.S.C. §282; *see also Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008).  Yet Dr. Helfrick admits he began his invalidity analysis with the opposite assumption--that the claims were invalid--then provided an "expert opinion" to arrive at that conclusion.  This approach is contrary to black letter patent law and his analysis would be contrary to how the Jury is to determine invalidity--rendering his opinion confusing to a Jury and not helpful in reaching a decision using the instructions that the Court will provide.

11

Dr. Helfrick has been disclosed as an expert witness to offer opinions of noninfringement and invalidity for the Jury's consideration.  But "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."  *McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted).  Dr. Helfrick's failure to construe the claims prior to his infringement analysis, and subsequently failure to employ a consistent claim construction for his invalidity analysis renders both opinions completely unreliable, inconsistent with the law and therefore not helpful for the jury.  In conducting his invalidity analysis, Dr. Helfrick, contrary to how the Jury must analyze the issue, ignored the core premise of patent law--that claims are presumed to be valid unless clear and convincing evidence proves otherwise.  *See Impax Labs., Inc. v. Aventis Pharms. Inc.*, 545 F.3d at 1314.  Instead, Dr. Helfrick started with the premise that the claims were invalid, and worked backwards to a starting point that fit with the opinions his client desired.  Dr. Helfrick's opinions on infringement and invalidity should be excluded in their entirety.  *McClain v. Metabolife*, 401 F.3d at 1245; *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d at 1344.

b. <u>Dr. Helfrick Does Not Understand The Fundamental Concept Of Anticipation</u>

Notwithstanding Dr. Helfirck's improper and shifting claim constructions, Dr. Helfrick's deposition testimony revealed more specific flaws in his invalidity opinions. "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently."  *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999), citing *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997).  Despite offering an opinion on the topic, Dr. Helfrick admitted that he did not know the test for invalidity under 35 U.S.C. §102.  When asked for his understanding of

anticipation as he applied it in his report, Dr. Helfrick was unable to define this basic tenet of patent law:

> Q.   Sure.  What's your understanding of the test to be applied when you're determining whether a patent is invalid under 35 U.S.C., Section 102?
>
> A.   If prior art suggests a claim or a method, you know, in something that's public, that would be anticipated.
>
> Q.   Does it have to be a single reference to anticipate?
>
> A.   <u>I'm not sure I could answer that, but I have more than one here</u>.

(Exhibit A, p. 133, ln. 22-p. 134, ln. 6 (emphasis added)).

Dr. Helfrick's misunderstanding of the basic principle of anticipation is borne out in his written opinions.  Dr. Helfrick opined in his written report that several of the Patents-in-Suit were invalid based on a <u>single</u> reference, yet he admitted during deposition that the references he relied upon in the report fail to disclose every element of the claims within a single reference, as required under 35 U.S.C. §102. *See MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d at 1365.  For example, Dr. Helfrick opines that the paper entitled "Digital Telemetry System for Real-Time Analysis of Airbus A320 Flight Test Results," anticipates both U.S. Patent Nos. 6,047,165 (the '165 Patent) and 6,108,523 (the '523 Patent).  Every claim of the '165 and '523 Patents includes one or more elements claiming spread spectrum communication devices and/or airport based structures.  Claim 1 of the '165 Patent provides a representative example of claims on which Dr. Helfrick ostensibly offers an opinion of anticipation:

| |
|---|
| 1. A system for providing a retrievable record of the flight performance of an aircraft comprising: |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: |

13

| |
|---|
| a) an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and |
| b) a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal; |
| An airport based wideband spread spectrum transceiver comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; |
| An airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data; and |
| An airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing. |

In the representative claim above, four of the six elements include airport based structures (e.g. airport based archival data store, airport based processor) and/or spread spectrum transceivers.  If Dr. Helfrick properly analyzed anticipation of the '165 and '523 Patents, he must identify each and every element of the claims in the alleged anticipatory reference.  *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995).   In stark contrast, Dr. Helfrick admitted during deposition that the Airbus reference discloses <u>neither</u> the use of spread spectrum communication devices nor use of airport based components and yet he still reaches the conclusion that the reference anticipates the claims:

Q.   Did the article disclose airport-based receivers?

MR. ANDERSON:  Object to the form.

A.    They refer to it here as ground analysis facilities, and therefore, I will not agree that they were airport based.  However, airports are typically on the ground, so it could be.  But they refer to it as a ground analysis.

* * *

Q.    So where is it in this reference that you found an airport-based wideband spread spectrum transceiver?

A.   <u>It is not spread spectrum</u>.  It is not wideband.  Well, let's back up, because the

data is -- it is 1.2 megahertz bandwidth, so that's not narrowband.  It does not use spread spectrum.  It does, however, wirelessly transmit data gathered during flight to a ground-based station.

* * *

Q.   But nothing in Exhibit 55 indicates that any of the -- that the receiver for receiving communications from a plane was airport based?

MR. ANDERSON:  Object to the form.

A.   I don't see, and I didn't quote, any airport location.

(Exhibit A, p. 132, lns. 2-9; p. 132, ln. 18-p. 133, ln. 1; p. 133, lns. 12-17 (emphasis added)).

During deposition Dr. Helfrick admitted, despite representations to the contrary in his written report, that the Airbus reference cited in his report fails to disclose all elements of the claims of the '165 and '523 Patents, as required for anticipation.  *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d at 1047.  Dr. Helfrick's misunderstanding of the principles of anticipation under 35 U.S.C. §102 are not minor issues.  This is a fundamental portion of FedEx's validity challenge.  Dr. Helfrick's testimony will only serve to confuse a Jury as his analysis of anticipation will be directly contrary to the instructions this Court will provide to the Jury.  Dr. Helfrick's opinions of anticipation should be stricken and he should be precluded from testifying as to opinions of anticipation at trial.  *See McClain v. Metabolife*, 401 F.3d at 1245 (internal quotes omitted); *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d at 1344.

### c.   Dr. Helfrick Does Not Understand The Standards Associated with Obviousness

Not only was Dr. Helfrick unfamiliar with invalidity standards for anticipation,

Dr. Helfrick was also unaware of the standards to be applied for obviousness under 35 U.S.C. §103.  While anticipation requires that all elements and limitations of the claim be contained within a single reference, multiple prior art references can be combined to prove an invention was obvious to one of skill in the art at the time of the invention pursuant to 35 U.S.C. §103.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 405 (2007). In the recent *KSR* decision, the Court rejected implementation of a rigid approach to the teaching, suggestion or motivation test to be applied when combining references under §103, but the Court confirmed that there should be an "explicit" analysis as to what would have led one of skill in the art to combine the references.  *See id.* at 418.  The Court cited with approval the decision of *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006), quoting the Federal Circuit's holding that "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *See KSR*, 550 U.S. at 418.

Dr. Helfrick admitted during deposition that he was unfamiliar with any standard to guide him in reaching his conclusions under §103:

Q.   Are you familiar with standards for how to determine whether specific references can be combined in a determination of obviousness?

A.  I think I have an understanding of that.

Q.  Okay.  What's your understanding of the circumstances under which someone is permitted to combine references?

A.   As I understand it, if the combined references -- again, known by those of ordinary skill in the art -- anticipates or actually described each element of the claim, that claim would not be valid.

Q.   Are you aware of any standards that guide whether certain references can be combined in forming an opinion as to obviousness?

A.   I may not be as familiar as you would think I am, but I'm not sure what you're trying to say.  I'm not sure what the question is.

Q.   Are you familiar with any standards that provide you guidance in deciding whether you can combine more than one reference to find the patents in suit obvious?

A.   When you say "standards," you're talking about legal?  Are you talking about from the federal code?

Q.   Right.  Are you aware of any law, case law, statutes that provide you guidance in forming your opinion as to whether the patents in suit are obvious?

A.   Case law, I'm not that familiar with case law.  So I would say no, I'm not that familiar if you're talking about case law.

