## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| HARRIS CORPORATION,<br><br>     Plaintiff,<br><br>v.<br><br>FEDERAL EXPRESS CORPORATION,<br><br>     Defendant. | Case No. 6:07-cv-1819-Orl-28 KRS |
| FEDERAL EXPRESS CORPORATION,<br><br>     Counterclaim Plaintiff,<br><br>v.<br><br>HARRIS CORPORATION,<br><br>     Counterclaim Defendant. | |

## FEDERAL EXPRESS CORPORATION'S OPPOSITION TO HARRIS CORPORATION'S CLAIM CONSTRUCTION BRIEF AND REQUEST FOR ORAL ARGUMENT

## TABLE OF CONTENTS

I.   Introduction ........................................................... 1

    A.   *The Accused System* ................................................ 1

II.   Claim Construction Principles ....................................... 2

    A.   *Intrinsic Evidence is the most important source of claim meaning* .......... 2

III.   Transmitting/During Flight Limitations .................................. 3

    A.   *Background* ...................................................... 3

        1.   The Prosecution of the '045  Reexamination .................... 5

        2.   The Prosecution of the '319 Patent .......................... 7

        3.   The Prosecution History of the '165 Reexamination .............. 9

    B.   *Construction of the Terms in the '045 Patent* .......................... 10

    C.   *Construction of the Terms in the '319 Patent* .......................... 12

    D.   *Construction of the Terms in the '165 Patent* .......................... 14

    E.   *Construction of the Terms in the '914 and '637 Patents* ................. 17

IV.   Airport Based/Ground Based ......................................... 18

    A.   *Law of indefiniteness* ............................................. 19

    B.   *"Airport based" is indefinite* ....................................... 20

    C.   *"Ground based" is indefinite* ....................................... 24

VI.   Conclusion .......................................................... 25

## Table of Authorities

**Cases**

*Alloc, Inc. v. ITC,* 342 F.3d 1361 (Fed. Cir. 2003) .................................................. 18, 19

*Ampex Corp. v. Eastman Kodak Co.*, 460 F. Supp. 2d 541 (D. Del. 2006) ........................... 11, 14

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) ...................................... 25

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) .................. 19, 20, 23

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988) ........................................................................................... 15

*Ethicon, Inc. v. Quigg,* 849 F.2d 1422 (Fed. Cir. 1988) ............................................... 15

*General Elec. Co. v. Wasbash Appliance Corp.*, 304 U.S. 364 (1938) ........................................ 19

*Halliburton Energy Services, Inc. v. M-I L.L.C.*, 514 F.3d 1244 (Fed. Cir. 2008) .... 19, 22, 23, 25

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2008 U.S. Dist. LEXIS 8168 (M.D. Fla. Feb. 4, 2008) ............................................................................ 16

*Hamilton Prod., Inc. v. O'Neill*, 492 F. Supp. 2d 1328 (M.D. Fla. 2007) (Hodges, J.) ........................................................................................................... 22

*In re Application of Hammack*, 427 F.2d 1378 (CCPA 1970) ...................................... 23

*Laitram Corp. v. Morehouse Industries, Inc.*, 143 F.3d 1456 (Fed. Cir. 1998) ........................... 16

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) ...................................... 2

*Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340 (Fed. Cir. 2004) ........... 3, 10, 16, 18

*Personalized Media Commc'ns, LLC  v. ITC*, 161 F.3d 696 (Fed. Cir. 1998) ........................... 20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................. 2, 15, 21

*Pods, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359 (Fed. Cir. 2007) .................................... 11

*Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) .............. 11, 12, 13

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ..................... 11, 12, 15

*Versa Corp. v. Ag-Bag Int'l*, 392 F.3d 1325 (Fed. Cir. 2004) ...................................... 25

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .......................................... 2

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F. 3d 1322 (Fed. Cir. 2006) .................................................................................................. 1, 19

**Statutes, Rules & Treatises**

35 U.S.C. § 112, ¶ 2 ...................................................................................... 19, 23

Manual of Patent Examining Procedure (MPEP) § 2209 ............................................. 5

3 Chisum on Patents § 8.06[1][a] ................................................................... 11

4A Chisum on Patents § 13.03 .......................................................................... 3

5A Chisum on Patents § 18.03[2][d] ................................................................ 3, 10, 17

## I.      Introduction

FedEx requests that the Court reject Harris's proposed claim constructions and

instead adopt the constructions proposed by FedEx. The table at Tab 1 in the Appendix of

Exhibits sets forth the claim limitations at issue and the table at Tab 2 sets forth FedEx's

proposed constructions for the disputed terms.[1]

### A.      *The Accused System*[2]

Harris's description of the background is adequate, although partisan, for purposes of

claim construction only. Harris accuses 92 of FedEx's B727 aircraft of infringing eight of the

patents-in-suit.[3] In September 2008, FedEx installed a modified version of the accused

system. The modified system does not download all the flight data stored during flight.

Instead, it downloads two parts of data from the aircraft, one from the beginning of the flight

and one from the end of the flight. The two parts are separated by a block of data of

approximately five minutes that is never transmitted from the aircraft to the ground.

FedEx's vendor, Avionica, relied on descriptions of the alleged invention[4] that Harris

made during prosecution when it re-designed the accused system. The law recognizes

---

[1] After careful consideration of the Federal Circuit's admonishment that the Court only construe claim terms that are actually in controversy, FedEx decided to drop its contentions as to some claim terms because its factual non-infringement arguments are sufficient to resolve the controversy based on Harris's proposed definitions.

[2] "[K]nowledge of [the] product or process [accused of infringement] provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F. 3d 1322, 1326-27 (Fed. Cir. 2006). The Court should not construe claims in a vacuum but instead, construe only those claims that are "in controversy." Thus, courts generally need some information regarding the accused device to frame the controversy.

