# TAB 23

*Harris Corp. v. FedEx Corp.*
USDC, Middle District of Florida
<u>Civil Action No. 6:07-CV-1819-28KRS</u>

| | EPA/EPO/OEB | Europäisches | European | Office européen |
|---|---|---|---|---|
| | D-80298 München | Patentamt | Patent Office | des brevets |

☎ +49 89 2399 - 0
TX 523 656 epmu d
FAX +49 89 2399 - 4465

Generaldirektion 2        Directorate General 2        Direction Générale 2

Ungerer, Olaf, Dipl.-Ing.
Eisenführ, Speiser & Partner
Arnulfstrasse 25
80335 München
ALLEMAGNE

EISENFÜHR, SPEISER & PARTNER
EINGEGANGEN/RECEIVED
Einspruch i. u. Sinne beendet
0 1. April 2003
RPT      MÜNCHEN
FRIST 11.04.03  mu
WVL  30.06.03  mu

| Application No. / Patent No. | Ref. | Date |
|---|---|---|
| 96 308 035.3-2206 / 0774724 / 02 | SM5190 | 31.03.2003 |
| Proprietor | | |
| HARRIS CORPORATION | | |

**Decision revoking the European Patent (Article 102(1), (3) EPC)**

The Opposition Division - at the oral proceedings dated 12.12.2002 - has decided:

**European Patent No. EP-B-0774724 is revoked.**

The reasons for the decision are enclosed.

**Possibility of appeal**
This decision is open to appeal. Attention is drawn to the attached text of Articles 106 to 108 EPC.

**Registered letter with advice of delivery**
EPO Form 2331 04.00CSX

Date   31.03.2003                Sheet   2                     Application No.: 96 308 035.3

**Opposition Division:**

Chairman:          KAHN K
2nd Examiner:      HENDERSON R
1st Examiner:      DE SYLLAS D

Legal Member:      SCHMITZ P M



Klaper, I
**Formalities Officer**
Tel. No.: +49 89 2399-7962

Enclosure(s):      32 page(s) reasons for the decision (Form 2916)
                   Wording of Articles 106 - 108 (Form 2019)
                   [✓] Minutes of oral proceedings

                                        to EPO postal service: 26.03.2003

**Registered letter with advice of delivery**
EPO Form 2331 04.00CSX

FX0014557

| | Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|---|
| | Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet   1<br>Feuille | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

## A.    FACTS AND SUBMISSIONS

I.   European patent No. EP-B1-0 774 724 is based upon European patent application No. 96 308 035.3 which was filed on 06.11.1996 and was claiming the priority from US-patent application No. 557 269 filed on 14.11.1995.  The title of the patent is: **"Wireless frequency-agile spread spectrum ground link-based aircraft data communication system".**

The mention of the grant of the patent was published in the European Patent Bulletin 2000/35 of 30.08.2000.

**Proprietors** of the patent are: **HARRIS CORPORATION**, Melbourne Florida 32919 (US).

A first notice of opposition was filed on 30.05.2001 (with letter dated: 30.05.2001) by **opponents-1: PENNY & GILES AEROSPACE Limited**, Spirent House, Crawley Business Quarter, Fleming Way, Crawley, West Sussex, RH10 2QL, (UK).  Opponents-1 requested thereby that the patent be revoked as a whole in accordance with Article 100 (a) EPC on the grounds of lack of inventive step (Article 56 EPC) relating to the subject-matter of independent claims 1 and 17 and of all dependent claims in respect to O1 in combination with the general knowledge in the art.  Additionally, they made an auxiliary request for oral proceedings in the event that the opposition division did not intend to revoke the contested patent as a whole.

A second notice of opposition was filed on 30.05.2001 (with letter dated: 30.05.2001) by **opponents-2: SITA**, 3100 Cumberland Boulevard, Suite 200, Atlanta, GA 30339 (US). Opponents-2 requested thereby that the patent be revoked as a whole in accordance with Article 100 (a) EPC on the grounds (i) of lack of novelty (Article 54 EPC) relating to the subject-matter of independent claims 1 and 17 in view of O2 or of O3 and of dependent claims 5 and 14 in view of O2 and (ii) of lack of inventive step (Article 56 EPC) of the subject-matter of the rest of dependent claims in view of the filed O2 to O8.  Additionally, they submitted an auxiliary request for oral proceedings in the event that the opposition division did not intend to revoke the contested patent as a whole.

Shortly thereafter, with letter of 11.06.2001 (thus after the end of the time limit for filing oppositions), the attorney of opponents-2 requested correction of their address on the

FX0014558

| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|

| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet<br>Feuille | 2 | Anmelde-Nr.:<br>Application No.:<br>Demande n°: | 96 308 035.3 |
|---|---|---|---|---|---|

basis of Rule 88 EPC, giving as new address the address of SITA in Belgium, reading SITA Société Anonyme de Télécommunications Aéronautiques (BE), 14, Avenue Henri Matisse, 1140 Brussels (BE), arguing that the US-company is a division of the BE-company. The EPO-formalities' officer registered the change in the computer system (on 22.06.01) and notified the patentee about both oppositions, the second one having the amended address data, by letter of 27.06.01.

The patentees with letter of 15.11.2001 objected to the admissibility of Opposition-2 because they failed to "appreciate exactly who the opponent-II is" and filed arguments relating to the identity of SITA(BE) and to the relationship of the latter with the initially filed opponents-2 SITA(US). Further arguments as to the allowability of their patent were also filed thereby.

The attorney of opponents-2 filed observations with letter of 04.06.2002 and argued on the merit of their case. More specifically, arguments were filed relating to the admissibility of Opposition-2 in connection with the requested change of address, supporting the allowability of this change by respective documentation. Moreover, arguments were filed regarding the availability of O3 to the public and the patent's novelty and inventive step.

Opponents-2 requested the acceleration of the proceedings with their letter of 13.06.2002 basing this request on the strong commercial interest already shown towards the patent.

The patentees filed new documents (O11 to O35) with letter of 06.08.2002 and arguments on the merit of their case.

The opposition division summoned the parties to oral proceedings with letter of 26.09.2002. Annexed to this letter was a preliminary view of the opposition division on all outstanding issues, namely on the admissibility of Opposition-2, on the availability of O3 to the public and on novelty and inventive step of the subject-matter of the independent claims in view of the documents on file and of the arguments supplied by the parties.

Opponents-2 filed new evidence (O36 to O43) with letter of 12.11.2002 and argued on merit of their case.

EPO Form 2916 01.91CSX

| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet   3<br>Feuille | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

The patentees filed with letter of 12.11.2002 a new document (O44) and arguments on merit of their case.

A last document (O45) was filed by the patentees with letter of 05.12.2002 accompanied by further arguments relating to the admissibility of Opposition-2.

Public Oral Proceedings were held before the opposition division on 12.12.2002 in the presence of the patentees and opponents-2. Opponents-1, although duly summonsed, announced that they would not be attending the Oral Proceedings with letter of 26.11.2002. At the end of the oral proceedings the opposition division, after study of the requests and the arguments of the parties, informed them of the outcomes, i.e. the admissibility of Opposition-2, the non-allowability of the requested change of address of opponents-2 on the basis of Rule 88 EPC and the due revocation of the patent on the basis of Article 102 EPC in connection with Article 100(a) EPC regarding novelty of the subject-matter of the independent claims.

