# TAB 24

*Harris Corp. v. FedEx Corp.*
USDC, Middle District of Florida
Civil Action No. 6:07-CV-1819-28KRS

| BESCHWERDEKAMMERN DES EUROPÄISCHEN PATENTAMTS | BOARDS OF APPEAL OF THE EUROPEAN PATENT OFFICE | CHAMBRES DE RECOURS DE L'OFFICE EUROPEEN DES BREVETS |
|---|---|---|

**Internal distribution code:**
(A) [ ] Publication in OJ
(B) [ ] To Chairmen and Members
(C) [X] To Chairmen
(D) [ ] No distribution

# D E C I S I O N
## of 20 July 2004

| | |
|---|---|
| **Case Number:** | T 0382/03 - 3.5.1 |
| **Application Number:** | 96308035.3 |
| **Publication Number:** | 0774724 |
| **IPC:** | G06F 17/40, G05D 1/00 |
| **Language of the proceedings:** | EN |

**Title of invention:**
Wireless frequency-agile spread spectrum ground link-based aircraft data communication system

**Patentee:**
HARRIS CORPORATION

**Opponents:**
Penny & Giles Aerospace Limited
SITA Société Internationale de Télécommunications Aéronautiques

**Headword:**
Wireless ground link/HARRIS

**Relevant legal provisions:**
EPC Art. 10(2)(a); 54; 56; 99(1)
EPC R. 55(a); 56(1); 88; 101(1),(4),(9)

**Keyword:**
"Inadmissible opposition - ambiguous identity of opponent"
"Sub-authorisation of professional representative - standard of proof"
"Novelty (yes), inventive step (no)"

**Decisions cited:**
G 0003/99, T 0025/85, T 0219/86, T 0870/92, T 0270/94, T 0154/95

**Catchword:**
-

EPA Form 3030 06.03

FX0014591



| Europäisches Patentamt | European Patent Office | Office européen des brevets |
|---|---|---|
| Beschwerdekammern | Boards of Appeal | Chambres de recours |

Case Number: T 0382/03 - 3.5.1

# D E C I S I O N
## of the Technical Board of Appeal 3.5.1
## of 20 July 2004

| | |
|---|---|
| **Appellant:**<br>(Proprietor of the patent) | HARRIS CORPORATION<br>1025 West NASA Boulevard<br>Melbourne<br>Florida 32919   (US) |
| **Representative:** | Schmidt, Steffen J., Dipl.-Ing.<br>Wuesthoff & Wuesthoff<br>Patent- und Rechtsanwälte<br>Schweigerstrasse 2<br>D-81541 München   (DE) |
| **Respondent(s):**<br>(Opponent 01) | Penny & Giles Aerospace Limited<br>Spirent House, Crawley Business Quarter,<br>Fleming Way<br>Crawley<br>West Sussex RH10 2Ql   (GB) |
| **Representative:** | Gibson, Stewart Harry<br>Urquhart-Dykes & Lord LLP<br>Three Trinity Court<br>21-27 Newport Road<br>Cardiff CF24 0AA   (GB) |
| (Former Opponent 02) | SITA<br>3100 Cumberland Boulevard<br>Suite 200<br>Atlanta, GA 30339   (US) |
| **Representative:** | Ungerer, Olaf, Dipl.-Ing.<br>Eisenführ, Speiser & Partner<br>Arnulfstrasse 25<br>D-80335 München   (DE) |

**Decision under appeal:** **Decision of the Opposition Division of the European Patent Office posted 31 March 2003 revoking European patent No. 0774724 pursuant to Article 102(1) EPC.**

Composition of the Board:

Chairman:   S. V. Steinbrenner
Members:    K. J. K. Bumes
            B. J. Schachenmann
            W. E. Chandler
            V. Di Cerbo

FX0014592

## Summary of Facts and Submissions

I.     This appeal lies from the Opposition Division's
       decision to revoke the appellant's European patent
       No. 0 774 724 for lack of novelty. That ground for
       opposition had been raised only by opponent 02, whereas
       both opponents had raised an obviousness objection. The
       patentee had contested the admissibility of opposition
       02 on the ground that the opponent's identity had not
       been established before the expiry of the opposition
       period. In its decision based on the evidence available
       to it, the Opposition Division considered the
       opposition by opponent 02 to be admissible. A request
       to correct the opponent's address was not allowed.

II.    The appellant patentee requested that:

       –     the decision under appeal be set aside, and

       –     European patent 0 774 724 be maintained as granted.

       Moreover, he requested that opposition 02 be rejected
       as inadmissible.

III.   Independent claims as granted (see EP-B1-0 774 724,
       denoted "B1" hereinafter)

       A.    The (only) independent system claim reads:

       "1. A system for providing a retrievable record of the
       flight performance of an aircraft comprising:

       a ground data link unit that obtains flight performance
       data representative of aircraft flight performance

2408.D

during flight of the aircraft, said ground data link
unit comprising:

> a) an archival data store operative to accumulate
> and store flight performance data during flight of
> the aircraft, and

> b) a wideband spread spectrum transceiver coupled
> to said archival data store, and comprising a
> transmitter that is operative after the aircraft
> completes its flight and lands at an airport to
> download the flight performance data that has been
> accumulated and stored by said archival data store
> during flight over a wideband spread spectrum
> communication signal;

an airport based wideband spread spectrum transceiver
comprising a receiver that receives the wideband spread
spectrum communication signal from the aircraft and
demodulates the signal to obtain the flight performance
data

an airport based archival data store coupled to said
airport based wideband spread spectrum transceiver that
receives and stores said flight performance data and

an airport based processor coupled to said archival
data store for retrieving flight performance data from
the airport based archival data store for further
processing."

2408.D

FX0014594

B.   The (only) independent method claim reads:

"17. A method of providing a retrievable record of the
flight performance of an aircraft comprising the steps
of:

acquiring flight performance data of an aircraft during
flight of the aircraft;

accumulating and storing within an archival memory of a
ground data link unit the flight performance data
during flight of the aircraft;

after the aircraft lands at an airport at completion of
the flight, downloading the flight performance data
that has been accumulated and stored within the
archival data store during the flight over a wideband
spread spectrum communication signal to an airport
based spread spectrum receiver;

demodulating the received spread spectrum signal to
obtain the flight performance data:

storing the demodulated flight performance data within
an airport based archival data storage; and

retrieving the flight performance data via an airport
based processor for further processing."

