**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| HARRIS CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 6:07-cv-1819-Orl-28 KRS |
| FEDERAL EXPRESS CORPORATION, | |
| Defendant. | |
| FEDERAL EXPRESS CORPORATION, | |
| Counterclaim Plaintiff, | |
| v. | |
| HARRIS CORPORATION, | |
| Counterclaim Defendant. | |

**DEFENDANT FEDERAL EXPRESS CORPORATION'S MOTION
FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-4 AND 17-20 OF U.S. PATENT NO. 6,047,165 AND
MEMORANDUM OF LAW IN SUPPORT AND REQUEST FOR ORAL
ARGUMENT**

# TABLE OF CONTENTS

I.      SUMMARY OF THE ARGUMENT ............................................................ 1

II.     THE '165 PATENT ............................................................................... 1

III.    LEGAL PREVIEW ................................................................................ 3

        A.      § 102 Law of Anticipation ...................................................... 4

        B.      § 103 Law of Obviousness ...................................................... 4

IV.     STATEMENT OF UNDISPUTED FACTS, PART 1:  SCOPE AND
        CONTENT OF THE PRIOR ART REGARDING SPREAD SPECTRUM .............. 5

        A.      ARINC and the Gatelink Standards ........................................ 5

                1.      ARINC is the Standard Setting Organization for the Industry ............... 5

        B.      The Gatelink System .............................................................. 6

        C.      Pete Hibson's Development of the System Disclosed in FCM-69 ............ 6

        D.      FCM-69 Disclosures Regarding Spread Spectrum ................... 8

                1.      It is Undisputed that FCM-69 Taught Spread Spectrum
                        Communication Between an Aircraft and the Ground .............. 8

V.      FRAMING THE ISSUE ......................................................................... 10

VI.     STATEMENT OF UNDISPUTED FACTS, PART 2:  SCOPE AND
        CONTENT OF THE PRIOR ART REGARDING COLLECTION AND
        STORAGE OF FLIGHT PERFORMANCE DATA ........................................ 10

        A.      FCM-69 Teaches the Use of an "Archival Data Store" on an Aircraft ........... 11

                1.      An Archival Data Store in Necessarily Present ..................... 11

                2.      The FAA Guidance Memo References Use of Computers .............. 12

                3.      FCM-69 Teaches a Link to the Aircraft "Intelligent Hub" ............ 12

        B.      FCM-69 Teaches Collection of Flight Performance Data ................... 13

        C.      The Gatelink Documents also Disclose an Aircraft-Based Archival
                Data Sore and a Ground-Based Archival Data Store ................... 15

                1.      Aircraft Computers ..................................................... 15

                2.      Ground Side Computer ................................................. 15

VII.  ARGUMENT .................................................................................................. 16

    A.    Invalidity Under § 102:  FCM-69 Teaches All Elements ................................. 16

        1.    FCM-69 Inherently Discloses the Collection and Storage of
            Flight Performance Data ......................................................................... 16

            a.    McAlexander's Admission and Hibson's Testimony
                Show That There Is No Question of Fact that FCM-69
                Inherently Discloses an Archival Data Store ............................. 16

            b.    FAA Guidance Memo Discloses That an Archival Data
                Store Was Necessarily Present in the FCM-69 System .............. 17

    B.    Invalidity Under § 103:  The Asserted Claims of the '165 Are Obvious ............ 17

        1.    Common Sense ........................................................................................ 17

        2.    Combination of FCM-69 and Gatelink Standards ................................... 18

            a.    Motivation to Combine FCM-69 and Gatelink
                Standards ...................................................................................... 18

            b.    FCM-69 and the Gatelink Standards Teach All
                Elements ...................................................................................... 19

        3.    Combination of FCM-69, the Gatelink Standards, and
            ARINC 624 ............................................................................................ 20

            a.    Motivation to Combine FCM-69, the Gatelink
                Standards, and ARINC 624 ......................................................... 20

            b.    FCM-69, the Gatelink Standards, and ARINC 624
                Teach Every Element ................................................................... 20

VIII.  THE ARINC PUBLICATIONS INCLUDING FCM-69 ARE PRINTED
      PUBLICATIONS ............................................................................................ 21

    A.    FCM-69 is a Printed Publication ..................................................................... 22

    B.    Each of the Relevant ARINC Publications is a Printed Publication ................... 23

IX.  SECONDARY CONSIDERATIONS ............................................................... 23

X.  DEPENDENT CLAIMS 2-4 AND 16-18 ARE ANTICIPATED OR
     OBVIOUS ...................................................................................................... 24

XI.  CONCLUSION ............................................................................................... 25

**Table of Authorities**

## Cases

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir), *cert. denied*, 469 U.S. 831 (1984) ............................................................... 3

*Black v. Ce Soir Lingerie Co.*, No. 2:06-CV-544, 2008 U.S. Dist. LEXIS 62484 (E.D. Tex. Aug. 15, 2008) .............................................................. 18, 19

*ChriMar Systems v. Cisco Systems*, 318 F. Supp. 2d 476 (E.D. Mich. 2004) ............................ 22

*Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991) ................. 4, 15

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317 (Fed. Cir. 2002) ............... 22

*In re Cronyn*, 890 F.2d 1158 (Fed. Cir. 1989) ............................................................. 22

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343 (Fed. Cir. 2002) ............................................. 4, 16

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006) ........................ 5

*Ethicon, Inc. v. Quigg*, 849 F.2d 1422 (Fed. Cir. 1988) ................................................. 3

*Gibson v. Walgreen Co.*, No. 6:07-1053, 2010 U.S. Dist. LEXIS 3954 (M.D. Fla. Jan. 19, 2010) ............................................................... 12

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ............................................................. 5

*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256 (11th Cir. 2004) ........................................... 11

*IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005) ................................. 3

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004) ............................... 24

*In re Kemps*, 97 F.3d 1427 (Fed. Cir. 1996) ......................................................... 18, 19

*KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 (2007) ................................................... *passim*

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008) ..................... 22

*Leapfrog Enters. Inc. v. Fisher-Price Inc.*, 485 F.3d 1157 (Fed. Cir. 2007) .......................... 5, 19

*Massachusetts Inst. of Tech. v. AB Fortia*, 774 F.2d 1104 (Fed. Cir. 1985) ............................... 22

*MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362 (Fed. Cir. 1999) ................................. 16

