**Exhibit 26**

CONFIDENTIAL

## THE UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| HARRIS CORPORATION,<br>    Plaintiff<br><br>v.<br><br>FEDERAL EXPRESS CORPORATION,<br>    Defendant<br><br><br>FEDERAL EXPRESS CORPORATION,<br>    Counterclaim Plaintiff<br><br>v.<br><br>HARRIS CORPORATION,<br>    Counterclaim Defendant | Case No. 6:07-cv-1819-ORL-28 KRS |

## SUPPLEMENTAL EXPERT REPORT OF ALBERT D. HELFRICK, P.E., Ph.D. CONCERNING VALIDITY

Albert D. Helfrick, P.E., Ph.D.
Chair, Electrical and Systems Engineering Department
Embry-Riddle Aeronautical University
Daytona Beach, Florida  32114

CONFIDENTIAL

## TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................................... 1

II.  HISTORY OF THIS LITIGATION ......................................................................... 3

III. BASIC UNDERSTANDING OF THE LAW OF INVALIDITY ......................... 5

    A.   Indefiniteness ................................................................................................. 5

    B.   Lack of Novelty (Anticipation) .................................................................... 6

    C.   Obviousness ................................................................................................... 6

    D.   Basic Understanding of the Law of Claim Construction ......................... 8

    E.   Person Having Ordinary Skill in the Art .................................................... 9

    F.   Claim Interpretation ................................................................................... 10

    G.   Intepretation of the claims of U.S. Patent 6,990,319 .............................. 12

        1.   The Prosecution History of the '319 Patent ................................. 12

        2.   The Transmitting Steps Recited in Claims 1, 11, and 21 of the '319 Patent ....................................................................................... 15

        3.   The Receiver in Claims 1, 11, and 21 of the '319 Patent ............. 16

    H.   Interpretation of the claims of U.S. Patent 6,154,637 ("the Probe Beacon patent") ........................................................................................... 17

        1.   The Channel Selecting Step Recited in Claim 31 of the '637 Patent .......... 17

        2.   The Data Downloading Step Recited in Claim 31 of the '637 Patent .......... 19

    I.   Interpretation of the claims of U.S. Patent 6,104,914 ("the Adaptive Power Control patent") ................................................................................ 19

        1.   The Adaptive Power Control Unit Recited in Claim 1 of the '914 Patent ....................................................................................... 19

        2.   The Data Transmitter Recited in Claim 1 of the '914 Patent ..................... 19

    J.   Interpretation of the claims of U.S. Patents 6,308,045 B1 and 6,308,045 C1 ("the '045 Certificate") ........................................................................... 20

        1.   The Prosecution History of the '045 Reexamination ................... 20

2.    The Data Transmitter Recited in Claim 4 and the Downloading Steps Recited in Claims 14 and 16 of the '045 Certificate ................................... 22

K.    Interpretation of the claims of U.S. Patent 6,047,165 ................................... 23

1.    The Receiver Recited in Claim 17 of the '165 Patent ................................... 23

2.    The Data Transmitter Recited in Claim 1 of the '165 Patent ..................... 24

IV.    THE CLAIMED INVENTION ................................................................. 24

A.    The Harris Patents Describe a Telemetry System ................................... 24

B.    The EPO Opposition to the Harris Patents ................................... 26

C.    The Petition for Reexamination of the '045 Patent ................................... 27

D.    The Petition for Reexamination of the '165 Patent ................................... 27

V.    THE PRIOR ART ................................................................. 27

A.    Admitted Prior Art in the '165 Background ................................... 27

B.    Prior Art References ................................................................. 29

C.    The State of the Art ................................................................. 45

VI.    OPINIONS REGARDING INVALIDITY ................................... 48

A.    U.S. Patent 6,047,165 ................................................................. 49

B.    U.S. Patents 6,308,045 B1 and 6,308,045 C1 ("the '045 Certificate") .............. 118

C.    U.S. Patent 6,104,914 ("the Adaptive Power Control patent") ........................ 207

D.    U.S. Patent 6,154,637 ("the Probe Beacon patent") ................................... 227

E.    U.S. Patent 6,990,319 ................................................................. 245

F.    U.S. Patent 6,108,523 ................................................................. 298

G.    U.S. Patent 6,775,545 ("the Interrogation Beacon patent") ........................... 376

1.    Lack of Novelty ................................................................. 376

2.    Obviousness ................................................................. 381

H.    U.S. Patent 6,154,636 ("the first OOOI patent") ................................... 387

I.    U.S. Patent 6,308,044 ("the second OOOI patent") ................................... 457

J.      U.S. Patent 6,173,159 ("the Flight Management Computer patent") ................ 495

K.      U.S. Patent 7,428,412 ............................................................................... 549

L.      U.S. Patent 7,426,387 ............................................................................... 594

M.      U.S. Patent 7,444,146 ............................................................................... 643

VII.   SECONDARY CONSIDERATIONS .......................................................................... 689

VIII.  CONCLUSION ...................................................................................................... 690

## TABLE OF EXHIBITS

Exhibit 1: Documents Considered

Exhibit 2: Qualifications; *Curriculum Vitae*

Exhibit 3: Qualifications; List of Publications

Exhibit 4: Qualifications; List of Other Cases

Exhibit 5: Statement of Compensation

167.   Furthermore, I note at the outset of this invalidity discussion my opinion that the features and functions recited in the claims which are based on the IEEE 802.11 protocol, including the various message types and beacons, were not invented by Harris Corporation or those named on the patents. Those features and functions are anticipated by the 802.11 draft specifications and publications from the early workshops. Harris Corporation developed its wireless system "based on IEEE 802.11." See *Ground Data Link System*, a Presentation to ARINC by Harris Corporation (July 29, 2003), at slide 24 (HARRIS-40275 through 40300).

**A.   U.S. Patent 6,047,165**

168.   It is my opinion that the '165 patent is obvious based on any of the following combinations of the prior art:

(1)   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper;

(2)   The Airbus Digital Telemetry Paper in combination with the Douglas Aircraft Paper;

(3)   The Airbus Digital Telemetry Paper in combination with the Technology Development Concept Paper;

(4)   The FCM-69 Paper in combination with the L-1011 Paper;

(5)   *Weisbart* in combination with the FCM-69 Paper;

(6)   *Weisbart* in combination with the Technology Development Concept Paper;

(7)   *Weisbart* in combination with the Douglas Aircraft Paper; or

(8)   ARINC 632 and ARINC 751, in combination with the FCM-69 Paper.

**1.   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper**

169.   In my opinion, one of ordinary skill in the art at the time of invention would understand that the Airbus Digital Telemetry Paper has every limitation of the '165 patent except

## 9.    The Dependent Claims of the '165 Patent are Obvious

260.    As detailed in the chart below, each and every element of the dependent claims of the '165 patent would have been obvious to a person having ordinary skill in the art at the time of the claimed invention.

| Dependent Claims of the '165 Patent | *Each dependent claim is obvious in light of the reference or combination set forth for the independent claim from which it depends, plus the following reference . . .* |
| --- | --- |
| [See Independent Claim 1, above] | |
| 2.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum communication signal. | U.S. Patent 5,463,656 issued to *Polivka, et al,* ("the Polivka patent") (filed October 29, 1993) teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 3.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The "S band" ranges from 2.0 to 4.0 GHz. The AEEC Future Concepts for Maintenance Subcommittee Report teaches that one of the advantages of spread spectrum is the ability to use "FCC Allocated Bands With No License Requirements (900 MHz, 2.4 [GHz], and 5.4 GHz)." (FCM-69,p. 13, Attachment 2). |
| 4.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches that one of the advantages of spread spectrum is the ability to use "FCC Allocated Bands With No License Requirements (900 MHz, 2.4 [GHz], and 5.4 GHz)." (FCM-69, p. 13, Attachment 2). |
| 5.    A system according to claim 1, wherein the airport based wideband spread spectrum transceiver further comprises a wireless router that couples said wideband spread spectrum transceiver to said airport based archival data store. | ARINC 632 teaches all aspects of Gatelink data exchange on the ground side, including the use of standard wireless routers. |
| 6.    A system according to claim 1, wherein said archival data store of said ground data link unit further comprises means for compressing said flight performance data during the flight of the aircraft. | The Ng patent teaches data compression prior to storage. (Ng patent, col. 6, lines 1-3). |

CONFIDENTIAL

| Dependent Claims of the '165 Patent | *Each dependent claim is obvious in light of the reference or combination set forth for the independent claim from which it depends, plus the following reference . . .* |
|---|---|
| 7.     A system according to claim 1, wherein said transceivers comprise half-duplex transceivers. | ARINC 632 and other ARINC Characteristics teach all aspects of Gatelink data exchange on the ground side, including the use of different types of transceivers. |
| [Independent Claim 8] | |
| 9.     A system according to claim 8, wherein said data to be uploaded to an aircraft further comprises video, audio and flight information that has been stored within said airport based archival data store. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle. (Ng patent, col. 5, lines 34-39). ARINC 623 teaches that "data exchange may include updates of onboard databases ... and interactive data or voice communications." (ARINC 623, p. 1). |
| 10.     A system according to claim 8, wherein said video, audio and flight information to be uploaded to said aircraft further comprises digitized in-flight passenger service and entertainment video and audio files. | ARINC 623 teaches that "data exchange may include updates of onboard databases ... and interactive data or voice communications." (ARINC 623, p. 1). |
| 11.     A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 12.     A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a signal within the S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 13.     A system according to claim 8, wherein the wideband spread spectrum communication signal comprises a signal in a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |
| 14.     A system according to claim 8, wherein the airport based wideband spread spectrum transceiver further comprises a wireless router that couples said wideband spread spectrum transceiver to said airport based archival data store. | ARINC 632 teaches all aspects of Gatelink data exchange on the ground side, including the use of standard wireless routers. |

| **Dependent Claims of the '165 Patent** | ***Each dependent claim is obvious in light of the reference or combination set forth for the independent claim from which it depends, plus the following reference . . .*** |
|---|---|
| 15.    A system according to claim 8, wherein said archival data store of said ground data link unit further comprises means for compressing said flight performance data during the flight of the aircraft. | The Ng patent teaches data compression prior to storage. (Ng patent, col. 6, lines 1-3). |
| 16.    A system according to claim 8, wherein said transceivers comprise half-duplex transceivers. | ARINC 632 and other ARINC Characteristics teach all aspects of Gatelink data exchange on the ground side, including the use of different types of transceivers. |
| [Independent Claim 17] | |
| 18.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 19.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 20.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |
| 21.    A method according to claim 17, and further comprising the step of compressing the flight performance data within the archival data store of the ground data link unit during flight of the aircraft. | The Ng patent teaches data compression prior to storage. (Ng patent, col. 6, lines 1-3). |

| **Dependent Claims of the '165 Patent** | ***Each dependent claim is obvious in light of the reference or combination set forth for the independent claim from which it depends, plus the following reference . . .*** |
|---|---|
| 22.   A method according to claim 17, and further comprising the step of routing the flight performance data from an airport based processor and archival data store from a first ground based wideband spread spectrum transceiver via a first wideband spectrum communication signal to a second ground based wideband spread spectrum transceiver functioning as a repeater to relay the flight performance data to the aircraft via a second wideband spread spectrum communication signal. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle. (Ng patent, col. 5, lines 34-39). |
| [Independent Claim 23] | |
| 24.   A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 25.   A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 26.   A method according to claim 23, wherein the wideband spread spectrum communication signal comprises a signal within a range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |
| 27.   A method according to claim 23, and further comprising the step of routing the flight performance data from an airport based processor and archival data store via a first ground based wideband spread spectrum transceiver via a first wideband spread spectrum communication signal to a second ground based wideband spread spectrum transceiver functioning as a repeater to relay the flight performance data to the aircraft via a second wideband spread spectrum communication signal. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle. (Ng patent, col. 5, lines 34-39). |

CONFIDENTIAL

| Dependent Claims of the '165 Patent | *Each dependent claim is obvious in light of the reference or combination set forth for the independent claim from which it depends, plus the following reference . . .* |
|---|---|
| 28.    A method according to claim 23, and further comprising the step of uploading to the aircraft from the airport based spread spectrum transceiver video, audio and flight information that has been stored within the airport based archival data store. | The Ng patent describes the uploading transmission of signals, stored data, and messages from the ground "to the train" or other vehicle. (Ng patent, col. 5, lines 34-39).<br><br>ARINC 623 teaches that "data exchange may include updates of onboard databases ... and interactive data or voice communications." (ARINC 623, p. 1). |
| 29.    A method according to claim 23, wherein the video, audio and flight information to be uploaded further comprises digitized inflight passenger service and entertainment video and audio files. | ARINC 623 teaches that "data exchange may include updates of onboard databases ... and interactive data or voice communications." (ARINC 623, p. 1). |
| [Independent Claim 30] | |
| 31.    A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum communication signal. | The Polivka patent teaches that "[s]pread spectrum processing can take the form of direct PN sequence modulation and/or frequency hopping." (Polivka patent, col. 2, lines 49-55). |
| 32.    A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including the S band. (FCM-69, p. 13). |
| 33.    A system according to claim 30, wherein the wideband spread spectrum communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz. | The AEEC Future Concepts for Maintenance Subcommittee Report teaches the use of unlicensed FCC bands, including 2.4 GHz. (FCM-69, p. 13). |

### 1.    Indefiniteness

261.    I understand that a patent claim may be found invalid for indefiniteness if the claim, as written, is incoherent, uncertain, or insolubly ambiguous.

262.    Independent claim 23 recites the step of "storing data to be uploaded to the airport based aircraft within the airport based archival data store."