(Exhibit A, p. 144, ln. 6-p. 145, ln. 10).

Moreover, during deposition Dr. Helfrick was unable to provide a basis for

combining references:

Q.   You state in Paragraph 300 that a person of ordinary skill in the art would combine the Airbus telemetry paper with any reference teaching the use of spread spectrum.  Is there any reference you can point to that suggests the combination of the Airbus system and the use of spread spectrum?

MR. ANDERSON:  Object to the form.

A.   The same argument goes here, that if you can't obtain a license for a telemetry channel for your purposes, then you've got to go for an alternative, and the unlicensed radio that's available to you are an obvious choice.
     So the answer to your question is, can I cite something?  No, because, once again, I think it's so obvious that no one would have written a paper about that.

* * *

Q.   Is there any concrete motivation for you to combine these two references?

MR. ANDERSON:  Object to the form, asked and answered.

A.   There's no magic between these two references other than each one individually discloses the elements of the claim.

(Exhibit A,  p.152, ln. 20-p. 153, ln. 10; 175, lns. 4-10).

17

In one instance, instead of articulating a basis for combining the references, Dr. Helfrick falls back on a circular argument that he need not identify a basis for combining the references because it seems so obvious to him (in hindsight) that no one would have ever pointed out how obvious it was.  (Exhibit A, p. 152, ln. 20-p. 153, ln. 10).  Put another way, Dr. Helfrick has no basis for combining the references, other than "mere conclusive statements," a practice rejected by the Supreme Court and the Federal Circuit.

Throughout his "expert" report, Dr. Helfrick cites numerous references that ultimately lead Dr. Helfrick to an opinion that all nearly all of the claims are invalid for obviousness.  Unfortunately, the basis for combining these references is never articulated beyond the mere conclusory statements that one of skill in the art would have known to combine the references.  Indeed, it is unclear which references Dr. Helfrick combines with respect to the dependent claims identified in Dr. Helfrick's report.  Not only was Dr. Helfrick unable to provide any explicit reason for combining the references he cites in his report, but it became clear during his deposition that even he did not understand that certain references in his own report needed to be combined to reach his ultimate opinion. For example, when asked whether the individual references included in Dr. Helfrick's obviousness charts were the only references he was relying upon for his conclusion, i.e. they were not to be combined with additional references, he confirmed that was how his report was to be construed:

> Q.   If you'd turn to your chart on Page 84.
>
> A.   (Witness complies.)
>
> Q.   Is this a chart that provides your opinion as to the references you believe result in a determination that the 165 patent is obvious?

A.  Yes.

Q.   And with respect to Claim No. 2, what references do you base your conclusion of obviousness on?

A.  This is a prior art patent.

Q.  Is that the only reference you are considering in terms of finding Claim 2 of the 165 patent obvious?

A.  Yes.

* * *

Q.  With respect to Claim 3, what references do you contend make Claim 3 of the 165 patent obvious?

A.  As indicated in this chart, there was an AEEC Future Concepts Report which taught the advantages of the spread spectrum, and the idea, of course, was to use bands that required no license. And as you can see there, there's an L-band band there; there's also an S-band; and there's also a C-band.

Q.  And this AEEC Future Concepts reference is the only reference you're using with respect to your determination that Claim 3 of the 165 patent is obvious?

MR. ANDERSON:  Object to the form.

A.  Yes.

Q.  And if I go down through your chart, is it safe to assume that for each claim that's listed on the left side, the reference that's listed on the right side of the chart is your basis for an opinion as to invalidity due to obviousness?

A.  That is the major basis, the ones that are outlined here.

Q.  Well, is there any other basis beyond what's represented in this chart?

A.   Well, my own personal experience, which, of course, then I can't cite a document.  But to me a lot of these claims were obvious, but these are the cited documents.

Q.  I just want to make sure I understand your opinion so that we don't come in later and you tell me there are other references or other things you're relying upon. We're looking at this chart, for example, and Claim 6 is the one that I'm on. Claim 6 you contend is obvious in light of the Ng patent that's listed on the right-hand side of that table?

A.   That's correct.

(Exhibit A, p. 157, lns. 4-17; p. 158, ln. 7-p. 159, ln. 17; and see also Dr. Helfrick's

Expert Report submitted on January 29, 2009 (hereinafter referred to as "Exhibit C")

p. 84-88).

Thus, it appears Dr. Helfrick was taking a prior art reference and combing it

with his own undocumented experience to magically arrive at the conclusion his

client sought.  However, later in the deposition Dr. Helfrick was asked again whether

his opinion on obviousness was based on a single reference or based on combining

references.  The second time, with assistance from his counsel, Dr. Helfrick changed

his position and indicated that he did intend for certain references to be combined:

Q.   If I could turn your attention back to Page 84 of your report, and I just want to make sure that I'm understanding everything.  For example, if I look at Claim 2, you have the prior art that makes Claim 2 obvious is Polivka.  Do you see where I'm at?

A.   Yes.

Q.   And you're not relying on Airbus as part of this Claim 2 obviousness?

A.   Because they did not use direct sequence spread spectrum.

Q.   So the Airbus reference that you've cited elsewhere is not the basis for your contention that Claim 2 of the 165 is obvious?

A.   This is a dependent claim and it refers back to Claim 1.  Is that correct?

Q.   I don't know.  I'm asking you.

A.   So going back to Claim 1, the Airbus telemetry paper is cited.

Q.   So for Claim 2 are you relying upon Airbus and Polivka?

A.   Yes.

Q.   And you know that because your attorney flipped over other pages of your

expert report?

A.  That was a hint.

Q.  And that's why the testimony now you're giving is different from earlier when you said Polivka was --

A.   That's correct, because I didn't notice it was a dependent claim.  I wasn't paying close attention.

(Exhibit A,  p. 186, ln. 22-p. 188, ln. 1).

Although Dr. Helfrick was eventually able to discern the references he relied upon in his own opinion, he was never able to set forth any basis for the combination of the references.  Current Supreme Court precedent requires an explicit basis for the combination of references as a basis for an obviousness conclusion.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. at 418.  Dr. Helfrick failed to supply an explicit basis for combining the references in his report and during deposition.  Indeed, until his counsel helped him with his report, Dr. Helfrick believed his opinion was a single reference combined with his personal belief that all other elements were known, making it obvious.

Even assuming there was a basis for combining the references cited by Dr. Helfrick, Federal Circuit precedent also requires that he consider evidence of secondary considerations of nonobviousness in his analysis.  "In a § 103 obviousness analysis, *Graham* requires that the trier assess certain underlying facts: (1) the [**9]  scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) the so-called "secondary considerations."  *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 857 (Fed. Cir. 1985), *citing Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).  In this case, there is considerable evidence secondary considerations, such as evidence of commercial success

and a successful licensing program of Harris, copying by Avionica (the vendor who supplied the accused system to FedEx), and that the invention was contrary to the accepted wisdom of the prior art.  However, when asked about secondary considerations, Dr. Helfrick admitted he did not know what secondary considerations were, much less consider them as part of his analysis:

> Q.  Are you familiar with the term "secondary factors" of non-obviousness?
>
> A.  No.
>
> Q.   Did you consider any secondary factors of non-obviousness as part of rendering your opinion?
>
> A.   Not being familiar with the term, the answer, of course, is I didn't.  It was possible I did, not knowing that that's what it's called.
>
> Q.  Are you familiar with the term "secondary considerations"?
>
> A.  No.

(Exhibit A,  p. 146, lns. 3-13).