[3] *See* Harris Corporation's Motion for Claim Construction [Dk. No. 115] (hereinafter "Pl. Mem.") at 1, n.2.

[4] FedEx contends that the claimed inventions are obvious; however, for convenience, FedEx will refer to "the invention" rather than the "alleged" or the "purported" invention.

Avionica's right to rely on the file histories to design around the patents:

> [C]ompetitors are entitled to review the public record [of a patent], apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention.

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

## II.    Claim Construction Principles[5]

Claim construction is the process of determining the scope and meaning of disputed claim terms, and is a matter of law exclusively for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The Federal Circuit clarified the principles of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Claim terms "are generally given their ordinary and customary meaning" which is "the meaning that the term would have to a person of ordinary skill in the art . . . at the time of the invention." *Id.* at 1312-13. The ordinary meaning is assessed by one of ordinary skill in the art based on his reading of the claim term in the context of the claims and the entire patent, including the specification." *Id.* at 1313.

### A.    *Intrinsic evidence is the most important source of claim meaning*

Patent claims "do not stand alone" but are "part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Phillips*, 415 F.3d at 1315 (citation omitted). Claims are to "be read in view of the specification, of which they are a part." *Id.* The "specification 'is always highly relevant to

---

[5]Because it is an excellent primer, FedEx attaches the claim construction chapter from *Patent Law in a Nutshell* for the Court's reference. *Patent Law in a Nutshell* is co-authored by a sitting Federal Circuit Judge (Randall R. Rader), a well-respected professor of patent law (Martin J. Adelman) and a practicing patent lawyer (Gordon P. Klancnik). Tab 3.

the claim construction analysis.'" *Id.* In addition to the specification, courts should consider

the patent's prosecution history which "consists of the complete record of the proceedings

before the PTO . . . ." *Id.* at 1317. The prosecution history is often important to the analysis

because it can provide "evidence of how the PTO and the inventor understood the patent." *Id.*

It can also show "whether the inventor limited the invention in the course of prosecution,

making the claim scope narrower than it would otherwise be." *Id; see generally,* 5A Chisum

on Patents § 18.03[2][d].

## III.   Transmitting/During Flight Limitations

### A.   Background

Each of the asserted patents (the '165, '914, '637, '045, '319, '387, '146, and '412

[Tabs 4-14]) includes transmission (or downloading) limitations that require that all the flight

data that has been accumulated and stored during the entire flight be transmitted from the

plane when it lands. Tab 1. These patents are closely related to each other. Tab 15. The '914,

'637, '045, '319, '387, '146, and '412 patents are "continuations" of the '165, meaning that

they have the identical specification, but slightly different claims.[6] Because these patents are

interrelated, arguments made in one of the applications will have consequences in the others.

*Microsoft Corp. v. Multi-Tech Systems, Inc.,* 357 F.3d 1340, 1350 (Fed. Cir. 2004).

---

[6] "A continuation application is a second application that contains the same disclosure as the original application. It may not contain anything that would have been considered 'new matter' if inserted in the original application. Such an application is fully entitled to the benefit of the filing date of the original application under Section 120 . . . . Such an application is used 'to introduce into the application a new set of claims and to establish a right to further examination by the primary examiner.'" 4A Chisum on Patents § 13.03.

As continuations, the '914, '637, '045, '319, '387, '146, and '412 patents claim priority to the filing date of the '165. All the patents will also expire on the same date. Moreover, Harris gave "terminal disclaimers" in the '045, '319, '387, '412, and '146 patents to avoid an Examiner's rejection that the continuation patent claims were obvious variations of the claims in the '165 patent. *See* 3A Chisum on Patents § 9.04

When the '165 patent issued, its independent claims included a limitation that the system include a "transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight..." Tab 4; 165;16:59-64.[7] The '914 and '637 patents also issued with essentially the same transmission limitation. Tabs 1, 6-7. The '045 application contained a similar limitation that required "a transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during flight . . . ." Tab 17.

While the '045 application was pending,[8] two third parties filed opposition actions[9] at the European Patent Office (EPO) to block the issuance of the European counterpart to the '165 patent.[10] Tabs 18-20. In those proceedings, the EPO cited a prior art patent issued to Ng, which disclosed a system for trains and planes. Tab 21. In the train system, sensors collected data as the train traveled and downloaded it along the route as the train passed a series of antennas along the way. *Id.*, Fig. 1. While this reference was being considered by the EPO, the '045 issued in the United States. Tab 16. Also prior to the EPO decision, Harris filed the '319 continuation application in the USPTO, which included a limitation requiring "transmitting the accumulated, stored generated aircraft data" after the plane landed. Tab 22. In sum, prior to the ruling in the EPO opposition, all pending or issued patents in the '165

---

[7] Citations to the patents-in-suit are in the following format: last 3 digits of the Patent Number;Column:Lines.

[8] *See* Tab 15 which is a diagram designed to show the relationship of the patents-in-suit.

[9] These actions were later consolidated.

[10] The EPO patent was extremely similar to the US '165, with many of the claims being identical. Compare Tab 4 with Tab 20. None of the differences are material to the issues in this case.

family included a limitation that the claimed system (or method) store data accumulated "during flight" and then transmit the stored data after the plane landed. Tab 16.

The EPO revoked the European counterpart to the '165 patent in March 2003. Tab 23. In 2004, the EPO Board of Appeals affirmed this revocation. Tab 24. In reaction to the European events, Harris took several steps in the USPTO that are critical to the interpretation of the patents at issue here. To salvage the '045, '319 and '165 patents, Harris made essentially the same arguments during examination of each patent. Tab 25.