II. The only **text of the contested patent** under consideration is:

(i) Claims 1 to 33 of the patent as published;
(ii) description columns 1 to 24 as published; and
(iii) figures 1 to 8 (sheets 1/7 to 7/7) as published.

III. During the course of the written proceedings, the following documents were submitted as **evidence**:

O1: US 4,792,102
O2: US 5,445,347
O3: AEEC Letter 91-079/DLK-391 to AEEC Members dated April 05, 1991, with Attachments
O4: ARINC Specification 632, published December 30,1994
O5: ARINC Characteristic 751, published January 1, 1994
O6: Aviation Week & Space Technology "Safety Board Urges Mandatory Use Of FDR/CVRs in Commuter Transports", August 31, 1987, p. 73

FX0014560

| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
| --- | --- | --- |

| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet<br>Feuille | 4 | Anmelde-Nr.:<br>Application No.:<br>Demande n°: | 96 308 035.3 |

O7:  Aviation Week & Space Technology "Conversion Approach Appears Flawed",
        July 26, 1993, p. 48

O8:  Electronic Engineering Times "Module Is Result Of Work With Apple - Plessey
        Makes Leap With Wireless LAN", November 7, 1994, p. 1

O9:  Excerpt from the SITA website  (http:\\www.sita.int/contact/hrdept.asp)

O10: SITA Activity Report 2000

O11: AEEC letter 94-171/DLK-663 of August 30, 1994

O12: AEEC letter 94-010/DLK-617 of January 24, 1994

O13: AEEC letter 93-262/A)O(-61 of November 12, 1993

O14: AEEC letter 93-213/DLK-596 of August 30, 1993

O15: AEEC letter 93-201/DLK-595 of August 30, 1993

O16: AEEC letter 93-186/DLK-591 of August 30, 1993

O17: AEEC letter N93-187/DLK-592 of August 28, 1993

O18: AEEC letter 93-140/DLK-578 of July 12, 1993

O19: AEEC letter N93-123/DLK-574 of June 14, 1993

O20: AEEC letter 93-122/DLK-573 of June 14, 1993

O21: AEEC letter 93-060/DLK-555 of March 26, 1993

O22: AEEC letter 93-065/DLK-556 of April 5, 1993

O23: AEEC letter N93-066/DLK-557 of April 5, 1993

O24: AEEC letter 92-277/DLK-520 of October 16, 1992

O25: AEEC letter 92-267/DLK-522 of October 16, 1992

O26: AEEC letter N92-293/DLK-521 of October 5, 1992

O27: AEEC letter 92-206/DLK-500 of August 5, 1992

O28: AEEC letter 92-096/DLK-477 of April 20, 1992

O29: AEEC letter N92-094/DLK-475 of April 20, 1992

O30: AEEC letter 92-039/DLK-457 of February 26, 1992

O31: AEEC letter N92-040/DLK-458 of February 26, 1992

O32: AEEC letter 91-215/DLK-421 of October 3, 1991

O33: AEEC letter N91-239/DLK-431 of September 17, 1991

O34: AEEC letter 91-226/DLK-426 of August 13, 1991

O35: AEEC letter N91-217/DLK-422 of July 31, 1991

O36: Business Information Printout of the Corporations Division of the Georgia
        Secretary of State with print date of 08.10.2002

O37: Excerpt from the SITA Activity Report 2000 (not dated)

O38: SITA download web page with excerpt of a self-running multimedia file version of

EPO Form 2916 01.91CSX

FX0014561

| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  31.03.2003 | Blatt<br>Sheet<br>Feuille  5 | Anmelde-Nr.:<br>Application No.:<br>Demande n°:  96 308 035.3 |

the SITA Activity Report 2001 (not dated)

O39: Affidavit of Mr. Alvin Burgemeister dated 1 November 2002

O40: Excerpts from IEEE P 802.11 Document Lists 1992, 1993 and 1994

O41: Draft proposal for a Direct Sequence Spread Spectrum PHY standard edited by
      Jan Boer, AT&T, dated 22.03.1994

O42: Description of ACARS from the ACARS website (not dated)

O43: Excerpt from "Spread Spectrum Systems" 2nd edition, Robert C. Dixon, John
      Wiley & Sons, 1994; pages 108 and 325

O44: EP-B1-1 060 462

O45: Search Results in the Internet web site of the Secretary of State of Georgia,
      USA, section Corporations Register, dated 04.12.2002

IV. According to the latest **requests of opponents-1,** filed in their notice of opposition, it is requested that the patent be revoked as a whole in accordance with Article 100 (a) EPC on the grounds of lack of inventive step (Article 56 EPC) relating to the subject-matter of independent claims **1** and **17** and of all dependent claims in view of O1 in combination with the general knowledge in the art.

V. According to the latest **requests of opponents-2,** filed during the oral proceedings, it is requested that the patent be revoked in its entirety in accordance with Article 100(a) EPC on the grounds of lack of novelty (Art. 54 EPC) and lack of inventive step (Art. 56 EPC) of the subject-matter of independent claims 1 and 17. The opponents-2 also maintained their request, submitted with letter of 11.06.2001, for correction of the opponents-2 address from SITA in Atlanta to SITA in Belgium in accordance with Rule 88 EPC.

VI. The **proprietors requested** to reject the opposition-2 as inadmissible and reject both oppositions because the grounds of opposition brought forward did not prejudice the maintenance of the patent in unamended form.

EPO Form 2916 01.91CSX



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   6 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

VII. **Independent system claim 1** reads as follows:

"A system for providing a retrievable record of the flight performance of an aircraft comprising:

a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising:

   a) an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and

   b) a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal;

an airport based wideband spread spectrum transceiver comprising

   a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data

   an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data and

   an airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing."

VIII. **Independent method claim 17** reads as follows:

FX0014563



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet   7<br>Feuille | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

"A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of:

acquiring flight performance data of an aircraft during flight of the aircraft;

accumulating and storing flight performance data within a archival memory of a ground data link unit flight performance data during flight of the aircraft; and

after the aircraft lands at an airport at completion of the flight, downloading the flight performance data that has been accumulated and stored within the archival data store during the flight over a wideband spread spectrum communication signal to an airport based spread spectrum receiver;

demodulating the received spread spectrum signal to obtain the flight performance data;

storing the demodulated flight performance data within an airport based archival data storage; and

retrieving the flight performance data via an airport based processor for further processing."

EPO Form 2916 01.91CSX

| | Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|---|
| | Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   8 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

## B.   REASONS FOR THE DECISION

### B.1   ADMISSIBILITY OF OPPOSITION-1 (filed by PENNY & GILES AEROSPACE Limited)

This opposition, filed by reasoned statement in due time and in proper form, is formally admissible in that it complies with the requirements of Articles 99(1), 100 and Rules 1(1), 55 EPC.