IV.   The appellant further requested accelerated proceedings
in view of the fact that the procedure before the
Opposition Division had already been given accelerated
processing following a request by the professional
representative who had filed opposition 02.

2408.D

FX0014595

V.      The professional representative, Mr U., who had filed
        opposition 02 requested that the appeal be dismissed.

VI.     Respondent 01 (opponent 01) did not submit any request
        in writing during the appeal procedure. However, at the
        oral proceedings before the Board (see below), Mr U.
        claiming to also represent respondent 01 requested on
        its behalf that the appeal be dismissed.

VII.    During the appeal proceedings, the identity of opponent
        02 was discussed in particular on the basis of the
        following documents:

        C36: Business Information Printout concerning "SOCIETE
             INTERNATIONALE DE TELECOMMUNICATIONS
             AERONAUTIQUES, LTD.", from a business registration
             database maintained by the Georgia Secretary of
             State (US), Corporations Division; printed on 8
             October 2002 from the Internet site of said
             Corporations Division.

        C37: SITA Activity Report 2000.

        C45: Results of a search for "SITA" on the Internet
             site of the Corporations Division of the Georgia
             Secretary of State (US), as of 4 December 2002.

        C49: "Crucial data network role for little-known co-
             operative" by Kim Thomas, Financial Times, 2 May
             2001.

2408.D

FX0014596

C53: Excerpt from the Brussels register of commerce relating to "SOCIETE INTERNATIONALE DE TELECOMMUNICATIONS AERONAUTIQUES", Société coopérative, abbreviated as S.I.T.A., registered on 30 April 1971.

C54: ".air" TOP LEVEL DOMAIN APPLICATION of SITA Information Networking Computing BV [SITA INC] for submission to ICANN, dated 29 September 2000; printed from www.icann.org.

VIII.  The subject-matter of the opposed patent was compared with
prior art in particular in relation to the following evidence:

C0:  US-A-5 359 446

C1:  US-A-4 729 102

C2:  US-A-5 445 347

C3:  AEEC Letter 91-079/DLK-391 to AEEC Members, dated April 5, 1991, entitled "CIRCULATION OF GATELINK AD HOC MEETING REPORT AND STRAWMAN MATERIAL", including Attachments 1 to 3.

C4:  ARINC Specification 632, published December 30, 1994, entitled "GATE-AIRCRAFT TERMINAL ENVIRONMENT LINK (GATELINK) - GROUND SIDE".

C5:  ARINC Characteristic 751, published January 1, 1994, entitled "GATE-AIRCRAFT TERMINAL ENVIRONMENT LINK (GATELINK) - AIRCRAFT SIDE".

2408.D

FX0014597

C39: Affidavit (1 November 2002) by Mr Alvin H.
     Burgemeister, attendee of the meeting reported on
     by C3.

C40: Excerpts from IEEE standard P802.11, document
     lists 1992 to 1994.

C43: Excerpts from a textbook entitled "Spread Spectrum
     Systems" by Robert C. Dixon, 2nd edition 1984,
     John Wiley & Sons, New York, pages 108 and 325.

C46: AEEC Letter 91-029/DLK-381 to AEEC Members,
     dated February 4, 1991, entitled "REPORT OF THE
     GATELINK SUBCOMMITTEE MEETING HELD JANUARY 7-8,
     1991 IN SUNRISE, FLORIDA", including Attachments 1
     to 6.

IX.   The Board summoned the parties to attend oral
      proceedings scheduled for 20 July 2004. In an annex to
      the summons, the Board informed the parties that it
      intended to grant the request for accelerated
      proceedings. Further, the Board elaborated the issues
      to be discussed at the oral proceedings:

      —    Admissibility of opposition 02 with respect to the
           opponent's identity.

      —    Authorisation and representation status of Mr U.

      —    Novelty of the subject-matter of the independent
           claims in particular over C2.

2408.D

FX0014598

- Inventive step from the prior art put forward by the oppositions and/or acknowledged in the introductory portion of the patent.

- Availability of the meeting report C3 to the public in the light of Affidavit C39.

X.    By fax of 15 July 2004, professional representative Mr E. of the association of professional representatives UDL representing respondent 01 informed the Board "that we shall be represented by [Mr U.] (Professional representative No. [...]) at the Oral Proceedings on Appeal T 382/03-351 of 20 July 2004."

XI.   Oral proceedings before the Board took place as scheduled (20 July 2004) during which the following issues were discussed.

A.    Issue of representation of respondent 01

(a)   Mr U. declared that he intended to represent both respondents at the oral proceedings and submitted a written authorisation from the association UDL signed by Mr E.

To establish that (also) respondent 01 wanted to be represented by him at the oral proceedings, Mr U. referred to said fax from the association UDL (15 July 2004) and in addition submitted

C51:  A printout of an e-mail from Mr S., Curtiss-Wright Controls, Inc. (US), to Mr U., dated 13.07.2004.

2408.D

According to C51, Curtiss-Wright Controls, Inc. was the parent company of respondent 01. Mr S. was General Counsel of the parent company and also Secretary of respondent 01, authorised to act on its behalf on this matter. C51 was to confirm that a sub-authorisation from the association UDL to Mr U. was acceptable to respondent 01.

As a general argument, Mr U. referred to his status as a professional representative and to the overwhelming interest of the public in having the validity of an opposed patent examined ("G 1/84"). Therefore, a formalistic approach on the authorisation issue should be avoided.

(b)   In the appellant's opinion, Mr U. was not authorised to represent respondent 01. Firstly, there was no evidence on file as to whether this opponent's initial representative, Mr G., was entitled to give sub-authorisations. Moreover, Mr G. was no longer a member of the association UDL, and Mr E., the current representative of respondent 01, had not been a member of that association at the time of filing of opposition 01.

Secondly, the appellant denied any evidential value of the unsigned e-mail C51 and also raised doubts about its author's legal status by referring to

2408.D

FX0014600

C52:    A printout from an Internet site
        (www.investor.reuters.com, updated 20 July
        2004) listing company officers and directors
        of Curtiss-Wright Corp (NYS).

That list mentioned a General Counsel Mr D. but
not Mr S.

(c)   The Board decided, for the reasons given below, to
      consider Mr U. as being sub-authorised to
      represent respondent 01 at the oral proceedings.

B.    Issue of admissibility of opposition 02

(a)   The appellant argued that opponent 02 was not
      unambiguously identifiable at the end of the
      opposition period. The notice of opposition 02
      mentioned merely "SITA" as the opponent's name, in
      relation to an address in Atlanta, Georgia (US),
      where in fact two legal entities "SITA SC" and
      "SITA INC" were located.