*Newell Cos. v. Kenney Mfg.*, 864 F.2d 757 (Fed. Cir. 1988) ..................................... 7, n.9

*Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368 (Fed. Cir. 2005) ........................... 4

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007) ........................................ 23

*Quad Environmental Techs. v. Union Sanitary Dist.*, 946 F.2d 870 (Fed. Cir. 1991) ................. 3

*Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008) ........................... 24

*Rothman v. Target Corp.*, 556 F.3d 1310 (Fed. Cir. 2009) .......................................... 23

*Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373 (Fed. Cir. 2003) ...................... 4, 16

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.3d 1530 (Fed. Cir. 1983) ............................. 3

*Sud-Chemie, Inc. v. Multisorb Techs.*, 554 F.3d 1001 (Fed. Cir. 2009) ...................... 24

*In re Swanson*, 540 F.3d 1368 (Fed. Cir. 2008) ........................................................... 3

*Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687 (Fed. Cir. 1985) ................... 3

**Statutes, Rules & Treatises**

35 U.S.C. § 102 ....................................................................................................... *passim*

35 U.S.C. § 103 ....................................................................................................... *passim*

2-5 Chisum on Patents § 5.04[3][e] ............................................................................. 4

2-5 Chisum on Patents § 5.04[1][e][iii] ...................................................................... 18

1-3 Chisum on Patents § 3.04[2] ............................................................................... 22

FedEx moves, pursuant to Rule 56, for partial summary judgment that claims 1-4 and 17-20 of the '165 patent are invalid under 35 U.S.C. §§ 102 and 103.[1]

## I.     SUMMARY OF THE ARGUMENT

In 1994, Pete Hibson, an engineer scientist working for McDonnell Douglas made a presentation to ARINC, the airline industry's standards-setting organization, describing a wireless spread spectrum link as a substitute for the infrared link used by existing Gatelink systems. In September 1994, ARINC published Hibson's description of the system under the title "FCM-69." This printed publication discloses all elements, and thus anticipates, the asserted claims of the '165 patent. Further, a person of ordinary skill would have been motivated to combine FCM-69 with applicable industry standards, such as ARINC 632 and 751, which described the Gatelink system that Hibson's system was meant to replace. This combination discloses all the elements of the asserted '165 patent claims and, therefore, renders them obvious.

Because there is no genuine and material question about these facts, a reasonable jury could not return a verdict for Harris. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Accordingly, the asserted claims of the '165 patent are invalid under §§ 102 and 103.

## II.    THE '165 PATENT

The '165 patent purports to claim a new way of transferring flight performance data from an aircraft to the ground after landing. The inventors conceded it was well known to

---

[1] This motion is limited to the '165 patent because of space limitations. However, because the other patents asserted by Harris are continuations of the '165, the requested invalidity ruling may affect their validity as well.

collect data from sensors during flight and save the data in the "black box." [Tab 1 at 1:21-34]. The inventors also conceded it was standard practice to transfer the saved information from the plane once it landed. Sometimes a floppy disk was walked off the plane ("sneakernet"); sometimes the data was transferred wirelessly using an "infrared link … to couple an on-board aircraft computer system with a ground-based computer system." [*Id.* at 1:62-64]. The inventors noted that the FAA had encouraged airlines to review the collected flight information data to improve safety. [*Id.* at 1:36-43]. Against this background, the "invention" was using a wireless spread spectrum RF link to transfer the flight performance data.[2] Harris asserts that FedEx infringes claims 1-4 and 17-20.

---

[2] Independent claim 1 of the '165 patent is representative: reads:

> 1. A system for providing a retrievable record of the flight performance of an aircraft comprising:
>
> a **ground data link** unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit **comprising**:
>
> a) an **archival data store** operative to accumulate and store flight performance data during flight of the aircraft, **and**
>
> b) a **wideband spread spectrum transceiver** coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal;
>
> an **airport based wideband spread spectrum transceiver** comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data;
>
> an **airport based archival data** store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data; and
>
> an **airport based processor** coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing.

[Tab 1 at 16:49-17:8 (emphasis added)]. Independent claim 17, [*Id.* at 18:22-41], re-characterizes the same elements as method steps.

### III.   LEGAL PREVIEW

All patents are presumed valid. This presumption, though, is, like all legal presumptions, a procedural device, not substantive law. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1524 (Fed. Cir. 1983). The '165 patent is invalid if FedEx proves, by clear and convincing evidence, that the patent is either anticipated or obvious.

Courts are "the final arbiter on questions of law such as validity." *Quad Envtl. Tech. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 876 (Fed. Cir. 1991). Because FCM-69 and the Gatelink standards were submitted to the PTO, FedEx has a so-called "heavier" burden of proving invalidity. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). But, the clear and convincing standard remains the same. *See id.* Furthermore, notwithstanding the presumption of validity, a court may find a patent anticipated based on a reference that was properly before the patent examiner. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005).

Nor is the fact that the '165 patent has been reexamined dispositive. A prior holding of validity is not necessarily inconsistent with a subsequent holding of invalidity, and is not binding on subsequent litigation. *In re Swanson*, 540 F.3d 1368, 1377 (Fed. Cir. 2008). There is "nothing untoward" about the PTO upholding the validity of a reexamined patent which a district court later invalidates. *Ethicon, Inc. v. Quiqq,* 849 F.2d 1422, 1428 (Fed. Cir. 1988); *Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 690 (Fed. Cir. 1985).

Indeed, there would be nothing remarkable about finding the '165 patent invalid on summary judgment. Summary judgment is as appropriate in patent cases as it is in non-patent cases. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831

(Fed. Cir. 1984); 2-5 Chisum on Patents § 5.04[3][e].

Moreover, the ARINC references that FedEx submits to explain the inherency of certain elements in FCM-69 were not before the PTO. Consequently, FedEx is confident that it has met its burden to show invalidity of the '165 patent by clear and convincing evidence.

### A.    § 102 Law of anticipation

A single reference must disclose each and every element of a patent claim to anticipate. 35 U.S.C. § 102; *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). A prior art reference that does not expressly reference a claim limitation still invalidates if it *inherently* teaches the missing element. *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375-1376 (Fed. Cir. 2005). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002).