**B.   U.S. Patents 6,308,045 B1 and 6,308,045 C1 ("the '045 Certificate")**

264.    I understand the USPTO issued Ex Parte Reexamination Certificate US 6,305,045

C1 on December 30, 2008 (the '045 Certificate).  The '045 Certificate lists the claims, as

amended during the reexamination process.

265.    I understand that Federal Express has filed a counterclaim seeking a declaratory

judgment that the '045 Certificate is invalid and unenforceable.

266.    It is my opinion that the '045 patent is obvious based on any of the following

combinations of the prior art:

    (1)    The Airbus Digital Telemetry Paper in combination with
the FCM-69 Paper;

    (2)    The Airbus Digital Telemetry Paper in combination with
the Douglas Aircraft Paper;

    (3)    The Airbus Digital Telemetry Paper in combination with
the Technology Development Concept Paper;

    (4)    The FCM-69 Paper in combination with the L-1011 Paper;

    (5)    *Weisbart* in combination with the FCM-69 Paper;

    (6)    *Weisbart* in combination with the Technology
Development Concept Paper;

    (7)    *Weisbart* in combination with the Douglas Aircraft Paper;
or

    (8)    ARINC 632 and ARINC 751, in combination with the
FCM-69 Paper.

**1.    The Airbus Digital Telemetry Paper in combination
with the FCM-69 Paper**

267.    In my opinion, one of ordinary skill in the art would understand that the Airbus

Digital Telemetry Paper has every limitation of the '045 patent except that it does not teach use

of a wideband spread spectrum transceiver.  The claim chart below shows specifically where

each element of the independent claims of the '045 patent were previously disclosed in the

E.    **U.S. Patent 6,990,319**

398.    It is my opinion that the '319 patent is obvious based on any of the following

combinations of the prior art:

(1)    The Airbus Digital Telemetry Paper in combination with
the FCM-69 Paper;

(2)    The Airbus Digital Telemetry Paper in combination with
the Douglas Aircraft Paper;

(3)    The Airbus Digital Telemetry Paper in combination with
the Technology Development Concept Paper;

(4)    The FCM-69 Paper in combination with the L-1011 Paper;

(5)    *Weisbart* in combination with the FCM-69 Paper;

(6)    *Weisbart* in combination with the Technology
Development Concept Paper;

(7)    *Weisbart* in combination with the Douglas Aircraft Paper;
or

(8)    ARINC 632 and ARINC 751, in combination with the
FCM-69 Paper.

1.    **The Airbus Digital Telemetry Paper in combination
with the FCM-69 Paper**

399.    In my opinion, one of ordinary skill in the art would understand that the Airbus

Digital Telemetry Paper has every limitation of the '319 patent except that it does not teach use

of a wideband spread spectrum transceiver.  The claim chart below shows specifically where

each element of the independent claims of the '319 patent were previously disclosed in the

prior-art Airbus Digital Telemetry Paper (FX 172,684-692) (*Digital Telemetry System for Real-

Time Analysis of Airbus A320 Flight Test Results*, 18th Annual Symposium of the Society of

Flight Test Engineers, XP008032852, pp. 19-1 through 19-9 (1987)).

400.    In summary, the Airbus Digital Telemetry Paper describes an airborne data

recording and acquisition system with onboard data storage, radio-frequency (RF) transmitters

**F.    U.S. Patent 6,108,523**

499.    It is my opinion that the '523 patent is obvious based on any of the following

combinations of the prior art:

(1)    The Airbus Digital Telemetry Paper in combination with
the FCM-69 Paper;

(2)    The Airbus Digital Telemetry Paper in combination with
the Douglas Aircraft Paper;

(3)    The Airbus Digital Telemetry Paper in combination with
the Technology Development Concept Paper;

(4)    The FCM-69 Paper in combination with the L-1011 Paper;

(5)    *Weisbart* in combination with the FCM-69 Paper;

(6)    *Weisbart* in combination with the Technology
Development Concept Paper;

(7)    *Weisbart* in combination with the Douglas Aircraft Paper;
or

(8)    ARINC 632 and ARINC 751, in combination with the
FCM-69 Paper.

**1.    The Airbus Digital Telemetry Paper in       combination
with the FCM-69 Paper**

500.    In my opinion, one of ordinary skill in the art would understand that the Airbus

Digital Telemetry Paper has every limitation of the '523 patent except that it does not teach use

of a wideband spread spectrum transceiver.  The claim chart below shows specifically where

each element of the independent claims of the '523 patent were previously disclosed in the

prior-art Airbus Digital Telemetry Paper (FX 172,684-692) (*Digital Telemetry System for Real-

Time Analysis of Airbus A320 Flight Test Results*, 18th Annual Symposium of the Society of

Flight Test Engineers, XP008032852, pp. 19-1 through 19-9 (1987)).

501.    In summary, the Airbus Digital Telemetry Paper describes an airborne data

recording and acquisition system with onboard data storage, radio-frequency (RF) transmitters

### K.   U.S. Patent 7,428,412

889.   It is my opinion that the '412 patent is obvious based on any of the following combinations of the prior art:

(1)   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper;

(2)   The Airbus Digital Telemetry Paper in combination with the Douglas Aircraft Paper;

(3)   The Airbus Digital Telemetry Paper in combination with the Technology Development Concept Paper;

(4)   The FCM-69 Paper in combination with the L-1011 Paper;

(5)   *Weisbart* in combination with the FCM-69 Paper;

(6)   *Weisbart* in combination with the Technology Development Concept Paper;

(7)   *Weisbart* in combination with the Douglas Aircraft Paper; or

(8)   ARINC 632 and ARINC 751, in combination with the FCM-69 Paper.

### 1.   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper

890.   In my opinion, one of ordinary skill in the art at the time of invention would understand that the Airbus Digital Telemetry Paper has every limitation of the '412 patent except that it does not teach use of a wideband spread spectrum transceiver.  The following claim chart shows specifically where each element of the independent claims of the '412 patent were previously disclosed in the prior-art Airbus Digital Telemetry Paper (FX 172,684-692):

L.   **U.S. Patent 7,426,387**

982.   It is my opinion that the '387 patent is obvious based on any of the following combinations of the prior art:

(1)   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper;

(2)   The Airbus Digital Telemetry Paper in combination with the Douglas Aircraft Paper;

(3)   The Airbus Digital Telemetry Paper in combination with the Technology Development Concept Paper;

(4)   The FCM-69 Paper in combination with the L-1011 Paper;

(5)   *Weisbart* in combination with the FCM-69 Paper;

(6)   *Weisbart* in combination with the Technology Development Concept Paper;

(7)   *Weisbart* in combination with the Douglas Aircraft Paper; or

(8)   ARINC 632 and ARINC 751, in combination with the FCM-69 Paper.

1.   **The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper**

983.   In my opinion, one of ordinary skill in the art at the time of invention would understand that the Airbus Digital Telemetry Paper has every limitation of the '387 patent except that it does not teach use of a wideband spread spectrum transceiver. The following claim chart shows specifically where each element of the independent claims of the '387 patent were previously disclosed in the prior-art Airbus Digital Telemetry Paper (FX 172,684-692):

| Independent Claims 1, 6, and 11 of the '387 Patent | *The Airbus Digital Telemetry Paper* |
|---|---|
| 1.   A system for providing a retrievable record of the flight performance of an aircraft comprising: | |

### M.   U.S. Patent 7,444,146

1075.   It is my opinion that the '146 patent is obvious based on any of the following combinations of the prior art:

(1)   The Airbus Digital Telemetry Paper in combination with the FCM-69 Paper;

(2)   The Airbus Digital Telemetry Paper in combination with the Douglas Aircraft Paper;

(3)   The Airbus Digital Telemetry Paper in combination with the Technology Development Concept Paper;

(4)   The FCM-69 Paper in combination with the L-1011 Paper;

(5)   *Weisbart* in combination with the FCM-69 Paper;

(6)   *Weisbart* in combination with the Technology Development Concept Paper;

(7)   *Weisbart* in combination with the Douglas Aircraft Paper; or

(8)   ARINC 632 and ARINC 751, in combination with the FCM-69 Paper.

### 1.   The Airbus Digital Telemetry Paper in   combination with the FCM-69 Paper

1076.   In my opinion, one of ordinary skill in the art at the time of invention would understand that the Airbus Digital Telemetry Paper has every limitation of the '146 patent except that it does not teach use of a wideband spread spectrum transceiver.  The following claim chart shows specifically where each element of the independent claims of the '146 patent were previously disclosed in the prior-art Airbus Digital Telemetry Paper (FX 172,684-692):

| Independent Claims 1, 8, and 15 of the '146 Patent | *The Airbus Digital Telemetry Paper* |
|---|---|
| **1.      A method of providing data from an aircraft comprising:** | The Airbus telemetry system provides a retrievable record of flight performance, as described below. |

**Exhibit 27**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| HARRIS CORPORATION | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| FEDERAL EXPRESS CORPORATION | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | | Civil File No. 6:07-CV-1819-28KRS |
| FEDERAL EXPRESS CORPORATION | § | |
| | § | |
| Counterclaim-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS CORPORATION | § | |
| | § | |
| Counterclaim-Defendant. | § | |

**EXPERT REPORT BY FRANK R. KOPERDA REGARDING VALIDITY**

## CONTENTS

1. SUMMARY OF CONCLUSIONS.................................................................14

2. INSTRUCTIONS...............................................................................14

3. BRIEF CURRICULUM VITAE ................................................................14

4. PRIOR TESTIMONY...........................................................................15

5. OPINION .......................................................................................15

Bases for Opinions ........................................................................16
Legal Standards..........................................................................16
Information Relied On ..................................................................17
The EPO Decisions with Regard to the Harris Patents.......................17
Methodology ..............................................................................18
Ordinary Skill in the Art ...............................................................18
Claim Construction .....................................................................18
Introduction to the Prior Art ..........................................................21
Prior Art - A systems analysis and project management plan for the Petite Amateur Navy Satellite (PANSAT) – Markham K. Rich, September 1994 ..........28
Prior Art 4,831,539 - Apparatus and method for locating a vehicle in a working area and for the on-board measuring of parameters indicative of vehicle performance) – LeRoy Hagenbuch ..................................................29
Prior Art 4,531,527 - Ambulatory monitoring system with real time analysis and telephone transmission ...............................................................30
Prior Art 5,666,648 - Polar relay system for satellite communication.................31
Industry Overview .......................................................................34
Patent No. 6,047,165.........................................................................38
Claim 1 – Obviousness .................................................................38
Patent No. 6,308,045.........................................................................54
Claim 4 – Obviousness .................................................................54
Patent No. 6,775,545.........................................................................70
Claim 1 - Lack of Novelty ..............................................................70
Patent No. 6,990,319.........................................................................72
Claim 1 – Obviousness .................................................................72
Patent No. 6,104,914.........................................................................87
Lack of Enablement – Adaptive Power Control ..................................87
Claim 1 – Obviousness .................................................................89
Patent No. 6,154,637.........................................................................105
Claim 31 - Obviousness ...............................................................105
Patent No. 6,108,523.........................................................................114
Claim 1 – Obviousness .................................................................114
Patent No. 7,428,412.........................................................................129
Claim 1 – Obviousness .................................................................129

Patent No. 7,426,387..........................................................................145
   Claim 1 – Obviousness ...............................................................145
Patent No. 7,444,146..........................................................................161
   Claim 1 – Obviousness ...............................................................161
Patent No. 6,154,636..........................................................................177
   Claim 1 - Obviousness ...............................................................177
Patent No. 6,308,044..........................................................................186
   Claim 1 – Obviousness ...............................................................186
Patent No. 6,173,159..........................................................................194
   Claim 23 – Obviousness .............................................................194
Secondary Considerations of Non-Obviousness Raised By Mr. McAlexander .......207

6.     EXPERT'S DECLARATION ...............................................................209

7.     STATEMENT OF TRUTH ...................................................................209

APPENDIX A.   DETAILED CURRICULUM VITAE ...................................................1

APPENDIX B.   DOCUMENTS CONSIDERED .........................................................1
   Pleadings ...............................................................................................1
   Interrogatories .......................................................................................1
   Expert Reports ......................................................................................1
   Depositions............................................................................................2
   Patents ..................................................................................................2
      Plaintiff Patents...............................................................................2
      Patent File Histories........................................................................2
      Other Patents ..................................................................................3
   Other Documents ..................................................................................3

APPENDIX C.   CLAIM CHARTS FOR PATENT 6,047,165 .......................................1
   Patent 6,047,165 compared to the Prior Art in the Specification ..................1
      Claim 1 ...........................................................................................1
      Claim 8 ...........................................................................................3
      Claim 17 .........................................................................................5
      Claim 23 .........................................................................................7
      Claim 30 .........................................................................................8
   Patent 6,047,165 compared to DOUGLAS AIRCRAFT PAPER (1993)....................11
      Claim 1 .........................................................................................11
      Claim 8 .........................................................................................12
      Claim 17 .......................................................................................14
      Claim 23 .......................................................................................15
      Claim 30 .......................................................................................16
   Patent 6,047,165 compared to the ARINC AEEC FCM 69 Publication ...................19
      Claim 1 .........................................................................................19
      Claim 8 .........................................................................................21
      Claim 17 .......................................................................................22
      Claim 23 .......................................................................................24
      Claim 30 .......................................................................................25
   Patent 6,047,165 compared to Technology Development Concept Paper ..............28

proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every element of the independent claims of the '165 patent.  As explained in separate claim charts in Appendix C, except for spread spectrum, every element of the independent claims of the '165 patent was disclosed by the text or cited references in the '165 specification itself.