Thus, Dr. Helfrick's analysis will again be at odds with the instructions provided to the Jury--rendering his testimony unreliable and confusing to a Jury. Without at least a rudimentary understanding of legal concepts the Jury must apply, and in fact applying standards different from those the Jury will apply (and implied by law), any opinion Dr. Helfrick could offer on invalidity is unreliable and could only serve to confuse the Jury. Dr. Helfrick's opinions on invalidity due to obviousness should be stricken, and he should be precluded from testifying on these or related opinions.

d.  Dr. Helfrick's Invalidity Opinions on U.S. Patent Nos. 6,154,636; 6,308,044;  and  6,173,159  are  Ill-Defined  and  Conclusory  and Should be Excluded

At the end of Dr. Helfrick's report, perhaps as an afterthought, Dr. Helfrick

opines in two sentences that the '636, the '044 and the '159 Patents are "invalid for the same reasons the '165 Patent is invalid." (Exhibit C, pp. 173, 174.) Of course, the claims in these three patents differ from those of the '165 Patent. Moreover, Dr. Helfrick fails to even identify the statutory basis for his contention that the '636, '044 or '159 Patents are invalid, whether under 35 U.S.C. §§102, 103, 112 or some combination of these statutes. Not surprising, in the two sentences Dr. Helfrick dedicates to his conclusions of invalidity, there is no analysis on a claim by claim basis, much less on an element by element basis, to demonstrate where in the alleged prior art references each element can be found or even inform one as to the basis for Dr. Helfrick's opinions. If Dr. Helfrick contends the '636, '044 and '159 Patents are anticipated, where in the references are each element found? If Dr. Helfrick contends that the claims are invalid under 35 U.S.C. §103, which references has he combined and why? "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Cook v. Sheriff of Monroe County*, 402 F.3d at 1111 (internal quotes omitted). As such, Dr. Helfrick's opinions of invalidity on the '636, '044 and '159 Patents should be excluded and Dr. Helfrick should be barred from testifying as to his invalidity opinions for these patents.

      e.    <u>Any Opinions of Dr. Helfrick Related to Unenforceability Should Be Excluded</u>

In Dr. Helfrick's report, Dr. Helfrick "understands" that FedEx has filed declaratory judgment actions for unenforceability on the Patents-in-Suit. (Exhibit C, pp. 173, 174.) However, nowhere in his report does Dr. Helfrick offer opinions on unenforceabilty. Moreover, Dr. Helfrick admitted during deposition he did not know the

standard to be applied for unenforceability or how it differed from invalidity. (Exhibit A, p. 77, ln. 19-p. 78, ln. 14).  To the extent Dr. Helfrick attempts to offer any opinions on unenforceability at trial, his opinions should be excluded because he has never disclosed such opinions and admitted he did not know or understand the analysis to be applied to patent unenforceability.

CONCLUSION

FedEx's technical expert, Dr. Helfrick, fails to apply the same legal standards the Court and Jury are bound to apply, making his testimony unreliable and confusing to the Jury.  Dr. Helfrick was tasked with finding the patents invalid or not infringed by any means necessary--working backwards for the conclusion to contrive a basis for that opinion.  Along the way Dr. Helfrick takes inconsistent positions on claim construction and applies the wrong legal standards for anticipation and obviousness.

WHEREFORE, Plaintiff respectfully requests this Court strike the report of Dr. Helfrick and exclude any testimony of Dr. Helfrick related to infringement, validity or unenforceability.

LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Harris has conferred with counsel for Federal Express, who opposes the relief sought in this Motion.

24

Respectfully submitted this Thursday, March 26, 2009.

s/Ryan T. Santurri
Brian R. Gilchrist, FL Bar #774065
bgilchrist@addmg.com
Ryan T. Santurri, FL Bar #0015698
rsanturri@addmg.com
Allen, Dyer, Doppelt, Milbrath
  & Gilchrist, P.A.
255 South Orange Avenue, Suite 1401
Orlando, Florida  32802-3791
Telephone:      407/841-2330
Facsimile:      407/841-2343
Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on March 26, 2009, I electronically filed the following using the Management/Electronic Case Filing ("CM/ECF") system which will send a Notice of Electronic Filing to the following CM/ECF participants:

J. Scott Anderson, Esquire
andersonsj@ballardspahr.com
Charley F. Brown, Esquire
browncf@ballardspahr.com
Robin L. Gentry, Esquire
gentryrl@ballardspahr.com
Lawrence K. Nodine, Esquire
nodinelk@ballardspahr.com
Sumner C. Rosenberg, Esquire
rosenbergsc@ballardspahr.com
**BALLARD, SPAHR, ANDREWS**
 **& INGERSOLL, LLP**
999 Peachtree Street, Suite 1000
Atlanta, GA  30309

Marilyn G. Moran, Esquire
mmoran@bakerlaw.com
**BAKER & HOSTETLER, LLP**
200 South Orange Avenue, #2300
Post Office Box 112
Orlando, FL  32802-0112

Local Counsel for
Federal Express Corporation

       s/Ryan T. Santurri

# HARRIS CORPORATION

## vs

# FEDERAL EXPRESS CORPORATION

# ALBERT D. HALFRICK,

**March 2, 2009**

BARBARA PERRY AND COMPANY
PHONE  407-422-2953
FAX 407-422-2990

Exhibit A

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO:  6:07-CV-1819-ORL-28 KRS

HARRIS CORPORATION,

       Plaintiff,

vs.

FEDERAL EXPRESS CORPORATION,

       Defendant.

-------------------------------------------------------

                        March 2, 2009
                        9:00 a.m.


       The deposition of ALBERT D. HELFRICK, P.E.,

Ph.D.,taken on behalf of the Plaintiff, at the

offices of Allen, Dyer, Doppelt, Milbrath &

Gilchrist, P.A., 1135 East State Road 434, #3001,

Winter Springs, Florida 32708, before Stacey

Walters, Court Reporter and Notary Public, in and

for the State of Florida at Large.

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 47

1    claims of the 165 patent?

2            MR. ANDERSON:  Object to the form.

3        A.   No.

4        Q.   Okay.  Let's start with Claim 1.  Why

5    doesn't the FedEx system, prior to the September 26,

6    2008 modification, infringe Claim 1 of the 165 patent?

7        A.   Claim 1 talks about an airport-based

8    archival data store.  The server that is the archival

9    data store for the FedEx system is not at an airport

10   proper.

11       Q.   Do you recall from the testimony of Robert

12   Swanson that he testified that the airport-based --

13   that the 727 server is located on property owned by

14   Memphis Airport?

15       A.   It is my understanding that the property is

16   owned by the Memphis Airport.

17       Q.   But you contend that although it's on

18   airport property, it's not an airport-based component?

19       A.   Correct.

20       Q.   Tell me what your definition is for

21   airport-based archival data store?

22       A.   I attempted to find an FAA definition of an

23   airport.  And lacking that, it is my opinion that

24   there is a clear line of demarcation to what is an

25   airport, and that would be signified by fences,

Page 48

1  security checks, security cameras, etc., and according

2  to my conversation with those who work in the building

3  where the server is located and the deposition of

4  Swanson, that this server is outside the airport

5  proper.

6      Q.   The FedEx server is within the Air

7  Operations Center?

8      A.   I believe that's what they call it, the Air

9  Operations Center.

10     Q.   And in order to access that area, one has to

11 provide their ID?

12     A.   To get in to access the area beyond the

13 reception area, you have to provide an ID.

14     Q.   I believe you also indicated that

15 individuals that move beyond the reception area of the

16 Air Operations Center may also have an escort with

17 them?

18     A.   That's what I was told.

19     Q.   Are you familiar with any airports in the

20 U.S. that require every one that enters the airport to

21 have an escort?

22     A.   Not in such a sense.  I would imagine that

23 there are certain parts of the airport where you might

24 have to have an escort.

25     Q.   Would you agree that requiring an escort is

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

**f261ae89-5586-4ea5-8bd5-05bea8c75dd7**

Exhibit A

Page 52

1   don't know the answer to that.

2        Q.   How about any X-ray devices?

3        A.   I doubt it but I don't know for certain.

4        Q.   And once beyond that checkpoint, student

5   pilots can move about airport property?

6        A.   In an aircraft.  If they walk, they're

7   certainly going to be apprehended.