### 1.    The prosecution history of the '045 reexamination

Harris's first response after the EPO decision was to request reexamination by the USPTO of the '045 based on the references cited in the EPO ruling.[11] Tab 26. In the first Office Action of the '045 reexamination, the Examiner rejected all of the claims as obvious based on the combination of Ng and another reference. Tab 28. In response, Harris conducted an interview with the Examiner during which they discussed "amending claims (especially claim 1) to overcome the prior art (Ng)." Tab 29. During that interview, someone wrote proposed amendments, inserting the words "the entire" into the "during flight" phrases so that they read "during the entire flight." *Id*. Harris filed the recommended amendment along with explanatory remarks:

> These claim amendments were considered to distinguish the present claimed invention from Ng. The amended claims now stress not only the use of the ground data link and archival data store, but also detail that the ground data link is operative to accumulate and store flight performance data during the entire flight of the aircraft. Also the spread spectrum transceiver, whether a frequency hopping

---

[11]Any party may request a reexamination based on new prior art that creates a substantial new question of patentability of the claims. The reexamination essentially reinstates the patent examination process. Manual of Patent Examining Procedure (MPEP) § 2209; Tab 27; *see also*, 37 C.F.R. § 1.510 *et seq*.

> or direct sequence spread spectrum transceiver, is coupled to the archival data
> store and *includes a transmitter that is operative to download the flight
> performance data that has been accumulated and stored* by the archival data store
> during <u>the entire</u> flight <u>after the aircraft completes its flight and lands at an
> airport.</u>

Tab 30, at 10-11 (underlining in original; italics added).

Despite the amendment, the Examiner again rejected the claims, although based on a different combination of references. Tab 31. The Examiner's statements show that he understood that Harris's characterization of its invention included transmittal of *all* the data accumulated during the entire flight: "Ng discloses such wireless transmission of flight performances [sic] data to the ground base unit but does not explicitly suggest that the entire flight data operative to download when the aircraft has landed . . . ." *Id.* at 5.

In a request for reconsideration, Harris argued that its invention was distinct from Ng:

> Applicants emphasize that there is no suggestion in the combination of Ng, Miller
> and Ames to accumulate and store flight performance data *during the entire
> flight* of an aircraft in an archival data store and wirelessly *transmit the
> accumulated data* after the aircraft completes its flight and lands at an airport.
>
> ***
>
> Performing inspections in near real time [as in Ng] in an automated wireless
> preventative maintenance monitoring system has nothing in common with
> acquiring a comprehensive long-term picture derived from *the totality of the
> flight performance data over the entirety of a flight* in order to identify and
> remedy adverse trends.

Tab 32 at 11, 15. The Examiner maintained the rejections and Harris appealed. Tab 34.

In its appeal brief, Harris repeatedly characterized its invention as recording and transmitting data accumulated during the "entire flight." *Id.* In distinguishing its claimed invention over the prior art, Harris argued:

At the outset, Applicant emphasizes that there is no suggestion in the combination of

Ng, Miller and Ames to accumulate and store flight performance data *during the entire flight* of an aircraft in an archival data store and wirelessly *transmit this accumulated data* after the aircraft completes its flight and lands at an airport.

*Id.* at 9 (emphasis added).

[The Ng system] is clearly different from the present claimed invention where the aircraft accumulates data in a data store *during the entire flight* of an aircraft, completes its flight and lands at an airport, and *downloads the accumulated data* to a ground based transceiver over a spread spectrum communications signal.

*Id.* at 13 (underlining in original; bold added).

Performing inspections in near real time in the automated wireless preventive maintenance monitoring system of Ng has nothing in common *with acquiring a comprehensive long-term picture derived from the totality of the flight performance* data in order to identify and remedy adverse trends as in the present claimed invention.

*Id.* at 13-14 (emphasis added).

[I]t is evident that the present claimed invention provides a seamless, fully automated *end-to-end data transmission* between the archival data store on-board the aircraft and the airport based archival data store.

*Id.* at 14 (emphasis added).

The present claimed invention in this reexamination, on the other hand, facilitates the acquisition of a comprehensive long-term picture derived *from the totality of the flight performance data* in order to identify and remedy adverse trends.

*Id.* at 15 (emphasis added). The Examiner allowed the claims based on Harris's appeal brief.

Tab 35. The '045 Reexamination Certificate issued December 30, 2008. Tab 9.

## 2.   The prosecution history of the '319 patent

Harris made virtually identical amendments and arguments to salvage the method claims that were pending in the application that matured into the '319. When the Examiner rejected the pending claims using a combination of references including Ng, Harris requested

an interview and stressed that Ng only transmitted "snapshots"[12] of data.  Tab 36.

Harris subsequently amended the '319 claims to add the limitation "during the entire flight," as it was required to do in the '045 reexamination three months earlier, remarking:

> The amended claims now stress not only the use of the ground data link and data store, but also detail that the ground data link is operative to accumulate and store aircraft data during the entire flight of the aircraft. Also the spread spectrum transceiver is coupled to the data store and *includes a transmitter that is operative to download the engine data that has been accumulated and stored* by the data store during the entire flight after the aircraft completes its flight and lands at an airport.
>
> ***
>
> [T]he present invention is a much different system [than Ng] and provides the capability for periodically accessing and analyzing aircraft data by means of a wireless ground data link, by which *aircraft data provided by airborne data acquisition equipment is accumulated and stored during the entire flight of the aircraft, and is subsequently downloaded* to an airport resident ground subsystem after the aircraft has landed. . . . Performing inspection in near real time in an automated wireless preventive maintenance monitoring system has nothing in common with **acquiring a comprehensive long-term picture derived from the totality of the aircraft data of the entirety of a flight** in order to identify and remedy adverse trends.
>
> ***
>
> The present invention is opposite, of course, and requires the aircraft to land and download the accumulated data that has been generated and accumulated over the entire flight of the aircraft . . . .