### B.2   ADMISSIBILITY OF OPPOSITION-2 (filed by SITA) - REQUEST FOR CHANGE OF ADDRESS

1.  Opposition-2 was filed on behalf of SITA, 3100 Cumberland Boulevard, Suite 200, Atlanta, GA 30339 (USA) on 30.05.2001, i.e. on the last day of the opposition period.  By letter dated 11 June 2001, it was requested to replace the opponents-2 address by 14, Avenue Henri Matisse, 1140 Brussels (Belgium), because SITA-USA was a division of SITA-Brussels. This new address was registered accordingly by the formalities officer, the responsibility of a final decision remaining with the opposition division being responsible to decide on the admissibility of the opposition as well as on the identity of the opponents.

2. The patentees submitted that it was not clear who the opponents-2 exactly were. They alleged that the SITA group consisted of a co-operative organisation SITA SC with headquarters based in Geneva, Switzerland and SITA INC., a value-added services company, with headquarters in Amsterdam, the Netherlands.

3.  In response opponents-2 set out that the original intention was to file the opposition in the name of SITA-Brussels instead of SITA-USA, initially registered as opponents-2, since the latter was a division of the former.  As evidence they filed the SITA Activity Report 2000 and an extract from the Trade Register of Brussels as well as a paper copy of an e-mail message giving respective instructions to the patent attorney.

EPO Form 2916 01.91CSX



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) | |
|---|---|---|---|
| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet<br>Feuille | 9 | Anmelde-Nr.:<br>Application No.:<br>Demande n°: | 96 308 035.3 |

4. It was already noted in the preliminary opinion of the opposition division that, since no evidence had been filed as to the relationship between SITA-USA and SITA-Brussels, this correction could not be allowed and would be retracted.

5. Finally, the patentees submitted a week before the oral proceedings took place -on 05.12.2002- O45, which thus was filed late, i.e. after the one-month deadline allowed by the opposition division for filing new evidence. This document, showing the results of a search in the Internet web site of the Secretary of State of Georgia, USA, section Corporations Register, included many companies having "SITA" as part of their official names, but none of them having an address in Atlanta. The opposition division found this document very relevant to the decision to be taken and accepted the document in the proceedings.

6. During the oral proceedings the argumentation of the parties was repeated. The patentees emphasised that the opponents-2 never unambiguously stated in which name the opposition was to be filed and that it was therefore unclear who SITA is, and moreover, which SITA filed the opposition. SITA is merely a group of corporations but the legal entity who filed the opposition was unknown. In the present case the identity of the opponents-2 was not established at the end of the nine-month period, and could not be established even during the oral proceedings. There is no SITA at 3100 Cumberland Boulevard, Atlanta, but rather a 'Société Internationale de Télécommunications Aéronautiques', and since the list (O45) clearly indicates that there are twelve SITA's in Georgia alone, it is imperative to know which legal entity was valid for the proceedings. The proprietors stated that the opponents-2 attempted to change legal entities.

7. Opponents-2 also cited during the oral proceedings from the list (O45) introduced by the patentees, claiming that not one single address among the found companies was in Atlanta, and hence there is no ambiguity who SITA is, since if one accesses the SITA website for continuing his search, SITA Atlanta would immediately be found as having only one address in Atlanta, the one mentioned in the notice of opposition.

8. The opposition division, taking into account the facts and submissions found that Opposition-2 is admissible. According to Article 99 and Rule 55(a) EPC, in order for an opposition to be admissible, the identity of the opponents must be clear by the end of the

EPO Form 2916 01.91CSX



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet   10<br>Feuille | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

opposition period. In Decision T 870/92 the board of appeal ruled that when indicating a legal entity, failure to use its exact official designation (Rule 26(2)(c) EPC) did not necessarily mean that the opposition was inadmissible as long as it was clear which legal entity was meant.

9. In the present case the patentees submitted that it was completely unclear who the opponents were. In a search conducted on the Corporate Register on the web-site of the Secretary of State of the State of Georgia (see O45), twelve SITAs had been found, none of them having the address 3100 Cumberland Boulevard, Atlanta, GA 30339. In this respect it should be observed that SITA is obviously an abbreviation of Société Internationale de Télécommunications Aéronautiques. This company is registered in the business register maintained by the Georgia Secretary of State under the address 3100 Cumberland CIR, Atlanta, GA 30339 (see O36), thus the same address as given in the notice of opposition. The situation at hand is comparable to the one underlying Decision T 219/86, where the opponents used a name other than the officially-registered one. SITA is obviously the name under which the company conducts its business, while its official registered name is "Société Internationale de Télécommunications Aéronautiques". By giving the name normally used in business and indicating the address in the notice of opposition, opponents-2 were clearly identifiable by the end of the opposition period and therefore the opposition is admissible.

10. The request to correct the opponents-2 address is not allowable. Under Rule 88, sentence 1, EPC, which would apply in the present situation, a correction can be allowed if the Office is satisfied that a mistake has been made, what the mistake was and what the correction should be (J 8/80, OJ EPO 1980, 293). It seems clear from the e-mail message dated 29 May 2001, ie. before the notice of opposition was filed, that the opposition should have been filed in the name of Société Internationale de Télécommunications Aéronautiques, Brussels. However, the opposition division is of the opinion that Rule 88 EPC does not allow the opponents identity to be changed. In the present case it seems that SITA, 3500 Cumberland Boulevard, Atlanta is an independent legal entity, registered in the business register of the Secretary of State of the State of Georgia. Thus it is not a dependent sub-unit of SITA Brussels.

11. In Decisions T 870/92 and T 219/86 the Boards of Appeal have allowed corrections

EPO Form 2916  01.91CSX



| | Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|---|
| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet 11<br>Feuille | Anmelde-Nr.:<br>Application No.: 96 308 035.3<br>Demande n°: |

with respect to the opponents' name. However, this did not result in a change of the opponents' identity. The opposition procedure is a contentious procedure. By the end of the opposition period it must be clear to the patentees and the opposition division who the parties are. When the opponents are clearly identified in the notice of opposition, they become a party to the proceedings. Changing a party to the proceedings after expiry of the opposition period would mean initiating a new procedure. This would not be in line with the purpose of the nine-month opposition period, since at the end of this period, for reasons of legal security, it must not only be clear that legal proceedings have been started, but also by whom.

### B.3  AVAILABILITY OF O3 TO THE PUBLIC
### ("ARINC Attachments in circular letter of 5 April 1991 to all AEEC members")

1.  Opponents-2 submitted during the written proceedings that the subject-matter defined in claims 1 and 17 of the patent in suit lacks novelty in the light of O3. According to them, O3 was a letter circulated to the members of AEEC on April 5,1991 without any secrecy agreement. Thus it was possible for members of the public to gain knowledge of the subject-matter disclosed therein and there was no bar of confidentiality restricting the use or dissemination of this document.

2.  The patentee responded that O3 could not be qualified as prior art. The AEEC was the industry leader in standardisation of air transport avionics equipment and telecommunications systems.  Its membership was limited solely to representatives from the airlines. Its members on that date were the persons listed in the upper right hand corner of the first page of the letter; a closed group.  This letter was directed to persons who closely co-operated in this project and thus they cannot be considered as members of the public.