(b)   Mr U., the professional representative who had
      filed the notice of opposition 02 in the name of
      "SITA", pointed out that he had erroneously
      indicated the Atlanta address instead of an
      intended address in Brussels (BE) where SITA SC
      had its headquarters (C53). Indicating the Atlanta
      address was against the client's explicit
      instructions, as evidenced by an e-mail dated
      29 May 2001 (filed with Mr U.'s letter of 4 June
      2002). A (retroactive) correction of the address
      under Rule 88 EPC should be available. The acronym
      "SITA" was well-known - in particular to

2408.D

competitors like the proprietor – to stand for
"Société Internationale de Télécommunications
Aéronautiques" (see C37, for example). That full
name provided a direct link to document C36, which
in turn identified the Atlanta-based SITA as a
foreign company under Belgian jurisdiction. The
unambiguous conclusion was that SITA SC was the
opponent 02 because only SITA SC was headquartered
in Belgium, as evidenced by C53.

(c)  In a second line of argument, Mr U. asserted that
only SITA SC was registered officially (C36) – and
therefore had a principal place of business – at
the Atlanta address, while SITA INC had its
principal place of business in Amsterdam (NL) (see
C54, e.g. section I "General Information"). As far
as SITA INC was concerned, the Atlanta address was
only a branch or contact office. Hence, SITA SC
was identifiable as the opponent in an objective
and unambiguous manner.

The fact that C36 qualified the Société
Internationale de Télécommunications Aéronautiques
as "Ltd." rather than "SC" was only due to
registration regulations in Georgia (US).

(d)  In a third line of argument, Mr U. emphasised that
SITA SC was a non-profit company (see C36),
whereas SITA INC was a for-profit company (see
C54). As the proprietor knew who his competitors
were in the market, he must have been able to
distinguish which one of the SITA companies was
his actual opponent. An e-mail (dated 14 February
2002) which the proprietor sent to "SITA.Int" to

2408.D

FX0014602

offer a licensing agreement showed that the
proprietor was aware of the opponent's identity.
(A hardcopy of that e-mail had been filed with
Mr U.'s letter of 13 June 2002).

(e)   The Board decided, for the reasons given below, to
reject opposition 02 as inadmissible. Therefore,
Mr U. was allowed to represent only respondent 01
during the rest of the oral proceedings.

C.   Issue of novelty of the claimed subject-matter
with respect to C2

(a)   While the Opposition Division considered C2 as
novelty-defeating (and revoked the patent for that
reason), the appellant pointed out a conceptual
difference of the claimed system: The thrust of
the patent was to facilitate the acquisition of a
long-term picture of flight performance data, with
a view to improving the safety of an aircraft (or
aircraft fleet), whereas C2 related to a near
real-time monitoring of a train or an aircraft.
The different concepts translated into different
functional features: While the system of C2
generated sequential snapshots of parameter values
(relayed by plural NSIUs 22 arranged along a path
of travel), the patent aimed at accumulating a
bulk of data during the travel (flight) and
transmitting the accumulated data at the end of
the travel (after landing). Large storage and
transmission capacities had to be provided
accordingly, on board and on the ground, in
contrast to the aircraft and ground facilities of
C2.

2408.D

FX0014603

(b)     According to respondent 01, the system as claimed
        was anticipated by C2. He emphasised that C2
        related explicitly to train and aircraft
        implementations and had in fact been filed by an
        aircraft company. As far as novelty was concerned,
        any different intention of use was immaterial so
        long as the prior art system was objectively
        suitable for that use. The wording of claim 1
        could be read onto C2 because the claim did not
        specify the amount of data to be accumulated and
        transmitted; hence, one sensor data snapshot taken
        during the flight of an aircraft and transmitted
        after landing (corresponding to a train stop in
        C2) to a ground computer (at a maintenance
        facility or control centre) constituted flight
        performance data falling within the definition of
        claim 1.

D.      Issue of novelty of the claimed subject-matter
        with respect to C3

(a)     The appellant questioned whether C3 was still in
        the proceedings after the rejection of the
        (inadmissible) opposition 02 which had introduced
        that document. In any event, he did not consider
        C3 as available to the public, since C3 was a
        report to the attendees of a meeting, i.e. to a
        finite list of addressees, all of them being
        representatives of airlines rather than forming
        the public.

2408.D

FX0014604

The affidavit C39 was meant to prove the public availability of C3 but was questionable itself: It presented a blunt statement of a critical issue ("Gatelink connection utilizing the IEEE 802.11 standard") instead of providing supportive circumstances. It was strange that the affidavit C39 referred precisely to a critical standard (IEEE 802.11) which was missing from the large number of standards reiterated in the exhaustive report C3. The affidavit thus lacked credibility at least in this respect.

Turning to the contents of C3, that document did not disclose a complete system, the only resemblance to claim 1 consisted in the general idea of Gatelink, i.e. a communication link for transmitting data between an aircraft (parked at a gate) and the airport. In particular, C3 mentioned neither the origin nor the destination of the data to be communicated over the Gatelink connection.

(b)   According to respondent 01, document C3 was available to the public, as evidenced by affidavit C39 which stated that the recipients of C3 were even encouraged to distribute C3 to third persons.

C3 disclosed not only a general aircraft-to-airport communication link but also the concept of using spread spectrum transmission (C3, Attachment 2, page 5, paragraph 3). The data source (aircraft black box) and data destination (ground-based analysis centre) were inherent to the technical environment of a Gatelink, since a regular evaluation of accumulated flight performance data

2408.D

FX0014605

(stored in the black box) was a requirement
established by flight safety authorities such as
the FAA (Federal Aviation Administration, US).
Hence, the overall teaching of C3 anticipated the
system of claim 1 of the patent.

E.   Issue of inventive step of the claimed subject-
     matter

(a)  According to respondent 01, the system of claim 1
     was rendered obvious by any of the following
     combinations of prior art:
     - C2 with general knowledge as exemplified by C0
       or C1;
     - C3 (Gatelink technology) with C4 or C5
       (components) and C40 (IEEE standard 802.11);
     - C4 (or C5) with C2.
     - C3 with C2.