Evidence outside of the reference can be used to prove inherency. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991). When the evidence demonstrates that the missing descriptive matter is necessarily present in the thing described in the reference, then the element is inherent. *Id.* Whether an element is inherent is a question of fact, but, is amenable to summary judgment. *See Schering*, 339 F.3d at 1374.

### B.    § 103 Law of obviousness

A patent claim is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious" to a person of ordinary skill in the art at the time of the invention. 35 U.S.C. § 103. Obviousness is a question of law involving a number of factual inquiries.

*KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 427 (2007); *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The *Graham* factors are: (1) the level of ordinary skill in the pertinent art, (2) the scope and content of the prior art, and (3) the differences between the prior art and the claims at issue. *Id*. Once the differences (if any) are identified, the Court then considers whether the claimed invention would have been obvious. *Id.* at 26.

Obviousness is shown when one of ordinary skill in the art would have reason to combine references to achieve the claimed invention. *KSR,* 550 U.S. at 418. The "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR,* 550 U.S. at 416. In combination patents, the substitution of modern electronics to older mechanical devices is commonplace and usually results in merely an obvious determination. *See, e.g., Leapfrog Enters. Inc. v. Fisher-Price Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007). It is entirely proper to decide issues of obviousness on summary judgment. *See, e.g., Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1358 (Fed. Cir. 2006).

## IV.   STATEMENT OF UNDISPUTED FACTS PART 1:  SCOPE AND CONTENT OF THE PRIOR ART REGARDING SPREAD SPECTRUM

### A.   ARINC and the Gatelink Standards

#### 1.   *ARINC Is The Standard Setting Organization for the Industry*

Established in 1929, ARINC is the leading provider of transport communications and systems engineering solutions for the airline industry. [Tab 2 at FX87953] All the airlines and aircraft manufacturers – including Harris and FedEx – are members of ARINC. [Tab 3 at 28]. The ARINC Airlines Electronic Engineering Committee (AEEC) is comprised of most

airline operators and manufacturers of electronic equipment used by airlines. [Tab 2 at FX87953]. The AEEC establishes voluntary, consensus-based industry standards that are published by ARINC and known generally as ARINC Characteristics. [*Id.*]. ARINC standards play a crucial role in the development of aircraft systems. [*Id.*]. Those of ordinary skill in the art[3] would consult ARINC standards when designing new systems. [Tab 5 at ¶ 5].

### B.    The Gatelink system

Two integrated ARINC standards (751 and 632) provide the specification for a prior-art system known as Gatelink, which is a full duplex[4] wireless infrared (IR) communication link between computers on-board a parked aircraft and computers inside the airport terminal. [Tab 6 at FX2446, § 1.2]. Both ARINC Gatelink standards say they must be read "in conjunction" to provide a "complete reference." [Tab 6 at FX2446, §1.2.1; Tab 2 at FX2418, § 1.3]. In the '165 background, the '165 inventors criticized the "obvious drawbacks" of an infrared system [Tab 1 at 1:64-2:6] and they claimed as their invention the use of spread spectrum instead of infrared. [*Id.* at 16:48-20:44].

### C.    Pete Hibson's development of the system disclosed in FCM-69

The prior art[5] ARINC FCM-69 document plainly shows why the '165 patent is invalid. This reference is a publication of ARINC's "Future Concepts for Maintenance"

---

[3] FedEx's expert, Dr. Albert Helfrick, opined that one of ordinary skill in the art would have a B.S. in electrical engineering or computer engineering or a related science, and three to five years minimum experience in the field of data gathering, communication, telemetry, and avionics. [Tab 4 at 242].

[4] "Full duplex" means the transceivers communicate in both directions.

[5] The publication history and dissemination of the FCM-69 publication is discussed more fully below. *See* Section VIII, *infra*.

(FCM) Subcommittee[6]. [Tab 3 at 42]. The FCM-69 reference was published in September 1994. [*Id.* at 23; Tab 8 at FX2374]. Pete Hibson, an engineer scientist at McDonnell Douglas (now Boeing) [7] was the primary author of the reference. [Tab 5 at ¶ 6].

Hibson had been working on the project for several years before the presentation to ARINC. [Tab 9 at 12]. McDonnell Douglas partnered with Dr. Darius Modarress of Physical Research, Inc. (PRI). [Tab 9 at 25]. This project was known as the OMS/ELS Cooperative IRAD.[8]  [Tab 5 at ¶ 4]. Hibson supplied the expertise regarding onboard aircraft maintenance systems; Dr. Modarress supplied the expertise in wireless spread spectrum communications. [Tab 9 at 25; 29]. In September, 1993, Hibson and Modarress made a confidential[9] presentation describing the system to the FAA to obtain guidance from the FAA regarding steps required to secure regulatory approval from the FAA. [Tab 12; Tab 9 at 13, 18, 56-58]. Hibson and Modarress also made a pitch of the system to NASA. [Tab 9; at 30-32; Tab 13].

McDonnell Douglas considered patenting Hibson's spread spectrum system for use with the known OMS/ELS aircraft components, but decided to disclose it publicly so that ARINC could produce a uniform standard for the system. [Tab 9 at 111, 153].

---

[6] Co-inventor, Jim Ziarno, told the patent office in a sworn affidavit that he invented the concept recited in the '165 claims at least as early as June 1995. [Tab 7 at 3].

[7] In 1994, Hibson was an employee of McDonnell Douglas. [Tab 9 at 9-10; Tab 5 at ¶ 2]. Douglas was later acquired by Boeing. Hibson is still employed by Boeing as an engineer scientist. [Tab 9 at 10; Tab 5 at ¶ 2].

[8] The acronyms referred to well known digital information systems called "Onboard Maintenance System" and "Electronic Library System," which were described in other ARINC standards, including ARINC 624-1 [Tab 10] and draft ARINC 649 [Tab 11]. [Tab 5 at ¶ 9].

[9] A document that does not qualify as "prior art" may still be used to show the knowledge of those of skill in the art in the § 103 obviousness analysis. *Newell Companies, Inc. v. Kenney Manufacturing Co.* 864 F.2d 757, 766 (1988).

As McDonnell Douglas's representative to the August 1994 FCM subcommittee

meeting, Hibson gave a slide presentation describing the system in detail. [Tab 8 at FX2374,

FX2385-2400]. Hibson also delivered a "Guidance Memo" from the FAA that explained how

manufacturers could secure regulatory approval for spread spectrum equipment. [*Id.* at

FX2374, 2401-2404]. Acting as representative of McDonnell Douglas, Hibson intended to

make the system and all prior communications about it public. [Tab 9 at 35, 49-50, 56, 153.]