The dependent claims of the '165 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 6,308,045
U.S. Patent No. 6,308,045 will be referred to as the '045 patent

### Claim 4 – Obviousness

This claim is a system having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further processing. Specifically, the data stored on the plane must be sent wirelessly with a wideband transceiver. The claim includes four elements which are discussed individually below.

It is my opinion that the FCM-69 Paper[59] in combination with the L-1011 Paper[60] discloses each and every claim limitation of the independent claims of the '045 patent.

The preamble of claim 4 reads as follows:

> 4.  A system for providing a retrievable record of the flight performance of an aircraft comprising:

---

[59]  AEEC FCM-69:  Future Concepts for Maintenance Subcommittee / AMC Task Group – Avionics Pub. 94-205/FCM-69: Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting Held August 24-25, 1994 in Bloomington (dated September 1, 1994) (FX 2,374 *et seq.*).

[60]  "L-1011:  Flight Data Recording Systems:  Background, Features, Implications and Benefits" (FX 2,325 *et seq.*)

time and expense of obtaining a license can be avoided.  Therefore, one of skill in the art in wanting to provide a low cost system to solve the problems in the prior art with systems such as Gatelink, it would be preferable to look to an unlicensed ISM band.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '045 patent are obvious in view of the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals.  I come to this conclusion because in my opinion, the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

The attached claim charts in Appendix D show that one of ordinary skill in the art would find each and every element of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals.  The same reasons to combine the references for claim 4 apply equally to the other independent claims.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '045 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every element of the independent claims of the '045 patent.  As explained in separate claim charts in Appendix D, except for spread spectrum, every element of the independent claims of the '045 patent was disclosed by the text or cited references in the '045 specification itself.

The dependent claims of the '045 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

document contains each and every element of the other independent claims of the '545 patents. Accordingly, it is also my opinion that those claims are invalid.

The dependent claims of the '545 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 6,990,319
U.S. Patent No. 6,990,319 will be referred to as the '319 patent

### Claim 1 – Obviousness

This claim includes a series of steps having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further processing. Specifically, the data stored on the plane must be sent wirelessly with a wideband transceiver. The claim includes five steps which are discussed individually below.

It is my opinion that the FCM-69 Paper[64] in combination with the L-1011 Paper[65] discloses each and every claim limitation of the independent claims of the '319 patent.

The preamble of claim 1 reads as follows:

> 1. A method of providing data from an aircraft comprising:

The FCM-69 Paper describes the use of "Spread Spectrum RF" – instead of infrared Gatelink – for providing data from an aircraft. See Appendix G for greater detail in the chart for each independent claim.

---

[64] AEEC FCM-69: Future Concepts for Maintenance Subcommittee / AMC Task Group – Avionics Pub. 94-205/FCM-69: Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting Held August 24-25, 1994 in Bloomington (dated September 1, 1994) (FX 2,374 *et seq.*).

[65] "L-1011: Flight Data Recording Systems: Background, Features, Implications and Benefits" (FX 2,325 *et seq.*)

spectrum proposals contains each and every step of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '319 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every step of the independent claims of the '319 patent. As explained in separate claim charts in Appendix G, except for spread spectrum, every step of the independent claims of the '319 patent was disclosed by the text or cited references in the '319 specification itself.

The attached claim charts in Appendix G show that one of ordinary skill in the art would find each and every step of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals.  The same reasons to combine the references for claim 1 apply equally to the other independent claims.

The dependent claims of the '319 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.


**PATENT NO. 6,104,914**
U.S. Patent No. 6,104,914 will be referred to as the '914 patent.


***Lack of Enablement – Adaptive Power Control***

The independent claim 1 of the '914 patent does not appear to be supported in the specification. It is my opinion that one of skill in the art at the time of the invention would not have been able to create an adaptive power control that varies the emitted power level of the transmitted signal based upon the geographic location of the airport, as recited in element 3 of claim 1, without

considerable experimentation, based on the limited explanation provided in the '914 patent. The basis for my opinion is outlined below.

I find no teachings in the patent specification that discuss the control of the emitted power of the transmit signal based upon the geographic location.

Should element 3 of claim 1 be interpreted to be related to the following statement –

> *"Pursuant to the present invention, the DSSS transceivers employed in each of the GDL unit 111 onboard the aircraft and in the airport's ground subsystem wireless router 201 are frequency agile, so that they can be tuned to any of a plurality of frequency channels approved for unlicensed operation in a given country."* *('914: Col 14 line 63 – Col 15 line 2)*

– then my response would be that frequency and transmitter power are very much separate issues. I also find that there is indication how such a frequency-agile system would understand what needs to be done, how the system would know which country it resides, and which parameters are altered for which country. Because of these complexities, the frequency agile aspect of adapting for a country is not taught.

I also would address the point that issue of the location of the airport requires some device that understands a geographic location and none of the devices disclosed have been identified as knowing the location of the airport. Further, no mechanism has been described that conveys that information to an adaptive power control unit that varies an emitted power level of the communications signal.

Still further, no mechanism has been described that associates the geographic location with a country. As is known, country names and their boundaries change and no identifiable block in the patent or a description of it functions is present in the '914 patent. As one skilled in the art, I do not find the invention as defined in the claim 1 taught or obvious and therefore not enabled.

Should it be construed that the location of the airport can be inferred from a message from the IEEE 802.11 access point, I would note that such a parameter is just a configurable number that

is unrelated to the actual location of the airport. For example, the IEEE 802.11 access point may indicate in its parameter the frequency parameter to be used is for the United States. Even if this parameter is honestly configured, the actual location of the airport may be another country that uses the same frequency plan as the United States. Stated another way, there is no actual correlation of the IEEE 802.11 configurable parameter and the location of the airport. My opinion remains that this element of the invention is not enabled.

Should it be construed that there is information obtained from the IEEE 802.11 ground transceiver, then I believe that concept of providing a location was at least anticipated in the document *IEEE PIEEE 802.11-94/ r6* (Nov 9, 1994) which described a Beacon Message containing a Country Location Parameter (page 74). It also has frequency ranges and hopping set parameters. Additionally, there are power control primitives disclosed (page 69) which sets the transmit power level.

I have reviewed the prosecution history of the '914 patent for additional information related to the adaptive power control that varies the emitted power level of the transmitted signal based upon the geographic location of the airport and did not find information that would assist in understanding how to implement this aspect of the invention.

For at least all of the above reasons, I find that the '914 patent specification fails to teach one of skill in the art how to create an adaptive power control that varies the emitted power level of the transmitted signal based upon the geographic location of the airport without undue experimentation.

### Claim 1 – Obviousness

This claim includes a series of steps having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further processing. Specifically, the data stored on the plane must be sent wirelessly with a wideband transceiver. The claim includes three elements which are discussed individually below.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '914 patent are obvious in view of the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals. I come to this conclusion because in my opinion, the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '914 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every element of the independent claims of the '914 patent. As explained in separate claim charts in Appendix E, except for spread spectrum, every element of the independent claims of the '914 patent was disclosed by the text or cited references in the '914 specification itself.

The dependent claims of the '914 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 6,154,637
U.S. Patent No. 6,154,637 will be referred to as the '637 patent

### Claim 31 - Obviousness

This claim includes a series of steps for providing a retrievable record of the flight performance of an airplane, including the steps of collecting and storing the data and then transmitting the data over a selected sub-band frequency channel. The steps are discussed separately below.

would have reason to combine the teachings of the Gatelink Documents with the known advantages of the McRae patent (the probe beacon and frequency management scheme) to develop a method for capturing and downloading flight performance, as recited in claim 31.

The attached claim charts in Appendix F show that one of ordinary skill in the art would find each and every step of the other independent claims in the combination of the Gatelink Documents and the McRae patent. The same reasons to combine the references for claim 31 apply equally to the other independent claims.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '637 patent are obvious in view of the combination of the Gatelink Documents and the McRae patent. I come to this conclusion because in my opinion, the combination of Gatelink and McRae contains each and every step of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '637 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every step of the independent claims of the '637 patent. As explained in separate claim charts in Appendix F, except for spread spectrum, every step of the independent claims of the '637 patent was disclosed by the text or cited references in the '637 specification itself.

The dependent claims of the '637 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

The attached claim charts in Appendix K show that one of ordinary skill in the art would find each and every element of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals. The same reasons to combine the references for claim 1 apply equally to the other independent claims.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '523 patent are obvious in view of the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals. I come to this conclusion because in my opinion, the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '523 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every element of the independent claims of the '523 patent. As explained in separate claim charts in Appendix K, except for spread spectrum, every element of the independent claims of the '523 patent was disclosed by the text or cited references in the '523 specification itself.

The dependent claims of the '523 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 7,428,412
U.S. Patent No. 7,428,412 will be referred to as the '412 patent.

### Claim 1 – Obviousness
This claim includes a series of steps having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further

proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every step of the independent claims of the '412 patent. As explained in separate claim charts in Appendix H, except for spread spectrum, every step of the independent claims of the '412 patent was disclosed by the text or cited references in the '412 specification itself.

The attached claim charts in Appendix H show that one of ordinary skill in the art would find each and every step of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals.  The same reasons to combine the references for claim 1 apply equally to the other independent claims.

The dependent claims of the '412 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.


## PATENT NO. 7,426,387
U.S. Patent No. 7,426,387 will be referred to as the '387 patent

### Claim 1 – Obviousness
This claim includes a series of elements having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further processing.  Specifically, the data stored on the plane must be sent wirelessly with a wideband transceiver. The claim includes four elements which are discussed individually below.

It is my opinion that the FCM-69 Paper[80] in combination with the L-1011 Paper[81] discloses each and every claim limitation of the independent claims of the '387 patent.

---

[80]  AEEC FCM-69:  Future Concepts for Maintenance Subcommittee / AMC Task Group – Avionics Pub. 94-205/FCM-69: Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting Held August 24-25, 1994 in Bloomington (dated September 1, 1994) (FX 2,374 *et seq.*).

spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

The attached claim charts in Appendix I show that one of ordinary skill in the art would find each and every element of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals. The same reasons to combine the references for claim 1 apply equally to the other independent claims.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '387 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every element of the independent claims of the '387 patent. As explained in separate claim charts in Appendix I, except for spread spectrum, every element of the independent claims of the '387 patent was disclosed by the text or cited references in the '387 specification itself.

The dependent claims of the '387 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 7,444,146
U.S. Patent No. 7,444,146 will be referred to as the '146 patent

### Claim 1 – Obviousness
This claim includes a series of steps having a retrievable record of the flight performance of a plane that is forwarded to a ground system and having that information later retrieved for further processing. Specifically, the data stored on the plane must be sent wirelessly with a wideband transceiver. The claim includes five steps which are discussed individually below.

communications system.  For example, obtaining a license can be an extremely expensive and time-consuming process.  When using an ISM (industrial, scientific, and medical) band, both the time and expense of obtaining a license can be avoided.  Therefore, one of skill in the art in wanting to provide a low cost system to solve the problems in the prior art with systems such as Gatelink, it would be preferable to look to an unlicensed ISM band.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '146 patent are obvious in view of the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals.  I come to this conclusion because in my opinion, the combination of the Weisbart Patent and any of the three (3) spread spectrum proposals contains each and every step of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

It is also my opinion that the technology admitted to be prior art in the Background and Specification of the '146 patent, in combination with any of the three (3) spread spectrum proposals – the FCM-69 Paper, the Douglas Aircraft Paper, or the Technology Development Concept Paper – discloses each and every step of the independent claims of the '146 patent. As explained in separate claim charts in Appendix J, except for spread spectrum, every step of the independent claims of the '146 patent was disclosed by the text or cited references in the '146 specification itself.

The attached claim charts in Appendix J show that one of ordinary skill in the art would find each and every step of the other independent claims in the combination of the Weisbart Patent in combination with any of the three (3) spread spectrum proposals.  The same reasons to combine the references for claim 1 apply equally to the other independent claims.

The dependent claims of the '146 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

The attached claim charts in Appendix L show that one of ordinary skill in the art would find each and every element of the other independent claims in the combination of the '636 Background in combination with any of the three (3) spread spectrum proposals.  The same reasons to combine the references for claim 1 apply equally to the other independent claims.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '636 patent are obvious in view of the combination of the '636 Background and any of the three (3) spread spectrum proposals.  I come to this conclusion because in my opinion, the combination of the '636 Background and any of the three (3) spread spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

The dependent claims of the '636 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

## PATENT NO. 6,308,044
U.S. Patent No. 6,308,044 will be referred to as the '044 patent.  The application for the '044 patent was filed as a continuation of the '636 patent (above), which means the Specification is the same for both patents.

### Claim 1 – Obviousness

It is my opinion that the prior art disclosed and discussed in the Background of the '044 patent, in combination with the FCM-69 Paper,[91] the Douglas Aircraft Paper (AVIO 9,464-469), or the

---

[91] AEEC FCM-69:  Future Concepts for Maintenance Subcommittee / AMC Task Group – Avionics Pub. 94-205/FCM-69: Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting Held August 24-25, 1994 in Bloomington (dated September 1, 1994) (FX 2,374 *et seq.*).

the teachings in response to an explicit and specific proposal to use spread spectrum (instead of infrared Gatelink) to develop a system for collecting and storing a retrievable record of flight performance data during flight, or update onboard nav files, as recited in claim 1.

As the three spread spectrum proposals show, those of skill in the art knew to replace the existing infrared Gatelink system with known limitations with a new technology that those of skill in the art recognized as an emerging technology that was at the forefront of a wireless technology explosion.[93] This substitution of infrared with Gatelink was part of a general trend in the early 1990's in a variety of industries that were turning to the new wireless technology embodied in the IEEE 802.11 standard.