8        Q.   How do they get to their aircraft?

9        A.   Walk out to the aircraft.  It's just right

10  outside the door.

11       Q.   Do you recall whether there were any changes

12  to the security at Daytona Beach International Airport

13  as a result of the 9/11 attacks?

14       A.   Yes, there were.

15       Q.   Tell me about the security prior to 9/11.

16       A.   Prior to 9/11 it was single-fenced, of

17  course, like every other airport in the country, and

18  had no TSA checkpoints.  Passengers without -- people

19  who were not passengers could go to the gates, like

20  any other airport.

21       Q.   Let me go back to your definition again,

22  because maybe I'm -- I may just be a little slow here.

23  Tell me again your definition for airport based as to

24  relates to either airport-based archival data store or

25  airport-based processor.

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1    A.    In my opinion, airport based means on the

2  airport proper; that is to say that you would have --

3  in that area you would have access to flights, to

4  other equipment required for operation of an airport.

5    Q.    What does that mean, "access to flights"?

6    A.    You could actually approach aircraft or

7  gates, aircraft that are in service.

8    Q.    So within the airport proper is access to

9  gates?

10   A.    Yes.

11   Q.    At the time that the 165 patent was filed,

12  what were the security protocols for any individual to

13  get access to a gate at an airport?

14   A.    What was the filing date of the 165?

15   Q.    1995.

16   A.    That was pre-9/11.  It was much more lax

17  than it is now.

18   Q.    Do you recall what the security protocols

19  were for access to gates when the 165 was filed?

20   A.    I don't think -- of course, there was no

21  TSA, so there was no X-ray, no metal locators to the

22  best of my knowledge.  Actually, I think that may not

23  be accurate.  I think X-rays were around.  But it is

24  less than it is now.  I don't recall exactly what was

25  in place.

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 54

1    Q.   Well, is your definition of "airport based"

2  a post-9/11 definition?

3    A.   It's more current, yes.

4    Q.   Well, what's your definition of "airport

5  based" at the time of the 165 filing?

6    A.   Well, clearly when 9/11 occurred, the

7  airports decided to define what was an airport and

8  what was behind the fence, if you will, and set up the

9  security measures we spoke of around a certain

10  perimeter.  So if something was outside of that

11  perimeter prior to 9/11, it was not airport based.

12    Q.   So again, going back to my question, what's

13  the definition of "airport based" if we're using a

14  filing date as opposed to post-9/11 security?

15    A.   Well, today's definition is clear.  The

16  security is well defined.  And the security, in my

17  opinion, was based on what the authorities considered

18  as the airport.  And if it was outside of that

19  perimeter, then it wasn't airport based at the time of

20  filing.

21    Q.   Okay.  Well, what was airport based at the

22  time of filing?

23    A.   As I said, it wasn't that well defined.  I

24  think clearly after 9/11, then the definition was

25  clear.

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 55

1      Q.   Well, how were inventors to know in 1995

2  what their invention might mean seven years later --

3  or six years later when 9/11 occurred?

4      A.   Of course, they wouldn't know.

5      Q.   Okay.  So tell me what one of skill in the

6  art would have viewed as airport based in 1995.

7      A.   Well, one with ordinary skill in the art --

8  airport based, that would imply that it was on the

9  airport proper and not off the airport, outside of the

10  fence, with a street address that's not the airport.

11      Q.   So now a street address is part of airport

12  based?

13      MR. ANDERSON:  Object to the form,

14      mischaracterizes the witness's testimony.

15      A.   I brought that up because this building is

16  accessible from -- where this is located is accessible

17  from an entrance that's not an entrance to the

18  airport, and I think anyone who has ordinary skill in

19  the art would realize if you went to an address that

20  wasn't the airport and you didn't go past the airport

21  fence, you're not in the airport.

22      Q.   Well, does the Air Operations Center of

23  FedEx meet the 1995 definition of "airport based"?

24      A.   No.

25      Q.   Why not?

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1    airport property, including property that part of the

2    university is on.

3         Q.    So is the main determining factor as to

4    whether something's airport based just whether it's

5    inside or outside of a security fence?

6              MR. ANDERSON:   Object to the form.

7         A.    I think in a very general way, absolutely,

8    yes.

9         Q.    Are there any particular requirements on an

10   airport that dictates where that security fence is

11   located?

12        A.    There are many requirements for laying out

13   an airport outlined by ICAO and then used as national

14   standards for the FAA.  I can't tell you all of them.

15   I've read a number of them.  There's various

16   clearances you have to have.  For example, there's

17   requirements that fencing be so many years from bypass

18   and so on.  There's a large number of requirements

19   for, you know, laying out an airport.

20        Q.    ICAO; is that what you said?

21        A.    Yeah, International Civil Aviation

22   Organization, ICAO, I-C-A-O.

23        Q.    Before 9/11 did every airport in the U.S.

24   have to have security fencing?

25        A.    Well, there are airports that are not public

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 63

1    access airports that virtually have nothing.

2         Q.   Today?

3         A.   Today.

4         Q.   So there are some airports today that have

5    no security fencing?

6         A.   That's correct.

7         Q.   Are those still considered airports?

8         A.   The FAA calls them airports.

9         Q.   But you don't?

10        A.   No.  But the server we're discussing is not

11   at an airport of that sort.

12        Q.   Well, I'm just trying to get your

13   understanding of what airport based is, and I think we

14   came down to a generalization that it's basically

15   property inside the fences.

16        A.   Uh-huh.

17        Q.   But now you're telling me that there are

18   other airports that don't have security fences.

19        A.   There are very small airports, not public

20   access, private airfields, that virtually have

21   nothing.

22        Q.   So if the FedEx system was set up at one of

23   these private airports, would its system then be

24   airport based?

25             MR. ANDERSON:  Object to the form, calls for

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 72

1    A.    It includes a receiving function, yes.

2    Q.    A receiver?

3    A.    I want to say receiving function because

4    there's a lot of sharing.  So it would be difficult to

5    take the schematic or whatever of a transceiver and

6    block off part and say that's a receiver, but it does

7    receive.

8    Q.    Can you tell me your understanding of the

9    test that you apply in determining patent

10   infringement.

11   A.    In what respect?

12   Q.    Well, let me back up.  Let's talk generally

13   about the process that you undertook in addressing the

14   infringement issues in your opinion.  Can you tell me

15   your understanding of the process that you -- or the

16   analysis that you have to go through to determine

17   whether there's infringement.

18   A.    Okay.  You take a claim and analyze whether

19   the system -- the infringing system does actually

20   perform -- you know, do what the claim cites, if it

21   actually does that.

22   Q.    Is that the only step you performed, was --

23   A.    Well, of course, if it's a method, you know,

24   then we talk about, does it, you know, perform the

25   same function or does it meet all the elements of a

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 73

1  claim?

2      Q.   Are there any other steps you undertook in

3  determining whether there was infringement in this

4  case?

5      A.   I think that's pretty much it in this case.

6      Q.   You understand that in order to infringe, a

7  system has to meet each element of a particular claim?

8      A.   Yes.

9      Q.   Does a system avoid infringement by adding

10  additional functionality beyond what's cited in the

11  claim?

12          MR. ANDERSON:  Object to the form, calls for

13      speculation.

14      A.   No.

15      Q.   Earlier I think you said the FedEx system

16  performs a -- that the ground-based components of the

17  FedEx system perform a receiving function; is that

18  right?

19      A.   I don't recall saying that.  When did I say

20  that?

21      Q.   Well, we'll back up, because I want to make

22  sure I understood you.  The ground side of the FedEx

23  system has a transceiver?

24      A.   Correct.

25      Q.   In your report you say that that includes

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Page 77

1     A.   Yes.

2     Q.   What's your opinion as to the enforceability

3 of the patents?

4     A.   You're referring now to validity.  Is that

5 what you're speaking of now?