---

[12] Harris had already used the "snapshot" terminology during prosecution. After sustaining an initial rejection of the claims as originally filed in the '319 application, Harris distinguished its invention over one of the prior art references:

> Thus there is a clear distinction between the present invention which uses a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and store[d] during the flight and the ACARS system which does not accumulate and store data in a memory for transmission, but instead sends out a "snapshot" of the data as it is being generated by the data acquisition unit while the aircraft is airborne, not on the ground.

Tab 37 at 10 (emphasis in original).

Tab 38 pg. 8 (underlining in original; italics added).[13] The amendments and arguments were successful and the '319 issued in 2006.

It is telling that when Harris filed additional new continuation applications after the '319 issued, Harris always included the "entire flight" limitation.  Harris did not even attempt to obtain claims directed to accumulating and storing data "during flight" in the applications leading to the '387, '412, and '146 patents. *See* Tab 15. Instead, Harris filed preliminary amendments in which it amended the claims to specifically recite "during an entire flight" or "during the at least two entire flights." Tabs 39-41.

### 3.    The prosecution history of the '165 reexamination

On March 30, 2007, Fedex's vendor, Avionica requested a re-examination of the '165 patent in view of the European rulings and the Ng reference. Tab 42. To overcome the Ng reference during the reexamination[14] of the '165 patent, Harris repeated the arguments it previously made to salvage the '045 and '319 patents.

In the first Office Action of the reexamination, the Examiner rejected all the independent claims for basically the same reason that the '045 and '319 claims had been rejected.  This time, the Examiner relied on the combination of Ng and a patent to Honcik to render the claims obvious.  Tab 43. In response, Harris distinguished its invention based on Ng's purported teaching of taking only "a snapshot of data." Tab 44, at 8. Harris explicitly told the examiner, and the public, what its invention covered:

---

[13] Compare to remarks in the '045 reexamination, page 5-7, *supra*; *see also*, Tab 25.

[14] When the EPO invalidated the European counterpart to the '165, Harris did not seek reexamination of the U.S. '165. Instead, in 2003, it requested re-examination of the '045, perhaps to test the waters. It was not until four years later in 2007 that Avionica requested reexamination of the '165.

The claimed invention under reexamination, on the other hand, facilitates the acquisition of a *comprehensive long-term picture derived from the totality of the flight performance data* in order to identify and remedy adverse trends.

*Id.* The argument was successful, as it had been twice before, in overcoming Ng. Tab 45.

The pattern and theme of Harris's response to the Ng reference are manifest. Harris repeatedly argued that, unlike the inventions claimed in the '045, '319 and '165 patents, Ng did not store and transmit the totality of the data accumulated over the entire flight. Harris amended the claims of the '045 and '319 to make the distinction crystal clear. Its arguments in support of the '165 are equally clear and plainly demonstrate that Harris limited its claims to a system that stores and transmits all of the stored data for the entire flight. Given the close relationship of these patents, the overlapping claim language and common enemy they all faced – the Ng patent – the consequences of Harris's various arguments and amendments are not confined to individual application files. Instead, the arguments in each of the files are relevant to all the patents in the family, including the '319 and '637. *See Microsoft,* 357 F.3d at 1350; *see generally,* 5A Chisum on Patents § 18.03[2][d][v].

**B.     Construction of the terms in the '045 patent**

| Claim Limitations | FedEx Construction | Harris Construction |
|---|---|---|
| During the entire flight | Plain meaning | Plain meaning |
| Transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during the entire flight … | a transmitter that is operative to download all the flight performance data that has been accumulated and stored by said archival data store during the entire flight… | a transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during the entire flight… |

FedEx asks that the Court construe the claims of the '045[15] to state the obvious: the claims require that all flight data that has been accumulated and stored during the entire flight

---

[15] *See* Tab 1 for a chart detailing each claim of the '045 patent in which the disputed limitation appears.

must be transmitted from the aircraft to the ground. The plain language of the claim requires this interpretation. Specifically, when in element 1(b)[16] the claim calls for "a transmitter that is operative to download *the* flight performance data that has been accumulated and stored by *said* archival data store during the entire flight. . ." [Tab 9, '045;1:35-38; Tab 10] the articles "the" and "said" refer to the proceeding clause 1(a), which requires storage of flight performance data for the entire flight. *Id.,* '045;1:31-33; Tab 10. This means that *all* the accumulated and stored data for the entire flight must be downloaded to the ground. *See Ampex Corp. v. Eastman Kodak Co.,* 460 F. Supp. 2d 541, 549 (D. Del. 2006) (construing "said image data set" to refer to all the data contained in its antecedent "image data set" necessary to recreate the image). This is generally referred to as the "antecedent basis" of a claim term. *See generally, Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1356 (Fed. Cir. 1999); Chisum on Patents § 8.06[1][a].

The prosecution history makes it abundantly clear that Harris meant, by amendments and associated arguments,[17] to distinguish Ng by limiting the '045 claims to systems that download *all* the flight data that has been stored during the entire flight. *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1579 (Fed. Cir. 1995); *Pods, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1366-67 (Fed. Cir. 2007). Harris's brief makes no argument against this interpretation of the '045.[18]

---

[16] Claim 1 is representative of the claims of the '045 claims at issue.  Tab 1 shows where identical or similar language appears in other claims.

[17] *See* pages 6-9, *supra.*

[18] Harris's brief sweeps the '045 patent into its discussion of "during flight." See Pl. Mem. at 21-22 and App. A. However, this makes no sense because the '045 does not include this phrase. The amendment during the '045 re-examination inserted the phrase "the entire" between "during" and "flight," hence "during the entire flight."