3. Opponents-2 provided as proof an affidavit (O39) of a participant of the meeting in question, being also one of the addressees of O3;  in this affidavit it was reassured under oath that this AEEC meeting was open to anyone who would like to attend it, that there

EPO Form 2916 01.91CSX



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  31.03.2003 | Blatt<br>Sheet<br>Feuille  12 | Anmelde-Nr.:<br>Application No.:  96 308 035.3<br>Demande n°: |

was no bar of confidentiality and on the contrary dissemination of the document was encouraged. Hence, O3 had to be regarded as state of the art in the sense of Article 54(2) EPC.

4.  A written description, i.e. a document, should be regarded as made available to the public if at the relevant date it was possible for members of the public to gain knowledge of the content of the document and there was no bar of confidentiality restricting the use or dissemination of such knowledge (Guidelines Part C-IV, 5.2). It is established in the case law of the Boards of Appeal that, where a public prior use is cited, the assessment of probability, which normally underlies the Office's opinion, must cede to a stricter criterion close to absolute conviction. In other words, there should be a degree of certainty which is beyond all reasonable doubt (of T 97/94, OJ EPO 1998, 467; T 472/92, OJ EPO 1998, 161). The same standard of proof is to be applied when it is alleged that a document was made publicly available before the relevant date.

5.  The opposition division considers that the affidavit provided by opponents-2 clarifies the circumstances under which the document was distributed and the meeting took place. However, because of the fact that the issue was not treated during the oral proceedings and thus the parties were not given the opportunity to argue on the matter, no decision is taken as to whether O3 belongs to the state of the art.

EPO Form 2916 01.91CSX

FX0014569



| Entscheidungsgründe (Anlage) | | Grounds for the decision (Annex) | | Motifs de la décision (Annexe) | |
|---|---|---|---|---|---|
| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet<br>Feuille | 13 | Anmelde-Nr.:<br>Application No.:<br>Demande n°: | 96 308 035.3 |

## B.4   EXAMINATION OF THE ADMISSIBLE OPPOSITIONS (ARTICLE 101(1) EPC)

### B.4.1   EXAMINATION OF OPPOSITION-1

### I. NOVELTY (TOWARDS O1)

I.1  Opponents-1 point out that O1 discloses a system for providing a retrievable record of the flight performance of an aircraft (col 3, lines 58 to 64), the system comprising:

(i) an archival data store operative to accumulate and store flight performance data during flight of the aircraft (see AIDS PROGRAM MEMORY 58/NON-VOLATILE MEMORY 60 and column 13, lines 1 to 8; column 4, lines 19 to 26; and column 13, lines 26 to 31); and

(ii) a transceiver (28) comprising a transmitter that can be operated after the aircraft completes its flight and lands (re: landing information, see abstract) to download the flight performance data that has been accumulated and stored by the archival data store during flight (column 18, lines 55-56);

an airport (ground) based transceiver comprising a receiver that receives the signal from the aircraft and demodulates the signal to obtain flight performance data (inherent from column 18, lines 55-56;  column 19, lines 31-33);

an airport (ground) based archival data store coupled to the transceiver that receives and stores the flight performance data (see column 13, lines 50 to 53); and

an airport (ground) based processor coupled to the archival data store for retrieving flight performance data from the airport based archival data store for further processing (CPU 66, Fig. 1 or CENT. DATA PROCESSING).

I.2  Opponents-1 admit that O1 discloses a system and method having all of the features of claims 1 and 17 of the patent, except for the use of wideband spread spectrum communication for transmission of data from the aircraft to the airport-based part of the

EPO Form 2916 01.91CSX

FX0014570



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   14 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

system.  Thus, according to them novelty of the subject-matter of the independent claims is not put in question.

I.3  The patentees add further to the previous difference that, according to O1, the collected data are either stored for later retrieval by ground personnel or a snapshot of the operational status of the monitored aircraft equipment is transmitted while the aircraft is in flight by using ACARS™ system allowing -by its nature- only for the transmission of small amounts of data (see column 8, lines 40 -45 of O1).

According to the patentees, another major difference is that this communications channel is not utilized after the aircraft completes its flight and lands at an airport. Rather, when on the ground, the first mode of operation is used, according to which a portable ground readout unit (i.e. a commercially available, hand held computer, see column 6, lines 60 - 62 of O1) is physically brought onboard the aircraft by airline maintenance personnel and is connected to the AIDS CPU and the non-volatile memory for retrieving the performance data stored in the nonvolatile memory during the flight (see claims 2 or 18 and Fig. 1 of O1).

Reference is made to the passages of O1 teaching that "the digital signals provided by the AIDS circuitry are stored in a non-volatile memory device for retrieval by ground personnel and/or are transmitted to ground stations while the aircraft is in flight" (see column 6, lines 51-55 of O1) or further that "AIDS CPU 34 functions to control AIDS data acquisition unit 44 and interface unit 46 for the accessing of data to be processed and either stored in the AIDS circuitry 12 or transmitted to a ground station via communications addressing and reporting unit 28" (see column 9, lines 11-16 of O1).

I.4  The opposition division considers accordingly that, following the differences pointed out by both the patentees and opponents-2 mentioned above,  the subject-matter of independent claims 1 or 17 is novel in view of  O1.



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   15 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

## II.  INVENTIVE STEP (TOWARDS O1 & THE GENERAL KNOWLEDGE IN THE ART)

II.1 According to opponents-1, the problem which the patent seeks to overcome is the requirement for a licence to use radio communication at the airport site. They claim that, given that the system is concerned with the transmission of data over a short distance, the use of wideband spread spectrum communication is an obvious choice. They add that, since wideband spread spectrum communication is a well-known form of RF communication and in the introductory part of the patent (column 2, lines 22 to 25) some benefits typical of wideband spread spectrum signals are pointed out, particularly regarding their inherently low energy-density waveform properties with which the need for licensing is avoided, but also as to their resistance to jamming and their immunity to multi-path interference, introducing wideband spread spectrum communication in the system disclosed in O1 would be an obvious choice.

II.2  The patentees, considering O1, base their argumentation on the fact that the digital signals provided by the AIDS circuitry of O1 are either stored in a non-volatile memory device in the AIDS circuitry for later retrieval by ground personnel or they are transmitted to ground stations while the aircraft is in flight via the communications addressing and reporting unit.

They underline thus that there is a clear distinction between the invention which uses a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored during flight on the one hand and the ACARS™ system on the other hand which does not accumulate and store data in a memory for transmission, but instead sends out data as it is being generated by the data acquisition unit while the aircraft is airborne. Thus, while the aircraft is airborne, only snapshots of the operational status of the monitored equipment are transmitted to ground stations for evaluation and analysis using ACARS™. This communications channel is not utilized after the aircraft completes its flight and lands at an airport, when a portable ground readout unit (i.e. a commercially available, hand held computer) is physically brought onboard the aircraft by airline maintenance personnel and is connected to the AIDS CPU and the non-volatile memory for retrieving the performance data stored in the nonvolatile memory during the flight.