     It was difficult to see what the contribution by
     the patented subject-matter was. Spread spectrum
     transceivers were acknowledged by the proprietor
     as forming part of the prior art (B1, column 19,
     lines 14 to 27). Thus, the patent might be
     directed only to a use of the spread spectrum
     transceivers in an airport environment but that
     specific use was suggested by C2 or C3. The choice
     reflected a normal trade-off between component
     economy and transmission speed, as apparent from a
     synopsis of advantages and disadvantages (C46,
     Attachment 1). The prior art provided sufficient
     pointers and incentives to remove drawbacks (e.g.
     C0, column 1, lines 25 to 33). When looking for
     wireless data communication technology, the

2408.D

FX0014606

skilled person obtained a promising solution from
C2, for example.

(b)   The appellant commented on those prior art
      objections essentially as follows.

(b1)  C0 mentioned a limited exchange of data between an
      aircraft computer and a ground-based computer but
      did not relate to accumulated flight performance
      data (C0, column 1, lines 11 to 24). C0 addressed
      a number of ways to transfer data from the
      aircraft to the ground: floppy disk, digital
      radio, fiber optic cable, and a free-space high-
      speed optical communication system. The latter
      constituted the preferred solution of C0, while
      digital radio was dismissed as unsuccessful.
      Hence, C0 taught away from radio frequency (RF)
      transmission rather than providing a realistic
      pointer to C2 or any other spread spectrum
      literature.

(b2)  According to C1, flight performance data was
      stored on a data carrier that had to be picked by
      airline personnel after landing. Wireless data
      transmission was provided only for in-flight data
      snapshots or telegrams.

(b3)  The monitoring system for vehicles, in particular
      trains, described in C2 took only snapshots of
      parameter values with the help of relay stations
      (NSIUs 22) which could not be equated with an
      airport. Neither the relay stations (22) nor the
      on-board monitoring units (SMDUs 12) comprised an
      archival memory capacity for holding long-term

2408.D

flight performance data. Upon transmitting a data
snapshot from the passing vehicle to one of the
relay stations (22), the on-board monitoring units
(SMDUs 12) just turned off (column 4, lines 53 to
61; column 5, lines 2 to 5). Subsequent data
snapshots according to C2 might not indicate any
abnormality of a parameter when in fact the
parameter may have been out of tolerance between
the snapshots. Conversely, an archival (long-term)
data store according to the patent would record
that malfunction for later analysis.

(b4) C3 (if considered public) in conjunction with
C4/C5 and C46 represented the most realistic
starting point because it documented the true
approach (Gatelink) of experts at the time of the
invention. The AEEC members contemplated a long
list of options (RF, VHF, UHF, microwaves,
satellite communication, fibre optic cables) for
realising the Gatelink connection, and they had
four years to select one of the options. They
encountered real problems ("no vendors have been
identified which provide wireless point-to-point
connections using other [than infrared]
technologies", see C3, Attachment 2, page 7,
paragraph 4). Although the AEEC specialists had
all the technical means at hand, they did not opt
for spread spectrum technology. Hence, it would be
unfair for non-specialists to conclude today, from
theoretical paperwork compiled with the benefit of
hindsight, that spread spectrum transmission was
an obvious choice.

2408.D

FX0014608

C4/C5 contemplated only two solutions: Free-space
optical infrared [IR] transmission, and an
umbilical fibre optical IR cable. The actual
technological evolution thus went in a direction
other than to spread spectrum transmission.

While C46 mentioned wireless media, such media did
not mean spread spectrum transmission. The IEEE
standard 802.11 was not mentioned in C46. The
advantages of spread spectrum technology
(resistance to interference, low power density; no
frequency shortage) supported the presumption of
an inventive step.

F.   At the end of the oral proceedings, the chairman
     pronounced the Board's decision.

**Reasons for the Decision**

1.   The appeal complies with the formal requirements of
     Articles 106 to 108 and Rules 1(1) and 64 EPC. It is
     therefore admissible.

2.   In response to the appellant's request, the Board
     granted accelerated processing of the appeal in
     accordance with the "Notice from the Vice-President
     Directorate General 3 dated 19 May 1998 concerning
     accelerated processing before the boards of appeal" (OJ
     EPO 1998, 362). While no infringement litigation was
     asserted, the Opposition Division had provided
     accelerated processing following a request by Mr U.
     (13 June 2002), professional representative of "SITA",

2408.D

reporting a major impact on investments and an
uncertainty on the global market.

3.    *Admissibility of opposition 01*

The notice of opposition 01 meets the formal
requirements of Articles 99(1) and 100 and Rules 1(1)
and 55 EPC. It is therefore admissible. The
admissibility of opposition 01 has not been in dispute.

4.    *Admissibility of opposition 02*

4.1   According to established jurisprudence of the Boards of
Appeal, the identity of an opponent has to be clearly
identifiable before the expiry of the opposition period
in order for the opposition to be admissible, see
T 25/85, OJ EPO 1986, 81 (points 6 and 7) as confirmed
by G 3/99, OJ EPO 2002, 347 (point 12). A number of
reasons for that requirement are listed in point 9 of
T 25/85; the present Board complements that list by
referring to the possibility of a decision apportioning
costs to an opponent under Article 104 EPC. Where the
identity of an opponent is ambiguous, each of the
potential opponents could deny being the origin of the
opposition to escape payment.

4.2   A correction, under Rule 88 EPC, of an opponent's name
or address after expiry of the 9-month opposition
period has been allowed only where the identity of the
opposing entity was unambiguous at the end of the
opposition period despite the incorrect information
given in the notice of opposition, see e.g. T 219/86,
OJ EPO 1988, 254 (point 5) and T 870/92 of 8 August
1997 (point 1.2).

2408.D

4.3   The notice of opposition 02 was filed on 30 May 2001
      (last day of the opposition period) and indicated the
      following name and address of the opponent:

      SITA
      3100 Cumberland Boulevard
      Suite 200
      Atlanta, GA 30339
      USA.

4.4   The above address in Atlanta is shared by at least two
      legal entities named SITA, viz. SITA [SC] and SITA INC,
      see C37 and C54.

      While the Board accepts "SITA" to be identifiable as a
      business or market place acronym of "Société
      Internationale de Télécommunications Aéronautiques",
      this still leaves the problem that more than one legal
      entity called "SITA" had their place of business at the
      address given in the notice of opposition.

      No authorisation was filed with the notice of
      opposition 02. In his capacity as a professional
      representative, Mr U. was indeed not required to file
      an authorisation (Decision of the President of the
      European Patent Office dated 19 July 1991 on the filing
      of authorisations, OJ EPO 1991, 489). However, as a
      consequence, the identity of the opposing legal entity
      "SITA" cannot be established from an authorising
      document.