Representatives from Northwest Airlines, ARINC, the Air Transport Association (ATA),

Aerospatiale, Airbus Industrie, Boeing, Computing Devices International, Demo Systems,

Douglas Aircraft, and Sextant Avionique – all aviation related companies – attended the

meeting. [*Id.* at FX2376].

In September 1994, more than one year prior to the filing date of the '165 patent,

ARINC published FCM-69. [Tab 8 at 2374, Tab 3 at 23]. FCM-69 includes Hibson's slide

presentation describing his spread spectrum system together with other related documents,

including the "guidance" letter from the FAA. [Tab 8 at FX2401-2404; Tab 9 at 56-58].

**D.    FCM-69 disclosures regarding spread spectrum**

> *1.    It Is Undisputed That FCM-69 Taught Spread Spectrum*
> *Communication Between An Aircraft And The Ground.*

FCM-69 *expressly* discloses every element of Claim 1 of the '165 patent, including

the element of a "spread spectrum transceiver." [Tab 14, 15, 19]. Claim 1 of the '165 patent

requires a "ground data link" that has two components: an archival data store and a spread

spectrum transceiver. FCM-69 explicitly discloses a "wideband spread spectrum

transceiver." References to spread spectrum are distributed throughout the document. [Tab

8 at FX2374, 2385-86, 2390; 2392-94]. For example, FCM-69 makes the following

disclosures:

- The cover page of FCM-69 states that Hibson "presented a novel concept of using Spread Spectrum technology ...." [*Id.* at FX2374].

- The FAA guidance letter states that "[t]he spread spectrum communications link is to be used for Onboard Maintenance System (OMS) and Electronic Library System (ELS) functions." [*Id.* at FX2401].

Other references to spread spectrum are distributed throughout the document. [*Id.*, FX2385-2386 (slides titled spread spectrum), FX2390 (data rates), FX2392-94]. Harris's expert, Joseph McAlexander, admits that FCM-69 discloses use of a wireless spread spectrum communications link to replace the IR link used in the Gatelink System. [Tab 16 at 29].

The claimed "spread spectrum transceiver" must be "operative after the aircraft completes its flight and lands at an airport." [Tab 1 at 16:48-17:8]. There is also no dispute that this element is explicitly present in FCM-69. [Tab 8 at FX2394-2398]. McAlexander admitted that the "Remote Terminals" shown in the FCM-69 "System Components" schematic are parked aircraft. [Tab 16 at 54]. Hibson's slides also depict images of aircraft on the ground within a circular zone obviously meant to depict the broadest zone of a spread spectrum router. [Tab 8 at FX2396-97; Tab 17]

Claim 1 of the '165 patent requires an "airport based wideband spread spectrum transceiver" [10] [Tab 1 at 16:48-17:8]. McAlexander admits that FCM-69 discloses this element. [Tab 16 at 53-54; *see also,* Tab 8 at FX2374, 2385-86, 2390; 2392-94; Tab 19].

## V.    FRAMING THE ISSUE

Because Harris's expert concedes that FCM-69 teaches the use of a spread spectrum

---

[10] Claim 1 of the '165 patent also requires that the transceiver of the ground data link transmit "flight performance data." [Tab 1 at 16:48-17:8]. This element is discussed in Section VI.B., *infra.*

wireless communication link that substitutes for the infrared link in the prior art Gatelink system [Tab 16 at 29], the issue devolves to whether FCM-69 discloses an "archival data store." De-mystified, this translates into whether FCM-69 discloses, explicitly or inherently, that the FCM-69 system would be connected to computer memory onboard the aircraft. Another issue might be whether any "archival data store" coupled to the FCM-69 system stores flight performance data collected during flight. If FCM-69 does not disclose such an "archival data store," the issue is whether it would have been obvious to add such a memory or functionality to the system disclosed in FCM-69.

All of these issues resolve in favor of FedEx. There is no question of material fact about whether FCM-69 discloses an archival data store of flight performance data, both explicitly and inherently. It unquestionably does. Moreover, it is not even remotely credible to argue that it was non-obvious "invention" to add an "archival data store" to the FCM-69 system. No reasonable jury could return a verdict for Harris on this point.

## VI.  STATEMENT OF UNDISPUTED FACTS, PART 2:  SCOPE AND CONTENT OF THE PRIOR ART REGARDING COLLECTION AND STORAGE OF FLIGHT PERFORMANCE DATA

It is undisputed that the use of computer memory – an "archival data store" – to store flight performance data was well known in the art in 1994. The monitoring of flight performance data is as old as the Wright Brothers. [Tab 16 at 116]. As computers emerged, this monitoring eventually evolved into collection and storage of data. Aircraft have long recorded flight performance data in the well-known "black box."

> Modern aircraft currently operated by the commercial airline industry employ airborne data acquisition (ADA) equipment, such as a digital flight data acquisition unit (DFDAU) as a non-limiting example, which monitor signals supplied from a variety of transducers distributed throughout the aircraft, and

> provide digital data representative of the aircraft's flight performance based upon such transducer inputs."

[Tab 1 at 1:21-28]. Since at least the 1970's, specific systems, such as Quick Access

Recorders (QARs), were used to facilitate the collection and storage of such data. [Tab 16 at

67]. Early systems for transferring this data from the aircraft to the ground were known as

"sneakernet" because someone would walk to a plane after it landed, take a floppy disk out

of an on-board computer and walk it to an on-ground computer. [Tab 1 at 1:42-60; Tab 9 at

14]. Through primitive by today's standards, sneakernet still reflects storage of the flight

performance data on an aircraft computer; it was only the sneakers that were unsophisticated.

Later systems used Ethernet cables or an infrared (IR) link "to couple an on-board aircraft

computer system with a ground-based computer system." [Tab 1 at 1:61-64; Tab 9 at 14].

### A.   FCM-69 teaches the use of an "archival data store" on an aircraft

For at least three reasons, FCM-69 discloses an archival data store, which is just a

fancy name for a computer memory [Tab 1 at 8:60-62].  The evidence is so one-sided that no

reasonable jury could find to the contrary.  *See Hickson Corp. v. N. Crossarm Co.,* 357 F.3d

1256, 1259 (11th Cir. 2004).