The attached claim charts in Appendix N show that one of ordinary skill in the art would find each and every element of the other independent claims in the combination of the '044 Background in combination with any of the three (3) spread spectrum proposals. The same reasons to combine the references for claim 1 apply equally to the other independent claims.

Based on the foregoing and my understanding of obviousness from Counsel, it is my opinion that the independent claims of the '044 patent are obvious in view of the combination of the '044 Background and any of the three (3) spread spectrum proposals. I come to this conclusion because in my opinion, the combination of the '044 Background and any of the three (3) spread spectrum proposals contains each and every element of the claimed invention and one of skill in the art would have reason to combine the references to arrive at the claimed invention.

The dependent claims of the '044 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.

---

[93] Bates #Harris 35147

The dependent claims of the '159 patent in my opinion are all obvious variations of the independent claims, whose elements are either found in the cited prior art or are within the knowledge of one of ordinary skill in the art.


## Secondary Considerations of Non-Obviousness Raised By Mr. McAlexander

Counsel has informed me that secondary considerations of non-obviousness should be considered in every case in which they are raised.  Counsel has informed me that secondary considerations tending to show obviousness may include:

- Commercial success of the invention;
- A long-felt, but unsolved, need for the solution provided by the claimed invention;
- Unsuccessful attempts by others to find the solution provided by the claimed invention;
- Copying of the claimed invention by others;
- Unexpected and superior results from the claimed invention;
- Acceptance by others of the claimed invention as shown by praise from others in the field of the invention or from the licensing of the claimed invention;
- Disclosures in the prior art that criticized, discredit, or otherwise discourage the claimed invention and would therefore tend to show that the invention was not obvious
- Other evidence tending to show no obviousness.

I also understand that the following factors tend to show obviousness:

- Independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it; and
- Other evidence tending to show obviousness.

Counsel has also informed me that although secondary considerations of no obviousness must be taken into account, if presented, those secondary considerations may be inadequate to overcome a strong case of obviousness.

# PATENT 6,047,165 COMPARED TO THE L-1011 PAPER (1978)

The '165 Patent compared to the L-1011 Paper (1978)

*Claim 1*

| Element | L-1011 Paper (1978) |
|---|---|
| 1.     A system for providing a retrievable record of the flight performance of an aircraft comprising: | |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The L-1011 Paper (1978) (FX 2,325) describes the use of an onboard unit that obtains flight performance data representative of aircraft performance during flight. "Experimentation with in-flight recording at some airlines in the United States and in Europe during the early 1960's indicated that recording equipment could be obtained for … (2) continuous digital data recording of the minimum basic parameters with capabilities for continuous recording of other parameters with very little increased complexity of the recording equipment." [L-1011 Paper at page 2]. |
| a)  an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and | The L-1011 Paper describes an archival data store operative to accumulate and store flight performance data during flight.  As quoted above, "… recording equipment could be obtained for … (2) continuous digital data recording of the minimum basic parameters with capabilities for continuous recording of other parameters with very little increased complexity of the recording equipment." (L-1011 Paper at page 2]. The L-1011 Paper also describes several types of archival data stores, including at page 3 a "Continuous Loop Recorder (CLR) that records data from all monitored systems …, a long term recorder called the Incremental Recorder (IR) that permanently records data … and a Digital Flight Data Recorder (DFDR) which retains the most recent 25-hour period of operations."  The CLR "records continuously." The L-1011 Paper at page 5 describes a Quick Access Recorder "that holds 50 hours of data from a FDAU." |

| Element | L-1011 Paper (1978) |
|---|---|
| b) a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal; | |
| an airport based wideband spread spectrum transceiver comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; | |
| an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data; and | The L-1011 Paper describes an archival data store at page 7. "Implicit with the recording of flight data is the need to read the data and make use of it. ... All L-1011 operators have purchased playback equipment .... The playback station is typically a mini-computer, fully supported with general purpose scientific operating software .... The programs are large, the data master files are large .... Thus these stations employ bulk data storage on disc memory drives." |
| an airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing. | The L-1011 Paper describes a processor at page 6, specifically for "... 1) performance, 2) trend analysis, 3) diagnostic analysis." |

*Claim 8*

| Element | L-1011 Paper (1978) |
|---|---|
| 8. A system for exchanging information to and from an aircraft comprising: | |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The L-1011 Paper (1978) (FX 2,325) describes the use of an onboard unit that obtains flight performance data representative of aircraft performance during flight. "Experimentation with in-flight recording at some airlines in the United States and in Europe during the early 1960's indicated that recording equipment could be obtained for ... (2) continuous digital data recording of the minimum basic parameters with |

**Exhibit 28**

**MCDONNELL DOUGLAS**

93FAA-C1-E00-5855
Oct. 11, 1993

To:         Federal Aviation Administration
            Northwest Mountain Region
            Los Angeles Aircraft Certification Office
            3229 East Spring Street
            Long Beach, California  90806-2425

Attention:  Manager, ANM-100L

Subject:    MD-11 Onboard Maintenance System (OMS) / Electronic Library System
            (ELS) Spread Spectrum Radio Frequency (RF) Link

Project No: TD3012LB-T

Reference:  Communications - Certification Item #FO-FC167


This letter transmits the following enclosures:
      (X) Record Summary.......for your ( ) review and approval or (X) information
      ( ) compliance record(s) for your ( ) review and approval or ( ) information
      (X) applicant's record(s)
and   ( ) attached FAA Form(s) 8110-3

The DER has verified, in accordance with established procedures, that the:
      ( ) Record Summary
      ( ) compliance record(s)
listed on the FAA form are in compliance with the applicable sections of the
regulations indentified on the 8110-3.

The DER ( ) recommends your approval of the data listed on the 8110-3.
      ( ) approves the data listed on the 8110-3.
FAA    ( ) review and approval is requested.

Those portions of the enclosed data that are considered to be proprietary information
by MDC are identified on the enclosures.

It is requested that upon completion of the FAA review, the enclosures be returned to
MDC for retention in the repository at the Douglas Aircraft facility in Long Beach,
California.

Sincerely,

R. B. Harris
General Manager
Airworthiness

EXHIBIT
10-23-09
71
Hibson

SJ/EWP:llc
Enclosures A, B

Attorneys Eyes Only

Harris v. FedEx
TBC 000107

93-5855 10/11/93
ENCLOSURE A

## *DOUGLAS AIRCRAFT COMPANY*

### RECORD SUMMARY

**Subject:**   Onboard Maintenance System (OMS)/Electronic Library System (ELS)
Spread Spectrum Radio Frequency (RF) Link

**Reference:**   None

Enclosure B:

Is in response to a request by Herb Peters of the FAA Long Beach
ACO. The following is provided as a summary of that request:

* A joint presentation by McDonnell Douglas Aerospace Corporation
  and Physical Research Incorporated (PRi) was made on September
  20, 1993.

* This enclosure is the submittal of a paper addressing possible
  implementation of spread spectrum technology with applications
  toward OMS/ELS.

* The intent of this enclosure is to seek FAA support and guidance.

* Please direct all question or need for additional information
  to:

  1. Dariush Modarress, Ph.D.
     Vice President, PRi
     (310) 378-0056

     -OR-

  2. E. W. Piper
     Douglas Aircraft Co.
     (310) 593-1029

The proprietary information of McDonnell Douglas Corporation (MDC) and MDC's
subcontractors, suppliers, or customers are included in the information disclosed herein. Pages marked
"These data subject to the restrictive legend on the title page" contain proprietary data and may also
contain non-proprietary data. Following notification from the FAA of a Freedom of Information Act (FOIA)
request, MDC will bracket the proprietary data whenever less than the entire page is proprietary.

DAC 25-2165 (REV 4-92)          *MCDONNELL DOUGLAS CORPORATION*

Attorneys Eyes Only

Harris v. FedEx
TBC 000108

ENCLOSURE B

# APPLICANTS RECORD

September 29, 1993

Subject:      Application of Spread Spectrum wireless communication to OMS/ELS.

## I.    PURPOSE

The purpose of this document is to summarize information regarding an emerging wireless communication technology, and its potential application related to Onboard Maintenance System (OMS) and Electronic Library System (ELS). Further more, the intent of this paper is to seek input from the FAA concerning their current certification guidelines, thier support for this application.

## II.   BACKGROUND

In today's operational use of aircraft, there are many means to distribute and update the information required to operate and maintain aircraft. In particular, we are focusing on bi-directional information transfer from the ground to the aircraft, aircraft to personnel, ground to personnel, and personnel to personnel. Some of current processes and their shortcomings are briefly mentioned here:

MANUAL PROCESS:  These include paper based transmission of data to the aircraft resulting in slow, expensive, and time/labor intensive process.

TETHERED COMMUNICATIONS:  These include airborne and portable data loaders, portable terminals, as well as quick connect intercom systems. These have positive savings and safety features associated with them, but do not solve the entire information/communication problems that exists today.

WIRELESS COMMUNICATIONS:  These include ACARS, hand held radios, and SATCOM. These methods were not designed for economically updating information intensive systems like OMS or ELS.

GATELINK:  Gatelink is a high speed (100 Mb/sec) fiber optic or infrared system to communicate with appropriately equipped parked aircraft. This system requires either a manual hook up (of optical fiber) to the aircraft or line-of-sight infrared (IR) communication links between IR transceivers located at the gate and at the aircraft. Either system requires that the aircraft be parked only at the designated sites within an airport and does not provide communication capability to the ground personnel.

OMS/ELS REQUIREMENTS

The OMS and ELS provide centralized maintenace capability, manage information on the aircraft, and serve as common source of automated documentation, procedures and information. It is required communications links between the aircraft, the base station (ground-based network), and remote

MCDONNELL DOUGLAS CORPORATION PROPRIETARY RIGHTS ARE INCLUDED IN THE INFORMATION DISCLOSED HEREIN. RECIPIENT BY ACCEPTING THIS DOCUMENT AGREES THAT NEITHER THIS DOCUMENT NOR THE INFORMATION DISCLOSED HEREIN NOR ANY PART THEREOF SHALL BE REPRODUCED OR TRANSFERRED TO OTHER DOCUMENTS OR USED OR DISCLOSED TO OTHERS FOR MANUFAC-TURING OR ANY OTHER PURPOSE EXCEPT AS SPECIFICALLY AUTHORIZED IN WRITING BY MCDONNELL DOUGLAS CORPORATION.

Attorneys Eyes Only

Harris v. FedEx
TBC 000109

manitenance and support personnel within and around the aircraft. Numbers and the types of communication channels required are as follows:

Up to five high speed (1 Mb/sec) channels between the aircraft and the ground-based network for large daata file transfer.

Depending on the application a number (TBD) of 9.6 Kb/sec channels between the aircraft, the remote locations, and the base-station for small data file transfers.

A number (TBD) of voice channels between the aircraft, the remote locations, and the base-station.

## III.   CODE DIVISION MULTIPLE ACCESS SPREAD SPECTRUM (CDMA/SS) WIRELESS COMMUNICATION OF VOICE, ASCII DATA, AND IMAGES

### A) TECHNOLOGY ABSTRACT

RF wireless communication is ordinarily achieved by transmitting the signal over a narrow band radio frequency. This usually requires high transmission power, provides little immunity to external RF sources, and is not appropriate for high quality data transmission.

Spread spectrum is a digital coding technique originally developed for the military. The coding operation increases the actual number of bits transmitted and expands the transmitted bandwidth. This technique provides resistance to jamming, interference, multipath and interception, to other users. One of the main implementations of spread spectrum is a code division multiple access direct sequence.

In a direct sequence system, the digital information signal is multiplied by a rapidly switched sequence of carrier phase variations (chip sequence). In additions, the direct sequence signal bandwidth is significantly expanded beyond the original information bandwidth. At the receiver, the information signal is recovered by re multiplying with a locally generated replica of the transmitted pseudo-random chip sequence. However, interfering signals are subjected to only the one multiplication process in the receiver. The interference is thus increased (or spread) to at least the bandwidth of the chip wave form and is then removed by filtering. This results in high signal-to-noise and high noise rejection capability. Error correction capabilities provide robustness and high quality of transmission.

By providing different pseudo-random codes (that are mutually orthogonal to each other) to different users, the same transmission bandwidth may be used by a number of different users at the same time. The maximum capacity of the CDMA/SS system is a function of the transmission frequency and bandwidth, the

MCDONNELL DOUGLAS CORPORATION PROPRIETARY RIGHTS ARE INCLUDED IN THE INFORMATION DISCLOSED HEREIN. RECIPIENT BY ACCEPTING THIS DOCUMENT AGREES THAT NEITHER THIS DOCUMENT NOR THE INFORMATION DISCLOSED HEREIN NOR ANY PART THEREOF SHALL BE REPRODUCED OR TRANSFERRED TO OTHER DOCUMENTS OR USED OR DISCLOSED TO OTHERS FOR MANUFAC- TURING OR ANY OTHER PURPOSE EXCEPT AS SPECIFICALLY AUTHORIZED IN WRITING BY MCDONNELL DOUGLAS CORPORATION. UNPUBLISHED - ALL RIGHTS RESERVED UNDER THE COPYRIGHT LAWS

Attorneys Eyes Only

data rate, transmission power, transmission quality (in terms of minimum accepted bit error rates), and other parameters.