6     Q.   No.  I'm actually referring to Paragraph 21

7 on Page 4 of your report where you say at the end of

8 Paragraph 21 that FedEx is seeking a declaratory

9 judgment that the claims are not infringed, that the

10 patents are invalid, and that the patents are not

11 enforceable.

12     A.   That's what I mean by invalid, invalidity.

13     Q.   Do you have any opinion as to enforceability

14 other than your opinions on invalidity?

15     A.   These are facts that -- it says, "I

16 understand that..."  These are facts that were related

17 to me by counsel, so this is stating what I

18 understand.

19     Q.   Do you have an understanding as to the legal

20 analysis one goes through to determine

21 unenforceability?

22     A.   I am not that familiar with that.  It was

23 invalidity that I was more concerned about.

24     Q.   So your opinion here is limited to

25 invalidity and infringement and doesn't address

Page 78

1   unenforceability?

2        A.   I don't recall that.  Invalidity is the

3   subject matter that I was concerned with.

4        Q.   Is there any analysis in your report on

5   unenforceability?

6        A.   The analysis in my report is -- I don't

7   recall using, other than here, the term

8   "enforceability."  Invalidity is definitely covered

9   in this report.

10       Q.   And enforceability is not covered, other

11  than the statement right here?

12       A.   I'm not sure I understand what the

13  distinction is between enforceability when

14  infringement and validity are considered.

15       Q.   So you don't have an understanding as to

16  enforceability?

17       A.   How it's distinguishable from invalidity.

18       (Plaintiff's Exhibit No. 53 was marked for

19  identification.)

20  BY MR. SANTURRI:

21       Q.   You've been handed what was marked as

22  Exhibit 53.  Do you recognize that as a copy of the

23  637 patent?

24       A.   Yes.

25       Q.   And I'll have you turn your attention to

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  ground.

2      Q.    Did the article disclose airport-based

3  receivers?

4          MR. ANDERSON:   Object to the form.

5      A.    They refer to it here as ground analysis

6  facilities, and therefore, I will not agree that they

7  were airport based.   However, airports are typically

8  on the ground, so it could be.   But they refer to it

9  as a ground analysis.

10     Q.    Is ground analysis the same as airport?

11     A.    Well, not necessarily.   In fact, I would

12  guess that these ground stations were probably not at

13  airports, because when they do their flight test, they

14  do it out away from traffic patterns and traffic areas

15  and control centers.   So it's very possibly that these

16  ground stations were not at airports.   Of course, they

17  could be at airports too.

18     Q.    So where is it in this reference that you

19  found an airport-based wideband spread spectrum

20  transceiver?

21     A.    It is not spread spectrum.   It is not

22  wideband.  Well, let's back up, because the data is --

23  it is 1.2 megahertz bandwidth, so that's not

24  narrowband.  It does not use spread spectrum.   It

25  does, however, wirelessly transmit data gathered

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  during flight to a ground-based station.

2      Q.   Is there anything in this reference that

3  suggests there is an airport-based transceiver for

4  receiving communications from the plane?

5          MR. ANDERSON:  Object to the form, lack of

6      foundation.

7      A.   This paper here, if I remember correctly and

8  from what I'm looking at here, does not say where the

9  ground stations are.  It would not be difficult to

10 assume that at least one of those stations was at an

11 airport.

12     Q.   But nothing in Exhibit 55 indicates that

13 any of the -- that the receiver for receiving

14 communications from a plane was airport based?

15         MR. ANDERSON:  Object to the form.

16     A.   I don't see, and I didn't quote, any airport

17 location.

18     Q.   What's your understanding of the test to be

19 applied for determining anticipation of a patent

20 claim?

21     A.   What is my -- please repeat that.

22     Q.   Sure.  What's your understanding of the test

23 to be applied when you're determining whether a patent

24 is invalid under 35 U.S.C., Section 102?

25     A.   If prior art suggests a claim or a method,

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 134

1   you know, in something that's public, that would be

2   anticipated.

3       Q.   Does it have to be a single reference to

4   anticipate?

5       A.   I'm not sure I could answer that, but I have

6   more than one here.

7       Q.   Well, I'm looking at, for example, Page 75

8   of your report.  I believe that you contend that all

9   of the independent claims of the 165 patent are

10  anticipated by the "Airbus Digital Telemetry Paper."

11  Do I understand that correctly?

12      A.   Yes.

13      Q.   So is it your opinion that every element of

14  Claim 1 of the 165 patent is found in what we have as

15  Exhibit 55?

16      A.   Yes.  There's also another -- there's

17  another paper that went with that as well.  There's a

18  magazine article but it was based on this paper.

19      Q.   Where is it that you were able to locate an

20  airport-based wideband spread spectrum transceiver

21  within Exhibit 55?

22      A.   The method of modulation was wideband.  And

23  also, as you can see, the bandwidth of this system is

24  1.2 megahertz, so that's not narrowband.  So it is

25  wideband and there are ground stations.  They clearly

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1    to determinations of obviousness?

2              MR. ANDERSON:  Object to the form.

3              THE WITNESS:  Could you rephrase that for

4         me.

5    BY MR. SANTURRI:

6         Q.   Are you familiar with standards for how to

7    determine whether specific references can be combined

8    in a determination of obviousness?

9         A.   I think I have an understanding of that.

10        Q.   Okay.  What's your understanding of the

11   circumstances under which someone is permitted to

12   combine references?

13        A.   As I understand it, if the combined

14   references -- again, known by those of ordinary skill

15   in the art -- anticipates or actually described each

16   element of the claim, that claim would not be valid.

17        Q.   Are you aware of any standards that guide

18   whether certain references can be combined in forming

19   an opinion as to obviousness?

20        A.   I may not be as familiar as you would think

21   I am, but I'm not sure what you're trying to say.  I'm

22   not sure what the question is.

23        Q.   Are you familiar with any standards that

24   provide you guidance in deciding whether you can

25   combine more than one reference to find the patents in

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 145

1   suit obvious?

2       A.   When you say "standards," you're talking

3   about legal?  Are you talking about from the federal

4   code?

5       Q.   Right.  Are you aware of any law, case law,

6   statutes that provide you guidance in forming your

7   opinion as to whether the patents in suit are obvious?

8       A.   Case law, I'm not that familiar with case

9   law.  So I would say no, I'm not that familiar if

10  you're talking about case law.

11      Q.   Well, do you know whether it's acceptable

12  for you to find individual elements in different

13  references and combine those references together with

14  no basis for the combination?

15          MR. ANDERSON:  Object to the form.

16      A.   I don't know that I can cite a standard on

17  that, no.  I would hope that my counsel would make

18  sure that the opinions I came up with would meet that

19  requirement.

20      Q.   Well, how did you determine that the

21  references you combined within your expert opinion

22  were references that were available for combination in

23  a determination of obviousness?

24      A.   The references I found taught techniques and

25  procedure that were essentially the same as the

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 146

1  claims.  As far as applying a legal standard, that, I

2  think, is beyond my expertise.

3      Q.  Are you familiar with the term "secondary

4  factors" of non-obviousness?

5      A.  No.

6      Q.  Did you consider any secondary factors of

7  non-obviousness as part of rendering your opinion?

8      A.  Not being familiar with the term, the

9  answer, of course, is I didn't.  It was possible I

10  did, not knowing that that's what it's called.

11      Q.  Are you familiar with the term "secondary

12  considerations"?

13      A.  No.

14      Q.  Turning to Page 83 of your report,

15  Paragraph 299, can you tell me the references that you

16  suggest could be combined to deem the independent

17  claims of the 165 patent as obvious.

18      A.  Okay.  Now that I've had time to read the

19  paragraph, could you now restate your question?

20      Q.  Sure.  Can you tell me the references that

21  you combined in rendering your opinion that the

22  independent claims of the 165 patent are obvious.

23      A.  Well, as it states here, there is a previous

24  patent which describes a wireless link, and then there

25  are various texts and so on teaching the use of spread

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  name of the product is you're talking about again.