### C.    Construction of the Terms in the '319 Patent

| Claim Limitations | FedEx Construction | Harris Construction |
|---|---|---|
| During an entire flight | Plain meaning | Plain meaning |
| Transmitting the accumulated, stored or generated aircraft data | Transmitting all accumulated, stored flight performance data | Transmitting the accumulated, stored or generated aircraft data |
| Data representative of the flight performance of an aircraft | Data representative of the flight performance of an aircraft | Data representative of the accumulated stored data |

FedEx asks that the Court construe the claims of the '319[19] to require that all flight

data that has been accumulated and stored during an entire flight must be transmitted from

the aircraft to the ground. The plain language of the claim terms requires this interpretation.

The method claims of the '319 require[20] "transmitting *the* accumulated, stored generated

aircraft date from the ground data link unit...." Tab 11, 319;16:66-67.  Harris's interpretation

omits "the" from the clause, ignoring the basic rule of claim construction that the article

"the" indicates a reference to the antecedent clause. *Process Control Corp.*, 190 F.3d at 1356.

"*[T]he* accumulated, stored and generated aircraft data" refers to the immediately preceding

"generating" and "accumulating" elements [Tab 11, '319;16:57-64], both of which were

amended to add the "entire flight" limitation to overcome Ng. Tab 38. The arguments made

to overcome Ng[21] prevent Harris from expanding the meaning of this claim to read on

methods that transmit less than all the accumulated and stored data for an entire flight. *See*

*Southwall*, 54 F.3d at 1579.

Harris argues that the '319 claims should be construed to require only that a

representative sample of the flight data be demodulated and stored, pointing to language in

---

[19]  See Tab 1.

[20]  Again, claim 1 is representative.

[21]*See* pages 7-9, *supra*.

the demodulating step. Pl. Mem. at 13. Moreover, Harris asserts that FedEx is unreasonable when it insists that all data be collected and stored. *Id*.

Harris mischaracterizes FedEx's position. FedEx is *not* contending that all data detected by any sensor on an aircraft must be accumulated and stored. Rather, FedEx contends that all the data that is accumulated and stored, regardless of the frequency or accuracy of the data sample, must be transmitted.

Harris's sampling argument is flawed for five reasons. First, Harris omits "the" again. When "the" is put back in the phrase, it becomes clear that the language upon which Harris relies – "demodulating the received spread spectrum communications signal to obtain *the* accumulated aircraft data representative of the flight performance of the aircraft during an entire flight of the aircraft from take-off to landing" – is simply a reference to the antecedent generating and accumulating steps. *Process Control Corp.*, 190 F.3d at 1356. Second, Harris misconstrues the language. The clause refers to data that is representative *of the flight performance*, not data representative of the stored data. The language cannot be contorted to permit taking a sample of the stored data. Third, there is no specification support for interpreting the clause to mean that only a sample portion of the accumulated data need be demodulated. Fourth, Harris's interpretation absolutely contradicts the arguments Harris made to overcome Ng. Harris asserted at least a dozen times that its invention collected, stored and transmitted all the flight data. During prosecution there was no hint of the interpretation Harris now offers, and for good reason. Harris would not have overcome Ng if it had revealed such an interpretation to the USPTO. Finally, the argument only applies to the

demodulation step and would not, even if accepted, change the meaning of the transmission step, which requires that the flight data accumulated during the entire flight be transmitted.

This Court should reject Harris's effort to permit only a sample of the stored flight data to be downloaded. The claim should be construed to require transmission (or downloading) of all data that has been accumulated and stored.

### D.     Construction of the Terms in the '165 Patent

| Claim Limitations | FedEx Construction | Harris Construction |
|---|---|---|
| During flight | During entire flight | During flight |
| a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store | a transmitter that is operative after the aircraft completes its flight and lands at an airport to download all the flight performance data that has been accumulated and stored by said archival data store | a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store |

FedEx asks that the Court construe the '165 claims to require that all accumulated and stored data must be downloaded from the plane when it lands. The argument is familiar. The plain language of the claim uses "the" in the phrase "download *the* flight performance data that has been accumulated and stored." "The" therefore refers to the antecedent clauses. *Ampex,* 460 F. Supp. 2d at 549. The claim is not calling for transmitting "any" of the stored flight performance data or "some of" the stored data.  Instead it requires downloading of "*the* flight performance data that has been accumulated and stored." "[T]he flight performance data" refers to the antecedent clauses which were amended to say "the entire flight." *Id.*

Moreover, Harris cannot escape the consequences of its repeated insistence over five years of patent prosecution that the key to its invention was the storing and transmittal of all flight data for the entire flight. In dozens of statements to the USPTO, Harris consistently contended that it was different from Ng because its invention collected and transmitted flight

14

data for the entire flight, not "snapshots." Claim construction does not end with the words of the claims. Courts must also examine the specification and prosecution history. *See Phillips*, 415 F.3d at 1314-15. The use of the prosecution history extends to statements made in reexamination proceedings. *See e.g., E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir. 1988). The issuance of a reexamination certificate does not strengthen a patent or change the presumptions in any way.[22]

Each of the independent claims of the '165 patent were rejected based on the combination of Ng and Honcik. Tab 43. In response to this rejection, Harris distinguished its invention from the Ng reference based on Ng's purported teaching of taking only "a snapshot of data." Tab 44, at 8. Harris explicitly told the examiner, and the public, what its invention covered:

> The claimed invention under reexamination, on the other hand, facilitates the acquisition of a *comprehensive long-term picture derived from the totality of the flight performance data* in order to identify and remedy adverse trends.