EPO Form 2916 01.91CSX

FX0014572



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   16 | Anmelde-Nr.:<br>Application No.:<br>Demande n°:   96 308 035.3 |

The patentees add that O1 does not disclose any hint towards feasible alternatives to improve the aircraft data acquisition and recording system described therein. More specifically, that this document does not mention or hint towards an alternative for retrieving stored flight performance data other than bringing the portable ground readout unit onboard the aircraft while the aircraft is parked, connecting the portable ground readout unit to the memory for retrieving the data, saving the data in the portable ground readout unit onto a cassette tape and finally forwarding the cassette tape to the central data processor for storage and subsequent analysis. Moreover, O1 teaches that, if data is to be transmitted, it should be during flight, and solely a snapshot of performance data, or if accumulated and stored data is to be retrieved, it should be utilizing a physically connected ground readout unit brought onto the aircraft.

II.3  The opposition division agrees with the view of the patentees, in that nowhere in O1 is it disclosed or even hinted at some use of a transmitter after the aircraft completes its flight and lands at an airport over a wideband spread spectrum communication signal for data transmission from the aircraft-based part of the system to the airport-based part of the system in order to download the accumulated data. Thus, although the opponents-1 appear to be correct in arguing that the advantages of the wideband spread spectrum communication are well-known in the art and that this form of communication could be used instead of other forms of wireless communication while on ground, the general knowledge in the art does not answer to the question why a form of wireless communication should be employed in order to transmit the data collected during the flight and stored in an archival data store of the aircraft after the latter completes its flight and lands at an airport instead of the ground personnel obtaining the collected data by having a hardware connection, as taught by O1.

Hence, the opposition division considers that the subject-matter of claims 1 and 17 is not rendered obvious to a person skilled in the art considering O1 in combination with the general knowledge in the art.

EPO Form 2916  01.91CSX

FX0014573



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  31.03.2003 | Blatt<br>Sheet  17<br>Feuille | Anmelde-Nr.:<br>Application No.:  96 308 035.3<br>Demande n°: |

II.4  Dependent claims 1 to 16 and 18 to 33 set out additional features of the subject-matter of independent claims 1 and 17 in the category of a system and a method respectively.  Since the opposition division considers that O1 in combination with the general knowledge in the art does not prejudice novelty or inventive step of the subject-matter of the independent claims, this would also apply to the dependent claims mutatis mutandis.


### B.4.2  EXAMINATION OF OPPOSITION-2

### I. NOVELTY (TOWARDS O2)

I.1 Opponents-2 argue that O2 discloses -explicitly or implicitly- a system having all features of the system defined by independent claim 1.

More specifically, the system of O2 provides a retrievable record of the performance of a vehicle during its motion, expressly indicating that the system may also be implemented in aircrafts (cf. column 3, lines 25 to 28).

When used in an aircraft, the system monitor and diagnostic unit (SMDU, 12) provided in each car (16) of the train corresponds to a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft. As regards the obtained data, reference is made to column 6, lines 17 to 22 and 46 to 52 and to column 7, lines 10 to 17, where specifically aircraft flight performance data are indicated.

Furthermore, an archival data store (36 in Fig. 3) is disclosed, which is operative to accumulate and store the flight performance data during flight of the aircraft (cf. column 4, lines 55 to 57).

Moreover, a wideband spread spectrum transceiver is coupled to the archival data store and comprises a transmitter for downloading the flight performance data that

FX0014574



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date **31.03.2003** | Blatt<br>Sheet<br>Feuille **18** | Anmelde-Nr.:<br>Application No.:<br>Demande n°: **96 308 035.3** |

has been accumulated and stored by the archival data store during flight over a wideband spread spectrum communication signal (cf. spread spectrum transceiver 60 in Fig. 3, and column 4, lines 4 to 6).

Due to the fact that the spread spectrum network (30 in figure 2) is described in O2 as a low-power system which can be operated without government license (cf. column 4, lines 17 to 19), it is implicit that the download of the flight performance data is performed after the aircraft completes its flight at landing at an airport. Thus, this partial feature is implicitly disclosed in O2.

The same applies to the means defined in the last paragraphs of claim 1 (i.e. the two airport-based features) of the patent. Again, it has to be regarded obvious that the downloading or transmission of the flight data is performed at an airport if the system described in O2 is used in an aircraft. Moreover, according to column 3, lines 29 to 34, a network status interface unit (NSIU, 22) is provided at each fixed station (24) through which the vehicle (18) passes. Thus, in case of an aircraft, this fixed station clearly has to be regarded as an airport.

At the airport, according to Fig. 4 and column 4, lines 9 to 11 of O2, each NSIU (22) would include a spread spectrum transceiver (64) comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data. It is inherent in O2 that the spread spectrum transceiver (64 of Fig. 4) comprises a receiver which receives and demodulates the signal to obtain flight performance data supplied to the computer (66).

Furthermore, O2 discloses an archival data store (which is airport based in case the system is used for aircraft maintenance) coupled to the wideband spread spectrum transceiver that receives and stores the flight performance data (cf. column 2, lines 21 to 33).

The airport based archival data store (82 in Fig. 5) is coupled to an (airport based) processor (70) for retrieving said performance data from the airport based archival data store (82) for further processing, e.g. based on an access by technicians via

FX0014575



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  31.03.2003 | Blatt<br>Sheet<br>Feuille  19 | Anmelde-Nr.:<br>Application No.:<br>Demande n°:  96 308 035.3 |

e.g. the manual communication unit (78).

I.2  Further to the system disclosed in O2, opponents-2 argue that O2 also discloses a method of providing a retrievable record of the flight performance of an aircraft as defined by claim 17 of the patent in suit.

The flight performance data are acquired in the SMDU (12) based on the input received from the respective sensors (cf. column 3, lines 52 to 66). The flight performance data are accumulated and stored within the memory (36) of the SMDU (12) during flight of the aircraft. At a station (i.e. airport) the flight performance data are downloaded to the NSIU (22) over a wideband spread spectrum communication signal to a spread spectrum receiver. The received spread spectrum signal is necessarily demodulated to obtain the flight performance data. The demodulated flight performance data are then stored within an archival data storage in the MCC (28) which may be located at an airport, and the flight performance data are retrieved via an (airport based) processor (70) for further processing.

I.3 On the other hand, the patentees argue that O2 describes an automated wireless preventive maintenance monitoring system. This system downloads data over a wireless TDMA communications link in response to control commands issued by fixed stations ('airports') while the train 'flies' along the track. They underline that this system has a completely different structure and function compared to the subject-matter claimed in claims 1 or 17 of the present patent.

According to the patentees, O2 describes a system specifically designed for a magnetic levitation train, mentioning also the possibility to use it for aircrafts (see column 3, lines 22 - 28 of O2). To a person skilled in the art, this would mean that the NSIUs are to be implemented as ground stations provided along the flight path of the aircraft, continuously transmitting polling signals in the form of control messages, and receiving the status data from the SMDUs when the aircraft passes overhead (i.e. passes within the RF range of) these ground stations.