2408.D

FX0014611

4.4.1   The ambiguity could be resolved if only one of the
        SITA companies had its "principal" place of business
        (Rule 55(a) EPC) at the Atlanta address while other
        SITA companies had only a branch office there. However,
        as pointed out by Mr U. with reference to C53 via C36,
        the first SITA company was headquartered and registered
        in Brussels (SITA SC), whereas the second SITA company
        (SITA INC) was headquartered in Amsterdam (C54). Hence,
        following Mr U.'s own argument, the shared SITA office
        in Atlanta did not constitute a principal place of
        business to any of the SITA companies referred to
        above.

4.4.2   It has been established that an Atlanta-based SOCIETE
        INTERNATIONALE DE TELECOMMUNICATIONS AERONAUTIQUES,
        LTD. was registered as "a foreign non-profit company"
        (i.e. possibly pointing to SITA SC) with the
        Corporations Division of the Georgia Secretary of State
        (US) (see C36), while no such official registration at
        the Atlanta address has been shown to exist for SITA
        INC. However, the legal nature of this registration
        under the law of Georgia is not clear to the Board and
        the parties did not submit any information to this
        effect. Hence, the Board hesitates to regard such a
        registration (C36) as a clear and unambiguous exclusive
        pointer to one opponent.

        In any event, there are only two possibilities:

        (a)   Either SOCIETE INTERNATIONALE DE
              TELECOMMUNICATIONS AERONAUTIQUES, "LTD."
              corresponded to SITA "SC", as asserted in Mr U.'s
              main line of argument. Then the registration C36
              cannot be considered in isolation from C53

2408.D

FX0014612

according to which Brussels was the principal
place of business of SITA SC, and the "Ltd."
company registered in Atlanta (C36) did not have
an autonomous legal status as opponent.

(b)  Or SOCIETE INTERNATIONALE DE TELECOMMUNICATIONS
     AERONAUTIQUES, "LTD." did not correspond to SITA
     "SC" but was a third SITA company at the Atlanta
     address which could file an opposition in its own
     name. Then the identity of opponent "SITA" would
     be even less transparent.

4.4.3  Nor can the identity of the opponent be resolved from
       the fact that the company registered in Georgia was a
       non-profit organisation (i.e. possibly SITA SC) while
       SITA INC was profit-oriented. Any conclusion drawn from
       this fact would be speculative and, thus, cannot
       establish the requisite legal certainty as to the
       identity of an opponent.

4.4.4  Finally, the identification of an opponent (at the end
       of the opposition period) must be possible for the
       proprietor as well as the public, the Opposition
       Division and the Board of Appeal (T 25/85, point 7).
       Hence, even if the proprietor knew his competitors on
       the global market and may have known or guessed which
       SITA company was the actual opponent, such *inter partes*
       knowledge would not be sufficient to establish the
       identity of an opponent under admissibility aspects.
       Incidentally, the e-mail of 14 February 2002 from the
       proprietor to "SITA.Int" did not differentiate between
       SITA SC or SITA INC and, thus, entailed the same
       ambiguity as the notice of opposition 02 did. Hence,
       even if a proprietor's knowledge of an opponent's

2408.D

FX0014613

identity was a sufficient criterion, the Board would
not be able to derive from that e-mail whether or not
the proprietor knew the opponent's identity.

4.5     For these reasons, the Board holds opposition 02
        inadmissible (Article 99(1) in conjunction with
        Rule 56(1) EPC).

5.      Representation of respondent 01 by Mr U. at the oral
        proceedings before the Board

5.1     The notice of opposition in the name of opponent 01
        (Penny & Giles Aerospace Limited) was signed by
        professional representative Mr G. who was a member of
        the association of professional representatives UDL. No
        authorisation by opponent 01 in favour of Mr G. or the
        association UDL was filed with the notice of opposition
        or any subsequent letter.

5.2     Rule 101(1) first sentence EPC requires representatives
        to file, upon request, a signed authorisation within a
        period to be specified by the European Patent Office.
        Rule 101(1) second sentence EPC in conjunction with
        Article 10(2)(a) EPC empowers the President of the
        European Patent Office to determine the cases where an
        authorisation is to be filed.

        The President of the EPO made use of this mandate by
        issuing a Decision dated 19 July 1991 on the filing of
        authorisations (OJ EPO 9/1991, 489). According to
        Article 1(1) of that Decision, a professional
        representative whose name appears on the list
        maintained by the European Patent Office and who
        identifies himself as such shall be required to file a

FX0014614

signed authorisation only in specific circumstances set
out in paragraphs (2) and (3) of the Article. Those
paragraphs read:

"(2) If the European Patent Office is informed of a
change of representative involving professional
representatives who are not members of the same
association, without being notified that the previous
representative's authorisation has terminated, the new
representative must file, together with the
notification of his appointment, an individual
authorisation (original and one copy) or a reference to
a general authorisation already on file. If he does
not, he shall be requested to do so within a period to
be specified by the European Patent Office. If the
European Patent Office is informed before the end of
the specified period that the previous representative's
authorisation has terminated, such request may be
disregarded. The European Patent Office shall send the
previous representative a copy of the individual
authorisation or notify him of the number of the
general authorisation and the name of the new
representative, and inform him that the subsequent
proceedings will be conducted with the new
representative.

(3) The European Patent Office may require that an
authorisation be produced if the circumstances of a
particular case necessitate this, particularly in case
of doubt as to the professional representative's
entitlement to act."

2408.D

FX0014615

5.3   Pursuant to the provisions referred to above, Mr G.
      would have been required to submit an authorisation
      from opponent 01 only if the European Patent Office had
      raised doubts as to Mr G.'s entitlement to act; that
      was not the case.

      Moreover, other professional representatives of the
      same association (i.e. the association UDL) were
      allowed to act on behalf of opponent 01 without filing
      authorisations. That conclusion derives from
      Article 1(2) of the President's Decision of 19 July
      1991 referred to above.

      Hence, effectively all the professional representatives
      practising within the association UDL were *prima facie*
      authorised to act on behalf of respondent 01 without
      filing authorisations. That presumptive authorisation
      of the members of the association UDL prevailed even
      when a member left the association (Mr G.) and/or a new
      professional representative joined (Mr E.).