#### 1.   An archival data store is necessarily present

FCM-69 discloses a system that would use wireless spread spectrum to transfer flight

data collected and stored on aircraft computers to computers on the ground. [Tab 5 at ¶ 18;

Tab 9 at 13, 17-20; Tab 18].  McAlexander conceded that the spread spectrum system was

connected to a computer on the ground, but would only admit that it had to be connected to

"something" on the aircraft.  [Tab 16 at 63].  This "something" is necessarily a computer that

includes "an archival data store."  [Tab 5 at ¶ 13, 16-17; Tab 9 at 18-20, 62, 64].  It would be

absolutely incredible to deny the inherent presence of computers on both sides of the FCM-69 system. No reasonable jury could rule for Harris on this point.

### 2. *The FAA Guidance Memo references use of computers*

The FAA Guidance Memo that is part of FCM-69 explains that "[t]he spread spectrum communication link is to be used for Onboard Maintenance Systems (OMS) and Electronic Library System (ELS) functions." [Tab 8 at FX2401]. One of ordinary skill in the art would have recognized that "OMS/ELS" referred to well established systems used by the airlines. [Tab 5 at ¶ 12]. The ARINC specifications for OMS and ELS, without a doubt, teach use of computer storage. [Tab 10 at FX88013-88015; Tab 11 at HARRIS 15620].

### 3. *FCM-69 teaches a link to the aircraft "intelligent hub"*

FCM-69 further discloses that the proposed spread spectrum system would be connected to the extensive computer systems already on the aircraft, including the "aircraft's intelligent hub (649)." [Tab 8 at 2394; Tab 20]. The reference to the "Aircraft's Intelligent Hub (649)" in the "System Components" schematic is a reference to ARINC 649. [Tab 9 at 44; Tab 5 at ¶ 14]. This reference again teaches the use of vast amounts of computer memory. [Tab 5 at ¶¶ 10, 17; Tabs 20-22; Tab 11 at HARRIS 15620].

Given these numerous references, both express and inherent, to computer memory and storage, it is difficult to understand how Harris can genuinely contend that FCM-69 does not include an archival data store on an aircraft. Regardless, no reasonable jury could find that FCM-69 does not disclose an archival data store. *See Gibson v. Walgreen Co.,* No. 6:07-1053, 2010 U.S. Dist. LEXIS 3954 at * 22 (M.D. Fla. Jan. 19, 2010).

**B.      FCM-69 teaches collection of flight performance data**

FCM-69 discloses the storage of "flight performance data" both expressly and
inherently.  The FAA Guidance Memo states that "[i]n our understanding of the proposed
CDMA/SS [spread spectrum] system, the pilot could access certain aircraft information,
including possible performance/navigation information."  [Tab 8 at FX2403].  Although this
passage refers to communications with the pilot, it nonetheless explicitly shows that the
"performance" information is stored.

The collection of flight performance data is inherently disclosed in FCM-69 by at
least two references to the "Onboard Maintenance System" ("OMS").  First, the FAA
Guidance Memo says that the spread spectrum system was to be used with the existing OMS
and ELS functions.  [Tab 8 at FX2403]  The OMS/ELS system collected DFDAU data:

> Ms. Gentry: The mass memory systems on the OMS/ELS Cooperative IRAD
> system – was it contemplated that they would store DFDAU data?
> Mr. Hibson: Yes, if you --
> Mr. Gilchrist: Object to the form.
> Mr. Hibson: Yes, if you go back to ARINC 624, there's a, like I said, a whole
> section on *aircraft condition monitoring* of which QAR's and DFDAU's are
> portions of.

[Tab 9 at 64 (emphasis added)].  The '165 patent defines DFDAU as a "digital flight data
acquisition unit" that collects data that is "representative of the aircraft's flight performance"
from "a variety of transducers distributed throughout the aircraft." [Tab 1 at 1:24-28].

ARINC 624 (to which Hibson referred) is entitled "Guidance for Onboard
Maintenance System." It provides "basic guidance and certain specific recommendations for
an onboard maintenance system (OMS)." [Tab 10 at FX87959, § 1.1]. One part of OMS,
known as the "Airplane Condition Monitoring System"(ACMS), "is an airplane and flight

performance monitoring system. Its purpose is to "monitor[] and record[] selected airplane

data related to airplane maintenance, performance, troubleshooting, and trend monitoring."

[*Id.* at FX 88012 § 8.1]. The FAA's explicit reference to OMS, consequently, inherently

discloses the ACMS teachings.

The second reference to the OMS is found in the FCM-69 schematic, which shows

that the FCM-69 system is connected to the aircraft's "Intelligent Hub (649)."

**SYSTEM COMPONENTS**



[Tab 8 at FX2394; Tab 20]. Hibson testified that "Intelligent Hub( 649)" referred to the latest

draft of ARINC 649, which set the industry standards for an "intelligent hub" a digital

network to which many systems, including the OMS, connect. [Tab 5 at ¶ 18. Tabs 20-22].

One of the diagrams from the ARINC 649 draft specifically references ARINC 624, which,

as already explained, discloses the collection and storage of flight performance data by virtue

of its discussion of ACMS.  [Tab 5 at 9; Tab 10 at FX88012-88014; Tab 21-22].

In sum, FCM-69 discloses the storage of flight performance data explicitly and

inherently.  The ARINC standard for the OMS system, to which FedEx is entitled to refer to show what a reference inherently discloses (*Continental Can Co.*, 948 F.2d at 1268-69), shows that the monitoring, collection and storage of flight performance data was necessarily included in the FCM-69 system.

### C.  The Gatelink standards also disclose an aircraft based archival data store and a ground based archival data store

#### 1.  *Aircraft computers*

The Gatelink standards disclose computers (archival data stores) on both the aircraft side and the ground side.  ARINC 751, the Gatelink Specification that pertains to the aircraft side of the system, specifically discusses the need for the Gatelink system to be interfaced with the OMS's "central maintenance computer (or CMC function)." [Tab 6 at FX2458, §§5.2, 5.3; Tab 10 at FX87964, § 3.1].  These computers necessarily monitor, store and record flight performance data, including engine performance data.  [Tab 10 at FX 88012, § 8.0; Tab 2 at FX 2418, § 1.2, Commentary].  Thus, ARINC 751 discloses the use of archival data storage for storing flight performance data.