Recently FCC allocated frequency bands in the 900 MHz, 2.4 and 5.7 GHz range for the spread spectrum application. Operating under Part 15.247 of the FCC rules, a spread spectrum communication system certified by the FCC to meet the appropriate requirements requires no user license. DACs current frequency target is the 5.7 GHz range.

## B) BENEFITS

Major benefits of the CDMA/SS over existing wireless communication techniques include:

- Significantly higher speed: The CDMA/SS wireless communication system using present-day technology can transmit high quality digital data at high bit rates. Future development may potentially increase the data rate up to 100 Mb/sec.

- No user license: Transmission at the designated frequencies does not require user resulting in low message costs.

- Low equipment cost: Equipment cost should be sufficiently low so as to permit installation in aircraft models that will never have a GATE LINK or SATCOM.

- Multi-media transmission: The CDMA/SS system is capable of simultaneous transmission of voice, data, and high speed data.

- High multi-user capacity: Preliminary investigations have shown that a CDMA/SS system can simultaneously support up to 25 channels for high speed data transmission along with several hundred audio and data channels. High capacity ensures that saturation should not occur even with several systems operation on an airport simultaneously.

- Security: Each user has a unique digital code providing high level of protection against interception.

- Reliability: Use of error correction and other techniques ensures high quality of the transmitted data.

## C) SAFETY ISSUES ASSOCIATED WITH CERTIFICATION

Overall safety and integrity of the data transmitted from a source computer to a receiving computer is presently ensured through an end-to-end character redundancy check (CRC). The wireless link will use error correction and other techniques to

MCDONNELL DOUGLAS CORPORATION PROPRIETARY RIGHTS ARE INCLUDED IN THE INFORMATION DISCLOSED HEREIN. RECIPIENT BY ACCEPTING THIS DOCUMENT AGREES THAT NEITHER THIS DOCUMENT NOR THE INFORMATION DISCLOSED HEREIN NOR ANY PART THEREOF SHALL BE REPRODUCED OR TRANSFERRED TO OTHER DOCUMENTS OR USED OR DISCLOSED TO OTHERS FOR MANUFACTURING OR FOR ANY OTHER PURPOSE EXCEPT AS SPECIFICALLY AUTHORIZED IN WRITING BY MCDONNELL DOUGLAS CORPORATION. COMPUTERSHOD ALL RIGHTS RESERVED UNDER THE COPYRIGHT LAWS.

Attorneys Eyes Only

ensure the integrity of the data transmitted through the wireless link. Bit error rates (BER) of $10^4$ or higher will be achieved. Data is available that shows the comparison of the data rate and quality of the data for a spread spectrum system as compared with other existing or proposed links.

The failure rate of the wireless link is calculated as follows:

Assumptions: Average length of packet: 240 (6 bit) characters
Average message size: 20 packets
Bit error rate for the wireless link: $10^5$

The failure rate defined as the average number of times that the data is required to be re-transmitted is calculated to be 1 in 3000 transmissions. Note that this does not affect the overall integrity of the data which is controlled by the CRC. It merely states that the wireless link will contribute to the dismissal of the data once every 3000 times. Increase in the BER will further improve the retransmission rate.

MCDONNELL DOUGLAS CORPORATION PROPRIETARY RIGHTS ARE INCLUDED IN THE INFORMATION DISCLOSED HEREIN. RECIPIENT BY ACCEPTING THIS DOCUMENT AGREES THAT NEITHER THIS DOCUMENT NOR THE INFORMATION DISCLOSED HEREIN NOR ANY PART THEREOF SHALL BE REPRODUCED OR TRANSFERRED TO OTHER DOCUMENTS OR USED OR DISCLOSED TO OTHERS FOR MANUFACTURING OR FOR ANY OTHER PURPOSE EXCEPT AS SPECIFICALLY AUTHORIZED IN WRITING BY MCDONNELL DOUGLAS CORPORATION. UNPUBLISHED - ALL RIGHTS RESERVED UNDER THE COPYRIGHT LAWS.

Attorneys Eyes Only

**Exhibit 29**

```
 1                    LOS ANGELES, CALIFORNIA

 2              THURSDAY, OCTOBER 22, 2009; 9:00 A.M.

 3

 4              THE VIDEOGRAPHER:  Good morning.  My name is

 5    Amy Kostka.  I'm the videographer with Barkley Court

 6    Reporters located at 1875 Century Park East, Los Angeles,

 7    California 90067.  The time is 9:01 a.m. on October 22nd,

 8    2009.

 9              This is the videotaped deposition of Elmo Piper

10    taking place at Ballard Spahr in Los Angeles, California,

11    in the matter of Harris Corporation versus Federal Express

12    Corporation, Case No.6:07-cv-1819-Orl-28 KRS.  This

13    deposition is being taken on behalf of the defendant.

14              May we please have introductions beginning with

15    the witness.

16              THE WITNESS:  Elmo Piper.

17              MR. PETRIE:  Art Petrie, Hatton, Petrie &

18    Stackler, representing the deponent and the Boeing

19    Company.

20              MR. GILCHRIST:  Brian Gilchrist on behalf of

21    Harris.

22              MR. BROWN:  Charley Brown on behalf of Federal

23    Express Corporation.

24              MS. GENTRY:  Robin Gentry on behalf of Federal

25    Express.
```

ELMO PIPER - CONFIDENTIAL, ATTORNEYS' EYES ONLY

**BARKLEY**
Court Reporters

```
 1              THE VIDEOGRAPHER:  The court reporter may now
 2    swear in the witness.
 3
 4                       ELMO PIPER,
 5         having been first duly sworn, was examined
 6                   and testified as follows:
 7
 8                       EXAMINATION
 9    BY MR. BROWN:
10       Q    Mr. Piper, first, I'd like to say thank you for
11    taking the time to talk to us today.
12       A    Um-hmm.
13       Q    I'd like to go over a few guidelines that, if we
14    could follow, it would make the deposition go a lot
15    smoother.
16            So first off, I'd like to make sure you
17    understand that the questions you are being asked today
18    and the answers you're providing are just as if you were
19    in a court --
20       A    Um-hmm.
21       Q    -- you understand?
22       A    Um-hmm.
23       Q    Okay.  Also, if you could make sure you answer
24    your questions verbally --
25       A    Yes.
```

ELMO PIPER - CONFIDENTIAL, ATTORNEYS' EYES ONLY

BARKLEY
Court Reporters

1          MR. GILCHRIST:  Mind if I use the defendant's

2     numbering since I have no idea what --

3          MR. BROWN:  That's perfectly okay.

4          (The document referred to was marked as

10:52   5          Defendant's Exhibit 71 for identification.)

6     BY MR. GILCHRIST:

7     Q     Defendant's 71 -- is that a letter to the FAA?

8     A     Yes, it is.

9     Q     And does that enclose some of the information we

10:53  10    talked about earlier today?

11    A     Yes, it does.

12    Q     And does it specifically request that the FAA

13    return those materials to McDonald Douglas/Boeing?

14    A     Does the letter request it?

10:53  15    Q     Yes, on the first page, one of the bottom

16    paragraphs.

17    A     Yes.

18    Q     And was that standard operating procedure?

19    A     Yes.

10:53  20    Q     And does the FAA, in fact, return those

21    documents?

22    A     Yes, they do.

23    Q     And in this case, were the documents in your

24    files the ones that were returned from the FAA?

10:53  25    A     Yes, they were.

69

BARKLEY
Court Reporters

```
 1        Q    And anything you have in your -- in your desk, as

 2   you mentioned earlier, you -- would be considered

 3   confidential to Boeing or McDonald Douglas?

 4        A    Yes, it would be.

 5        Q    So all the things in your file would have never

 6   left your office to anyone other than a McDonald Douglas

 7   employee or someone with an agreement of confidentiality?

 8        A    From my desk, correct.

 9        Q    Okay.  And that would include the entire file we

10   went through today?

11        A    The SPP file, yes.

12        Q    Okay.  So the FAA would not have maintained any

13   of the slide show presentation or any materials that we've

14   seen here today?

15             MR. BROWN:  Object to the form.

16   BY MR. GILCHRIST:

17        Q    Correct?

18        A    Yes.  I have no knowledge that they would have.

19        Q    And did there ever come a -- a system that

20   required you to apply the spread spectrum FAA policy that

21   we see in Exhibit 63?

22        A    Your question again?

23        Q    Was there ever a system that you had to pull what

24   the FAA sent you and see if you could certify it?

25        A    No.
```

10:53 — line 5
10:54 — line 10
10:54 — line 15
10:55 — line 20
10:55 — line 25

70

BARKLEY
Court Reporters

**Exhibit 30**

# 1. ABSTRACT

A team of McDonnell Douglas Aerospace (MDA), Federal Aviation Administration (FAA), United Airlines (UA), Computing Devices International (CDI), and Key Information Delivery (KID), proposes to develop a research analysis and a prototype system of an airport wireless Spread Spectrum Ground Communication (SSGC) system toward the enhancement of aircraft maintenance, flight, dispatch, and cargo operation efficiency.

The proposed system will provide both text/graphics data transmission and voice communication for flight crew, maintenance, and dispatch personnel in the airport gate environment. This system will link ground information system, onboard avionics systems, and provide access by ground crew to information database through portable graphics terminals. The objective is to integrate both airborne avionics, ground crew, and ground based resources into a seamless operating system. The benefits include significant cost savings through increased aircraft availability, and reduced maintenance man-hours, flight delays, inventory costs, maintenance training time, and thus provided a much greater degree of operational readiness.

# 2. INTRODUCTION

Aircraft maintenance, flight, and dispatch operations require transmission of ever-growing quantities of information in voice, character-based (text) and graphic image formats. The type of communication includes voice communication between cockpit crew, cabin crew, dispatch personnel, and maintenance personnel. The type of data include flight plans, weather forecasts, passenger service information, maintenance records, procedures, and manuals. The Spread Spectrum Communication system introduces a technology which provides crew with rapid simple access to information, strong integration with avionics systems and ground systems,

coupled with a streamlined method for keeping information up-to-date and accurate. The proposed system provides an efficient means of communication in an airport environment that is technically feasible and economically desirable.

## 2.1 PROBLEMS

The problem associated with current airport operation is the lacking of an effective delivery of information and knowledge to where the work is being done. On-ground and on-board systems must communicate to exchange updated information at varying intervals. A majority of information exchange will take place with the aircraft on the ground. Currently, most digital data transfer is through the Aircraft Communications and Address Reporting System (ACARS). This is a low speed, character-oriented VHF network with a separate voice communications system. Transmission of graphics images with ACARS is impractical due to the small data block size (220 characters) and slow speed. SATCOM and Gatelink are systems that have been suggested as alternatives. SATCOM is satellite-based and designed for support of trans-oceanic operations. Required equipment will cost from $500K to $750K per aircraft for two voice and one data channels, and data service cost will be $1.00 per thousand bits transmitted. Gatelink is a high speed fiber optic system under development for installation at airport gates. It will use either fiber optic cable connection to the aircraft or line-of-sight infrared (IR) transmission; communication is limited to a single aircraft in a restricted position requiring a gate or terminal for the physical connection. It does not support on-ground and on-ground personnel. None of these systems combine voice, text, and graphics data transmissions. It becomes necessary to develop and deploy progressive generations of advanced communication system in response to the complex aircraft operational needs.

## 2.2 BENEFITS



EXHIBIT

10 - 21-09

6 7

Dc. Moderess

ATTORNEYS EYES ONLY

Harris v. FedEx
TBC000008

A low-power wireless RF link using Spread Spectrum technology offers an attractive alternative to the communication problem described above. With the proposed system, flight crews, dispatchers, ground maintenance, and engineering personnel will all have access to common database and maintain interactive communication between each other via aircraft, ground, or portable graphics/voice terminals. An important aspect of the Spread Spectrum wireless system is simultaneous sharing of the frequency band by several users. SSGC provides the data link between aircraft and ground information system to allow automatic data upload and download operations to be performed automatically and efficiently.

Information and knowledge will be delivered to all locations throughout the air transport system: on the flight line for maintenance, in ready rooms, in hangars, and onboard the aircraft at remote locations. The SSGC is faster, more accurate, and provides more useful information than message on paper. SSGC system shall provide communication with parts inventory system to order the needed parts, retrieve documentation, collect relevant maintenance history data, reserve tools and equipment, assign personnel, thereby saving time, reducing manual effort, and increasing efficiency of the air transportation operations. With the SSGC capabilities in place, the jobs of dispatchers, maintenance mechanics, cargo operator, and engineering will be enhanced. Provide valid, up-to-date information to crews, correct decisions can be made on the line, eliminating any unnecessary effort in locating the needed material and information; SSGC will increase the capacities of each crew to accomplish more with less effort.

This communication system provides significant benefits over systems now in use or in development in operational cost, performance, and potential functional growth. Rapid transmission of data and graphics images simultaneously to many users becomes necessary in meeting the demands of today's complex operational needs. Providing this concept in an actual military/commercial operation has the technical benefits of illustrating that cost effective communications can be established for both the airborne and the ground applications.

## 3. PROGRAM MANAGEMENT

A collaborative consortium is established for this proposal with McDonnell Douglas Aerospace (MDA), Federal Aviation Administration (FAA), United Airlines (UA), Computing Devices International (CDI), and Key Information Delivery (KID). A hierarchical work breakdown for all partners participating in this project is provided in section 4.2. This cooperative teaming arrangement includes an airframe manufacturer, federal agency, airline customer, hardware/software development company, and communication/ interface manufacturer. Each team member is financially committed to implement digital wireless communication technology into dual-use applications within two-three years.

### 3.1 ORGANIZATION & BACKGROUND

This organization of five partners shall be responsible for the planning, development, integration, test, and verification of the prototype system. The point of contact for each partner is listed below.