2      A.   I worked for a company called Gemini

3  Industries, and we made consumer devices.  We made a

4  transmitter/receiver pair that would allow you to, let

5  us say, play a VCR in one room of your house and

6  broadcast it wirelessly to another room where you can

7  pick it up in a TV set.  And I did that design just

8  before I came to Florida, so we're talking about like

9  1989 and 1990, around then.

10         Now, that was not spread spectrum, but that

11 was the unlicensed ISM bands, which is what the 802.11

12 occupies.

13     Q.   And did that product have anything to do

14 with aviation or avionics?

15     A.   No.

16     Q.   Did you get a patent for any of your work

17 done at Gemini?

18     A.   I have patents but not on anything there,

19 no.

20     Q.   You state in Paragraph 300 that a person of

21 ordinary skill in the art would combine the Airbus

22 telemetry paper with any reference teaching the use of

23 spread spectrum.  Is there any reference you can point

24 to that suggests the combination of the Airbus system

25 and the use of spread spectrum?

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 153

1    MR. ANDERSON:  Object to the form.

2    A.    The same argument goes here, that if you
3  can't obtain a license for a telemetry channel for
4  your purposes, then you've got to go for an
5  alternative, and the unlicensed radio that's available
6  to you are an obvious choice.

7    So the answer to your question is, can I
8  cite something?  No, because, once again, I think it's
9  so obvious that no one would have written a paper
10  about that.

11    Q.    Would the use of a wideband spread spectrum
12  communication link have worked in the Airbus test
13  flight plan to provide real-time data while the plane
14  was in flight?

15    A.    Your question was, would a wideband spread
16  spectrum --

17    Q.    Right, a wideband spread spectrum operated
18  at 2.4 to 2.5 gigahertz, would a system such as that
19  have allowed Airbus to transmit flight test data
20  wirelessly while the plane was in flight?

21    A.    Yes.

22    Q.    At what range?

23    A.    It depends upon your antenna gains and your
24  optical line of sight, the very same thing that we
25  were discussing in this paper.

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  it.  But when you say "the 802.11 spec," are you

2  talking about the issued spec or are you talking about

3  the draft or what?

4      Q.   If you'd turn to your chart on Page 84.

5      A.   (Witness complies.)

6      Q.   Is this a chart that provides your opinion

7  as to the references you believe result in a

8  determination that the 165 patent is obvious?

9      A.   Yes.

10      Q.   And with respect to Claim No. 2, what

11  references do you base your conclusion of obviousness

12  on?

13      A.   This is a prior art patent.

14      Q.   Is that the only reference you are

15  considering in terms of finding Claim 2 of the

16  165 patent obvious?

17      A.   Yes.

18      Q.   And with respect to Claim No. 2, you state

19  that Claim No. 2 is obvious in light of Polivka, which

20  teaches that spread spectrum processing can take the

21  form of direct PN sequencing modulation and/or

22  frequency hopping?

23      A.   Correct.

24      Q.   Do you know whether the Polivka patent was

25  considered during the examination of the 165 patent?

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 158

1        A.    I don't recall.

2        Q.    Well, if you were to be told that the

3    Polivka patent was considered, would that change your

4    opinion as to whether Claim 2 of the 165 patent is

5    obvious in light of Polivka?

6        A.    No.

7        Q.    With respect to Claim 3, what references do

8    you contend make Claim 3 of the 165 patent obvious?

9        A.    As indicated in this chart, there was an

10   AEEC Future Concepts Report which taught the

11   advantages of the spread spectrum, and the idea, of

12   course, was to use bands that required no license.

13   And as you can see there, there's an L-band band

14   there; there's also an S-band; and there's also a

15   C-band.

16       Q.    And this AEEC Future Concepts reference is

17   the only reference you're using with respect to your

18   determination that Claim 3 of the 165 patent is

19   obvious?

20            MR. ANDERSON:   Object to the form.

21       A.    Yes.

22       Q.    And if I go down through your chart, is it

23   safe to assume that for each claim that's listed on

24   the left side, the reference that's listed on the

25   right side of the chart is your basis for an opinion

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  as to invalidity due to obviousness?

2      A.   That is the major basis, the ones that are

3  outlined here.

4      Q.   Well, is there any other basis beyond what's

5  represented in this chart?

6      A.   Well, my own personal experience, which, of

7  course, then I can't cite a document.  But to me a lot

8  of these claims were obvious, but these are the cited

9  documents.

10     Q.   I just want to make sure I understand your

11 opinion so that we don't come in later and you tell me

12 there are other references or other things you're

13 relying upon.  We're looking at this chart, for

14 example, and Claim 6 is the one that I'm on.  Claim 6

15 you contend is obvious in light of the Ng patent

16 that's listed on the right-hand side of that table?

17     A.   That's correct.

18     Q.   Claim 9, you identify two references there.

19 Are you relying on those two references in combination

20 or each reference individually for your determination

21 that Claim 9 of the 165 patent is obvious?

22     A.   There is redundancy there, so they need not

23 be taken together.

24     Q.   There's some discrepancies in your table in

25 that we have ARINC 623 and 632 both stated on Page 85.

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

**f261ae89-5586-4ea5-8bd5-05bea8c75dd7**

Page 166

1   through 328 of your report?

2       A.   The standard is based on definiteness.

3       Q.   Did you consider the presumption of validity

4   in making this finding?

5       A.   And you mean by that?

6       Q.   Did the presumption of validity enter your

7   analysis when you made your determination as to this

8   section of your report?

9       A.   So you're asking me, did I presume that they

10  were valid?

11      Q.   Correct.

12      A.   And then go on to state that they're all

13  indefinite?

14      Q.   Yes.

15      A.   No.

16      Q.   Do you have any understanding as to whether

17  there's a presumption of validity with respect to

18  issued patent claims?

19      A.   If you have a patent, I assume that someone

20  has determined -- the USPTO -- that the claims are

21  valid.

22      Q.   In your role as an expert witness in this

23  case, do you understand that the claims at issue are

24  all presumed to be valid?

25      A.   But the goal in many cases is to overturn

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 167

1   that validity.  So therefore, if one is trying to

2   question validity, one can't presume that it's valid,

3   unless I don't understand it.

4       Q.   Was that your goal?  Is that the goal of

5   your representation in this agreement, to find a basis

6   for invalidity?

7       A.   No.  It's to provide a technical opinion on

8   whether I think there's obviousness or indefiniteness.

9   And if that turns out to invalidate claims, then yes.

10          MR. SANTURRI:  Can you read back the

11      previous answer.

12      (The requested answer was read back as follows:)

13          THE COURT REPORTER:  "But the goal in many

14      cases is to overturn that validity.  So

15      therefore, if one is trying to question validity,

16      one can't presume that it's valid, unless I don't

17      understand it."

18  BY MR. SANTURRI:

19      Q.   So you said the goal is overturning

20  validity?

21          MR. ANDERSON:  Object to the form.

22      Q.   Is that right?  Did the court reporter read

23  that statement right?

24      A.   Well, if that's what it said, I'm sure she's

25  quite accurate.

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 168

1    Q.   And when you said the goal is to overturn

2    validity, that's the goal of your representation in

3    this litigation?

4         MR. ANDERSON:   Object to the form.

5    A.   As I said, my part in this investigation is

6    to provide expert opinion.   And if it involves

7    validity of claims, then that is what -- I would then

8    provide expert opinion for that purpose.

9    Q.   And as part of providing your opinion, you

10   did not presume that the claims at issue are valid?

11   A.   The claims at issue, are you talking

12   specifically 045 or --

13   Q.   I'm talking about all of the claims at issue

14   in this case.

15   A.   No.   I provided my opinion on obviousness

16   and definiteness.   And therefore, if I come to the

17   conclusion that claims should be found invalid,

18   obviously I didn't presume they were valid.