*Id.* Harris's repeated arguments distinguishing Ng act as a disavowal of claim scope that expressly limits the scope of the claims of the '165 patent to collecting data and transmitting the totality of the collected data to the ground. *See e.g., Southwall*, 54 F.3d at 1579. Moreover, Harris *chose* to use the same language to characterize its "invention" as it used in

---

[22]The re-examination result is no different than the original issuance of the patent.

> The awkwardness presumed to result if the PTO and court reach different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence.

*Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988).

the prosecutions of the '319 and '045 patents [Tab 25]: language it used *after* it had amended the claims in both patents. The relevance of the language Harris chose to use is enhanced by the fact that those statements are in "an official proceeding in which [Harris] had every incentive to exercise care in characterizing the scope of its invention." *Microsoft,* 357 F.3d at 1350.

Harris is bound not only by its arguments in the '165 re-examination, but also by arguments and representations it previously made in the related '319 and '045 patent prosecution and re-examination. *Microsoft,* 357 F.3d at 1350. Importantly, Harris made the argument that its invention (necessarily the same invention as disclosed in the '165 patent because all three patents share the same specification) requires storage and transmittal of the totality of flight performance data recorded during the entire flight. Harris also expressly amended the claims to avoid the prior art. *See e.g., Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 2008 U.S. Dist. LEXIS 8168 (M.D. Fla. Feb. 4, 2008) ("[a] patentee may also limit the scope of the claims by disclaiming a particular interpretation during prosecution.").

Harris is wrong when it suggests that FedEx has the burden to show that the patent examiner relied on its arguments and amendments, although, given the sheer number of repetitions over so many years, reliance cannot really be in doubt. *See Microsoft,* 357 F.3d at 1350 ("We have stated on numerous occasions that a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation."); *Laitram Corp. v. Morehouse Industries, Inc.,* 143 F.3d 1456, 1462 (Fed. Cir. 1998).

Harris argues that it may avoid prosecution argument disclaimer because the

Examiner did not require an amendment in the '165 reexamination. Harris offers no support for this proposition. Harris is not entitled to any favorable inference from the absence of an amendment. *See e.g., Alloc, Inc. v. ITC*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); 5A Chisum, § 18.03[2][d].

Moreover, FedEx's key point is that all of the accumulated and stored flight data must be downloaded after landing. This interpretation of the downloading limitation requires that all of the stored flight data be download, even if the system stored data for less than the entire flight. All stored data must be downloaded.

FedEx is not blind, however, to the anomaly that amendments were required in the '045 and '319, but not in the '165. This defies explanation. Certainly, Harris has not articulated any meaningful distinction between the claims that were amended in the prosecution of the '045 and the '319 patents and those at issue in the '165. The claims depend from the same specification, they use the same terminology, they are subject to terminal disclaimers and they were defended by Harris using virtually identical arguments. Tab 25. There is nothing in the record to explain this anomalous result. In any event, Harris's repeated contentions that its invention transmitted all of the data accumulated and stored during the entire flight were clear and unequivocal disavowals.

Consequently, the '165 claims should be construed consistently with the '319 and '045 claims to mean that all accumulated and stored data must be downloaded. In addition, the phrase "during flight" should be construed to mean "during the entire flight."

**E.    Construction of the terms in the '914 and '637 patents**

For exactly the same reasons, the downloading limitations in the '637 and '914

17

patents should be limited to transmission of all the data accumulated and stored during the

entire flight of the aircraft. Like the '045 and '165 patents, the '637 and '914 issued before

the European decisions. Tab 15. But unlike the '045 and '165, the '637 and '914 were not

reexamined. This difference does not matter to the claim construction issue, however,

because statements made in subsequent file histories are relevant to the construction of

similar terms in previous file histories for related patents. *Microsoft,* 357 F.3d at 1350; *Alloc,*

342 F.3d at 1368. In the '319, '045 and '165 the inventors characterized "the invention" as

allowing for transmission of the totality of the flight performance data accumulated during

the flight. These arguments apply to the interpretation of the same claim language in the '637

and '914 patents.

## IV.    Airport Based/Ground Based

| Claim Limitations | FedEx Construction | Harris Construction |
|---|---|---|
| Airport Based | Indefinite | Located at or proximate to an airport |
| Ground Based | Indefinite | Located on the ground |

The "airport based" limitation dictates *where* the physical geographical location is for

various components of the claimed system—the transceiver, the archival data store, and the

processor—are located. If the devices are "airport based" there is infringement; if any of the

devices is not "airport based," then there is no infringement. Hence, the question of where the

boundaries are for "airport based" components is of critical importance.

FedEx contends that "airport based" is indefinite because the boundaries of the

claimed "airport based" area are not precise and there is no objective standard for where to

draw the boundary. [23] Persons of ordinary skill in the art can only apply their subjective understanding to the term. Therefore, the phrase is indefinite.

### A.    *Law of indefiniteness*

The definiteness requirement is based on 35 U.S.C. § 112 ¶ 2, which requires that "claims particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." This requirement "guard[s] against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights." *General Elec. Co. v. Wasbash Appliance Corp.*, 304 U.S. 364, 369 (1938). A claim is indefinite it does not reasonably inform the public of the "bounds of the protected invention." *Halliburton Energy Services, Inc. v. M-I L.L.C.*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); 35 U.S.C. § 112, ¶ 2. "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningful precise claim scope." *Halliburton* 514 F.3d at 1251. Courts have applied the definiteness requirement in many circumstances. For example, a term of degree is indefinite when it is used without a proper disclosure of the boundaries of the term. *Id.* A claim is also indefinite if it contains a term that is "completely dependent on a person's subjective opinion." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). The common thread in these cases is that claims are indefinite where a person of ordinary skill in the art cannot determine the bounds of the claims, *i.e.*, when the claims are insolubly ambiguous. *Halliburton*, 514 F.3d at 1249.