O2 describes, according to the patentees, an en-route, near real-time diagnostic
system for such vehicles, where the train inevitably transmits current status
conditions every time it comes within range of a fixed NSIU in-route. Each vehicle
and the engine are provided with a system monitor and diagnostic unit (SMDU)
(O2; column 3, lines 18 - 20). Network status interface units (NSIU) are provided at
stations and at other fixed locations through which the vehicles pass (O2; abstract
and column 3, lines 29 -31). In operation, the sensors in the SMDUs continuously
monitor the operating condition of the engine and the vehicles, and store data
signals representing the sensed operating conditions in the SMDU memories. The
NSIUs - provided alongside the track - operate as the master (O2; reference
number 64 in figure 4) and transmit control signals which poll the SMDUs, which
operate as slaves (O2; reference number 60 in figure 3) in the vehicles and cause
the SMDUs to transmit data signals representing the operational status of the
vehicles to the NSIUs via a spread spectrum time-division-multiple-access (TDMA)
network when the vehicle passes proximate thereto (O2; abstract and column 2,
lines 20 - 25). Every NSIU continuously transmits polling signals in the form of
control messages (O2; column 4, lines 57-61). When a vehicle comes within range
of one of the stations and receives the control message from the NSIU in the
respective station, the SMDU computer in each vehicle will transmit its data signals
in response thereto, and then turn off (O2; bridging paragraph between columns 4
and 5).

As a result, small data portions acquired during the 'flight' of the train are
downloaded by the SMDUs in the course of the 'flight' rather than being
accumulated and stored for retrieval upon landing.

In contrast thereto, claims 1 and 17 of the present patent define a system and a
method, respectively, whereby the flight performance data that has been accu-
mulated and stored during flight is downloaded by a transmitter onboard the aircraft
that is operative after the aircraft completes its flight and lands at an airport.

1.4  The opposition division is of the opinion that the assumption made by the
patentees on the en-route nature of the system disclosed by O2, if at all, only



applies to a train implementation, but not to an aircraft implementation. According to column 4, lines 17 to 20 of O2, the described spread spectrum system is designed to operate over a small distance of up to 1/2 to 1/4 mile. This clearly teaches against the alleged transmission from an airborne aircraft to a ground station provided along the flight path. According to Fig. 1 and the description in column 2, lines 16 to 27 and column 3, lines 29 to 31 of O2, the NSIUs are provided at fixed train stations through which the train passes proximate thereto.

I.5  In view of the above teachings of O2, the only feasible solution for an aircraft implementation is to provide the NSIUs at airports and to perform data transmission after landing. This is considered to be implicitly disclosed in O2. As a result, the opposition division shares the opinion of opponents-2 that the features of "accumulating flight performance data" and "data downloaded after the aircraft has landed" are known from O2.. According to O2 (figure 1) it is straightforward that the NSIU (Maintenance Facility) is not situated en route and therefore the train would imperatively stop there, as it does at a station. Considering the train of the embodiment of O2 (figure 1) to be an aircraft and the train station to be an airport appears to be a valid implementation of the prior art.

I.6  Furthermore, the opponents-2 appear to be correct in saying that any en-route data download would be difficult, since there would be many technical problems and the flight plan should be known in advance (O44; page 5, lines 15-42). Since O2 does not treat any such problems relating to aircraft, data transfer would be only possible after landing at an airport in accordance with the teaching of O2.

I.7  In concluding, the opposition division finds that the system architecture of O2 (figure 3) is similar to the one of the patent. Data history is obtained during the train journey as is flight data during a flight, and said data is not merely a snapshot (figure 3; analysis system 50 and Built-In-Test-Unit 52). Furthermore, it is inherent in O2 that the train will eventually stop and transfer data thereafter. This is analogous to the aircraft landing. Furthermore, data is accumulated in the system

FX0014578



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date     31.03.2003 | Blatt<br>Sheet<br>Feuille     22 | Anmelde-Nr.:<br>Application No.:     96 308 035.3<br>Demande n°: |

of O2 (column 4, lines 53-55) . Reference is made to the figures 2, 3, and 5 of O2, showing a ground data unit (12), memory (36), transceiver (60) and an archival store in a mass-memory (82) situated at the MCC (column 4, lines 46-52). Thus all the structural features of independent claim 1 are disclosed by O2, the teaching of the latter is identical to that of the patent, and therefore O2 is novelty destroying for the patent in suit.

I.8  The argumentation of the patentees referring to the inclusion of two archival data stores in the system of the patent -one on the aircraft and one at the airport- instead of a single one (at the stations) in the case of O2 cannot be followed either, since even if the memory on the vehicle disclosed in O2 is used for buffering messages before they are downloaded, these messages -sensed operating conditions- are stored (cf. column 4, line 55 of O2), at least until they are downloaded in response to polling messages; thus O2 discloses clearly a storage memory, the characterisation of this memory as "archival" not possibly adding some discriminating feature to it.

I.9  Referring to systematical difference pointed out by the patentees between the patent and O2, since the patented invention is concerned with historic data collected during the whole flight, whereas the system of O2 is based on receiving near real-time data (column 7, line 51) whilst the train is still en-route and passes by a station, so that problems can be addressed immediately (column 4, line 52 onwards), it is noted that the patent is also concerned with near real-time data, since data is downloaded every time the aircraft reaches an airport, thus after every single flight.

I.10  The patentees point out that O2 does not teach anywhere, implicitly or expressis verbis, that data download occurs once the train has stopped. On the contrary, when the train stops transmission occurs from the station to the train, i.e. analogously from the ground to the aircraft, which is the opposite to what is claimed in claim 1.  However, the opposition division is of the view that even in O2

EPO Form 2916 01.91CSX



the train must stop at the stations, as their name implies and the interrogation for passing on measurement data from the train to the station's equipment would also happen there, independently of which other data are uploaded to the vehicles' monitoring system.

I.11  Furthermore the patent (column 5, lines 5-22; column 22, lines 43-48) also relies upon the use of a polling system whereby an aircraft receives a polling message upon which it downloads its data. Hence, the patent discloses the use of the same ping-pong approach as the one taught by O2. The opponents-2 stated that collected flight data in O2 (column 6, lines 17-46; column 7; line 10 onwards; performance and environmental data) is transmitted to the airport which is no different from the patent.

I.12  The patentees argued that in O2 it is possible for the aircraft to download data during flight in accordance with the power restrictions imposed by the ISM band and that this is shown in O44 wherein en route communication at distances of 400 miles is achieved by the use of cells (O44 - fig. 3; 300) having a radius of more than 200 miles (paragraphs 23-30).  However, it appears that the operating range in the system of O2 is not more than ¼-½ mile (column 4, line 17) and therefore not suitable for ranges of up to 400 miles as in O44;  as a result O2 applied to aircrafts would implicitly impose the operation of the polling procedure in the close vicinity of an airport, thus at completion of a flight.

I.13  According to the opposition division, although O2 fails to disclose the details as to when this data is being transmitted by the aircraft to the ground-based facilities (only after the completion of the flight or also en route) and as to the portion of the data transmitted to the ground station of the airport reached at landing in relation to the quantity of data stored during the flight,  it is considered that the view taken by the opponents-2, i.e. that the transmission of collected data according to the communication system of O2 can be effected in the case of aircrafts after the aircraft lands at an airport, thus after completion of a flight,

EPO Form 2916_01.91CSX

FX0014580



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   24 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

appears to be the only valid option. Additionally, the stations in which the "ground" transmitting facilities NSIU are found, clearly correspond to the receivers and archival data storage units at airports, as defined by independent claims 1 and 17 of the patent in suit.