5.4   According to Article 1(2) of the President's Decision
      of 19 July 1991, a different situation may arise where
      a new representative is appointed to act on behalf of a
      party which was represented by a representative from a
      different association: If the EPO is not notified that
      the previous representative's authorisation has
      terminated, the new representative must file an
      individual authorisation or a reference to a general
      authorisation already on file.

      In the present case, previous representative Mr E. from
      the association UDL filed a fax (15 July 2004) to
      announce that Mr U., who was not a member of this

2408.D

FX0014616

association, would appear for respondent 01 at the oral
proceedings before the Board. Mr E. did not notify the
Board that his association's authorisation was
terminating. Hence, that was a situation where the
President's Decision of 19 July 1991 required the new
representative, Mr U., to prove that he was authorised
to act on behalf of respondent 01.

5.5    As Mr U. did not refer to a general authorisation from
respondent 01, proof of an individual authorisation had
to be provided to the Board. In principle, that was
possible by filing a direct individual authorisation
from opponent 01, or by filing a sub-authorisation from
an authorised representative who was entitled to sub-
authorise a third representative. In view of the sub-
authorisation by the association UDL submitted by Mr U.
at the oral proceedings, the only issue remaining was
whether or not UDL was entitled to give such sub-
authorisation.

As Mr G. filed the notice of opposition 01 without
filing an authorisation, there is no evidence on file
that Mr G. obtained the power to give sub-
authorisations.

On the other hand, Mr S.'s e-mail (C51, 13 July 2004)
declared that respondent 01 accepted a sub-
authorisation to be given by the association UDL to
Mr U., even though C51 did not comprise a handwritten
signature. In the Board's view, the fact that C52 does
not list Mr S. as a General Counsel of Curtiss-Wright
Controls, Inc., the parent company of respondent 01,
does not affect the evidential value of the e-mail C51,

2408.D

FX0014617

since C52 lists officers and directors of Curtiss-
Wright Corp. which is a different legal entity.

5.6    In the Board's view, the issue of whether or not a
       Board considers a representative as authorised by a
       party is a matter of proof including a free evaluation
       of the evidence and overall circumstances of an
       individual case. The abovementioned Decision of the
       President of the European Patent Office dated 19 July
       1991 on the filing of authorisations indicates that
       flexible criteria are applicable to professional
       representatives whose names appear on the list
       maintained by the EPO. One of the reasons justifying
       that flexibility is that professional representatives
       are subject to statutory regulations of their
       profession.

5.7    To define an appropriate standard of proof with respect
       to a representative's authorisation, the Board takes
       account of the purposes of requiring an authorisation.

       (a)   A main purpose is to protect the authorising
             party's interest in being represented by a
             representative of the party's choice and trust,
             i.e. to ensure that the representative acts in the
             party's interest.

       (b)   A further purpose of requiring an authorisation
             from one party may be to protect the interest of
             the other parties to the proceedings in obtaining
             binding statements from a party's representative.

2408.D

FX0014618

    (c)   A third purpose is to protect the EPO's interest in procedural economy. Procedural steps taken by non-authorised representatives are deemed not to have been taken (Rule 101(4) EPC) and, thus, may result in procedural loops or other delays.

5.8    The Board is convinced that the aforementioned purposes are met in the light of the circumstances and submissions of the present case.

The filed evidence shows that respondent 01 indeed wanted to be represented by Mr U. who acted on the opposing side and, thus, in the interest of respondent 01.

Moreover, Mr U.'s request on behalf of respondent 01 was identical with the original request of this opponent, i.e. to have the revocation of the patent confirmed. No new request was submitted by Mr U. which might have created an additional, potentially unreliable obligation of respondent 01.

Hence, the Board's acceptance of Mr U.'s sub-authorisation did not increase the risk of a procedural delay.

6.    *Novelty of the claimed system (claim 1) over C2*

C2 discloses an automated wireless preventive maintenance monitoring system for trains and other vehicles (title), the other vehicles comprising airplanes (column 3, lines 22 to 28; column 6, lines 17 to 22 and lines 46 to 53; column 7, lines 10 to 17).

2408.D

6.1   The only embodiment of the concept described in C2
      refers to a magnetic levitation train with a path of
      travel along which wireless stationary relay
      transceivers (NSIUs 22) are arranged "in stations and
      at other fixed locations" through which the
      train/vehicle passes (Figures 1 and 2; column 2,
      lines 13 to 25).

      The goal of that concept is to perform vehicle
      inspections "continuously in near real time" (column 2,
      lines 38 to 40; column 7, lines 48 to 53).

      The stationary relay transceivers (NSIUs 22) interact
      with a wireless transceiver (60) of an on-board
      monitoring unit (SMDU 12; Figures 1 and 3) arranged on
      the train vehicle (engine 14 or car 16) to be
      monitored. The on-board monitoring unit (SMDU 12)
      obtains travel performance data representative of
      vehicle performance during travel of the vehicle
      (column 3, lines 52 to 66; column 4, lines 53 to 57),
      and comprises:
           a) a data store (36) operative to store travel
      performance data of a portion of the travel of the
      vehicle (column 3, lines 45/46; column 4, lines 53 to
      57), and
           b) a wideband spread spectrum transceiver (60)
      coupled to said data store (36) and comprising a
      transmitter that is operative, when the vehicle is
      approaching one of the stationary transceivers (NSIUs
      22), to download the travel performance data that has
      been stored by said data store (36) during a portion of
      the travel over a wideband spread spectrum
      communication signal (column 2, lines 20 to 25;

2408.D

column 3, lines 35 to 40; column 4, lines 3 to 8 and
lines 17 to 31; column 4, line 62 to column 5, line 5).

Each stationary transceiver (NSIU 22) is a wideband
spread spectrum transceiver (Figure 4; column 2,
lines 16 to 27; column 3, lines 29 to 32; column 4,
lines 9 to 31) comprising a receiver that receives the
wideband spread spectrum communication signal from the
vehicle and demodulates the signal to obtain the travel
performance data.