#### 2.  *Ground side computer*

The Gatelink standards also specifically teach the use of a computer located on the ground, and specifically at the airport.  ARINC 632 teaches the use of a "Gatelink Database Server" located on the ground/airport.  A database server has both an archival data store and a processor for processing stored data. [Tab 2 at FX2421, 2436-39; *see also* Tab 6 at , FX2453, § 3.1; Tab 2 at FX2418, § 1.2, 2428].

15

# VII.   ARGUMENT

## A.   Invalidity under § 102: FCM-69 teaches all elements

Most of the elements of Claim 1 are *explicitly* taught in FCM-69. The chart attached at Tab 15 provides specific citations to FCM-69 detailing where it explicitly teaches each element of Claim 1 of the '165 patent.  The only element not *explicitly* shown is the collection and storage of flight performance data.  However, this element is inherent; and, thus, is as relevant as the explicit teachings in FCM-69 in support of a finding of invalidity. *See Schering,* 339 F.3d at 1379.

### 1.   *FCM-69 inherently discloses collection and storage of flight performance data*

There is no question of fact that the collection and storage of flight performance data is inherent in FCM-69.

#### (a)   McAlexander's admission and Hibson's testimony show that there is no question of fact that FCM-69 inherently discloses an archival data store

An element is inherent in a reference if the prior art necessarily functions in accordance with, or includes, the claims limitations ...." *In re Cruciferous Sprout Litig.,* 301 F.3d 1343, 1349 (Fed. Cir. 2002). "Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *MEHL/Biophile,* 192 F.3d at 1365; *In re Cruciferous,* 168 F. Supp. 2d at 538.

The spread spectrum system disclosed in FCM-69 had to be connected to something on the aircraft. [Tab 16 at 63].  This "something" was necessarily a data store. [Tab 5 at ¶ 13, 16-17; Tab 9 at 18-20, 62, 64].  No reasonable jury could find otherwise.  FCM-69 teaches

the transmittal of data from the aircraft to the ground. [Tab 8 at FX2394; Tab 5 at ¶ 18; Tab 16 at 63]. If this data did not exist in a data store, it would be impossible for the spread spectrum transceiver to obtain data to download after flight – a function McAlexander admits FCM-69 discloses. [Tab 16 at 63]. Thus, there is no genuine issue of material fact that FCM-69 inherently discloses an archival data store.

<blockquote>
**(b)   FAA Guidance Memo discloses that an archival data store was necessarily present in the FCM-69 system**
</blockquote>

The collection and storage of flight performance data is inherent in FCM-69 for a second, independent reason. As described in the FAA policy statement, the FCM-69 system was to be used in connection with the existing OMS/ELS components, which necessarily include an archival data store. [Tab 8 at FX2401; Tab 5 at ¶ 13, 16-17; Tab 9 at 13, 18-20, 62, 64; Tab 10 at FX88012-88014]. Therefore, FCM-69 inherently discloses an archival data store for the collection and recording of flight performance data. No reasonable jury could find that an archival data store is not disclosed in the FCM-69 reference.

**B.   Invalidity under § 103: The asserted claims of the '165 are obvious**

*1.   Common sense*

Assuming, *arguendo,* that the Court finds that there is a question of fact regarding whether FCM-69 discloses the storage of flight performance data, FedEx is entitled to summary judgment that the asserted claims of the '165 patent are obvious. The '165 patent Background acknowledges that the FAA had encouraged the airline industry to collect and analyze flight performance data. [Tab 1 at 1:35-42]. Nothing counseled against doing so. Motivated by the FAA's encouragement, it would have been obvious to a person of ordinary skill in the art to respond to the FAA's suggestion by improving the FCM-69 system by

connecting it to an aircraft's computer where flight performance data was stored. If more data were needed, it would have be obvious to record more.

KSR supports this result. "The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." KSR, 550 U.S. at 419. Courts are required to use a more "expansive and flexible approach" to determine if a patent claim is obvious, including common sense where appropriate. Id. at 415. If specific teachings of the claimed subject matter are absent, "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." Id. at 418.

### 2.    Combination of FCM-69 and the Gatelink standards

The elements that are inherent in FCM-69 are also disclosed *explicitly* in the Gatelink standards (ARINC 632 and ARINC 751). Consequently, if there were any missing elements in FCM-69, they would be found when FCM-69 is combined with ARINC's Gatelink standards.

### (a)    Motivation to combine FCM-69 and the Gatelink standards

FCM-69 specifically references Gatelink. [Tab 8 at FX2385]. A specific reference to a combination represents an express motivation to combine. In re Kemps, 97 F.3d 1427, 1430 (Fed. Cir. 1996); Black v. Ce Soir Lingerie Co., 2008 U.S. Dist. LEXIS 62484, *47-48 (E.D. Tex. Aug. 15, 2008) (finding there was motivation to combine a prior art patent that cited a second patent); Chisum § 5.04[1][e][iii] (an express suggestion of the modification or substitution in questions tends to confirm obviousness).

The people working on aircraft systems in 1994 knew that ARINC published standards and would consult these standards when designing new aircraft systems. [Tab 5 at ¶ 5]. The explicit reference to "Gatelink" in FCM-69 would of course lead one of ordinary skill in the art to the governing Gatelink standards, ARINC 632 and ARINC 751. [Tab 5 at ¶ 11; *see also, In re Kemps,* 97 F.3d at 1430; *Black,* 2008 U.S. Dist. LEXIS 62484 at *47-48.].

**(b)   FCM-69 and the Gatelink standards teach all elements**

The combination of FCM-69 and the Gatelink standards teaches each and every element of the asserted claims of the '165 patent. Harris admits that FCM-69 teaches all of the elements of claim 1 of the '165 except for an archival data store that collects and stores flight performance data.

The Gatelink standards explicitly teach an archival data store. [Tab 2 at FX2418, § 1.2; FX2418, FX2421; Tab 6 at FX2458, §§ 5.0-5.3; FX2461, FX 2465]. They also teach the collection and recording of flight performance data in that archival data store. [Tab 2 at FX2418, § 1.2; FX2418, FX2421; Tab 6 at FX2458, §§ 5.0-5.3; FX2461, FX 2465; Tab 10 at FX88012, §§ 8.0-8.2.5, FX88015]. Thus, when the teachings of the Gatelink standards are combined with the wireless spread spectrum link taught in FCM-69, each and every element is disclosed, and the claimed combination is obvious.