MDA, Advanced Aircraft Systems,
M/C 71-11, 1510 Hughes Way, Long Beach, CA 90810-1864,
Jeffrey Tu, 310-982-9851

FAA, Flight Test & Certification
MS/ ANM-111, 1601 Lind Ave. South West,
Renton, WA 98055-4056
John Dimtroff, 206-227-2117

UA, DENFO
Stapleton Int'l Airport, Denver, CO 80207
Augie Stasio, 303-898-1319

ATTORNEYS EYES ONLY

Harris v. FedEx
TBC000009

CDI, Advanced Concept Development & Technology
8800 Queen Ave. South, Minneapolis, MN 55431-1996
Jim James, 612-921-6212

Key Information Delivery Inc.
320 Division St., Northfield, MN 55057
David Carroll, 507-645-5646

MDA is responsible for the overall schedule coordination, requirement definition, field test & evaluation, and effectiveness analysis & documentation. MDA has conducted Independent Research and Development and Contract Research and Development effort for many years. MDA has supported both military (USAF C-17, KDC-10) and commercial (MD-11) transport aircraft technology development that yield functions to enhance performance and usability. Both the C-17 and MD-11 have data upload/download capabilities via standard portable data devices. By providing both aircraft the capabilities to allow maintenance, flight, and dispatch functions to be performed simultaneously, a measurable 'hard dollar' benefit for the commercial airlines and military fleet is demonstrated.

FAA shall take on an active role in providing design guidance, certification requirement definition, and granting air worthiness approval for this new wireless communication technology. FAA's influence in all phases of this project ensures the delivery of a product meeting all aspects of the safety, reliability, and performance certification requirement. FAA's participation in this project demonstrate our commitment to the concept of commercial market productization and the continuing health of American air transportation.

UA has a focus in developing and implementing new technology aimed at future efficiency improvements. UA has established several partner relationships with suppliers and airframe manufacturer to expedite the development of technical solutions to airline efficiency problems. In addition to incorporating airline operational criteria into the design, UA shall provide an aircraft with the associated facilities to demonstrate, test, and evaluate the prototype system. This testbed will allow us to realistically assess the effectiveness of the prototype system in an actual airline environment.

CDI has a long history of systems integration and system engineering in both hardware and software development programs. CDI was selected as the systems integrator for the Flight Analysis and Data Systems for the U.S. Space Center in Houston. In addition, CDI developed the U.S. Navy's Ada Language System/Navy (ALS/N) which provided a standard high-level software, mandated by DoD, to run on embedded military avionics computers. Additional platforms include AYK-14, AN/UYKK-43, and AN/UYK-44 tactical computers. In the areas of commercial application, CDI is currently involved in the development of ground information system and onboard systems such as Onboard Maintenance Terminal (OMT) for Federal Express' MD-11, and the Electronic Resource System (ERS) for UA's DC-10. CDI shall be responsible for the onboard system development, and integration to the ground information system.

KID has been involved in the area of portable touch-screen computers that supports both voice and graphics capabilities with RF wireless interface. Their focus is to delivery on-site integration of advanced computing devices into customers' operating environment. They are currently involved in cooperative development efforts with International Business Machine (IBM), Ford Motor Company, and U.S. Navy S.E.A.L.s for the development of communication and automation technologies. For the proposed system, KID shall be responsible for the development of the portable terminal and the RF interface for this wireless communication system to the ground station. KID satisfies the economically disadvantaged small business

ATTORNEYS EYES ONLY

Harris v. FedEx
TBC000010

criterion, and has been involved in numerous development effort with CDI toward both military and commercial applications.

## 3.2 COST SHARING

The cost sharing summary provided in table 3-2 depicts the overall partner contribution and TRP matching based on a 50/50 cost sharing guideline. The cost breakdown presented in this table shall be used as a baseline figure. Before the functional requirement and system definition are available, assumptions have to be made to estimate the extent of the effort for each partners' role in this project. The In-Kind contributions are estimated realistically. The contribution does not include any past engineering spending toward this technology development; the market value for the result of past engineering effort was estimated.

| Partners | | Contribution | | TRP Matching |
|---|---|---|---|---|
| | | FY 95 | FY 96 | |
| MDA | In-Kind | 200K | 200K | 400K |
| | Cash | 150K | 150K | 300K |
| FAA | In-Kind | 100K | 100K | 200K |
| | Cash | 100K | 100K | 200K |
| UA | In-Kind | 100K | 100K | 200K |
| | Cash | 150K | 150K | 300K |
| CDI | In-Kind | 100K | 100K | 200K |
| | Cash | 100K | 100K | 200K |
| KD | In-Kind | 100K | 100K | 200K |
| | Cash | 100K | 100K | 200K |

Table 3-2, Cost Sharing Summary

## 4. TECHNICAL IMPLEMENTATION

Spread Spectrum is the latest innovation in the field of Radio Frequency (RF) data communications. Spread Spectrum Ground Communication (SSGC) spreads the signal over a much wider bandwidth than Narrow Band signals. As a result of the increased bandwidth, SSGC provides higher data rate than conventional RF communication, greater immunity to

interference, and simultaneous voice, data, and video transmission.

## 4.1 SYSTEM CONFIGURATION

Functionally, the development of the wireless SSGC system can be categorized into three areas, onboard system, base station, and portable terminals development. A concept layout of the wireless SSGC system implementation at a airport environment is illustrated in Figure 4. The onboard and portable terminals communicate with the base station via the wireless Spread Spectrum RF interface at a data transmission rate of 1 Mb per second. The base station is connected to the ground information network directly via a standard protocol that is compatible with the existing network.



Figure 4, SSGC System Configuration

The onboard system development includes the installation of a graphics/voice platform in the flight deck to provide the flight crew with the real-time access to the central information database. Human Factors Engineering shall be performed to evaluate the functional and physical installation of such processing platform onto the onboard environment. Standard interface shall be

ATTORNEYS EYES ONLY

Harris v. FedEx
TBC000011

established to achieve a strong integration with existing avionics systems. The onboard system shall be implemented with off-the-shelf hardware and software for system performance and cost effectiveness. The onboard system is an active matrix color Liquid Crystal Display (LCD) with backlight capability and touchscreen overlay. The hardware platform is recommended to be Intel 486 DX2 66 based with ARINC 429 interface to existing aircraft data bus, and RF interface to the base station. Integration with existing antenna system (such as Microwave Landing System antennas) shall be made to minimize the cost and risk associated with the development of a new antenna system.

The base station also provides integrated speaker and microphone to support voice communication with onboard and portable systems. The onboard system and portable systems communicate interactively with the base station to access the central database. The base station provides wireless or wire interface to the local server of the ground central database unit via async, SNA/SDLC, TCP/IP over Ethernet, or SNA over Token Ring. The range of RF coverage, number of users, data rate, allocated frequency bands, network requirements of the SSGC system can be tailored toward the specific needs of the customer.

This wireless system has low operational costs since it operates in existing Federal Communications Commission (FCC) frequency range and requires no additional FCC license. This low-power system (10mW-500mW) will not interfere with any existing communication systems that are operating in the same frequency range. The on-ground installation and interface to existing information system can be easily implemented without any structural modification to the ramp, hangar, or gate. The on-board installation can be easily retrofitted with existing aircraft antenna system (such as the MLS antenna) at a minimal cost. This non-line-of-sight system does not require precise positioning of aircraft for tether hookup, and performance

cannot be affected by the adverse weather condition of the environment.

## 4.2 TASK BREAKDOWN & SCHEDULE

The proposed effort can be divided into three phases: Phase 1 - Systems Engineering and Lab Platform Installation, Phase 2 - Hardware/Software Integration with Onboard and Ground Environment, Phase 3 - Field Test and Certification; an overall program schedule is provided in Figure 4-2. Phase 1 involves system functional requirement definition, test & certification guideline development, and the prototype system design & evaluation in a lab environment. Phase 2 involves the actual integration of the prototype system with the ground information network and onboard avionics system. This includes both functional and physical integration with the actual operating environment to effectively evaluate the functionality of the system. Phase 3 involves the operational certification and evaluation of the prototype system. In addition, the development documentation and effectiveness analysis shall be performed during this phase to ensure that the delivery system has met functional and certification requirement.



Figure 4-2, Task Breakdown & Schedule

## 5. PERVASIVE IMPACT

This SSGC system introduces a new technology concept that benefits U.S military transport operation as well as commercial airlines

5

ATTORNEYS EYES ONLY

operations through cost reduction and performance improvements. In addition, the development and delivery of SSGC system will generate new, high quality jobs in three areas: system development, data communication suppliers, and air transportation operations.

The continuing health of the airlines industry is critical to the economic health of the United States. The U.S. commercial airline industry's ability to compete on a domestic and global market is being hampered by high costs of maintaining a massive and aging fleet of aircraft, inefficiencies in airlines' operation, and a obsolete infrastructure that is incapable in meeting the demands of today's complex operational needs. The SSGC's positive impact on the competitiveness of U.S. airlines can translate into significant savings for the entire airline industry. The airlines will recognize these savings through improvements in aircraft availability, reduced parts inventory, and more effective labor processes.

The SSGC's integrated communication approach to performing air transport maintenance, dispatch, and cargo operation will enhance the quality and timeliness of the service. Since there are significant pressures on the government to reduce costs while maintaining aircraft readiness, such a cost reduction with improved maintenance quality will contribute to improving national security.

Once the infrastructure for delivery information via

SSGC is in place, the technology can be extended to provide active process delivery technology to other activities within the airline operations. Each extension will generate new jobs in the areas of hardware manufacturing for portable graphics terminals, application software to support the additional functions, and field engineering for long-term

system support. All of these jobs are equally applicable to providing products and services to government and commercial customers.

## 6. SUMMARY

The project team's SSGC effort proposed for TRP funding is important to the continuing success of the United States air transportation industry. With FAA and an airline as partners, the team is commitment to develop and implement the SSGC for commercial and government air transportation use within the next three years. The potential efficiency and cost savings the SSGC will provide justify this effort. With a coherent teaming arrangement, this proposal satisfies the dual-use requirement and demonstrates our commitment to near-term productization in the U.S. TRP funding will greatly assist this team to accelerate the development of digital wireless communication technology, to modernize and improve the overall competitiveness of the commercial/ military air transportation operations.

ATTORNEYS EYES ONLY

Harris v. FedEx
TBC000013

**Exhibit 31**

BEST AVAILABLE COPY

XP008032852

## DIGITAL TELEMETRY SYSTEM FOR REAL-TIME

## ANALYSIS OF AIRBUS A320 FLIGHT TEST RESULTS

by
Yves NEGRE, technical assistant flight test Manager
Denis LAFOURCADE, head of the telemetry computer centre
Company : AEROSPATIALE - AIRCRAFT DIVISION

### Abstract

Aerospatiale has chosen to develop a 1500 MHz wave band high data flow digital telemetry system. The area of coverage extends in a crescent from the Bay of Biscay , over South West and Western  France up to the coast of the British Isles.
The telemetry system has mainly been developed to provide Aerospatiale with a tool capable of permitting real time analysis of aircraft test flight results during the development and certification period. The amount of time thus saved in analysing each test flight is an important factor in the reduction of the flight test cycle. The Airbus A320 is the first aircraft to benefit from this tool.
After a brief reminder of the background of the particularly ambitious A320 test programme, the paper will describe the airborne flight test installation and general ground analysis facilities.
The telemetry system constitutes an important component of these flight and ground facilities. A large part is therefore devoted to this high technology tool, with special emphasis on the ground analysis aspect. In particular, the paper describes the general test analysis philosophy, the organization of the resulting work, the station installation, associated graphic facilities and computer hardware implemented and emphasizes the universality of the basic and application software which Aerospatiale has developed or has had developed.

## 1. Airbus A320 flight tests

The Airbus A320 development and certification flight test programme is particularly ambitious in many respects. Only the particularities likely to affect the test facilities to be provided will be described here. The presence, on this aircraft, of fly-by wire controls to a degree never yet reached on a civil aircraft, the novelty of the power plant and all the systems and equipment are all factors which illustrate the technical ambition of this project. To this technical ambition must be added an industrial ambition, as regards certification of the aircraft, which is to be obtained 11 months after first flight in 1200 flight hours, and the airline delivery schedule ; indeed, only 13 months separate first flight from first delivery to a customer, with an increase in production rate to enable 30 aircraft to be deliverd or leave the assembly line only 6 months after this first delivery.
To avoid costly scrapping and retrofitting, it is therefore necessary to freeze the "configurations" of the aircraft only a few months after first flight : everyone knows that this is a difficult challenge, even on a conventional aircraft ;

it becomes a very difficult one on an aircraft with so many technological novelties.
To ensure rapid development of the aircraft and its systems, therefore, it is necessary, as regards the flight test installation, to set up :
- very fine mesh airborne measurement facilities to examine the aircraft and its systems
- higher performance ground analysis facilities to ensure very rapid processing of very large flows of measurement data.

## 2. Airborne test installation

The airborne recording and acquisition system has been designed to acquire and store :

- 1600 analogue measurements
- 500 discrete signals
- 200 ARINC 429 digital buses.

Among these measurements,500 analogue measurements can be recorded in frequency modulation on three analogue recorders.