19   Q.   At Page 98 of your report -- and it spills

20   onto Page 99 -- you reference a paper entitled "Spread

21   Spectrum PBX System Using CDMA."   Do you see where I'm

22   at?

23   A.   Yes.

24   Q.   The power control algorithm that's

25   referenced in Paragraph 337, that power control

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 175

1    controls, such as a cell phone.  This is just one that

2    was described, and this paper was one that was

3    available.

4         Q.   Is there any concrete motivation for you to

5    combine these two references?

6              MR. ANDERSON:  Object to the form, asked and

7         answered.

8         A.   There's no magic between these two

9    references other than each one individually discloses

10   the elements of the claim.

11        Q.   Could you turn to Page 106 of your report.

12        A.   (Witness complies.)

13        Q.   Just to make sure I understand your charts,

14   we have on the left dependent claims of the 914 patent

15   and on the right prior art that makes the dependent

16   claims obvious.  And next to Claim No. 2, you have

17   "The 802.11 March Draft Specification."  Is that the

18   only reference you're using in forming your opinion

19   that Claim 2 of the 914 patent is invalid for

20   obviousness?

21        A.   Yes.

22        Q.   And would that reference be cumulative of

23   the 802.11 standard cited in the specification of the

24   914 patent?

25             MR. ANDERSON:  Object to the form.

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1    operations control center and airport-based processor

2    analyze flight performance data; is that right?

3         A.    It says here, "an airport based

4    communications network operatively connecting said

5    remote flight operations control center and airport

6    based processor to allow the remote flight operations

7    control center to receive and analyze the flight

8    performance data."  In my opinion, that says the

9    remote flight operations control center analyzes

10   flight performance data.

11        Q.    And where in Airbus digital telemetry paper

12   is the remote flight operations center again?  Do we

13   have a figure that you can point to?

14        A.    It describes it in this paper here, and it

15   says -- for example, in 19-5 Section 7, it says, "The

16   room in which results are analysed (sic) contains six

17   work stations..."  It describes a place where -- a

18   room where telemetry data are analyzed.

19        Q.    Is that room at the airport?

20        A.    Excuse me?

21        Q.    Is that room at an airport?

22        A.    I don't know, and I don't know that the

23   flight operations control center is.

24        Q.    And where is the airport-based communication

25   network in the Airbus digital telemetry paper?

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 184

1    A.   If you look at the block diagram, Figure 4,

2   Page 19-4, it shows a ground station.  It made

3   reference to the ground station.  I admitted that it

4   doesn't say at an airport.  However, I believe that

5   the one at Toulouse is, in fact, at the airport, which

6   they call the master station.

7    Q.   And your belief that one of these stations

8   is at the airport, is that sufficient to meet the

9   standard for finding that these claims are invalid due

10   to anticipation?

11    A.   Where one physically puts the antenna for

12   the communications network, airport or not airport,

13   really doesn't matter.  But I think one is, in fact,

14   at an airport.

15    Q.   Didn't you tell me earlier that the basis

16   for many of your non-infringement positions is whether

17   there's a security fence around property that's called

18   an airport?

19    A.   Yes.

20    Q.   And now you're telling me that where you put

21   the antenna, whether it's on an airport or not,

22   doesn't really matter?

23        MR. ANDERSON:  Object to the form.

24    A.   For its function, it doesn't matter.

25    Q.   Rather than considering its function, how

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

1  elsewhere.  And this is about disclosing and, you

2  know, lack of novelty and obviousness, and it doesn't

3  matter where it is; it performs the same function.  It

4  doesn't do something different if it's at an airport.

5      Q.   So for purposes of non-infringement,

6  location at an airport or otherwise matters; but for

7  purposes of our opinions on obviousness and

8  invalidity, location of these components has no

9  bearing on the issue?

10          MR. ANDERSON:  Object to the form,

11       mischaracterizes the witness's testimony.

12      A.   The discussion of airport based was relative

13  to a server, and this is relative to being obvious.

14  It's obvious that something that works at an airport

15  will work off the airport.  There's no magic to being

16  at an airport.

17          MR. SANTURRI:  Let's go ahead and take a

18       break.

19      (A break was taken from 4:31 p.m. until

20  4:41 p.m.)

21  BY MR. SANTURRI:

22      Q.   If I could turn your attention back to

23  Page 84 of your report, and I just want to make sure

24  that I'm understanding everything.  For example, if I

25  look at Claim 2, you have the prior art that makes

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

Page 188

1   attention.

2        Q.    And is there any basis you can provide for

3   combining the Airbus reference with the Polivka

4   reference we have here?

5        A.    The basis is that the Airbus telemetry

6   system discloses a communications link, improved

7   communications can be had, and then the applications

8   with direct sequence spread spectrum.   And since

9   Claim 2, the dependent claim, refers to that, then I

10  refer to the Polivka patent.

11            MR. ANDERSON:   Let the record reflect I was

12        looking -- because I was not provided a copy of

13        the report, I was looking for myself to see what

14        was cited in the claim.

15  BY MR. SANTURRI:

16       Q.    And the basis for turning to Polivka is the

17  165 patent itself?

18            MR. ANDERSON:   Object to the form,

19        mischaracterize the witness's testimony.

20            THE WITNESS:   The basis?

21            MR. SANTURRI:   Yes.

22  BY MR. SANTURRI:

23       Q.    Your basis for using Polivka as a basis for

24  obviousness is the 165 patent itself?

25       A.    It was a source of -- it was my introduction

BARBARA PERRY AND COMPANY, INC. 407/422-2953
3101 MAGUIRE BOULEVARD, SUITE 150, ORLANDO, FLORIDA 32803

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Exhibit A

# HARRIS CORPORATION

# V.

# FEDERAL EXPRESS CORPORATION

# ROBERT P. SWANSON

**December 17, 2008**

BARBARA PERRY AND COMPANY
PHONE  407-422-2953
FAX 407-422-2990

Page 44

9    BY MR. GILCHRIST:

10        Q.   Where does the information go?

11        A.   It resides on a computer server in Memphis.

12        Q.   Where is that computer server?

13        A.   In the computer server room of the air operations

14   center in Memphis.

15        Q.   Is the air operation center at the Memphis

16   airport?

17        A.   It is near the airport, yes; adjacent to the

18   airport.

19        Q.   Is it physically on the airport property?

20        A.   I believe that the facility is on property, yes.

21   I believe it's leased from the airport authority.

f564d9ee-7dc0-47d2-8134-f5c386ca9d50

Exhibit B

**CONFIDENTIAL**

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HARRIS CORPORATION,

     Plaintiff

v.

FEDERAL EXPRESS CORPORATION,

     Defendant

Case No. 6:07-cv-1819-ORL-28 KRS

FEDERAL EXPRESS CORPORATION,

     Counterclaim Plaintiff

v.

HARRIS CORPORATION,

     Counterclaim Defendant

## EXPERT REPORT OF ALBERT D. HELFRICK, P.E., Ph.D.

Albert D. Helfrick, P.E., Ph.D.
Chair, Electrical and Systems Engineering Department
Embry-Riddle Aeronautical University
Daytona Beach, Florida  32114

Exhibit C

CONFIDENTIAL

301.    Additionally, it is my opinion that the prior art references and arguments in the "Request for *Ex Parte* Reexamination of U.S. Patent No. 6,047,165" represent a strong and well reasoned explanation of why the '165 patent claims are obvious.