---

[23] FedEx focuses on the indefiniteness because its accused system is not at the Memphis Airport but rather at the FedEx facility. The parties disagree about whether the FedEx facility is part of the airport. *Wilson Sporting Goods.*, 442 F. 3d at 1326-27.

Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Commc'ns, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998). For a claim term to be definite, the patent must "set forth an objective way" for a person of ordinary skill to determine whether the claim is satisfied. *Datamize,* 417 F.3d at 1352 ("a claim term, to be definite, requires an objective anchor"). Although invalidity for indefiniteness is shown by clear and convincing evidence, "the standard is met where an accused infringer shows ... that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history." *Halliburton,* 514 F.3d at 1249-50.

### B. *"Airport based" is indefinite*

There is no ordinary or customary definition of "airport based" in the field. *See* Tabs 46-47. Nor does the specification provide a definition for "airport based" or even "airport." The patent figures depict the gates and ramps at two large airports, but otherwise, provide no support for the term. Tab 4, Figs. 1a, 1b, 4. The specification does not even use the phrase "airport based." Instead it uses a number of similar phrases: *"airport located,"*; *"airport-resident"* and *"airport base station"* Tab 4 (see yellow highlighting).

Harris argues that "airport based" means: "[l]ocated at or proximate to an airport":

> Anyone who has visited an airport recognizes that all the facilities associated with the airport, such as terminal buildings, hangars, gates, baggage claim, parking, car rentals, cargo facilities, non-passenger operations, lodging, etc. are all airport based.

Pl. Mem. at 6. However, Harris offers no support for this assertion.

Those of ordinary skill in the art would likely readily agree that the terminal gates are "airport based." But the *outer limit* of the airport area is not known with certainty to persons

of ordinary skill in the art. Tab 46, ¶¶ 7, 10. Harris does not point to any evidence in the specification or the record to show that those of ordinary skill in the art have a shared understanding of the those outer limits. *See Phillips,* 415 F.3d at 1313. Nor can it. There is absolutely no evidence of record that provides support for drawing an outer boundary.

One might be tempted to argue that ownership of the airport property controls the question. However, this cannot be the answer, since persons of ordinary skill in the avionics art would not likely know the metes and bounds of the airport property. Tab 46, ¶ 12. Moreover, if the test in effect incorporates real estate records, then the claim would be invalid. Tab 48 (only patents may be incorporated by reference into claims); *see also* 37 CFR 1.57. It is unacceptable to require a land title search to understand the scope of a patent's claims.

Moreover, such a solution would lead to absurd results. If the entity that owns the airport property also owns land 20 miles from any runways or terminals, that land would seem to "airport based" merely because of common ownership, rather than activity that occurred on the property. The Daytona 500 racetrack, which adjoins the Daytona Airport, is on property owned by the same entity as the Daytona Airport. Tab 46, ¶ 13. Under a common-ownership test, the largest NASCAR event in the world is "airport based."

The use of the term "based" accentuates the problem. The word "based," as applied by Harris, implies that the boundary is not strictly limited to airport property: it implies a fuzzy edge. But the specification does not imply a fuzzy edge. The terms "airport located," "airport resident" and "geographical confines of the airport" indicate a precise boundary, albeit without defining that boundary. The term "base" is never used in the specification to

imply a fuzzy edge to airport. Instead, the specification points to devices "residing at" the airport.

Harris makes the indefiniteness problem worse when it proposes, in its definition, to add areas "proximate to" the airport. Pl. Mem. at 6. There is no basis for this. The specification says nothing remotely similar to "proximate." Additionally, the term "base" does not support Harris's proposal that the phrase be interpreted to include the area "proximate to" an airport.[24] However, Harris's desire to add "proximate" to the definition shows that it endorses a fuzzy definition of "airport based." There is no evidence of record that a person of ordinary skill in the art would interpret the claim language to include areas "proximate to" the airport, much less that they would know the limits of the "proximate" area. The specification never uses the term "proximate" so it provides no guidance to one trying to delineate the boundaries of the "proximate" area. Claim terms such as "proximate" may be used only if the specification includes information sufficient to guide a person of ordinary skill to understand the range of acceptable values that would be considered "approximate." *See Hamilton Prod., Inc. v. O'Neill*, 492 F. Supp. 2d 1328, 1340 (M.D. Fla. 2007) (Hodges, J.) (holding that terms "less than approximately" and "greater than approximately" were "insolubly ambiguous and incapable of construction."); *but see Kinzenbaw v. Case LLC*, 179 Fed. Appx. 20 (Fed. Cir. 2006). There is nothing in the '165 specification that would satisfy this requirement. Absent the requisite guidance as to an objective way to determine claim scope, the specification fails to provide a reasonable,

---

[24] Indeed, descriptions of an embodiment that provide examples or benefits of the invention do not, *per se*, resuscitate the claim. *Halliburton*, 514 F.3d at 1251, n.3; *Datamize*, 417 F.3d at 1352-53.

definite construction. *See Halliburton*, 514 F.3d at 1251-52; *Datamize,* 417 F.3d at 1352-53.

Harris argues that "all the facilities associated with the airport" are "airport based." Pl. Mem. at 6. Harris's use of the phrase "associated with" exemplifies the indefiniteness. Neither Harris nor the specification identify in what way or by whom there is an "association with" the airport. Therefore, the claim is indefinite. *See In re Application of Hammack*, 427 F.2d 1378, 1382 (CCPA 1970) (holding claim requiring "determining differences between geometric parameters of configurations *associated with* said points of unknown position" indefinite because the claim "does not state how the 'configurations' are 'associated' with the 'points.'")(emphasis added).