I.14  Thus, even if the patentees might be correct in arguing that the system according to O2 is not explicitly limited to the airport-based facility of the airport at which the aircraft completes its flight but could embrace other ground stations being in the RF range of the aircraft when airborne, taking into account that the spread-spectrum communication according to O2 is possible at the near vicinity of an airport, because of the RF range of a ground station located at it, it is also clearly possible -if not imperative- to effect such a communication after the completion of the flight, i.e. between the aircraft to ground station of the airport of destination.

I.15  As a result, the subject-matter of independent claims 1 and 17, in the category of a system and a method respectively, is not novel over O2.

## II.  NOVELTY (TOWARDS O3)

II.1  Even if it could be accepted that this document belongs to the state of the art (cf. point B.3 above), the opposition division is of the opinion that this document is not relevant for the following reasons.

II.2  Opponents-2 argued in their notice of opposition that the subject-matter of independent claims 1 and 17 is not novel when compared to the disclosure of O3. According to them, since attachment 2 of O3 relates to the protocols for the so-called "Gatelink" (cf. page 13, first paragraph of O3) and the general specification of the Gatelink environment is defined in ARINC specification 632 (O4), the latter

FX0014581



has to be regarded as implicitly disclosed in O3.

Opponents-2 argued that O3 unambiguously suggests in the third paragraph of page 17 that a wireless connection may be provided between the jetway and the aircraft, which wireless connection may based on a spread spectrum technology.

Additionally, they pointed out in the written proceedings that the wireless connections disclosed in this document do not relate to links inside the aircraft only, as suggested by the patentees, but rather to a LAN connection between the Gatelink Logical Unit at the airport and the CMU on the aircraft (see page 14, 6th paragraph and Figs. 1 and 2). This connection -via the ports- is a wired connection, but it is suggested on page 17, 3rd paragraph, to replace this wired LAN-connection by a wireless LAN-connection, linking thus wirelessly the aircraft and the airport and no longer requiring the hardware and optical ports shown in the respective figures of O3.

II.3  The patentees argued on the other hand that O3 does not attack novelty of claims 1 and 17 for the following reasons.  First of all, according to chapter 2.1 of the GATELINK STRAWMAN, "Uses of Gatelink", Gatelink communication may only occur when an aircraft is parked.  At this time, a physical connection will be made between the aircraft and the ground based system (see p. 24, pare. 3 of O3). In attachment 1, item 2 and 4 of O3, the token ring topology adopted is a bridge in the ground facilities connected through a hybrid wire/infrared connector to a trunk coupling unit (TCU) on the aircraft (see attachment 1 in O3, Item 2, first sentence). In the drawings of attachment 1, various solutions to connect a computer network onboard an aircraft to a computer network in an airport are shown including a cable connection between aircraft and ground.

Secondly, because attachment 2 of O3 contains an analysis of LAN (Local Area Networks) and point-to-point architectures for GATELINK (see title of Attachment 2 in O3) it is clearly showed in the chapter "LAN Approach", Figs. 1, 2 (see page 14, 15 of O3) that the connection between the airport and the aircraft (above and below the dashed lines, respectively) is provided by connectors containing a hardwire port

FX0014582



| | Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|---|
| Datum<br>Date<br>Date | 31.03.2003 | Blatt<br>Sheet<br>Feuille    26 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

and an optical port.  Furthermore, the spread spectrum communications path set out at page 17, paragraph 3 of O3 could not be provided between the jetway and the aircraft, but it would rather refer to alternative means for links in the LAN inside the aircraft connecting the logical units, the LAN Bridge and the CMU (Communications Management Unit; see page 14, penultimate paragraph of O3), respectively (see Attachment 2, page 15, Fig. 1 and page 16, Fig. 2 of O3).  The connection between the airport side and the aircraft side was, and always remains, a hardwire port and an optical port.

II.4  The opposition division does not share the view of the patentees referring to the nature of the connection between aircraft and ground.  The LAN approach set out in attachment 2 (pages 14 and 17) is effected basically with the optical and hardware ports on both the aircraft and the ground;  the alternative wireless approach - using infrared, microwave and spread spectrum technology- set out at paragraph 3 of page 17 also refers to the connection between aircraft and ground.  Thus the feature of the wireless spread spectrum communication between aircraft and ground, being by its nature a wideband communication,  is known from O3.

Hence, the following features of claims 1 and 17, relating to the wireless spread spectrum communication between aircraft and ground, are considered as implicitly disclosed by O3:

(i)  a wideband spread spectrum transceiver onboard of the aircraft;

(ii)  a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the data that has been accumulated and stored onboard the aircraft during flight over a wideband spread spectrum communication signal;

(iii) an airport based wideband spread spectrum transceiver;

(iv)  a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the initial data.

EPO Form 2916 01.91CSX



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date    31.03.2003 | Blatt<br>Sheet    27<br>Feuille | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

II.5  It is however difficult to follow the argumentation of opponents-2 according to which all features of claims 1 and 17 are disclosed by O3, since no explicit or implicit reference is made to the following features in claim 1 (in the category of a system) or in claim 17 (in the category of a method):

(i)  an archival data store operative to accumulate and store flight performance data during flight of the aircraft and being coupled to the transceiver onboard the aircraft;

(ii)  an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data;

(iii)  an airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing.

II.6  Thus novelty of independent claims 1 and 17 of the patent in suit would not be attacked by O3, even if O3 was considered as belonging to the prior art, since O3 does not disclose all features defined in the aforementioned claims.

## III. NOVELTY AND INVENTIVE STEP OF DEPENDENT CLAIMS

III.1  Following the interpretation of O2 given during the proceedings in combination with the general knowledge in the art, it is considered that the subject-matter of **dependent claims 2 to 16 and 18 to 33** do not define features, in addition to the ones of the claims to which they are appended, which would render them allowable regarding novelty and inventive step.

EPO Form 2916 01.91CSX

FX0014584



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   31.03.2003 | Blatt<br>Sheet<br>Feuille   29 | Anmelde-Nr.:<br>Application No.:   96 308 035.3<br>Demande n°: |

communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz.

III.6  According to the **dependent claims 5 and 14**, the system is specified in that the airport based wideband spread spectrum transceiver further comprises a wireless router that couples the wideband spread spectrum transceiver to the airport based archival data store.  O2 (figure 2) discloses the use of a WAN (32) which may be a wireless network (cf. column 3, lines 40 and 41), since a wireless router must be provided in the WAN (32).

Furthermore, O3 discloses (page 17) that wireless Ethernet and token-ring LAN products may be used. Thus, the router (GIU) in attachments 7 to 9 of O4 may as well be a wireless router.

Additionally, O5 (figures 1-3) which also relate to the Gatelink architecture depicts a router which also may be a wireless router if the teaching of O3 is considered.

III.7  According to the **dependent claims 6, 15 and 21**, the system and method, respectively, are specified in that the archival data store of the ground data link unit further comprises means for compressing the flight performance data during the flight of the aircraft.  O6 discloses in the paragraph bridging pages 4 and 5 that a data compression is employed in order to retain the required recording activity.  Due to the fact that O6 relates to aircraft technology for recording flight data and aircraft communication, respectively, especially to the use of data compression in flight data recorders, a combination of O6 with each of O2 to O4 would be obvious to the person skilled in the art.