The monitoring system of C2 further comprises a ground
based archival data store (mass memory 82 of
maintenance control center 28 in Figure 5) coupled to
said stationary wideband spread spectrum transceiver
(NSIU 22), and that data store (82) receives and stores
(and accumulates) said travel performance data
(column 2, lines 25 to 33; column 4, lines 46 to 52;
column 7, lines 48 to 58). As the computer 70 at the
maintenance control center 28 of C2 is designed to
establish statistics on the acquired component
performance data (column 7, lines 53 to 56), the mass
memory 82 of the maintenance control center 28 has to
hold accumulated travel performance data even though
each of the NSIUs 22 relays only a buffered data
snapshot of a sub-interval of the travel.
In addition, the monitoring system of C2 comprises a
ground based processor (70 in Figure 5) coupled to said
ground based archival data store (82) for retrieving
travel performance data from the ground based archival
data store (82) for further processing (column 2,
lines 28 to 31; column 4, lines 32 to 52; column 5,
lines 25 to 56; column 7, line 38 to column 8, line
46).

2408.D

6.2    The data store 36 used in the on-board monitoring unit
       of C2 (Figure 3, SMDU 12; column 3, lines 45/46) is not
       disclosed explicitly as an archival data store, or mass
       memory, in contrast to the ground based data store 82
       of the maintenance control center 28 which is
       explicitly called a mass memory (C2, column 4, lines 46
       to 48).

       In order to determine whether C2 implicitly teaches the
       on-board data store 36 to be an archival data store,
       the function of the SMDU 12 has to be borne in mind.
       While the SMDU 12 keeps monitoring the associated
       vehicle throughout its travel (C2, column 4, lines 53
       to 57), the data downloading operation of the SMDU 12
       is described only with respect to intervals of the
       travel (C2, column 4, line 62 to column 5, line 5). The
       SMDU 12 downloads its memory content every time it
       travels past an NSIU 22, and then turns off (C2,
       column 5, line 5), i.e. it stops transmitting data to
       the NSIU 22 which has been passed. As the transmission
       takes place while the vehicle is passing, the
       transmission time is limited and so is the amount of
       data that can be transmitted during that time window.
       Moreover, the intervals between successive downloads
       will be short in order to assure the desired near real
       time monitoring (column 2, line 40; column 7, line 52).
       Therefore, the memory 36 of SMDU 12 needs to hold and
       transmit only a limited amount of performance data (a
       buffered data snapshot) covering only a portion of the
       travel.

2408.D

FX0014622

Hence, as the on-board memory 36 of C2 is not required
to have a large capacity, that memory does not
translate directly into a mass memory (or archival
memory). Therefore, document C2 might prompt the use of
an on-board mass memory only indirectly, by reference
to an aircraft implementation.

6.3    The crucial question is what is directly and
       unambiguously disclosed by document C2 with respect to
       an aircraft monitoring system mentioned generally in
       that document as a further field of application.

6.3.1  In the Board·s judgement, there is no clear explicit or
       implicit teaching in document C2 as to what such an
       aircraft monitoring system would look like. Rather, a
       skilled person would have to fill the gaps of
       disclosure by his own evaluations and preferences,
       thereby making selections among different possibilities.

       In particular, one might think of keeping the
       conventional flight data recorder ("black box") of an
       aircraft as a data store. Such an aircraft
       implementation would thus imply an on-board mass memory
       or archival memory within the meaning of claim 1, that
       memory accumulating performance data of the flight
       until landing of the aircraft. However, directly
       applying the teaching of C2, the on-board transceiver
       would still download only a portion of flight data (an
       incremental data snapshot) at each stationary
       transceiver, namely the portion of data that has been
       acquired since the previous contact with a stationary
       transceiver. It follows in this case that the subject
       matter of claim 1 still differs from the teaching of C2
       by requiring the data that has been accumulated during

2408.D

FX0014623

the whole flight to be downloaded after completion of
the flight.

Furthermore, regarding the wireless transmission
technology to be chosen, there are two alternatives
disclosed in C2: low-power spread spectrum transmission
technology which is preferred in C2 for a number of
advantages, and conventional single-frequency
communication (column 4, lines 3 to 31). Whereas the
latter would be suitable to monitor aircraft at higher
cruising altitudes, the former due to its limited
operating range (400 to 800 metres) would be limited to
low flying aircraft unless the stationary transceivers
arranged along the path of travel were omitted and
performance data of the entire flight were accumulated
and downloaded after landing. However, such a
modification would abandon both the goal (continuous
monitoring) and structure (plural relay transceivers
along the path of travel) of C2.

Hence, the application to aircraft monitoring systems
is not sufficiently described in C2 to make the subject
matter claimed in the patent in suit directly and
unambiguously derivable for a skilled person.
Consequently, the Board does not consider the claimed
subject matter as anticipated by the prior art
disclosed in C2.

7.      Novelty of the claimed system (claim 1) over C3

7.1     With respect to C3, the appellant raised the question
        as to whether that document was still in the
        proceedings even though C3 had been introduced by the
        inadmissible opposition 02. (The same question applies

2408.D

FX0014624

to C2 and the other documents introduced only by
opposition 02.)

According to decision T 154/95, point 2 of the Reasons
(summarised in the "Case Law of the Boards of Appeal of
the European Patent Office", 4th edition 2001, chapter
VII.C.9.3.3), documents are allowed to originate from
an opposition that has been declared inadmissible,
provided that at least one admissible opposition is
left so that the proceedings continue.

The same applies to a ground for opposition (lack of
novelty) that was raised only by the inadmissible
opposition 02 (see decision T 270/94, summarised in
chapter VII.C.9.3.4 of the abovementioned case law
book).

7.2    The Board has no doubt that C3, which is a meeting
       report to AEEC members that had attended the meeting,
       was available to the public within the meaning of
       Article 54(2) EPC. At the meeting, eleven airline
       companies and manufacturers were represented to deal
       with the standardisation of a data communications link
       ("Gatelink") for use between an airport-based data
       processing terminal and an aircraft parked at a gate.
       Technical standardisation procedures are more likely to
       require publicity than secrecy. This general
       presumption is in line with the Affidavit C39 from one
       of the attendees stating that the recipients of the
       report C3 were even encouraged to distribute that
       letter to third persons.

2408.D

FX0014625

On the other hand, the Board hesitates to take account of a critical technical detail ("IEEE 802.11 standard") which C39 points out as having been discussed at the meeting (or some other AEEC Gatelink meeting before the priority date of the patent in suit) while the meeting report itself is silent on precisely that detail and otherwise abundant in specific references to multiple standards.

7.3   C3 deals with a data communications link ("Gatelink") for use between an airport-based data processing terminal and an aircraft parked at a gate, see e.g. Attachment 3 (section 1 "Introduction" and section 2.1 "Uses of Gatelink"). The document considers a variety of technical implementations of the required communications link (Attachment 2, pages 2 and 5), notably wireless connections including infrared, microwave and "spread spectrum" (Attachment 2, page 5, paragraph 3).