The substitution of modern electronics to older mechanical devices is commonplace and usually results in merely an obvious determination. *See e.g., Leapfrog,* 485 F.3d at 1162. FCM-69 suggests exactly that: the substitution of a newer spread spectrum link (made possible by recent advances) to replace the old infrared technology. There is no question of fact that spread spectrum for networking computers was an emerging technology in 1994.

[Tab 1 at 14:28-34]. The inventors merely replaced the old infrared Gatelink system that had well-known and "obvious drawbacks" [Tab 1 at 13:47-58] with the next wave – spread spectrum.   Because Hibson had already disclosed in FCM-69 the substitution of a spread spectrum link in place of the infrared Gatelink, the concept claimed by Harris is an obvious substitution.

### 3.    *Combination of FCM-69, the Gatelink standards and ARINC 624*

#### (a)    **Motivation to combine FCM-69, the Gatelink standards, and ARINC 624.**

The Gatelink standards include an explicit suggestion to combine the teaching about infrared technology with the teachings in ARINC 624 (the specification for Onboard Maintenance Systems or OMS).  First, ARINC 751 states that the Aircraft IR Transceiver Unit (ATU) of the Gatelink system "should contain BITE capability in accordance with ARINC Report 624." [Tab 6 at FX2458, § 5.3.1]. ARINC 751 further teaches that part of the OMS system is a system called ACMS (Airplane Condition Monitoring System) and that all the OMS systems need to be totally integrated. [*Id.* at 2458, § 5.2]. Finally, immediately after summarizing the contents of ARINC 624, the ARINC 751 standard states:

> Airframe and equipment designers are encouraged to take advantage of this guidance information, beginning with the earliest design phases of new equipment.

[*Id.* at FX 2458].  In complementary fashion, ARINC 624 specifically refers to the use of the OMS with Gatelink. [Tab 10 at FX88013, § 8.2.6]. Given this, one of ordinary skill in the art would have reason to combine the documents. *See KSR,* 550 U.S. at 418 (interrelated teachings of multiple patents often reveal a reason to combine known elements).

**(b)**     **FCM-69, the Gatelink standards, and ARINC 624 teach
every element.**

If there were still a question regarding invalidity based on the combination of

FCM-69 and the Gatelink standards (which, as described above, teach each and every

element of the claimed invention), the combination of FCM-69, the Gatelink standards, and

ARINC 624 would put the issue entirely to rest.  Given the three-page description of ACMS

in ARINC 624, [Tab 10 at FX88012-88014] and its teachings that (1) it monitors and records

selected airplane data related to airplane maintenance, *performance*, . . . and trend

monitoring; (2) that it should "have the capability to acquire selected groups of data to be

used in event monitoring, data recording and report generation;" and (3) that it should be

capable of collecting and storing data for later distribution to various output devices – which

include data links – there cannot be any question of *material* fact that the combination of

references discloses each and every element of claim 1 of the '165.  As discussed above,

there is also motivation to combine.  Therefore, the combination of FCM-69, the Gatelink

standards, and ARINC 624 render claim 1 of the '165 patent obvious.

## VIII.   THE ARINC PUBLICATIONS, INCLUDING FCM-69, ARE PRINTED PUBLICATIONS.

The FCM-69, the Gatelink standards, and the other ARINC standards are each printed

publications[11] that were published more than one year prior to the filing date of the '165

---

[11]  A 'printed publication' is an absolute bar to patentability.  As set forth in 35 U.S.C. § 102(b):  "A
person shall be entitled to a patent unless ... (b) the invention was patented or described in a printed
publication in this or a foreign country ... more than one year prior to the date of the application for
patent in the United States."

patent application. They thus qualify as "prior art" to the '165 patent. The '165 patent

issued from an application filed November 14, 1995. [Tab 1]. Thus, November 14, 1994 (one

year prior to filing) is the critical date.

A reference is a printed publication under Section 102 if, "before the critical date the

reference [was] sufficiently accessible to the public interested in the art." *In re Cronyn*, 890

F.2d 1158, 1160 (Fed. Cir. 1989). Whether a document is a printed publication under

Section 102 is a question of law for the court, based on underlying factual determinations.

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002).

"[D]issemination and public accessibility are the keys to the legal determination whether a

prior art reference was 'published.'" *Cronyn*, 890 F.2d at 1160. "[V]ery little circulation of

permanency is required if the work is specially directed to those skilled in the art or trade to

which the patent in question relates.'" *ChriMar Systems v. Cisco Systems*, 318 F. Supp. 2d

476, 503 (E.D. Mich. 2004), quoting 1-3 Chisum on Patents § 3.04[2] (2003); *see also,*

*Kyocera Wireless Corp. v ITC*, 545 F.3d 1340, 1350-51 (Fed. Cir. 2008) (GSM standards

were widely distributed and publicly available before the critical date of the asserted patent.)

*Id.* at 1350-1351; *see also Massachusetts Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109-10

(Fed. Cir. 1985) (finding a printed publication because paper was orally presented to a

conference attended by 50 to 500 interested scientists, and disseminated without any

restrictions on its use to 6 persons).

### A.   FCM-69 is a printed publication

FCM-69 is a printed publication. FCM-69 was circulated on or before September 8,

1994, prior to the '165 patent's critical date. [Tab 3 at 23]. Hibson described his spread

spectrum system to at least 12 attendees at an ARINC meeting of the FCM subcommittee in August 1994. [Tab 8 at FX2376; Tab 3, p. 44:23-25]. ARINC distributed FCM-69 without restrictions to all members of the FCM subcommittee, all members of the PMAT working group, all AEEC members (about 30), all AMC members (about 20), 83 persons on the Airline Subscriber list [Id., p. 30:8-9 and included Exh. 96], approximately 70 persons on the Special Subscriber list (about 90%) [Tab 3, p. 29:3-5 and included Exh. 96], all those Regular Subscribers who either requested a copy or had a standing request for documents published by the FCM subcommittee or PMAT working group, and any member of the public who requested a copy. [Tab 3 at 39, 49, 44, 22, 23, 24, 29, 48, 46, and depo Exhs. 96-100]. Consequently, FCM-69 was a printed publication widely distributed, without restriction, before the critical date.