The other measurements are covered by the digital acquisition system, at a maximum sampling rate of 1024 pps.
The whole system can be programmed by EPROM module before each flight. The diagram on Figure 1 details the various components of this flight test installation. It shows :

. the digital acquisition system, made up of acquisition units each containing 16 cards; each card is capable of accepting 8 digital buses, or 16 analogue signals, or 48 discrete signals. The parameters to be recorded have been distributed between the acquisition units so as to constitute independent groups as far as data processing is concerned.
These messages are "PCM" messages.
Four PCM messages are therefore available at the acquisition unit outputs :
.PCM 1, which contains structure, handling, engine and systems parameters
.PCM 2  which contains avionics parameters
.PCM 3  which contains fly-by-wire parameters
.PCM 4  which contains flutter parameters.
Each of these PCM messages constitutes a flow of 64 kilowords per second.

A special acquisition unit is also provided to receive general flight parameters  and derived parameters computed by the processing unit. These parameters leave this acquisition unit as an ARINC 429 bus and are reintroduced in the other acquisition units, thus making them available on all the PCM messages.
In addition , this acquisition unit supplies the accident recorder and sends a PCM digital message to the analogue recorders.

ANSDOCID <XP    8032852A 1 >

FX0172684

XP008032852

### . the processing unit

This is a dedicated real-time computer which receives the 4 PCM messages and thus possesses all the parameters acquired on board. It uses this information , which is demultiplexed to provide the following functions in real time :

- Creation of a PCM 5, with a flow of 64 kilowords per second, which is a collection of parameters selected from PCM messages 1 to 4. This PCM message is transmitted by the telemetry system ; it is thus programmed before each flight according to the test programme. The flight interphone is digitized by the acquisition system and transmitted in PCM 5 and PCM 4.

- Computation such as : -y = ax + b or y = f (x) to convert parameters into industrial units (UI)
  : -y = f (x,xz ...)
  for computing centre of gravity, inertia ...

- Display of data in engineering units, on a specific display and on graphic recorders.

- Display of FTI warnings and corrective actions for the flight engineer

- Transfer of all the data acquired by the 4 PCM messages to the airborne computer.

### . the airborne computer

This is a real-time general-purpose computer which receives, as shown above, all the data travelling on the 4 PCM's. This computer executes a certain number of programmes selected by the flight engineers to help them perform the tests or monitor the systems. Some of these programmes are : trajectography, performance, exceedence of structural limit load and synthetic images of the main aircraft systems.

### . the flight engineers station

This is a station for two engineers (see Fig. 2) which comprises :

- a polychrome raster CRT displaying the main flight parameters (flight display)

- two polychrome stroke CRT's supplied by the airborne computer (flight test monitor)

- a raw data display permitting access to any parameter

- the keyboards corresponding to these screens

- two screen hard copy units

- two graphic recorders

- a printer

- a video screen for airborne video camera display

- a system called SPATIAL which makes it possible, in flight, to :
  - command flutter type inputs
  - change the fly-by-wire control laws
  - send calibrated signals to the control surfaces
  - select new parameter addresses



Figure 2 : Flight engineer's station

### . Digital magnetic recording

This is done by two ENERTEC 28 track recorders lasting for five hours for which the density of data has been increased to 33 kilobits/inch. Recording is series/parallel with an error corrector code.

### . Direct broad band recording

Certain digital buses are recorded directly on a 28 track recorder, which prevents over sampling of the digital acquisition system and provides finer relative dating of events. This recording and its analysis which makes it possible to do a play back on a simulator, will be used to "hunt down" transient, non repetitive phenomena.

Figure 1 : Airborne flight test installation

FX0172685

. Lightning recording

The aircraft is equipped with electric and magnetic field sensors, which are recorded at the same time as electric voltages at the terminals of sensitive equipment. These recordings are made on video recorders.

. The video system

For certain specific phenomena

. The telemetry transmission system made by INTERTECHNIQUE

3. Objectives of the telemetry system

In the context described above, it is important to provide the Design Offices with the flight test results very quickly.
This is the principal objective of the telemetry system created for the A320 programme.
Figure 3 illustrates the two ways of analysing a flight :

. Without telemetry, as was the case for the Airbus A310 programme, it was necessary to wait for the aircraft to return, then collect the magnetic tape and the flight engineer's log book. The average time required to get the initial results was half a day to one day. This could seem short, in fact, it becomes long when a whole series of flights is involved.



**Figure 3 : Objectives of the telemetry system**

. With the telemetry system, the objective is to process, in real time, i.e. with no delay, 50% of all the quick look analysis and 30% of more complex analysis such as :
trajectography, autoland statistics, automatic detection of anomalies ...

Another important objective concerns flutter flights ; the aim is to have completed the modal analysis of a flight two hours after the last test, which can enable the test campaign to progress at a rate of two flutter flights per day. The decision to launch this telemetry system was made in February 1984.

4. Telemetry message transmission

. Transmission

On board the aircraft, the message is transmitted on two frequencies by two

antennae, one under the aircraft nose and the other divided into two half-antennae, on either side of the fin. The frequencies used are around 1500 MHz. The 852 kilobit/sec message is transmitted in NRZ-L code frequency modulation with a 1.2 MHz usable band width, the effective range is the optical range with a 14 dB signal/noise ratio and a 20 dB margin for a 20 watt transmission

. Reception

There is a master station at Toulouse and two remote controlled stations at St Nazaire and Bordeaux. When the signal is received by one of these two stations, it is transmitted to Toulouse by the TELECOM 1 satellite.
It is received by an automatic tracking 2 meter diameter parabolic antenna with a built-in camera to follow the manoeuvres of the aircraft on the ground and at take off and landing. The antenna gain is about 30 dB, elevation range -5 to 90°, azimuth range unlimited, and rotation speed 20°/sec. Three controls are provided : automatic tracking, position control and speed control.
The reception source is slightly canted with respect to the axis of the parabola and is subjected to a rotationary movement which enables the H.F. signal received to be modulated according to the angle of deviation between the target and the antenna axis. Antenna operation is remote controlled from a bay housing, the controls displays and electronic slide valves.
All this system is supplied by SNEC.

5. Ground analysis

Figure 4 shows the ground analysis computer facilities. They comprise :
- the ground data processing station
- user deported work-stations
- the telemetry data analysis station
These stations are linked together by an ETHERNET network, with a 1.3 Megabit/sec effective transfer speed.

. Ground data analysis station

This station comprises :
- 28 and 14 track flight tape readers
- a real-time computer responsible for the acquisition and conversion at speed 8 of one PCM digital message into engineering units
- a real-time computer responsible for simultaneous acquisition and conversion at speed 8 of several PCM digital messages into engineering units
- a so-called scientific computer which processes the results and is also used as a data base.

The two GOULD computers act as back-ups for each other.

19-3

BNSDOCID: <XP____8032852A_I_>

FX0172686

XP008032852



Figure 4 : Ground analysis computer facilities

. The deported work-stations
These are graphic stations linked by a ring
network, providing each of the users : avionics,
handling qualities, performance, engines, struc-
ture and systems, with an on-site processing
capacity associated with a 150 Megabyte mass
memory and a printer output. Each user can thus
gain access to the result files compiled at the
flight tape analysis station or the telemetry
station, via the Ethernet network, and process
data interactively, using all the possibilities
offered by this type of station and by the
specific software developed to process measu-
rement results.

. Finally, the telemetry station, which is
described in the following paragraph.

6. Telemetry data analysis station

This station is shown in detail on Figure 5.
The .852 kilobit/sec message is made up of
several non dissociated parameter lists :

. list L'o, which is available directly at
the frame synchro output and sent on two 8
track analogue recorders.

. list Lo, which is sent via the selection
and demultiplexing interface on four
electrostatic digital recorders, each
comprising 15 digital channels and 15
discrete tracks.

. lists L1, L2 and L3, the parameters of
which are converted into engineering
units by a vectorial preprocessor :
each of these lists represents a data
flow of about 20,000 words/sec on 32 bits.

The vectorial preprocessor is also used during
the flutter tests to calculate the fast Fourier
transforms which provide the measured

aeroelastic transfer functions of the aircraft
in real time.

List L1 contains the parameters corresponding
to the specific tests of a given flight :
about 7,000 words/sec. The parameters are
processed by a real-time computer, CP1, to be
displayed to operators on terminals with
polychrome screens according to menus program-
med by the different users. This list, L1, also
contains other parameters about 13,000 words/
sec, which make it possible to monitor automa-
tically certain systems that are particularly
important from a safety point of view, such
as fly-by-wire controls or the structure.
This automatic monitoring is performed in real-
time by the vectorial post processor. This
processor is also responsible for performing
the modal analysis calculations during flutter
tests.

List L2 mainly contains avionics parameters
whereas list L3 contains parameters for the
structure and the other systems.

Lists L1, L2 and L3 are permanently recorded
on a disc in a circular memory ; in the event
of a fault being detected by the automatic
monitoring programme, and according to the
system affected, the list concerned is automa-
tically safeguarded for a time interval surroun-
ding the event by + 30 seconds. A manual
safeguard is also available for each of the
operators. It is from these safeguarded para-
meters that the first search for the cause of
the fault can be initiated. In the case of
events leading to tripping of a logic circuit,
the automatic monitoring programme picks up
in real time the event that occurred on board
and a complete analysis is made by computer
CP3 in deferred time.

BNSDOCID: <XP_____8032852A_I_>

FX0172687

XP008032852



This analysis is made by a programme called "DECOLO", the originality of which is that it is the same whatever the incriminated aircraft computer ; this programme acts as a motor which organizes and processes the information made available to it according to clearly defined rules ; the information to be processed differs according to each computer ; it is classified in files containing an internal logic structure and links, inputs and outputs, between files. These files are called by the DECOLO programme according to the event that has occurred and the rules mentioned above.

Computer CP3 is also responsible for the management of two electrostatic plotters on which are generated the time-dependent parameter curves according to the selections made by the operators.

Finally, it should be noted that all this data processing chain is redundant, which provides a back-up in the event of failure.

### 7. Telemetry data processing analysis

The room in which the results are analysed contains six work stations plus a master station for the team leader. Three other stations without screens are available for observers.
A work station comprises a polychrome screen with a control keyboard and a service module containing radio VHF, aircraft interphone and ground interphone. The team leader analysis station also comprises a screen identical to that of the flight engineer, which reproduces essential aircraft configuration information (attitudes, altitude, speed, weight, C.G., N1 ...)

**Figure 5. Telemetry data processing station**



①② DEFERRED TIME ANALYSIS   ④ ANALYSIS STATION CONDUCTOR
③④ REAL TIME ANALYSIS   ⑦⑧ AUTOMATIC MONITOR SYSTEM
⑤ OBSERVER   ⑨⑩ STRIP CHART RECORDERS

**Figure 6 : Data analysis station**

19-5

BNSDOCID: <XP_____8032852A__I_>

FX0172688

XP008032852

A giant screen can receive the video projection of the camera located in the axis of the antenna or a synthetic image representing the position of the aircraft over France with an indication of the ranges of the telemetry stations. The main flight parameters are also shown on this chart.

The team leader is responsible for setting up the analysis station : he attends the briefing and ensures liaison with the aircraft during flight.

The operators present are all specialists in their discipline and are called by the team leader according to the subjects dealt with in the flight test programme. Similarly, the operators' work is organised according to this test programme, either for following the test in real time, or for slightly deferred time analysis.

A view of the analysis room is shown on Figure 6.

All the work-stations are interchangeable, whatever the discipline practised or the type of work performed in real or deferred time.

. In real time, each operator can make an initial analysis of the test which consists in :

- making an appreciation of the quality of the test and validating it
- selecting the interesting time interval
- storing the results on discs
- initiating the time-dependent parameter curve plotting process.

To do this, the operator selects the discipline he wants on the keyboard, and, using a series of menus within this discipline, he chooses the appropriate presentation for the test to be followed according to the example shown on Figure 7. The most significant parameters of the test appear in real time as moving curves as shown on Figure 8 ; the operator can then choose the time zone surrounding the test ; all the parameters involved are then stored on discs (List L1) and the plotting process concerning the discipline considered is initiated automatically.

Another example of real-time work can be taken with flutter tests. The operators are provided with the measured transfer functions in frequential form with superposition of the same functions at a lower aircraft speed, which enables them to make a qualitative judgement of the evolution of the stability of a mode. It is also possible to have real time spectral response or a Nyquist locus representation to judge the stability of the aircraft aeroelastic modes with servosystems.



<u>Figure 8 : Selection of a time zone during
an avoidance manoeuvre test</u>

Most of the interactions between the operator and the programme take place via a set of function keys. Fifteen of these keys are called "primary" keys as their allocation is permanent whatever the programme being run, change it, reset, expand or divide scales, make zooms and hard copies, record parameters or delimit test zones. They are fifteen other keys called "secondary" keys whose allocation depends on the programme.



<u>Figure 7 : Example of selection of a menu in the Handling discipline</u>

FX0172689

XP008032852

Figure 9 shows the primary function keys with an example of secondary keys.

More detailed analyses can be made in slightly deferred time. Taking the example of Handling tests once again, it is possible to gain access to the real-time result files, reselect the test time interval if necessary, select the zones to be analysed ; for each of these zones a mean point is automatically chosen and memorized, which makes it possible to obtain, in the end, the plot of one parameter versus another as shown on Figure 10, where the various parameters are plotted versus sideslip in the stabilized sideslip

Flutter can be taken as an example for slightly deferred time work. A few minutes after the frequency sweep, the operator is provided with a display of the measured tranfer functions and the calculated transfer functions for each of the accelerometers. The number of modes is fixed automatically according to a quadratic deviation criterion and the operator is able to read the frequency and damping of each of the aircraft modes directly.

All he has to do is give the test "quality marks" for each mode ; to do so he uses the display of a test coherence function.