302.    As detailed in the chart below, each and every element of the dependent claims of the '165 patent would have been obvious to a person having ordinary skill in the art.

| Dependent Claims of the '165 Patent | The Prior Art Makes the Dependent Claims Obvious |
|---|---|
| [See Independent Claim 1, above] | |
| 2.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum communication signal. | U.S. Patent 5,463,656 issued to *Polivka, et al.,* ("the Polivka patent") (filed October 29, 1993) teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 3.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The "S band" ranges from 2.0 to 4.0 GHz. The AEEC Future Concepts for Maintenance Subcommittee Report teaches that one of the advantages of spread spectrum is the ability to use "FCC Allocated Bands With No License Requirements (900 MHz, 2.4 [GHz], and 5.4 GHz)."  (FCM-69, p. 13, Attachment 2). |
| 4.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches that one of the advantages of spread spectrum is the ability to use "FCC Allocated Bands With No License Requirements (900 MHz, 2.4 [GHz], and 5.4 GHz)."  (FCM-69, p. 13, Attachment 2). |
| 5.    A system according to claim 1, wherein the airport based wideband spread spectrum transceiver further comprises a wireless router that couples said wideband spread spectrum transceiver to said airport based archival data store. | ARINC 632 teaches all aspects of Gatelink data exchange on the ground side, including the use of standard wireless routers. |

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 84)

Exhibit C

CONFIDENTIAL

| Dependent Claims of the '165 Patent | The Prior Art Makes the Dependent Claims Obvious |
|---|---|
| 6.      A system according to claim 1, wherein said archival data store of said ground data link unit further comprises means for compressing said flight performance data during the flight of the aircraft. | The Ng patent teaches data compression prior to storage.  (Ng patent, col. 6, lines 1-3). |
| 7.      A system according to claim 1, wherein said transceivers comprise half-duplex transceivers. | ARINC 632 and other ARINC Characteristics teach all aspects of Gatelink data exchange on the ground side, including the use of different types of transceivers. |
| [Independent Claim 8] | |
| 9.      A system according to claim 8, wherein said data to be uploaded to an aircraft further comprises video, audio and flight information that has been stored within said airport based archival data store. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle.  (Ng patent, col. 5, lines 34-39). ARINC 623 teaches that "data exchange may include updates of onboard databases … and interactive data or voice communications." (ARINC 623, p. 1). |
| 10.      A system according to claim 8, wherein said video, audio and flight information to be uploaded to said aircraft further comprises digitized in-flight passenger service and entertainment video and audio files. | ARINC 623 teaches that "data exchange may include updates of onboard databases … and interactive data or voice communications." (ARINC 623, p. 1). |
| 11.      A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping."  (Polivka patent, col. 2, lines 49-55). |
| 12.      A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a signal within the S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 13.      A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a signal in a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 85)

Exhibit C

CONFIDENTIAL

| Dependent Claims of the '165 Patent | The Prior Art Makes the Dependent Claims Obvious |
|---|---|
| 14.    A system according to claim 8, wherein the airport based wideband spread spectrum transceiver further comprises a wireless router that couples said wideband spread spectrum transceiver to said airport based archival data store. | ARINC 632 teaches all aspects of Gatelink data exchange on the ground side, including the use of standard wireless routers. |
| 15.    A system according to claim 8, wherein said archival data store of said ground data link unit further comprises means for compressing said flight performance data during the flight of the aircraft. | The Ng patent teaches data compression prior to storage.  (Ng patent, col. 6, lines 1-3). |
| 16.    A system according to claim 8, wherein said transceivers comprise half-duplex transceivers. | ARINC 632 and other ARINC Characteristics teach all aspects of Gatelink data exchange on the ground side, including the use of different types of transceivers. |
| [Independent Claim 17] | |
| 18.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping."  (Polivka patent, col. 2, lines 49-55). |
| 19.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band.  (FCM-69, p. 13). |
| 20.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz.  (FCM-69, p. 13). |
| 21.    A method according to claim 17, and further comprising the step of compressing the flight performance data within the archival data store of the ground data link unit during flight of the aircraft. | The Ng patent teaches data compression prior to storage.  (Ng patent, col. 6, lines 1-3). |

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 86)

Exhibit C

CONFIDENTIAL

| Dependent Claims of the '165 Patent | The Prior Art Makes the Dependent Claims Obvious |
|---|---|
| 22.      A method according to claim 17, and further comprising the step of routing the flight performance data from an airport based processor and archival data store from a first ground based wideband spread spectrum transceiver via a first wideband spectrum communication signal to a second ground based wideband spectrum spread spectrum transceiver functioning as a repeater to relay the flight performance data to the aircraft via a second wideband spread spectrum communication signal. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle.  (Ng patent, col. 5, lines 34-39). |
| [Independent Claim 23] | |
| 24.      A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping."  (Polivka patent, col. 2, lines 49-55). |
| 25.      A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band.  (FCM-69, p. 13). |
| 26.      A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a signal within a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz.  (FCM-69, p. 13). |
| 27.      A method according to claim 23, and further comprising the step of routing the flight performance data from an airport based processor and archival data store via a first ground based wideband spread spectrum transceiver via a first wideband spread spectrum communication signal to a second ground based wideband spectrum spread spectrum transceiver functioning as a repeater to relay the flight performance data to the aircraft via a second wideband spread spectrum communication signal. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle.  (Ng patent, col. 5, lines 34-39). |

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 87)

Exhibit C

CONFIDENTIAL

| Dependent Claims of the '165 Patent | The Prior Art Makes the Dependent Claims Obvious |
|---|---|
| 28.     A method according to claim 23, and further comprising the step of uploading to the aircraft from the airport based spread spectrum transceiver video, audio and flight information that has been stored within the airport based archival data store. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle.  (Ng patent, col. 5, lines 34-39).<br>ARINC 623 teaches that "data exchange may include updates of onboard databases … and interactive data or voice communications." (ARINC 623, p. 1). |
| 29.     A method according to claim 23, wherein the video, audio and flight information to be uploaded further comprises digitized in-flight passenger service and entertainment video and audio files. | ARINC 623 teaches that "data exchange may include updates of onboard databases … and interactive data or voice communications." (ARINC 623, p. 1). |
| [Independent Claim 30] | |
| 31.     A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum communication signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping."  (Polivka patent, col. 2, lines 49-55). |
| 32.     A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 33.     A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |

### 3.     Indefiniteness

303.    I understand that a patent claim may be found invalid for indefiniteness if the claim, as written, is incoherent, uncertain, or insolubly ambiguous.

304.    Independent claim 23 recites the step of "storing data to be uploaded to the airport based aircraft within the airport based archival data store."

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 88)

Exhibit C

CONFIDENTIAL

**H.     U.S. Patents 6,154,636 and 6,308,044 ("the OOOI patents")**

397.    I understand that Federal Express has filed a counterclaim seeking a declaratory judgment that U.S. Patents 6,154,636 and 6,308,044 ("the OOOI patents") are invalid and unenforceable.

398.    I note here that Harris's expert witness, Mr. McAlexander, expressed no opinion in his report supporting the validity or enforceability of the OOOI patents.

399.    The wireless transmission of OOOI data is not substantively different than the wireless transmission of flight performance data.  It is my opinion that the OOOI patents are invalid for the same reasons the '165 patent is invalid.

**I.     U.S. Patent 6,173,159 ("the Flight Management Computer patent")**

400.    I understand that Federal Express has filed a counterclaim seeking a declaratory judgment that U.S. Patent 6,173,159 (the '159 patent) is invalid and unenforceable.

401.    I note here that Harris's expert witness, Mr. McAlexander, expressed no opinion in his report supporting the validity or enforceability of the '159 patent.

402.    It is my opinion that the '159 patent is invalid for the same reasons the '165 patent is invalid.

**J.     U.S. Patents 7,428,412; 7,426,387; and 7,444,146 ("the new patents")**

403.    I understand from Federal Express's counsel that U.S. Patents 7,428,412; 7,426,387; and 7,444,146 ("the new patents") are not currently part of this case.  I reserve

CONFIDENTIAL

the right to supplement or amend my opinions or this Report if the new patents become

part of this case.

404.     I understand from Federal Express's counsel that Harris has not yet

accused Federal Express of infringing the new patents.

405.     I understand that Federal Express has not yet asserted any counterclaims

regarding these new patents.

Expert Report of Albert D. Helfrick, P.E., Ph.D. (Page 174)

Exhibit C