Harris even cavalierly proposes that the Court include "etc." in its list of "airport based" facilities. Pl. Mem. at 6. This is hardly the precision required of patent claims that define the metes and bounds of the invention. 35 U.S.C. § 112 ¶ 2.

Harris argues that the specification's references to "terminal buildings" help define the meaning of airport, but this tells nothing about the *boundary* of "airport based." Pla. Mem. at 6. FedEx concedes that the "main terminal" is part of the airport. The question is where the airport *ends*, not where it *begins*.

Harris also argues that passages in the specification that describe "airport *related*" services are, in its view, examples of "airport based" services. For example, Harris points to the specification's discussion of the problem of radio interference from "curbside baggage handling and ticketing, rental car and hotel services." Harris argues [Pl. Mem. at 7] that these are examples of "airport based" services, even though the cited passage [Tab 4 '165; 4:30-40] does not describe them as such. However, the specification later refers to these same

services – curbside baggage, rental cars and hotels – as "airport *related* services." *Id.,* '165;13:2. Unquestionably, the phrase "airport related" is indefinite and, to the extent "airport based" is treated as its equivalent, then it too is indefinite.

Harris attacks Dr. Helfrick's testimony. Pl. Mem. at 9-10. Dr. Helfrick opined that he thought it best to define airport as the area within the security boundaries of the airport. Tab. 46-47. Harris says Dr. Helfrick's definition is unacceptable because the security boundaries change with time.

But Harris's argument that the claim term's meaning must not vary over time is even more compelling when applied against Harris's own amorphous definition. At least Dr. Helfrick proposed a specific boundary—the secured area—as a defined limit. Harris offers no substitute for this boundary. Whatever the edges of Harris's "airport based" area, its boundaries are sure to change over time, especially given Harris's proposal that this Court consider parking lots, rental car services, hotels and anything else "associated with" an airport. If Dr. Helfrick's definition is not acceptable, then Harris's definition is unacceptable for the same reason. Consequently, "airport based" is insolubly ambiguous.

In sum, "airport based" is indefinite because persons of ordinary skill in the art do not know the boundaries of the claimed area without applying their own subjective definition.

### C.    *Ground based is indefinite*

"Ground based" seems simple enough on its face, especially when compared to "airport based." However, throughout the prosecution of the '045 reexamination, Harris distinguished its invention from Ng because Ng did not teach landing *at an airport*. Rather, the stations in Ng were merely locations of communication devices. Tab 32 at 14-15 ("The

stations referred to in Ng do not equate to airports"); Tab 34 at 13 ("This is clearly different from the present claimed invention where the aircraft accumulates data in a data store during the entire flight of the aircraft, <u>completes is flight</u> and <u>lands at an airport</u> . . . .") (emphasis in original), *Id.* at 14 ("The stations referred to in Ng do not equate to airports").   Harris specifically defined "ground based" as "at or near an airport." *Id.* at 3. Harris's definition now controls. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Harris is bound by its statement in the '045 prosecution history that "ground based" means "at or near an airport."  The doctrine of claim differentiation states that "airport based" must mean something else. *Versa Corp. v. Ag-Bag Int'l,* 392 F.3d 1325, 1330 (Fed. Cir. 2004).  Thus, "airport based" cannot mean at or proximate to an airport because that's what "ground based" is supposed to mean.

The definition Harris gave to "ground based" – at or near and airport – during prosecution suffers from the same indefinite problems as the meaning it attempts to give to "airport based" now. *See e.g., Halliburton,* 514 F.3d at 1251.

**VI.    Conclusion**

For the foregoing reasons FedEx respectfully requests that this Court construe the claims as set forth above and in Tab 2 attached hereto.

Respectfully submitted this 21st day of December, 2009.

/s/ Lawrence K. Nodine
Lawrence K. Nodine, Trial Counsel
Georgia Bar No. 545250
nodinel@BallardSpahr.com
J. Scott Anderson
Georgia Bar No. 017266

Florida Bar No. 115053 (inactive)
Robin L. Gentry
Georgia Bar No. 289889
Jeffrey H. Brickman
Georgia Bar No. 080432
Sumner C. Rosenberg
Georgia Bar No. 614550
Charley F. Brown
Georgia Bar No. 086754
**Ballard Spahr LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

Marilyn G. Moran
Florida Bar No. 0163813
mmoran@bakerlaw.com
**Baker & Hostetler, LLP**
P.O. Box 112
Orlando, Florida  32802-0112
Telephone 407-649-4000

ATTORNEYS FOR
FEDERAL EXPRESS CORPORATION

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 3.01(j), counsel for FedEx requests oral argument before the Court regarding Claim Construction. Given the complicated factual elements regarding claim construction of the disputed terms and the importance of the issues to the case, FedEx requests that the Court reserve four hours for a Claim Construction Hearing.

## COMPLIANCE WITH LOCAL RULE 3.01(g)

Counsel for FedEx conferred with counsel for FedEx regarding the claim construction issues, but was unable to reach agreement as to the disputed terms.

/s/ Lawrence K. Nodine
Lawrence K. Nodine, Trial Counsel
nodinel@BallardSpahr.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 21, 2009, I electronically filed the foregoing

document, **FEDERAL EXPRESS CORPORATION'S CLAIM CONSTRUCTION**

**BRIEF AND REQUEST FOR ORAL ARGUMENT**, using the Case Management /

Electronic Case Filing system which will send a Notice of Electronic Filing to the following

participants:


Ryan T. Santurri, Esq.
RSanturri@addmg.com
Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
P.O. Box 3791
Orlando, Florida 32802-3791
Telephone: 407-841-2330
Fax: 407-841-2343


/s/ Lawrence K. Nodine
Lawrence K. Nodine
**Ballard Spahr LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

ATTORNEY FOR
FEDERAL EXPRESS CORPORATION