III.8  According to the **dependent claims 7 and 16,** the system is specified in that the transceivers comprise half-duplex transceivers.  This feature relates however to a mere design alternative which can not justify an inventive step.

EPO Form 2916 01.91CSX

FX0014585



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date   **31.03.2003**<br>Date | Blatt<br>Sheet   **30**<br>Feuille | Anmelde-Nr.:<br>Application No.:   **96 308 035.3**<br>Demande n°: |

III.9  According to the **dependent claims 8 and 23**, the system and method respectively, are specified in that the wideband spread spectrum transceiver further comprises a receiver for receiving uploaded data over a second wideband spread spectrum communication signal, wherein the airport based wideband spread spectrum transceiver further comprises a transmitter that transmits data for uploading to the aircraft over a second wideband spread spectrum communication signal, and wherein the airport based archival data store coupled to the airport based wideband spread spectrum transceiver receives and stores the flight performance data to be uploaded to the aircraft.

These features can however be deduced from O4 where examples of data communication include updates of on-board databases such as an Electronic Library System, entertainment systems and the like (cf. page 1, section 1.2 of O4).  Thus, an uploading connection using a second wideband spread spectrum communication signal is rendered obvious by a combined consideration of O4 with either one of O2 and O3. Due to the fact that O2 may relate to the communication between an aircraft and a ground station, a combination of O2 and O4 has to be regarded obvious to the skilled person.

III.10  According to the **dependent claims 9 and 28**, the system and method, respectively, are specified in that the data to be uploaded to an aircraft further comprises video, audio and flight information that has been stored within the airport based archival data store.  According to the **dependent claims 10 and 29**, the system and method respectively, are specified in that the video, audio and flight information to be uploaded to the aircraft further comprises digitised in-flight passenger service and entertainment video and audio files.

These features can however be gathered from page 1, section 1.2 of O4 where the data communication is defined as including entertainment systems which generally comprise video and audio files.

EPO Form 2916 01.91CSX

FX0014586



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date    31.03.2003 | Blatt<br>Sheet<br>Feuille    31 | Anmelde-Nr.:<br>Application No.:    96 308 035.3<br>Demande n°: |

III.11  According to **dependent claims 22 and 27,** the method is specified by further comprising the step of routing the flight performance data form an airport based processor and archival data store from a first ground based wideband spread spectrum transceiver via a first wideband spread spectrum communication signal to a second ground based wideband spread spectrum transceiver functioning as a repeater to relay the flight performance data to the aircraft via a second wideband spread spectrum communication signal.

Reference is made to attachments 7 to 9 of O4, where the flight performance data is routed via a gateway device to an airline host system. In case a wireless system as suggested by O3 is used for this connection, a repeater must be provided to obtain enough signal power at the receiving end.  Similar considerations can be made on the basis of the wireless WAN (32) described in O2 as indicated in connection with claims 5 and 14.

III.12  Finally, according to **the dependent claim 30,** the system is further specified in that the aircraft comprises a plurality of flight parameter transducers and flight data acquisition equipment distributed throughout the aircraft, and the ground data link unit is operatively coupled to the plurality of flight parameter transducers and flight data acquisition equipment for obtaining the flight performance data representative of aircraft flight performance.  Reference is made to O2 (column 3, lines 45 to 66 in combination with columns 6 and 7), where a plurality of sensors and flight data acquisition equipment is disclosed. Thus, the feature of claim 30 can be deduced from O2.

--------------------------------

EPO Form 2916 01.91CSX

FX0014587



| Entscheidungsgründe (Anlage) | Grounds for the decision (Annex) | Motifs de la décision (Annexe) |
|---|---|---|
| Datum<br>Date    31.03.2003<br>Date | Blatt<br>Sheet    32<br>Feuille | Anmelde-Nr.:<br>Application No.:  96 308 035.3<br>Demande n°: |

## C.  TENOR

Since the subject-matter of independent claims 1 and 17 of the patentees' sole request has been found to lack novelty, these claims and consequently also the patent do not meet the requirements of the EPC.  For that reason, the opposition division decides that the contested patent is to be revoked in its entirety (Article 102(1) EPC).

tcom621

EPO Form 2916 01.91CSX

FX0014588

## Article 106
### Decisions subject to appeal

(1) An appeal shall lie from decisions of the Receiving Section, Examining Divisions, Opposition Divisions and the Legal Division. It shall have suspensive effect.

(2) An appeal may be filed against the decisions of the Opposition Division even if the European patent has been surrendered or has lapsed for all the designated States.

(3) A decision which does not terminate proceedings as regards one of the parties can only be appealed together with the final decision, unless the decision allows separate appeal.

(4) The apportionment of costs of opposition proceedings cannot be the sole subject of an appeal.

(5) A decision fixing the amount of costs of opposition proceedings cannot be appealed unless the amount is in excess of that laid down in the Rules relating to Fees.

## Article 107
### Persons entitled to appeal and to be parties to appeal proceedings

Any party to proceedings adversely affected by a decision may appeal. Any other parties to the proceedings shall be parties to the appeal proceedings as of right.

## Article 108
### Time limit and form of appeal

Notice of appeal must be filed in writing at the European Patent Office within **two months** after the date of notification of the decision appealed from. The notice shall not be deemed to have been filed until after the fee for appeal has been paid. Within **four months** after the date of notification of the decision, a written statement setting out the grounds of appeal must be filed.

### Further information concerning the filing of an appeal

(a) The appeal is to be filed with the European Patent Office either at its seat in Munich, at its branch at The Hague or at its Berlin sub-office. The postal addresses are as follows:

| | |
|---|---|
| (i)   European Patent Office<br>D-80298 Munich<br>Germany<br>(Telex: 523656 epmu d)<br>(Fax: +49 89 2399-4465) | (ii)   European Patent Office<br>Branch at The Hague<br>Patentlaan 2<br>Postbus 5818<br>NL-2280 HV Rijswijk (ZH)<br>Netherlands<br>(Telex: 31651 epo nl)<br>(Fax: +31 70 340-3016) |

(iii) European Patent Office
Berlin sub-office
D-10958 Berlin
Germany
(Fax: +49 30 25901-840)

(b) The notice of appeal must contain the name and address of the appellant in accordance with the provisions of Rule 26(2)(c) EPC, and a **statement** identifying the decision which is impugned and the extent to which amendment or cancellation of the decision is requested (see Rule 64 EPC). The notice of appeal and any subsequent submissions stating the grounds for appeal must be signed.

(c) Notice of appeal must be **filed in writing** (typewritten or printed (Rule 36(2) EPC), by telegram, telex or fax (Rule 36(5) EPC; OJ EPO 6/89, 219-225; OJ EPO 9/89, 396)).

(d) The fee for appeal is laid down in the Rules relating to Fees. The equivalents in the national currencies in which the fee for appeal can be paid are regularly published in the Official Journal of the European Patent Office under the heading "Guidance for the payment of fees, costs and prices".