While C3 discusses several types of data to be transferred across the communications link (Attachment 2, pages 1 and 2, "Requirements Analysis"), it does not enter into the recording and downloading of flight performance data. There is only a general hint at "maintenance" as one of the Gatelink applications (Attachment 3, section 2.1). In the Board's view, that mention is not specific enough to imply and anticipate the overall concept of aircraft-based performance data accumulation and ground-based data evaluation as claimed.

2408.D

FX0014626

8.      Novelty of the claimed system (claim 1) over C4/C5

        C4/C5 form an integral piece of prior art as those
        documents describe the final overall "Gatelink" system
        standard, with C4 relating to the ground side and C5
        relating to the aircraft side.

        The final standard for the communications link between
        an airport terminal and a parked aircraft adopted an
        infrared connection or an umbilical fibre optic
        connection (C4, page 5, sections 4.2.1 and 4.2.2; C5,
        pages 8 and 9).

        While C4 (page 19) shows that the Gatelink connects to
        a ground-based database server, the spread spectrum
        transmission that was contemplated initially by the
        standardisation group (C3, Attachment 2, page 5,
        paragraph 3) does not play any role in C4/C5.

        Hence, the system of claim 1 is novel at least in this
        respect.

9.      Since the remaining prior art is more remote from the
        claimed subject-matter, the Board concludes that the
        subject-matter of the system claim 1 is novel over the
        available prior art (Article 54 EPC).

10.     Issue of inventive step of the claimed system (claim 1)
        over the available prior art

10.1    As it cannot be obvious to modify the teaching of a
        document in a direction incompatible with the goal of
        that teaching, the Board does not use C2 as a starting
        point for the obviousness discussion. C2 aims at

2408.D

monitoring flight performance data in near real time,
while the claimed system relates to the downloading of
data that has been accumulated until landing.

10.2   Report C3, on the other hand, constitutes an open-ended
starting point. C3 presents a list of technologies
available for communication between a parked aircraft
and an airport terminal. A wireless connection is
contemplated in Attachment 2 (page 5, paragraph 3;
page 7, paragraph 4). In particular, spread spectrum
technology is mentioned there.

Spread spectrum transmission uses a wide band of
frequencies and, thus, avoids the problem of radio
frequency allocation. It is known to have significant
additional qualities (e.g. C2, column 4, lines 17 to
31):

–     spread spectrum transmission is resistant to
      interference; and

–     it can be operated at low power levels without a
      government license in the US, for example. That is
      a benefit sought by the opposed patent (see in
      particular paragraph [0008] therein).

It is true that spread spectrum transmission is no
longer mentioned in the final version of the "Gatelink"
standard documented by C4/C5. However, it remains a
fact that spread spectrum transmission is listed in C3
as one of the options for assuring the communication of
a parked aircraft. There may be various, e.g.
commercial, reasons why the expert group laying down
the final standard C4/C5 adopted an infrared or

FX0014628

umbilical fibre optic connection, such as the
availability of off-the-shelf hardware to reduce the
development costs (C3, Attachment 2, page 5, paragraph
4), or a lack of vendors of other technologies (C3,
attachment 2, page 7, paragraph 4).

C3 does not rule out the spread spectrum technology
which it mentions in its list of candidate technologies
(Attachment 2, page 5, paragraph 3). C3 rather states
that the "use of other technologies [i.e. other than
infrared transmission] may prove to be beneficial in
the future" (Attachment 2, page 7, paragraph 4, last
sentence). As the advantageous effects of spread
spectrum transmission are well-known (as mentioned
above), the choice of spread spectrum transmission from
said list of candidate technologies cannot represent a
selection invention either.

Incidentally, spread spectrum transceiver chipsets
became commercially available by the priority date of
the patent (as acknowledged in its paragraph [0072]),
thus removing this potential disincentive.

10.3   With respect to a wireless communication link according
to C3 (spread spectrum variation), the system and
method according to the independent claims of the
patent in suit contribute the concept of downloading
the accumulated flight performance data, after the
aircraft completes its flight and lands at an airport,
to an airport-based data store for further processing.

(a)   The added concept solves the problem of enabling
the accumulated flight performance data to be
examined on the ground (where more powerful

2408.D

FX0014629

processors may be available, or extensive data
checks can be carried out while the aircraft is
released for another flight, or statistical data
of several aircraft can be compiled, and the
like).

(b) That problem corresponds to a prior art
recommendation (September 1995) by the US Federal
Aviation Administration (FAA) that airlines look
at the information provided by the digital flight
data acquisition unit ("black box") of an aircraft
at regular intervals, as acknowledged in paragraph
[0003] of the patent (which claims a priority date
of November 1995). Looking at the recorded
information after landing constitutes an obvious
variation of said FAA recommendation. The
formulation of the problem does not, therefore,
imply any non-obvious aspect.

(c) Instead of collecting the recorded information on
a removable data carrier (e.g. floppy disc) to be
picked up by safety personnel (paragraph [0004] of
the patent), there is an evident and predictable
practical advantage in using the wireless data
link which exists in the ground data link
according to C3 anyway and is designed in
particular to transmit maintenance data (C3,
Attachment 3, section 2.1).

It is true that a portable data carrier may
provide a large storage capacity whereas a
wireless link may have a limited bandwidth.
However, as the aircraft is parked at the airport
terminal, the amount of the accumulated flight

2408.D

performance data is not a bottleneck to using a
wireless link. Hence, employing one of the
wireless technologies envisaged in C3 to
accomplish the data flow required by official
authorities (FAA) is obvious to a person skilled
in the art.

At the same time, an inherent requirement of the
FAA's recommendation is that the recorded and
transferred data be processed and analysed. As
ground-based processing obviously allows more
computing power to be used and enables the flight
data of several aircraft to be compared, for
example, the skilled person will envisage an
airport-based data store and data processor (as
opposed to an air-borne data processing facility)
to retrieve and further process the flight
performance data.

(d)   Therefore, the Board does not see any inventive
contribution by the system claim 1 or
corresponding method claim 17, contrary to the
requirements of Articles 52(1) and 56 EPC.

2408.D

FX0014631

## Order

## For these reasons, it is decided that:

1.     Opposition 02 is rejected as inadmissible.

2.     The appeal is dismissed.


The Registrar:                    The Chairman:



R. Schumacher                    S. V. Steinbrener


2408.D

FX0014632