## B.   Each of the relevant ARINC publications is a printed publication

Each of the ARINC publications discussed in the Motion was disseminated by ARINC directly to a large number of subscribers and interested persons in the aviation industry without restriction on its use or distribution to others before the critical date (i.e., before November 11, 1994). [Tab 23 at ¶ 17 (ARINC 751); ¶ 10 (ARINC 624); ¶ 11 (ARINC 624-1); ¶ 9 (ARINC 649); ¶ 13 (ARINC 632)]. Accordingly they also qualify as prior art to the '165 patent.

## IX.   SECONDARY CONSIDERATIONS

Although secondary considerations must be taken into account, they do not necessarily control the obviousness conclusion. *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 1372 (Fed. Cir. 2007) (citation omitted). The patentee carries the burden of proving

secondary factors. Even if Harris submits evidence of secondary features, it cannot meet its

burden of overcoming the strong *prima facie* case of obviousness set forth above. A strong

*prima facie* obviousness showing will overcome even considerable evidence of secondary

considerations. *See e.g., Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009).

When faced with a strong *prima facie* showing of obviousness, as here, secondary

obviousness factors are insufficient to create a question of fact as to the obviousness of the

patents in suit. *Sud-Chemie, Inc. v. Multisorb Techs.*, 554 F.3d 1001 (Fed. Cir. 2009).

## X.      DEPENDENT CLAIMS 2-4 AND 18-20 ARE ANTICIPATED OR OBVIOUS

Dependent claims 2-4 and 18-20 of the '165 patent are neither novel nor non-obvious.

Claims 2 and 18 add the limitation that the wideband spread spectrum signal is "a direct

sequence spread spectrum communication signal." Harris admits that direct sequence spread

spectrum was in existence at the time of filing the '165 patent. [Tab 1 at 13-14].

Accordingly, claims 2 and 18 are drawn merely to a known prior art variation of the

wideband spread spectrum in independent claim 1.

Claims 3 and 19 further limit the wideband spread spectrum communication signal to

be "a signal within an S band." Claims 4 and 20 further limit the wideband spread spectrum

communication signal to be "a signal within the range of about 2.4 to about 2.5 GHz." These

features are obvious variants. Harris's expert admitted that the frequencies between 2.4 and

2.5 GHz are referred to as the "S band," thus eliminating any patentable difference between

the limitation of claims 3 and 19 and that of claims 4 and 20. [Tab 24 at 125:6-11].

Moreover, the FCM-69 system disclosed spread spectrum, thoroughly detailed above, using

the 2.4 GHz frequency, and thus the S-band. [Tab 8 at FX2386]. Where a claimed range

overlaps with a range disclosed in the prior art, there is a presumption of obviousness. *See,*

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004).  Because

nothing "taught away" from using S-Band or its subset 2.4GHz range and there are no new

and unexpected results, the claims are obvious. *Ricoh Co., Ltd. V. Quanta Computer, Inc.*,

550 F.3d 1325, 1331 (Fed. Cir. 2008).

## XI.    CONCLUSION

There is no question about the material facts:  Hibson's FCM-69 taught the airline

industry that it should replace Gatelink's IR link with wireless spread spectrum. Hibson's

slides and the related FAA Guide Memo teach that Hibson's system would be used with the

OnBoard Maintenance System, which includes aircraft condition monitoring according to

both ARINC's Gatelink standards and ARINC's OMS standards.

FedEx asks for summary judgment that the FCM-69 reference discloses all elements

of the asserted '165 claims. FedEx also asks that these claims be ruled obvious.  If there are

any elements missing in FCM-69, they are present in the ARINC standards.

More basically, if FCM-69 fails perfectly to disclose the elements of the '165 patent,

common sense alone motivates a person of ordinary skill to supply the missing elements.  In

the post-KSR world, nothing could be more obvious than to connect the FCM-69 system to

computers on the aircraft and ground.  And  given the FAA's admonishment that flight data

should be reviewed to improve flight safety, it was undeniably obvious to use the FCM

system to do just that.  Accordingly, the '165 patent is invalid.

Respectfully submitted this 1st day of February, 2010.

/s/ Lawrence K. Nodine
Lawrence K. Nodine, Trial Counsel

Georgia Bar No. 545250
NodineL@BallardSpahr.com
J. Scott Anderson
Georgia Bar No. 017266
Florida Bar No. 115053 (inactive)
AndersonJS@BallardSpahr.com
Charley F. Brown
Georgia Bar No. 086754
BrownCF@BallardSpahr.com
Robin L. Gentry
Georgia Bar No. 289889
GentryR@BallardSpahr.com
Jeffrey H. Brickman
Georgia Bar No. 080432
BrickmanJ@BallardSpahr.com
Sumner C. Rosenberg
Georgia Bar No. 614550
RosenbergS@BallardSpahr.com
**Ballard Spahr LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

Marilyn G. Moran
Florida Bar No. 0163813
mmoran@bakerlaw.com
**Baker & Hostetler, LLP**
P.O. Box 112
Orlando, Florida  32802-0112
Telephone 407-649-4000
Fax 407-841-0168

ATTORNEYS FOR
FEDERAL EXPRESS CORPORATION

26

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 3.01(j), counsel for FedEx requests oral argument before the Court regarding Summary Judgment.  FedEx requests that the Court reserve four hours for a Claim Construction Hearing.

/s/ Lawrence K. Nodine
Lawrence K. Nodine, Trial Counsel
NodineL@BallardSpahr.com

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 21, 2009, I electronically filed the foregoing

document, **FEDERAL EXPRESS CORPORATION'S CLAIM CONSTRUCTION**

**BRIEF AND REQUEST FOR ORAL ARGUMENT,** using the Case Management /

Electronic Case Filing system which will send a Notice of Electronic Filing to the following

participants:

> Brian Gilchrist, Esq.
> Ryan T. Santurri, Esq.
> RSanturri@addmg.com
> Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
> P.O. Box 3791
> Orlando, Florida  32802-3791
> Telephone:  407-841-2330
> Fax:  407-841-2343

> /s/ Lawrence K. Nodine
> Lawrence K. Nodine
> **Ballard Spahr LLP**
> 999 Peachtree Street, Suite 1000
> Atlanta, Georgia 30309
> Telephone 678-420-9300
> Fax 678-420-9301

> ATTORNEY FOR
> FEDERAL EXPRESS CORPORATION