Figure 11 shows the display available to the operator for a given accelerometer.



| DISCIPLINE CHANGE<br>PROGRAM CHANGE<br>DISPLAY CHANGE<br>TEST TYPE CHANGE<br>PARAMETER CHANGE<br>TIME INTERVAL SELECTION<br>TRAJECTOGRAPHY DELETION | STOP<br>PROGRAM | START/STOP<br>RECORDING | RESTART |
|---|---|---|---|
| | START/STOP<br>TEST | CANCEL<br>TEST | NON STOP<br>TEST |
| | SCALE<br>RESET | X SCALE | ÷ SCALE |
| | ZOOM | MONITORING<br>CHANGE | HARD<br>COPY |
| | SAFEGUARD<br>L1 + L2 | SAFEGUARD<br>L3 | ALARM |

Figure 9 : Allocation of keys to the various functions



Figure 11 : Modal analysis for a given accelerometer

Having done this work for each of the aircraft accelerometers, the damping of each of the modes is obtained by calculating the weighted average of all the accelerometers. The final plot of evolution of the damping of each of the modes in terms of speed can thus be obtained less than two hours after the last test.

Figure 10 : Stabilized sideslip synthesis

BNSDOCID: <XP    8032852A_1_>

FX0172690

XP008032852

### 8. Operating software

One of the particularities of the telemetry data processing station is that it uses a vectorial processor for message acquisition and conversion to engineering units. The reasons for this choice and the functions and capability of this system will be described hereafter.

As Telemetry terminals and deported work stations are different, an original software system has been created to make the programmes independent of the hardware used. This software system will also be described hereafter.

#### a) Message pre-processing on the vectorial processor

The work specification for this pre-processing was as follows :

- large flow of data to be processed : 64 Kwords per second
- multiplicity of processing algorithms : more than 25 decoding formats.
- safeguard of the last minute processed on a disc, i.e a flow of 250 kbytes per second
- management of 4 digital graphic recorders
- real-time computation of 55 transfer functions.

The limited specific hardware existing on the market did not provide a satisfactory solution to this work specification, mainly as regards the flexibility of programming the decoding algorithms and the computation of transfer functions.

A vectorial processor, which is less specialized but fully programmable, was therefore selected.

The pre-processor architecture is as follows :

- an input/output processor manages the physical acquisition of the data provided by the frame synchro and controls the 4 graphic recorders
- an input/output processor manages the safeguard of the last minute processed on an 80 Mbyte disc
- an arithmetical co-processor computes the transfer functions
- a control processor ensures the synchronization of the various processors and performs the conversion into engineering units.
- all these processors share a 256 kword memory.

As the input/output processors are programmable, initial processing is performed at the same time as the acquisition:

- the 12 bit words are converted to floating point form
- the 24 bit words provided by digital buses and made up of two 12 bit consecutive words are reconstituted.

Conversion of the message into engineering units calls for complex algorithms, in particular for information provided by digital buses : first of all, it is necessary to extract usable bits by masking, shifting  or inverting bits, then apply a calibration law which can be linear or multi-linear. A parameter can also be a function of another parameter.

Elaboration of the transfer functions calls for many calculations, the organisation of which is complicated by the variety of the tests (multiple forms of excitation : tip-vane, control surface harmonic inputs, pyrotechnic bonkers ; several frequency bands studied).
The data is subjected to digital filtering before the transfer function calculation.
The system permits simultaneous calculation of 55 transfer functions for 5 possible inputs.
At the end of each test a fully automatic process makes it possible to initiate the identification of the transfers obtained on a second vectorial processor. The complete results are therefore available a few minutes after the end of the test.
The safeguard of the last minute processed is used during automatic fault detection, to go back in time in order to examine the causes of the events detected.

A programme enables the acquisition process to be prepared in less than 10 min : it merges the users' requirements for the flight, reads the characteristics of the message in the data base and generates the tables which control the acquisition. The result of this preparation is stored in a file which is loaded into the machine in less than 30 seconds and can be used for the next flight if no modifications have been made.

Programming all these functions at the lowest level of the machine has provided a high degree of efficiency and ensures the processing of the whole message in real time.

#### b) Display software

The objectives of this software were firstly to permit the independence of the programmes from the terminal used but also to enable the final user himself to define the presentation of the data on the screen.

The software system is organized in three distinct entities :

- EP (for Editeur de Présentations) Presentation Editor

- BPP (for Bibliothèque de Pilotage de Présentations) Presentation Control Library

- BGB (for Bibliothèque Graphique de Base) Basic Graphic Library

- EP
EP is a graphic editor installed on a work-station, which enables the user to define his display fully interactively : maximum use of the mouse, dynamic menus, help messages, symbology, colours ...

FX0172691

XP008032852

EP also makes it possible to position, on the
screen all the "objects" which constitute the
animated picture. The objects known to EP are
multiple.

- the decor : the fixed part of the screen, with
              drawings and texts.

- the components : drawings that can be animated
  (visibility, colours, texture)

- the modifiable texts : enable an alphanumerical
  value to be displayed

- the axes : X and Y axes

- the gauges and axis cursors : two ways of
  representing parameters on a linear scale

- the dynamic plots : enable parameters to be
  plotted in terms of another parameter

- the scrolling curves enable time-dependent
  parameters to be plotted in real-time.

EP is a true editor ; it enables the user's
displays to be created, modified and stored.

At the end of the session, the user asks EP
to generate a character type file which contains
all the data of his display in plain language.


- BPP
     BPP is a high level sub-routine library
enabling the programmer to animate the display
defined by the user. BPP enables the display to
be loaded on the screen using the file generated
by EP.

Primitives then permit functions such as adding
points on a scrolling curve, positioning an axis
cursor, putting a warning text, making a compo-
nent visible or invisible ...

BPP also makes it possible to manage all the
interactions between the programme and the user
via the set of function keys, the joystick (or
the mouse) or the keyboard.
These interactions can be made whether the screen
animation is stopped or not, as the programmer
desires.
BPP is fully independent of the terminal used.


- BGB
     In order to be independent of the terminal
used, to perform its various functions BPP calls
on a lower level library, one version of which
exists for each type of terminal used.

BGB therefore knows the target terminal and uses
its possibilities to the full. In the case of
scrolling curves, for instance, the terminals used
for telemetry manage such objects locally :
BGB only sends the values of the points to be
displayed, and the terminal does the rest.
On the deported work-stations, on the other
hand, BGB manages these objects completely as
the terminal does not possess this function.

All that is required to adapt the software
to another type of terminal is to write the
corresponding BGB and after they have been linked
with this BGB, the programmes written for other
terminals can be run with no further modification.

19-9

BNSDOCID: <XP    8032852A  I >

FX0172692

**Exhibit 32**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRIS CORPORATION,
a Delaware corporation,

     Plaintiff,

vs.                                                Case No. 6:07-CV-1819-ORL-28 KRS

FEDERAL EXPRESS
CORPORATION, a Delaware
corporation,

     Defendant.

_____/

FEDERAL EXPRESS
CORPORATION,

     Counter-Plaintiff,

vs.

HARRIS CORPORATION,

     Counter-Defendant.

_____/

<u>DECLARATION OF JOSEPH C. MCALEXANDER III IN SUPPORT OF
PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT</u>

I, Joseph C. McAlexander, III, am over the age of eighteen and I am competent to give the testimony set forth herein based on my personal knowledge:

1.     I was retained by Plaintiff Harris Corporation ("Harris") as a technical expert.

2.     In connection with my retention in this case, I have reviewed various documents related to the accused system operated by FedEx on its fleet of B727 aircraft.

I have provided a detailed accounting of the documents considered with the expert reports I have disclosed in this litigation.

3.    I have provided opinions of infringement of U.S. Patent Nos. 6,047,165 (the "'165 Patent"); 6,104,914 (the "'914 Patent"); 6,154,637 (the "'637 Patent"); 6,308,045 (the "'045 Patent"); 6,990,319 (the "'319 Patent"); 7,426,387 (the "'387 Patent"); 7,428,412 (the "'412 Patent"); and 7,444,146 (the "'146 Patent").  (hereinafter collectively referred to as the "Asserted Patents").

4.    I had the opportunity to physically inspect an Avionica MiniQAR and SecureLink router provided by FedEx during the course of this litigation.  I attached photographs of these components to my original expert report on infringement, disclosed on December 22, 2008.

5.    During the physical inspection of the MiniQAR, a processing unit inside the Compact Flash card was identified that receives and processes flight performance data for storage in the MiniQAR.  Photographs illustrating this processing unit are attached hereto as Exhibit A, and bear bates labels McAlexander-000011 and McAlexander-000014.

6.    I have also provided my opinions on the validity of the claims of the Asserted Patents, as well as the claims of U.S. Patent Nos. 6,108,523; 6,775,545; 6,154,636; 6,308,044 and 6,173,159 (collectively, the "Patents-in-Suit").

7.    In connection with rendering my opinions on the validity of the Patents-in-Suit, I had the opportunity to review the opinions from FedEx's two technical experts, Mr. Koperda and Dr. Helfrick.  I analyzed the expert opinions of both, and have offered rebuttal opinions to those opinions offered by Messrs. Kopreda and Helfrick.

8.     One aspect of my analysis of validity was to consider the individual theories of validity.  During that analysis, I considered whether references cited by Mr. Koperda and Dr. Helfrick were cumulative of those already considered by the USPTO.  Along those lines, I compared the ARINC 751 and 632 characteristics (referred to by FedEx as the "Gatelink Documents") with U.S. Patent No. 5,359,446.  In my opinion, the "Gatelink Documents" disclose, at most, a direct line-of-sight infrared or fiber optic cable link between aircraft and ground based equipment.  Accordingly, in my opinion, the "Gatelink Documents" were merely cumulative of the '446 Patent cited in the Patents-in-Suit.

9.     During my analysis of validity, I also considered the ARINC FCM-69.  In my opinion, the presentation included at Attachment 2 discloses, at most, the potential task of developing an aircraft to ground communications link using a spread spectrum radio link at some point in the future.

10.     The FCM-69 presentation may show a desire to develop such a system in the future, but I have not seen any evidence that such a system was being developed, least of all working, in any form.  Importantly, in my opinion, the ARINC FCM-69 does not provide the detail required to enable one of ordinary skill in the art to develop an operable system without undue experimentation.

11.     During my consideration of FedEx's obviousness positions, I also reviewed the L-1011 reference.  The L-1011 reference is a 1978 paper that describes flight data recording in a QAR tape recorder.  Data in the QAR could be retrieved by manual means using removable storage media.

12.　　The L-1011 paper discloses concepts like those disclosed in the background of the '165 Patent, such as U.S. Patent No. 4,729,102, of recording flight data and retrieving the data by manual means.  As such, the L-1011 reference was merely cumulative of references before the Examiners during the prosecution of the Patents-in-Suit.

13.　　I also reviewed the paper "Digital Telemetry System for Real-Time Analysis of Airbus A320 Flight Test Results," referred to herein as the "Airbus" reference.  The Airbus reference relates to a telemetry system for gathering and real time communication of data for test flights during flight.  The Airbus reference also describes manual retrieval of magnetic tape after flight.

I affirm under the penalty of perjury that the foregoing representations are true and accurate to the best of my knowledge.

Executed this February 1, 2010.


Joseph C. McAlexander, III

Exhibit A



MCALEXANDER-000011



MCALEXANDER-000014

**Exhibit 33**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

HARRIS CORPORATION,
a Delaware corporation,

     Plaintiff,

vs.                               Case No. 6:07-CV-1819-ORL-28 KRS

FEDERAL EXPRESS
CORPORATION, a Delaware
corporation,

     Defendant.

_____/

FEDERAL EXPRESS
CORPORATION,

     Counter-Plaintiff,

vs.

HARRIS CORPORATION,

     Counter-Defendant.

_____/

## DECLARATION OF JAMES J. ZIARNO IN SUPPORT OF PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

I, James J. Ziarno, am over the age of eighteen and I am competent to give the testimony set forth herein based on my personal knowledge:

1.     I have been an engineer for 35 years.  For 25 of those years, I have been employed at Harris Corporation.  I am also one of the named inventors of the Patents-in-Suit.

2.     Prior to the filing of the '165 Patent, I was generally aware of the ARINC 751 characteristic, an ARINC document discussing the concept of using a direct line-of-

1

sight infrared ("IR") link or fiber optic cables to transfer data between an aircraft and an airport based terminal.

3.      Although I knew of the ARINC 751 document at the time of filing of the '165 Patent, as an engineer I did not view the reference as material to the invention. Direct line-of-sight IR transmission is much different than the invention, which uses a wireless RF spread spectrum transmission of data.

4.      I have no clear recollection of the ARINC 632 document prior to filing the '165 Patent. I have since reviewed the ARINC 632 document.

5.      Near the time of the invention, companies in the industry, such as Eldec Corporation, were focused on the IR link system, the very technology described in ARINC 751 and ARINC 632 documents.

6.      Nonetheless, in the background of the '165 Patent describes the use of the direct line-of-sight IR link and of a fiber optic cable as other types of systems considered for use by others in the industry. The background also cites to U.S. Patent No. 5,359,446, which, according to the face page of the '446 Patent, was assigned to Eldec Corporation, and further described the IR link.

7.      Although the direct line-of-sight infrared link and fiber optic cables are discussed in the specification for the '165 Patent, it is my understanding that the ARINC 751 and 632 were filed in subsequent prosecutions in an abundance of caution.

8.      I never intentionally withheld any material document or information from the USPTO.

I declare under the penalty of perjury that the foregoing representations are true and accurate to the best of my knowledge.

Executed this February 1, 2010.

_____
James J. Ziarno