**Exhibit 34**

US005359446A

# United States Patent [19]

## Johnson et al.

[11]   **Patent Number:     5,359,446**

[45]   **Date of Patent:     Oct. 25, 1994**

[54]   **WIDE-ANGLE, HIGH-SPEED, FREE-SPACE OPTICAL COMMUNICATIONS SYSTEM**

[75]   Inventors:   **Bruce E. Johnson**, Seattle; **Thomas A. Lindsay**, Brier; **David L. Brodeur**, Seattle; **Randall E. Morton**, Redmond; **Mark A. Regnier**, Bothell, all of Wash.

[73]   Assignee:   **ELDEC Corporation**, Lynnwood, Wash.

[21]   Appl. No.:   **943,328**

[22]   Filed:   **Sep. 10, 1992**

[51]   Int. Cl.$^5$ ............................................. H04B 10/00

[52]   U.S. Cl. .................................... 359/152; 359/143; 359/154; 359/161; 359/172

[58]   Field of Search ............... 359/113, 143, 129, 144, 359/152–154, 159, 161, 164, 167, 172, 194

[56]   **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,422,180 | 12/1983 | Wendt | 359/144 |
| 4,691,385 | 9/1987 | Tupman | 455/607 |
| 4,882,770 | 11/1989 | Miyahira et al. | 455/603 |
| 4,921,468 | 5/1990 | Miwa | 359/144 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0338789 | 10/1989 | European Pat. Off. | 359/159 |
| 4034154 | 5/1991 | Fed. Rep. of Germany | 319/143 |
| 0037742 | 4/1981 | Japan | 359/159 |
| 0078233 | 4/1986 | Japan | 359/152 |

### OTHER PUBLICATIONS

"The Use of Directed Optical Beams in Wireless Computer Communications", Yen et al., *IEEE Globe Comm.* 85, New Orleans, Dec. 2–5, 1985. pp. 1181–1184.

Ian Catling et al., "Road Transport Informatics in Europe—Major Programs and Demonstrations," *IEEE Transactions on Vehicular Technology*, vol. 40, No. 1, Feb. 1991, pp. 132–140.

"Colloquium on Short Range Communication Systems and Techniques," IEE, 1983.

F. R. Gfeller et al., "Infrared Communication for In–house Applications," *Digest Papers, IEEE Computer Society International Conference, 17th Proceeding Fall*

*COMPCON '78* (IEEE Cat. No. 78CH1388–8C), pp. 132–138.

W. L. Hayden et al., "NASA's Flight–Technology Development Program: A 650 Mbps Laser Communications Testbed," *Proceedings of the SPIE*, vol. 1417, 1991, pp. 182–199.

K. A. Joyce, "Low–Cost Pointing–and–Tracking System for Optical Communications," Applied Technology Associates, Inc., Final Report, Oct. 1987–May 1988.

(List continued on next page.)

Primary Examiner—Richard E. Chilcot, Jr.
Assistant Examiner—K. Negash
Attorney, Agent, or Firm—Christensen, O'Connor, Johnson & Kindness

[57]   **ABSTRACT**

A free-space optical communications system for transmitting data between an aircraft computer system (14) and a ground-based computer system (12). The system includes a pair of corresponding optical transmitters (36) and optical receivers (38) that transmit and receive optical signals transmitted between the two computer systems. Included within each optical transmitter is one or more light-emitting diodes (42) that produce optical signals corresponding to the data to be transmitted. A beam-forming prism (44) is bonded directly to the light-emitting diodes to direct the optical signal uniformly over a target area. The optical receiver includes one or more infrared windows (50) to reduce the amount of ambient light received by the optical receiver. A compound parabolic concentrator (64) collects light transmitted from the optical transmitter and directs the light onto an avalanche photodiode (66), which includes thermal bias compensation. An AC network couples the output signal of the photodiode to a transimpedance amplifier (70). An optional optical shroud (34) surrounds the optical transmitters and receivers to further reduce the amount of ambient light that is received by the optical receivers.

**17 Claims, 5 Drawing Sheets**



**5,359,446**

Page 2

## OTHER PUBLICATIONS

H. Kamimura et al., "Radiated Optical Communication System for Mobile Robots," *Proceedings of the 4th International Conference on Automated Guided Vehicle Systems*: AGVS–4, Jun. 1986, pp. 123–128.

E. L. Kerr, "Integral Sunshade for an Optical Reception Antenna," *Optical Engineering*, vol. 30, No. 9, Sep. 1991, pp. 1372–1381.

M. King, "Security with Free Space Optical Link," *New Electronics*, vol. 22, No. 5, Jun. 1989, pp. 58–59.

Michael D. Kotzin et al., "A Duplex Infrared System for In–Building Communications," 36th IEEE Vehicular Technology Conference, May 1986, pp. 179–185.

H. Levenstein, "Wide Field of View Optics Applied to Multi–User Optical Communication," *Proceedings of the SPIE—The International Society for Optical Engineering*, vol. 1044, Jan. 1989, pp. 173–178.

A. K. Majumdar et al., "Wide–beam Atmospheric Optical Communication for Aircraft Application Using Semiconductor Diodes," *Applied Optics*, vol. 22, No. 16, pp. 2495–2504.

R. G. Marshalck, "An Optical Approach to Proximity–Operations Communications for Space Station Freedom," *Proceedings of the SPIE–The International Society for Optical Engineering*, vol. 1417, Jan. 1991, pp. 53–62.

J. J. O'Reilly et al., "New APD–Based Receivers Providing Tolerance to Alignment Jitter for Binary Optical Communications," *IEE Proceedings J (Optoelectronics)*, vol. 135, No. 2, Apr. 1988, pp. 119–125.

T. N. Rodgers, "An Optical Communication System for Aircarft," *SPIE*, 1978, pp. 108–113.

Steven E. Shladover, "Automatic Vehicle Control Developments in the PATH Program," *IEEE Transactions on Vehicular Technology*, vol. 40, No. 1, Feb. 1991, pp. 114–130.

Romuald von Tomkewitsch, "Dynamic Route Guidance and Interactive Transport Management with ALI–SCOUT," *IEEE Transactions on Vehicular Technology*, vol. 40, No. 1, Feb. 1991, pp. 45–50.

L. E. Wood et al., "Optical Communication Systems for Short–Haul Applications," Mar. 1973.

**U.S. Patent**

Oct. 25, 1994

Sheet 1 of 5

5,359,446



Fig. 1.



*Fig. 2.*

U.S. Patent

Oct. 25, 1994

Sheet 3 of 5

5,359,446



*Fig. 3.*

U.S. Patent

Oct. 25, 1994

Sheet 4 of 5

5,359,446



*Fig.4.*

**U.S. Patent**   Oct. 25, 1994   Sheet 5 of 5   **5,359,446**



*Fig. 5.*

1

# WIDE-ANGLE, HIGH-SPEED, FREE-SPACE OPTICAL COMMUNICATIONS SYSTEM

## FIELD OF THE INVENTION

The present invention relates to communications systems in general and, in particular, to infrared, free-space optical communications systems.

## BACKGROUND OF THE INVENTION

In the last 20 years, computers have played an ever increasing role in the airline industry. For example, computers are used onboard an aircraft for such tasks as aiding navigation, scheduling maintenance, monitoring the operation of equipment as well as for controlling the position of the flight control surfaces to fly the aircraft. On the ground, computers are used to ticket passengers, keep track of their luggage, maintain records of seat availability, schedule departure changes, etc. In the past, there has only been a limited exchange of data between the aircraft computer system and the ground-based computer system used by an airline. Such exchange usually took place by hand carrying a floppy disk between the two computer systems.

Since the invention of computer networks, there has been considerable effort within the airline industry devoted to developing a communication system that connects the aircraft computer system to the ground-based computer system. Early efforts used digital radio, but were unsuccessful because of the limited bandwidth available due to radio frequency spectrum allocation and contention/interference. One suggested method of establishing a higher bandwidth communication system was to connect the two computer systems together using a fiber optic communications link. In such a system, a fiber optic cable would extend from the ground-based computer system to a fiber optic cable connector disposed on the side of the aircraft. As the aircraft taxied into a dock, a member of the maintenance crew could plug the fiber optic cable into the side of the aircraft, thereby allowing the data communication to take place. However, such a solution was deemed undesirable due to the fragile nature of fiber optic cable connectors and the need for ground crew action. Additionally, it is possible that the aircraft could pull away from the dock without disconnecting the cable, causing subsequent delays and extensive damage to the fiber optic cable and aircraft.

To overcome the problems associated with a fiber optic cable-based communication system, an alternate communications scheme was suggested by the airlines industry. This alternate scheme involved the use of a free-space optical communications system that could transmit information between the aircraft computer system and the ground-based computer system using a modulated infrared light beam. The free-space optical communications system would eliminate the need for the fiber optic cable and the possibility that damage might occur because the aircraft may pull away without disconnecting the cable. However, current free-space optical communications systems suffer from at least three problems that in combination prevent such communications systems from being readily usable in an aircraft to ground-based computer communication link. First, current free-space optical communications systems do not operate at the high data rate that the airlines are requiting for a commercially viable communication system. For example, the Aeronautical Radio Incorpo-

2

rated (ARINC) standards group is currently developing a communications protocol that requires data communication between an aircraft and a ground-based computer system be accomplished at speeds of 100 Mbits/sec. Second, current state of the art high-speed, free-space optical communications systems often have a narrow field of view and, as such, require additional control systems to align the optical transceivers to ensure proper data transmission. Including such control systems into a free-space optical communications system adds significantly to the cost of the system, as well as introduces a likely source of system failure. Finally, current free-space optical communications systems will not operate in all types of weather conditions experienced at an airport.

Therefore, a need exists for a free-space optical communications system that can transmit data between an aircraft and a ground-based system at high speeds over all weather conditions. Additionally, the communication system should have a wide field of view to eliminate the need for any control systems to align the optical components of the system.

## SUMMARY OF THE INVENTION

The present invention comprises a free-space optical communications system that transmits data between two computer systems at high speed, in all weather conditions and without the need for precise alignment mechanisms. In the preferred embodiment of the present invention, the communication system is used to transmit information between an aircraft computer system and a ground-based computer system. The system includes a pair of optical transceivers, one of which is located on the aircraft and the other preferably located on an adjacent passenger loading bridge. Each transceiver includes an optical transmitter having one or more light-emitting diodes (LEDs) that produce optical signals corresponding to the data to be transmitted. Optically coupled to the LEDs is a nonimaging optical device such as a beam-forming prism to focus and uniformly distribute the optical signals over a target area in which the optical signals are to be received. Each transceiver also includes an optical receiver having one or more optical filters to reduce the amount of ambient light entering the receiver. A nonimaging optical collector such as a compound parabolic concentrator (CPC) is coupled with the optical filters and collects a portion of the optical signals produced by the optical transmitter. The CPC is optically coupled to a photodiode, such as an avalanche photodiode (APD), which produces an electrical output signal that corresponds to the optical signals received. The APD diode includes a biasing voltage supply having temperature compensation and automatic gain control (AGC) to allow operation over a wide temperature and signal level range. A current shunt is connected to the output of the APD diode to shunt away a portion of the output signal that is produced due to any ambient light collected by the CPC. An AC coupling means extracts a time varying portion of the output signal and feeds the time varying portion to an amplifier. The output of the amplifier is coupled to the receiving computer system. An optional optical shroud extends between the adjacent passenger loading bridge and the aircraft to surround the pair of optical transceivers to reduce the amount of ambient light that is collected by the optical receivers.

5,359,446

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and many of the attendant advantages of this invention will become more readily appreciated as the same becomes better understood by reference to the following detailed description, when taken in conjunction with the accompanying drawings, wherein:

FIG. 1 shows a free-space optical communications system according to the present invention that transmits data between an aircraft computer system and a ground-based computer system;

FIG. 2 shows an optional optical shroud that extends from a passenger loading bridge to the aircraft;

FIG. 3 shows a block diagram of the free-space optical communications system according to the present invention;

FIG. 4 shows an optical transmitter and an optical receiver according to the present invention; and

FIG. 5 shows an optical window located on the side of the aircraft for transmitting and receiving optical communication signals.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is a duplex, free-space optical communications system for transmitting information between two computer systems. As discussed above, the preferred embodiment of the present invention is used to transmit information between an aircraft computer system and a ground-based computer system. However, the present system could also be used to transmit information between any two computer systems, stationary or mobile, such as an automobile computer and a toll booth computer system, or from a computer system on a train to a ground-based computer system, etc.

FIG. 1 shows an aircraft 10 parked near a passenger loading bridge 20. As will be further described below, the free-space optical communications system 30 according to the present invention allows data to be transmitted using infrared light beams that are transmitted between an optical transceiver located behind an infrared window disposed in the side of the aircraft and a corresponding optical transceiver located underneath a passenger loading bridge 20. The transceiver disposed on the underside of the passenger loading bridge 20 is coupled to the ground-based computer system via a communications cable 40 such as a fiber optic cable. In the preferred embodiment, the optical shroud 34 is mounted on the underside of the passenger loading bridge 20. The free-space optical communications system can transmit data between the aircraft computer system (not shown) and the ground-based computer system (also not shown) at a rate of 100 Mbits/sec. Additionally, as will be further described below, the free-space optical communications system according to the present invention has wide transmission beams and corresponding wide fields of view to compensate for misalignments between the aircraft 10 and the passenger loading bridge 20 and needs no active control mechanisms to align the optical transceivers.

FIG. 2 shows how the free-space optical communications system according to the present invention is disposed underneath the passenger loading bridge 20 to transmit information between the aircraft computer system and the ground-based computer system. The optical shroud 34 extends between the passenger loading bridge 20 and the aircraft 10 to reduce the amount of ambient light that reaches the optical transceivers when the aircraft is parked at the passenger loading bridge. The optical shroud 34 has a horn-shaped construction with a cross-sectional area slightly larger than the transmitted beam from the transceiver disposed on the passenger loading bridge 20. The shroud 34 is approximately 1 meter long. Although the preferred embodiment of the present invention uses the optical shroud to reduce the amount of ambient light that enters the receivers, it will be apparent to those skilled in the art that such a shroud is not always required.

The communications cable 40 extends between the optical transceiver located under the passenger bridge 20 and the ground-based computer system (not shown) to carry the data to be transmitted by and the data received from the ground-based computer system.

As will be further discussed below, the optical transmitters transmit infrared optical signals uniformly over large target areas. Correspondingly, the optical receivers have large fields of view. This ensures that data communication can take place regardless of where in the target area a corresponding transceiver is located due to misalignment of the transceivers.

The size of the open end of shroud 34 at the point where the shroud meets the aircraft is large enough so that it does not interfere with the target area on the aircraft. In the preferred embodiment, the aircraft transceiver includes an infrared window 50 that covers the transceiver and is located flush with the surface of the aircraft 10 in a position that is generally below a door 17. When the aircraft is properly docked next to the passenger loading bridge 20, the infrared window 50 will be located within the respective target area.

A block diagram of the free-space optical communications system according to the present invention is shown in FIG. 3. The free-space optical communications system 30 transmits data bi-directionally between a ground-based computer system 12 and an aircraft computer system 14. The system includes a pair of optical transceivers each of which includes a separate optical transmitter 36 and an optical receiver 38. The optical shroud 34 reduces the amount of ambient light that is received by the optical receivers 38. To further reduce the amount of ambient light that enters the optical receivers 38, the transceivers include a pair of infrared windows 50. Data is transmitted between the two computer systems 12 and 14 via a modulated infrared light beam produced by the optical transmitters 36. Each optical transceiver is coupled to its respective computer system via a communications cable 40. In the preferred embodiment of the present invention, data is transmitted in full duplex between the ground-based computer system 12 and the aircraft computer system 14.

A more detailed view of the optical transmitter 36 and the optical receiver 38 is shown in FIG. 4. For purposes of illustration, FIG. 4 shows one optical transmitter 36 and a corresponding optical receiver 38. However, as will be appreciated, the system includes a second optical transmitter and corresponding optical receiver to transmit data in the opposite direction. The optical transmitter 36 includes a plurality of infrared light emitting diodes (LEDs) 42 driven by a transistor 43. An electronic signal that corresponds to the data to be transmitted is applied to the base electrode of the transistor 43, causing the transistor 43 to conduct current and in turn causing the plurality of LEDs 42 to produce an infrared optical signal. In the present em-

<table>
<tr><td>5</td><td>6</td></tr>
</table>

bodiment, the LEDs 42 comprise a two-by-two array of infrared LEDs connected in series to increase the optical power of the infrared signals produced.

Because the infrared light produced by the plurality of LEDs 42 extends at wide angles from the face of the LEDs, a beam-forming dielectric prism 44 is optically coupled to the face of the LEDs 42. As a result, the beam-forming prism 44 collects the infrared light and directs it towards the corresponding optical receiver 38. The beam-forming prism is made of any type of transparent optical material, including plastic or glass. The dimensions of the prism are chosen depending on the size of the target area and the separation between the transceivers. The beam-forming prism should take into account the illumination pattern of the LEDs and the difference in the index of refraction between the material that comprises the prism and the surrounding air so that infrared light produced by the plurality of LEDs 42 is directed with equal intensity over the entire target area. The angles of the sides of the prism are approximately equal to the angles of the optical beam required to cover the target area. The design parameters are defined to optimize optical intensity in the target area.

The beam-forming prism 44 increases the optical power that is transmitted in the direction of the receiver as well as distributes the optical signals evenly over the target area. As described above, the target area is a rectangular section. The size of the target area compensates for variations or misalignments between the aircraft and the passenger loading bridge. If the aircraft is parked such that the corresponding optical receiver 38 is located anywhere in the target area, then communication can take place between the aircraft and ground-based computers.

Disposed at the output end of the beam-forming prism 44 is an infrared window 50a. The infrared window 50a passes light having frequencies in the infrared range and serves to protect the optical transmitter from dirt, rain, etc.

The optical receiver 38 includes an infrared window 50b that preferably only passes light having frequencies in the infrared range of the optical transmitter 36. Disposed directly behind the infrared window 50b is a cylindrical lens 60. The cylindrical lens 60 serves to modify a circular field of view of a compound parabolic concentrator 64 into an elliptical field of view, where a noncircular field of view is needed. The cylindrical lens 60 therefore increases the light that is detected by receiver 38 in one axis.

Infrared light travelling through the infrared window 50b and the cylindrical lens 60 is collected by the dielectric, compound parabolic concentrator (CPC) 64. The CPC 64 is optically coupled to the light-sensitive surface of a photodiode 66. Preferably, the photodiode 66 is an avalanche photo detector (APD) type that conducts an electrical current that is proportional to the level of light received, however, other types of photo detectors could be used such as a PIN photodiode. The CPC 64 has superior light-gathering properties as compared to the imaging lens typically used with optical detectors. The CPC has a large far field of view and in combination with the cylindrical lens 60 can receive light from anywhere in the target area with high efficiency. The design parameters of the CPC are chosen to maximize the optical power detected in the target area. This large field of view is also sharply defined such that any light outside the field of view is not directed to the APD diode 66. This property also helps reduce the

amount of ambient light received by the diode. Finally, the light-gathering properties of the CPC are nearly uniform across its field of view. Therefore, there are no "dead spots" within the CPC's field of view that would attenuate any optical signal detected. The CPC 64 is preferably made of a dielectric material bonded directly to the light-gathering surface of the APD diode 66 with an optical grade epoxy. The details of how to construct a compound parabolic concentrator are well known to those skilled in the optical arts and therefore will not be discussed further.

The APD diode 66 is biased with a temperature compensated high voltage source 68 that produces photo current gain that does not substantially vary over wide temperature ranges. Disposed between the high voltage source 68 and the APD diode 66 is a resistor $R_1$ and a capacitor $C_1$. The resistor $R_1$ acts to provide automatic gain control for the optical receiver 38 as follows. In general, the electrical current that is generated by an APD diode 66 for a given amount of light increases exponentially as the bias voltage increases. However, as the APD diode 66 in the receiver 38 conducts more and more current due to more light being received, the voltage drop across the resistor $R_1$ increases thereby reducing the voltage that biases the APD diode 66, causing the APD diode to conduct less current. This negative feedback action tends to maintain the level of current that is conducted by the APD diode relatively constant despite fluctuations in the amount of input light received, thereby preventing the APD diode from saturating and keeping the output signal produced by the APD diode relatively uniform in magnitude. The capacitor $C_1$ operates in conjunction with the resistor $R_1$ such that the negative feedback is determined by slow or average variations of the received optical signal strength.

The temperature compensation provided by the high voltage source 68 is accomplished by comparing a fixed fraction of the bias voltage applied to the APD diode to a reference voltage produced by an IC temperature sensor (not shown) within the high voltage source 68. The difference between these two voltages drives a high-gain, negative feedback circuit that includes a fixed gain DC to DC converter (also not shown) so that the bias voltage adjusts over temperature to maintain constant APD current gain.

Connected between the output of the APD diode 66 and ground or other reference potential is a resistor $R_2$. Although the optical shroud 34 and the infrared window 50b remove most of the ambient light that may be impinging upon the APD diode 66, it is invariable that some ambient light will be collected by the CPC 64 and be passed to the APD diode. A coupling capacitor $C_2$ is connected between the output of APD diode 66 and a transimpedance amplifier 70. The capacitor $C_2$ passes only a time-varying portion of the output signal to the amplifier whereas current conducted by the diode 66 due to the ambient light is shunted to ground by resistor $R_2$. The time-varying portion of the output signal is directly proportional to the power of the optical signals produced by the optical transmitter 36 and received by the APD diode 66.

The transimpedance amplifier 70 with appropriate additional circuitry (not shown) converts an AC current flowing through the capacitor $C_2$ into a digital voltage signal that is transmitted to either the aircraft computer system 14 or the ground-based computer

7

system depending on whether the optical receiver 38 is located on the aircraft or on the ground.

As stated above, the free-space communications system according to the present invention also includes another optical transmitter and another optical receiver that transmit and receive data in the reverse direction. Together, these pairs of corresponding optical transmitters and receivers allow full duplex communication to take place between the aircraft computer system and the ground-based computer system. In operation, it is not necessary to vary the frequency of the optical signals that are transmitted from the aircraft to the ground-based computer system with respect to the frequency of the optical signals that are transmitted from the ground-based computer system to the aircraft. Full duplex transmission can take place if precautions are taken to ensure that the optical signals transmitted by a transceiver's optical transmitter are not received by the transceiver's own optical receiver. This is accomplished in the present invention by splitting each transceiver's window into two halves 50a and 50b as shown and discussed in further detail below.

FIG. 5 shows an infrared window 50 disposed on the exterior surface of an aircraft 10. The window includes two separate infrared windows 50a and 50b similar to those shown in FIG. 4. The window is mounted flush with the outer surface of the aircraft 10. A divider 55 separates the two infrared windows 50a and 50b to prevent light transmitted from the beam-forming prism 44 from leaking into the cylindrical lens 60. By preventing such leakage or cross-talk, the communication system according to the present invention can operate in full duplex at high data rates using the same frequency light pulses for data transmission in both directions.

As will be appreciated, the communication system according to the present invention is "passive" in the sense that no special equipment is needed to align the optical transceivers. This has the benefit of not only being cheaper to manufacture but is also less likely to malfunction as the communication system is exposed to the environment.

While the preferred embodiment of the invention has been illustrated and described, it will be appreciated that various changes can be made therein without departing from the spirit and scope of the invention.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A free-space optical communications system for transmitting data from an aircraft computer system to a ground-based computer system, comprising:

an optical transmitter coupled to the aircraft computer system for producing optical signals that correspond to the data to be transmitted between the aircraft computer system and the ground-based computer system, wherein the optical transmitter includes:

(a) a light source that produces optical signals corresponding to the data to be transmitted;

(b) a horn-shaped beam former, coupled to the light source, for gathering the optical signals produced by the light source and for distributing the optical signals uniformly over a target area;

an optical receiver coupled to the ground-based computer system, for receiving the optical signals produced by the optical transmitter, wherein the optical receiver includes:

8

(a) optoelectronic means for producing an output signal that corresponds to the data transmitted; and

(b) a compound parabolic concentrator coupled to the optoelectronic means, for gathering a portion of the optical signals produced by the light source and for directing the portion of the optical signals gathered to the optoelectronic means.

2. The free-space optical communications system of claim 1, further comprising:

an optical shroud that extends between the optical transmitter and the optical receiver for reducing the amount of ambient light that is received by the optical receiver coupled to ground-based computer system; and

light-filtering means disposed in front of the optoelectronic means for reducing the amount of ambient light directed to the optoelectronic means.

3. The free-space optical communications system of claim 1, wherein the optical receiver further includes means for removing a portion of the output signal due to ambient light received by the optical receiver.

4. The free-space optical communications system of claim 1, further comprising:

gain control means coupled to the optoelectronic means, for regulating the magnitude of the output signal produced by the optoelectronic means.

5. The free-space optical communications system of claim 1, further including:

a temperature-compensated biasing means for providing a bias voltage to the optoelectronic means.

6. A free-space optical communications system for transmitting data bi-directionally between an aircraft computer system and a ground-based computer system, comprising:

a first optical transmitter coupled to the aircraft computer system and a second optical transmitter coupled to the ground-based computer system, each transmitter including

(a) one or more light-emitting diodes (LEDs) that produce optical signals corresponding to the data to be transmitted between the aircraft computer system and the ground-based computer system;

(b) a horn-shaped beam former optically coupled to one or more LEDs to collect the optical signals produced by the one or more LEDs and direct the optical signals toward a corresponding optical receiver; and

a first optical receiver coupled to the ground-based computer system and a second optical receiver coupled to the aircraft computer system that receive the optical signals transmitted from a corresponding optical transmitter, wherein each optical receiver includes:

(a) a photodiode that produces an output signal that is proportional to a received optical signal;

(b) a compound parabolic concentrator bonded to the photodiode that collects the optical signals transmitted from the optical transmitter and directs the optical signals onto the photodiode;

(c) current shunt means coupled to an output of the photodiode for shunting away a portion of the output signal that is due to ambient light collected by the compound parabolic concentrator; and

shroud means for surrounding the first and second optical receivers to reduce the amount of ambient light received by the photodiodes.

9

**7.** The free-space optical communications system of claim **6,** wherein the first and second optical receiver each includes:

an optical filter disposed between the corresponding optical transmitter and the photodiode.

**8.** The free-space optical communications system of claim **6,** the first and second optical receivers each include:

a temperature-compensated voltage supply that provides a temperature-compensated biasing voltage to the photodiode.

**9.** The free-space optical communications system of claim **6,** the first and second optical receivers each include:

means for extracting a time varying portion of the output signal produced by the photodiode.

**10.** A free-space optical communications system for transmitting data bidirectionally between an aircraft computer system and a ground-based computer system, comprising:

a pair of optical transmitters, one of which is coupled to the aircraft computer system and another of which is coupled to the ground-based computer system, wherein each of the optical transmitters includes:

(a) one or more light-emitting diodes (LEDs) that produce optical signals that correspond to data to be transmitted;

(b) a beam-forming horn optically coupled to one or more LEDs for uniformly distributing optical signals produced by the LEDs over a target area, and

a pair of optical receivers, one of which is coupled to the aircraft computer system and another of which is coupled to the ground-based computer system, wherein each optical receiver includes:

(a) a compound parabolic concentrator for gathering light that impinges upon the optical receiver;

(b) a photodiode bonded to the compound parabolic concentrator, the photodiode producing an electrical signal that is proportional to the amount of light gathered by the compound parabolic concentrator; and

(c) filter means disposed in front of the compound parabolic concentrator for reducing the amount of ambient light received by the photodiode.

**11.** The free space, optical communications system of claim **10,** further comprising:

an optical shroud disposed around the optical transmitters and optical receivers that reduces the amount of ambient light received by the optical receivers.

**12.** A method of optically transmitting data between an aircraft computer system and a ground-based computer system, comprising the steps of:

producing an infrared optical signal that corresponds to the data to be transmitted;

directing the infrared optical signal through a beam-forming horn so that the optical signal is evenly distributed within a target area in which an optical receiver is positioned;

gathering light at the optical receiver using a compound parabolic concentrator that is bonded to a photodiode, the photodiode producing an electrical signal proportional to the amount of light gathered;

10

removing a component of the electrical signal produced by the photodiode due to ambient light gathered by the compound parabolic concentrator; and

coupling an AC component of the electrical signal produced by the photodiode to an amplifier, wherein a magnitude of the AC component of the electrical signal is proportional to the data transmitted between the aircraft computer system and the ground-based computer system.

**13.** An optical transceiver adapted to be coupled to an exterior of an aircraft for transmitting and receiving data between an aircraft computer system and a ground-based computer system comprising:

an optical transmitter for producing optical signals that correspond to data to be transmitted from the aircraft computer system to the ground-based computer system, including:

(a) one or more light sources coupled to the aircraft computer system for producing the optical signals corresponding to data that is transmitted from the aircraft computer system to the ground-based computer system;

(b) a beam-forming horn optically coupled to the one or more light sources for gathering the optical signals and distributing the optical signals uniformly over a target area;

an optical receiver for receiving optical signals that are transmitted from a second optical transmitter coupled to the ground-based computer system, including:

(a) a photodiode coupled to the aircraft computer system, the photodiode producing an output signal that is proportional to a received optical signal;

(b) a compound parabolic concentrator bonded to the photodiode that collects optical signals and directs the collected optical signals onto the photodiode; and

(c) a current shunt coupled to the output signal produced by the photodiode that shunts a portion of the output signal due to ambient light collected by the light-collecting means.

**14.** An optical communications system for transmitting data bidirectionally between a first computer system and a second computer system, comprising:

an optical transmitter coupled to the first computer system for producing optical signals that correspond to the data to be transmitted between the first computer system and the second computer system, wherein the optical transmitter includes:

(a) light-producing means for producing optical signals corresponding to the data to be transmitted;

(b) a beam-forming horn for gathering the optical signals produced by the light-producing means and for distributing the optical signals uniformly over a target area;

an optical receiver coupled to the second computer system for receiving the optical signals produced by the optical transmitter, wherein the optical receiver includes:

(a) optoelectronic means for producing an output signal that corresponds to the data transmitted;

(b) a compound parabolic concentrator bonded to the optoelectronic means for gathering a portion of the optical signals produced by the light-producing means and for directing the portion of the

5,359,446

11

optical signals gathered to the optoelectronic means; and

(c) light-filtering means disposed in front of the optoelectronic means for reducing the amount of ambient light directed to the optoelectronic means.

15. The optical communications system of claim 14, wherein the optical receiver further includes current shunt means coupled to the optoelectronic means for

12

removing a portion of the output signal due to ambient light received by the optical receiver.

16. The optical communications system of claim 14, further comprising:

gain control means coupled to the optoelectronic means for regulating the magnitude of the output signal produced by the optoelectronic means.

17. The optical communications system of claim 14, further including:

a temperature-compensated biasing means for providing a bias voltage to the optoelectronic means.

\* \* \* \* \*

**Exhibit 35**

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6866th)

# United States Patent
Wright et al.

(10) **Number:**　US 6,047,165 C1

(45) **Certificate Issued:**　Jun. 9, 2009

(54) **WIRELESS, FREQUENCY-AGILE SPREAD SPECTRUM GROUND LINK-BASED AIRCRAFT DATA COMMUNICATION SYSTEM**

(75) Inventors: **Thomas H. Wright**, Indialantic, FL (US); **James J. Ziarno**, Malabar, FL (US)

(73) Assignee: **Harris Corporation**, Melbourne, FL (US)

**Reexamination Request:**
　No. 90/008,567, Mar. 30, 2007

**Reexamination Certificate for:**
　Patent No.:　**6,047,165**
　Issued:　**Apr. 4, 2000**
　Appl. No.:　**08/557,269**
　Filed:　**Nov. 14, 1995**

Certificate of Correction issued Mar. 20, 2001.

Certificate of Correction issued Jul. 17, 2001.

(51) **Int. Cl.**
　*G05D 1/00*　(2006.01)
　*G08G 5/00*　(2006.01)
　*G06F 17/40*　(2006.01)

(52) **U.S. Cl.** .................. **455/66.1**; 455/431; 455/67.11; 455/67.13; 455/67.16; 340/945; 375/130; 375/219; 701/14; 701/35

(58) **Field of Classification Search** ........................ None
　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,729,102 A　3/1988　Miller, Jr. et al.
5,445,347 A　8/1995　Ng

5,761,625 A　*　6/1998　Honcik et al. ................. 701/14

OTHER PUBLICATIONS

ARINC Specification 632: Gate–Aircraft Terminal Environment Link (Gatelink)—Ground Side, Oct. 19, 1994 (Exhibit 4).

ARINC Characteristic 751: Gate–Aircraft Terminal Environment Link (Gatelink)—Aircraft Side, Oct. 21, 1993 (Exhibit 5).

ARINC AEEC Letter 91–079/DLK–391: Circulation of Gatelink Ad Hoc Meeting Report and Strawman Material, Apr. 5, 1991 (Exhibit 6).

ARINC AEEC Future Concepts for Maintenance Subcommittee/AMC Task Group—Avionics Pub 94–205/FCM–69; Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting Held Aug. 24–25, 1994 in Bloomington, dated Sep. 1, 1994, Minnesota (Exhibit 7).

L–1011: Flight Data Recording Systems—Background, Features, Implications and Benefits, AIAA Aircraft Systems and Technology Conference, Los Angeles, California, Aug. 21–23, 1978 (Exhibit 8).

ARINC 591: Quick Access Recorder for AIDS System (QAR), May 18, 1972 (Exhibit 9).

* cited by examiner

*Primary Examiner*—Charles Craver

(57)　　　**ABSTRACT**

A flight information communication system has a plurality of RF direct sequence spread spectrum ground data links that link respective aircraft-resident subsystems, in each of which a copy of its flight performance data is stored, with airport-located subsystems. The airport-located subsystems are coupled by way communication paths, such as land line telephone links, to a remote flight operations control center. At the flight operations control center, flight performance data downlinked from plural aircraft parked at different airports is analyzed. In addition, the flight control center may be employed to direct the uploading of in-flight data files, such as audio, video and navigation files from the airport-located subsystems to the aircraft.



US 6,047,165 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**, **8**, **17**, **23** and **30** is confirmed.

Claims **2–7**, **9–16**, **18–22**, **24–29** and **31–33** were not reexamined.

\* \* \* \* \*

**Exhibit 36**

## (12) EX PARTE REEXAMINATION CERTIFICATE (6589th)

# United States Patent
Wright et al.

(10) **Number:** US 6,308,045 C1

(45) **Certificate Issued:** *Dec. 30, 2008

(54) **WIRELESS GROUND LINK-BASED AIRCRAFT DATA COMMUNICATION SYSTEM WITH ROAMING FEATURE**

(75) Inventors: **Thomas H. Wright**, Indialantic, FL (US); **J. Ziarno**, Malabar, FL (US)

(73) Assignee: **Harris Corporation**, Melbourne, FL (US)

**Reexamination Request:**
No. 90/006,843, Nov. 5, 2003

**Reexamination Certificate for:**
Patent No.: 6,308,045
Issued: Oct. 23, 2001
Appl. No.: 09/714,584
Filed: Nov. 16, 2000

(*) Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 09/474,894, filed on Jun. 2, 1999, now Pat. No. 6,154,637, which is a continuation of application No. 08/557,269, filed on Nov. 14, 1995, now Pat. No. 6,047,165.

(51) **Int. Cl.**
*G05D 1/00* (2006.01)
*G06F 17/40* (2006.01)
*G08G 5/00* (2006.01)

(52) **U.S. Cl.** .......................... 455/431; 340/945; 375/130; 701/14; 701/35

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,675,675 A * 6/1987 Corwin et al. .............. 340/945

| | | | | |
|---|---|---|---|---|
| 4,729,102 A | * | 3/1988 | Miller et al. | 701/14 |
| 4,943,919 A | * | 7/1990 | Aslin et al. | 701/3 |
| 5,233,626 A | * | 8/1993 | Ames | 375/148 |
| 5,359,446 A | * | 10/1994 | Johnson et al. | 398/125 |
| 5,445,347 A | * | 8/1995 | Ng | 246/169 R |
| 5,646,761 A | * | 7/1997 | Medved et al. | 398/123 |
| 5,798,458 A | * | 8/1998 | Monroe | 73/587 |
| 6,092,008 A | * | 7/2000 | Bateman | 701/14 |
| 6,393,281 B1 | * | 5/2002 | Capone et al. | 455/428 |
| 6,788,935 B1 | * | 9/2004 | McKenna et al. | 455/431 |

OTHER PUBLICATIONS

"Wired Datalink for the Parked Airplane," Paper Presented at AEEC Data Link Subcommittee Meeting, May 16, 1989, 10 pages.
Mini QAR (Quick-Access Recorder), Avionics Test Solutions brochure, published by Avionica, 1996, 3 pages.
Future Concepts for Maintenance, Report of the Portable Maintenance Access Terminal (PMAT) Working Group Meeting, ARINC, 94–205/FCM–69, Sep. 1, 1994, 38 pages.
Gate–Aircraft Terminal Environment Link (Gatelink)—Ground Side, ARINC Specification 632, Dec. 30, 1994.
Airlines Electronics Engineering Committee Letter 91–079/DLK–391, Apr. 5, 1991.

.... (Continued)

*Primary Examiner*—Charles R. Craver

(57) **ABSTRACT**

A system and method for providing a retrievable record of the flight performance of aircraft includes a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft. A spread spectrum transceiver, such as a frequency hopping or direct sequence spread spectrum transceiver, is coupled to a data store. A transmitter is operative to download the flight performance data that has been accumulated and stored by the data store during flight over the spread spectrum communication signal. A ground based spread spectrum transceiver receives the spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data.



# US 6,308,045 C1
Page 2

## OTHER PUBLICATIONS

Gate–Aircraft Terminal Environment Link (Gatelink)—Aircraft Side, ARINC Characteristic 751, Jan. 1, 1994.

Aviation Week & Space Technology, "*Safety Board Urges Mandatory Use of FDR/CVRs in Commuter Transports,*" Avionics, p. 73, McGraw–Hill, Inc., Aug. 31, 1987.

Aviation Week & Space Technology, "*Conversion Approach Appears Flawed,*" Aerospace Business, vol. 139, No. 4, p. 48, McGraw–Hill, Inc., Jul. 31, 1993.

Electronic Engineering Times, "*Module is Result of Work With Apple—Plessey Makes Leap With Wireless LAN,*" Nov. 7, 1994.

* cited by examiner

US 6,308,045 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims 2, 5, 9 and 12 are cancelled.

Claims 1, 4, 7, 10 and 13–16 are determined to be patentable as amended.

Claims 3, 6, 8 and 11, dependent on an amended claim, are determined to be patentable.

1. A system for providing a retrievable record of the flight performance of an aircraft comprising:

a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising:

a) an archival data store operative to accumulate and store flight performance data during *the entire* flight of the aircraft, and

b) a frequency hopping spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during *the entire* flight over a frequency hopping spread spectrum communication signal;

a ground based spread spectrum transceiver comprising a receiver that receives the frequency hopping spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data;

a ground based archival data store coupled to said ground based spread spectrum transceiver that receives and stores said flight performance data; and

a ground based processor coupled to said archival data store for retrieving flight performance data from the ground based archival data store for further processing, *wherein said frequency hopping spread spectrum transceiver is operative to download the flight performance data after the aircraft completes its flight and lands at an airport.*

4. A system for providing a retrievable record of the flight performance of an aircraft comprising:

a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising:

a) an archival data store operative to accumulate and store flight performance data during *the entire* flight of the aircraft, and

b) a direct sequence spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative to download the flight

**2**

performance data that has been accumulated and stored by said archival data store during *the entire* flight over a direct sequence spread spectrum communication signal;

a ground based spread spectrum transceiver comprising a receiver that receives the direct sequence spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data;

a ground based archival data store coupled to said ground based spread spectrum transceiver that receives and stores said flight performance data; and

a ground based processor coupled to said archival data store for retrieving flight performance data from the ground based archival data store for further processing, *wherein said direct sequence spread spectrum transceiver is operative to download the flight performance data after the aircraft completes its flight and lands at an airport.*

7. A system for providing a retrievable record of the flight performance of an aircraft comprising:

a ground data link unit that obtains flight performance data representative of aircraft flight performance during *the entire* flight of the aircraft, said ground data link unit comprising:

a) a data store operative to accumulate and store flight performance data during *the entire* flight of the aircraft, and

b) a frequency hopping spread spectrum transceiver coupled to said data store, and comprising a transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during *the entire* flight over a frequency hopping spread spectrum communication signal; and

a ground based spread spectrum transceiver comprising a receiver that receives the frequency hopping spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data, *wherein the frequency hopping spread spectrum transceiver is operative after the aircraft completes its flight to download the flight performance data.*

10. A system for providing a retrievable record of the flight performance of an aircraft comprising:

a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising:

a) a data store operative to accumulate and store flight performance data during *the entire* flight of the aircraft, and

b) a direct sequence spread spectrum transceiver coupled to said data store, and comprising a transmitter that is operative to download the flight performance data that has been accumulated and stored by said data store during *the entire* flight over a direct sequence spread spectrum communication signal; and

a ground based spread spectrum transceiver comprising a receiver that receives the direct sequence spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data, *wherein the frequency hopping spread spectrum transceiver is operative after the aircraft completes its flight to download the flight performance data.*

13. A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of:

US 6,308,045 C1

3

acquiring flight performance data of an aircraft during *the entire* flight of the aircraft;

accumulating and storing within an archival memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft;

downloading the flight performance data that has been accumulated and stored within the archival data store during the *entire* flight over a frequency hopping spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*;

demodulating the received frequency hopping spread spectrum signal to obtain the flight performance data;

storing the demodulated flight performance data within a ground based archival data storage; and

retrieving the flight performance data via a ground based processor for further processing.

14. A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of:

acquiring flight performance data of an aircraft during *the entire* flight of the aircraft;

accumulating and storing within an archival memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft;

downloading the flight performance data that has been accumulated and stored within the archival data store during the *entire* flight over a direct sequence spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*;

demodulating the received spread spectrum signal to obtain the flight performance data;

storing the demodulated flight performance data within a ground based archival data storage; and

retrieving the flight performance data via a ground based processor for further processing.

15. A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of:

acquiring flight performance data of an aircraft during *the entire* flight of the aircraft;

accumulating and storing within a memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft;

downloading the flight performance data that has been accumulated and stored within the archival data store during the flight over a frequency hopping spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*; and

demodulating the received spread spectrum signal to obtain the flight performance data.

16. A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of:

acquiring flight performance data of an aircraft during *the entire* flight of the aircraft;

accumulating and storing within a memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft;

downloading the flight performance data that has been accumulated and stored within the data store during the flight over a direct sequence spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*; and

demodulating the received spread spectrum signal to obtain the flight performance data.

\*   \*   \*   \*   \*

**Exhibit 37**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent of **WRIGHT ET AL.** ) | |
| ) | |
| Request for Reexamination of: ) | |
| **U.S. PATENT NO. 6,047,165** ) | Examiner: C. Craver |
| ) | |
| Control No.  90/008,567 ) | |
| ) | |
| Filing Date: **March 30, 2007** ) | |
| ) | |
| Confirmation No. 8524 ) | Art Unit: 3992 |
| ) | |
| For: **WIRELESS, FREQUENCY-AGILE** ) | |
| **SPREAD SPECTRUM GROUND** ) | |
| **LINK-BASED AIRCRAFT DATA** ) | |
| **COMMUNICATION SYSTEM** ) | |
| ) | |

## NOTICE UNDER 37 C.F.R. §1.565(a)
## CONCERNING LITIGATION ACTIVITY

Mail Stop Ex Parte Reexam
Commissioner for Patents
P. O. Box 1450
Alexandria, VA  22313-1450

Sir:

        Applicants advise the U.S. Patent and Trademark Office
under its continuing responsibility under 37 C.F.R. §1.565(a) to
apprise the office of litigation activity regarding U.S. Patent
No. 6,047,165 that has been asserted in a counter-claim in a
litigation entitled Harris Corporation vs. Federal Express
Corporation, in the United States District Court for the Middle
District of Florida, Orlando Division, Case No. 6:07-CV-1819-Orl-
28KRS.

        Related U.S. Patent No. 6,308,045 is also asserted in a
counter-claim.

Request for Reexamination of:
U.S. PATENT NO. 6,047,165
Control No. 90/008,567
Filing Date:  March 30, 2007
_____/

Related U.S. Patent Nos. 6,104,914; 6,108,523;
6,154,636; 6,154,637; 6,173,159; 6,308,044; 6,775,545; and
6,990,319 are asserted in this litigation by Plaintiff, Harris
Corporation.

If the Examiner has any questions concerning this
notice, the undersigned attorney would appreciate a telephone
call.

Respectfully submitted,

RICHARD K. WARTHER
Reg. No. 32,180
Allen, Dyer, Doppelt, Milbrath
   & Gilchrist, P.A.
255 S. Orange Avenue, Suite 1401
Post Office Box 3791
Orlando, Florida 32802
Phone:  407-841-2330

2

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 2873421 |
| **Application Number:** | 90008567 |
| **International Application Number:** | |
| **Confirmation Number:** | 8524 |
| **Title of Invention:** | WIRELESS, FREQUENCY-AGILE SPREAD SPECTRUM GROUND LINK-BASED AIRCRAFT DATA COMMUNICATION SYSTEM |
| **First Named Inventor/Applicant Name:** | 6047165 |
| **Correspondence Address:** | RICHARD K. WARTHER, ESQ. |
| | ALLEN DYER DOPPELT MILBRATH & GILCHRIST |
| | 225 S. ORANGE AVENUE SUITE 1401 |
| | P.O. BOX 3791 |
| | ORLANDO                    FL            32802-3791 |
| | US              - |
| | - |
| **Filer:** | Richard K. Warther./Julie Lalan |
| **Filer Authorized By:** | Richard K. Warther. |
| **Attorney Docket Number:** | 01247.0002U1 |
| **Receipt Date:** | 18-FEB-2008 |
| **Filing Date:** | 30-MAR-2007 |
| **Time Stamp:** | 15:27:11 |
| **Application Type:** | Reexam (Patent Owner) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

**Exhibit 38**



**UNITED STATI DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/251,667 | 02/17/99 | WRIGHT | T | ASD-15.H6206 |

LM02/0802

RICHARD K WARTHER
ALLEN DYER DOPPELT MILBRATH & GILCHRIST
P O BOX 3791
ORLANDO FL 32802-3791

| EXAMINER |
|---|
| CROSLAND, D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2736 | |

**DATE MAILED:**   08/02/99

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

| ***Office Action Summary*** | Application No.<br>09/251,667 | Applicant(s)<br>THOMAS H. WRIGHT | |
|---|---|---|---|
| | Examiner<br>Donnie L. Crosland | Group Art Unit<br>2736 | |

☐ Responsive to communication(s) filed on _____

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _____3_____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) _59-117_____ is/are pending in the application.

☐ Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) _59-117_____ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐approved ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

   ☐ All ☐ Some* ☐None  of the CERTIFIED copies of the priority documents have been

      ☐ received.

      ☐ received in Application No. (Series Code/Serial Number) _____

      ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   *Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). _2 AND 3_

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

Application/Control Number: 09/251,667                                    Page 2

Art Unit: 2736

## DETAILED ACTION

### *Claim Rejections - 35 USC § 103*

1.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

2.      The factual inquiries set forth in *Graham* v. *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

    1. Determining the scope and contents of the prior art.
    2. Ascertaining the differences between the prior art and the claims at issue.
    3. Resolving the level of ordinary skill in the pertinent art.
    4. Considering objective evidence present in the application indicating obviousness or
       nonobviousness.

This application currently names joint inventors. In considering patentability of the claims

under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was

commonly owned at the time any inventions covered therein were made absent any evidence to

the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor

and invention dates of each claim that was not commonly owned at the time a later invention was

made in order for the examiner to consider the applicability of 35 U.S.C. 103© and potential 35

Application/Control Number: 09/251,667                                     Page 3

Art Unit: 2736

3.      Claims 59-117 are rejected under 35 U.S.C. 103(a) as being unpatentable over Miller, Jr.

et al in view of Schuchman et al and Polivka et al.

Miller shows a system for providing a retrievable record of the flight performance of an

aircraft comprising a ground data link unit that obtains flight performance data representative of

aircraft flight performance during flight of the aircraft ( col. 3, lines 50 et seq.), the ground data

link unit comprising:

an archival data store 60 (col. 13, lines 26 et seq.), operative to accumulate and store

flight data during flight (airborne) of the aircraft, and

a transmitter 28, coupled to the archival data store, and comprising a transmitter that is

operative after the aircraft completes its flight and lands at an airport to download the flight

performance data that has been accumulated and stored by the archival data store during flight

over a communication signal, col. 8, lines 33-50; It is noted that Miller states the transmission of

data during the flight, however, the skilled artisan would recognize that the data may just as well

be transmitted at the completion of the flight, such being a matter of choice as determined by

design;

an airport based receiver (ground unit, col. 9, lines 10-16, col. 13, lines 9-25) comprising a

receiver that receives the communication signal from the aircraft and demodulates (rf signals are

conventionally demodulated) the signal to obtain the flight performance data;

an airport based archival data store (memory as associated with ground readout unit 30 or

Application/Control Number: 09/251,667                                    Page 4

Art Unit: 2736

coupled to the airport based transceiver that receives and stores the demodulated flight

performance data; and

     an airport based processor 66 (or the one associated with receiver for receiving the

transmitted data from the transmitter 28) coupled to the archival data store for retrieving flight

data performance from the airport based archival data store; and

     a remote flight operations control center (to cent data processor as shown in figure 1)

operatively coupled to the airport based processor to receive and analyze the flight performance

data.

     Miller fails to suggest the communications addressing and reporting unit 28 as a

transceiver, and states that the unit 28 provides in flight data transmission, col. 8, lines 33-50.

     Schuchman shows a transceiver on the aircraft as well as a transceiver on the ground the

communication of data, see figure 9. The skilled artisan is taught from Schuchman to transmit

data from an aircraft to the airport employing transceivers at the aircraft and the airport.

     It would have been obvious to one having ordinary skill in the art at the time the invention

was made to provide transceivers on aircraft communication system of Miller transmitting stored

data because the specific use of transceivers in an aircraft communication system for transmitting

stored data is clearly suggested by Schuchman.

     Miller fails to suggest the specific communication link of "wideband spread spectrum".

Application/Control Number: 09/251,667                                    Page 5

Art Unit: 2736

Polivka shows communication of information between an aircraft and an airport being in

the form of spread spectrum. Spread spectrum modulation as well as spread spectrum

demodulation , hence a spread spectrum transceiver is realized in Polivka, see cols. 2-4.

Accordingly, Polivka clearly provides for the transmission of data from an aircraft to an

airport using the "spread spectrum transmission" technique.

It would have been obvious to one having ordinary skill in the art at the time the invention

was made to communicate data between the aircraft and airport employing a "spread spectrum

transmission" technique in Miller's aircraft to airport communication system because the specific

use and manner of data transmission between an aircraft and an airport employing the specific

"spread spectrum transmission" technique is clearly suggested by Polivka.

With respect to claims 60, 61, 70, 73, 82, 83, 95, 103, 112, 113,  note the conventional

communication network in either Polivka or Schuchman.

With respect to claims 62, 74, 84, 96, 104, 114, workstations are conventional in

operation systems for monitoring purposes. Such would not involve patentable invention.

With respect to claims 63-65, 75-77, 87-89, 97-99, 105-110, and 115-117, see Polivka.

With respect to claims 66, 78, 91, wireless routers are realized in figure 10 of Schuchman

et al.

Such would not involve patentable invention.

With respect to claims 67, 85, 86, 90, 92 see Polivka et al.

Application/Control Number: 09/251,667                                    Page 6

Art Unit: 2736

With respect to claims 71, 72 note the routers as shown in Schuchman.

With respect to claims 79, 100, see Polivka.

With respect to claims 80, 93, see figure 7 of Schuchman.

With respect to claim 101, note the routing of the data in Schuchman et al.

## 103 REJECTIONS

4.     The factual inquiries set forth in *Graham* **v.** *John Deere Co.*, 383 U.S. 1, 148 USPQ 459

(1966), that are applied for establishing a background for determining obviousness under 35

U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

It is submitted that the references to Miller, Schuchman, and Polivka establishes the scope

and the contents of the prior art.

Each reference is concerned with the communication of data or information with respect

to an aircraft and an airport.

Ii is submitted that the patents to Miller and Schuchman clearly teaches the artisan to

collect and store aircraft performance data on board of an aircraft for instant or later retrieval.

Application/Control Number: 09/251,667                                              Page 7

Art Unit: 2736

The prior art patents to Miller and Schuchman teaches the artisan to retrieve stored data from an aircraft for interpretation and display. The data may be retrieved in a wireless manner or through a line.

The prior art patent to Schuchman further teaches the artisan to route the retrieved data.

The prior art patent to Polivka teaches the artisan to communicate information between an aircraft and airport employing spread spectrum communication techniques. The information includes voice, data, and video.

In resolving the level of the skilled artisan, it is submitted the collective teachings of the references establishes the level. For instance, the transmission of aircraft data to an airport employing the conventional spread spectrum modulation and demodulation techniques.

Spread spectrum communication is also conventional in cell telephones that employs digital transmission methods.

Accordingly, patentable invention is not involve in employing conventional spread spectrum modulation/demodulation techniques for the communication of data from an aircraft to an airport.

*Conclusion*

Application/Control Number: 09/251,667                                    Page 8

Art Unit: 2736

In response to applicant's argument that , the test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references.  Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.  See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981).

5.       Any inquiry concerning this communication or earlier communications from the examiner should be directed to DONNIE L. CROSLAND whose telephone number is (703) 305-4388.

DONNIE L. CROSLAND
PRIMARY EXAMINER

DLC

**Exhibit 39**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HARRIS CORPORATION,

     Plaintiff,

v.

FEDERAL EXPRESS CORPORATION,

     Defendant.

Case No. 6:07-cv-1819-Orl-28 KRS

FEDERAL EXPRESS CORPORATION,

     Counterclaim Plaintiff,

v.

HARRIS CORPORATION,

     Counterclaim Defendant.

## FEDERAL EXPRESS CORPORATION'S SIXTH SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff, Federal Express Corporation ("Federal Express"), provides the following supplemental responses to "Plaintiff's First Set of Interrogatories to Defendant," numbered 1 through 10 ("Plaintiff's Interrogatories").

## PRELIMINARY STATEMENT

Federal Express has not completed its discovery, investigation, research, and trial preparation. The following responses are based upon information and writings presently

897635

available to and located by Federal Express and its attorneys, and such responses are made based on Federal Express's reasonable interpretation of each interrogatory. The answers herein to the interrogatories are given without prejudice to Federal Express's right to produce evidence of any additional facts. Discovery in this matter is ongoing, and Federal Express reserves the right to amend, revise, correct, supplement or clarify any of the responses based on any facts or information obtained at any time subsequent to this response, or if any inadvertent errors, mistakes or omissions should be found, to amend, revise or correct such errors, mistakes or omissions.

Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are Expressly reserved and may be interposed at the time of trial.

Federal Express's responses shall not be deemed to constitute admissions that (a) any particular document or thing exists, is relevant, non-privileged, or admissible into evidence, or (b) any statement or characterization in an interrogatory is accurate or complete.

No incidental or implied admissions are intended by the responses herein. The fact that Federal Express has answered or objected to any interrogatory should not be taken as an admission that Federal Express accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that Federal Express has answered

2

part or all of any interrogatory is not intended to be, and shall not be construed to be, a waiver by Federal Express of any part of any objection to the interrogatory.

## GENERAL OBJECTIONS

1.     Federal Express objects to every one of Plaintiff's Interrogatories, including but not limited to the "Definitions and Instructions" set forth in Plaintiff's Interrogatories, to the extent they purport to impose requirements that are different from, or in addition to, those imposed by the Federal Rules of Civil Procedure or other applicable rule or statute.  Federal Express further objects to Plaintiff's "Definitions and Instructions" as being overly broad, vague, and ambiguous.

2.     Federal Express objects to Plaintiff's Interrogatories to the extent that they seek or call for information protected by the attorney-client privilege and/or protected by the work-product doctrine, or that are subject to any other applicable privilege.  To the extent that Plaintiff's Interrogatories seek material reflecting attorney-client communications and/or material protected by the work-product doctrine, each such interrogatory is overbroad and seeks information that is beyond the scope of discovery permitted by the Federal Rules of Civil Procedure.  Federal Express will not divulge information that is protected from discovery by the attorney-client privilege or by the work-product doctrine.  Such responses as may hereafter occur shall not include any information protected by such privileges or doctrines, and any inadvertent disclosure of the same shall neither be deemed nor constitute a waiver of such privileges.

3.     Federal Express objects to the extent that Plaintiff's Interrogatories seek information that is confidential, sensitive, proprietary business information, and/or trade

3

secrets which are specifically excluded from discovery under the applicable Federal Rules of Civil Procedure. Federal Express shall make responsive information currently in its possession, custody or control available only after a suitable Protective Order or Confidentiality Agreement is in place.

4.      Federal Express objects to the extent that Plaintiff's Interrogatories seek information that is confidential, sensitive, proprietary business information, and/or trade secrets belonging to a third party. Unless ordered by the Court to do so, Federal Express will not divulge such information to the extent that it is under any obligation to maintain such third-party information in confidence and not to disclose it, unless the third party grants permission to do so.

5.      Federal Express objects to Plaintiff's Interrogatories to the extent that they fail to specify the information they seek with reasonable particularity.

6.      Federal Express objects to Plaintiff's Interrogatories as uncertain, overbroad, and unduly burdensome to the extent that many interrogatories fail to specify any specific time period, and accordingly, are not limited to events relevant to this lawsuit.

7.      Federal Express objects to Plaintiff's Interrogatories to the extent they are compound and actually include multiple interrogatories.

8.      Federal Express will respond to Plaintiff's Interrogatories with information in its possession, custody or control which is reasonably responsive to each interrogatory to the extent not specifically or generally objected to; therefore, Federal Express objects to Plaintiff's Interrogatories to the extent they purport to call for

4

information not in its actual possession, custody or control. Federal Express objects to Plaintiff's Interrogatories to the extent they purport to require Federal Express to identify and/or otherwise provide information with respect to documents no longer in its possession, custody or control on the grounds that they seek to impose requirements and/or obligations inconsistent with and in addition to the Federal Rules of Civil Procedure which are unduly burdensome and oppressive.

9.    Federal Express objects to each interrogatory to the extent it seeks information that is publicly available and/or as easily obtained by the Federal Express as by the Federal Express, on the grounds that such interrogatories are overly broad and unduly burdensome.

10.    Federal Express objects to each interrogatory to the extent it is premature and seeks information or admissions regarding facts that Federal Express has not yet had an opportunity to investigate through discovery.

11.    Federal Express objects to the definitions of the terms "you" and "your" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories to the extent that such definitions include Federal Express's "predecessor, successor, division, subsidiary, officer, director, shareholder, employee, or principal thereof, and any attorney or other agent acting on its behalf" on the grounds that such definitions are vague and ambiguous, irrelevant to the underlying litigation, contrary to the common everyday definition of such terms, call for a legal conclusion, call for defendants to make determinations without adequate foundation, and render the interrogatories overbroad, unduly burdensome and oppressive.

12.     Federal Express objects to the definition of the term "document" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories to the extent it purports to impose obligations beyond those imposed by law, and to the extent that it seeks information that is not reasonably accessible, or would pose an unreasonable and undue annoyance, burden, or expense on Federal Express.

13.     Federal Express objects to the definitions of the terms "identity" or "identify" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories on the grounds that such definitions are vague, ambiguous, contrary to the common everyday definition of such terms, and render the interrogatories overbroad, unduly burdensome and oppressive.

The foregoing General Objections are incorporated by reference into each of the following individual Responses, as though fully set forth therein, even though not specifically referred to in such Response. Subject to and without waiving these General Objections, Federal Express sets forth its specific objections and answers to the numbered interrogatories below.

## SPECIFIC OBJECTIONS AND ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

INTERROGATORY NO. 1:

Please identify any systems, including the Totally Integrated Technical Aircraft Network (TITAN) system, that assist in establishing wireless communications between an aircraft owned or operated by you, when that aircraft is on the ground, and airport-based ground equipment, and identify, by model name and number, every product of component of each such system.

**Supplemental Response to Interrogatory No. 1:**

**Subject to and without waiving any of the general or specific objections previously stated, Federal Express identifies the Avionica system of components, including a MiniQAR and a SecureLINK router, as a system that establishes wireless communications between a Federal Express aircraft (while on the ground) and ground equipment. The Avionica system of components includes a MiniQAR (part number 804-0105) and a SecureLINK router (part number 804-0500) installed on select Boeing 727 aircraft, a transceiver located near the ramp where Federal Express aircraft park, one or more connectors between the transceiver and a secure Federal Express network, and a ground-based dedicated server located in the Air Operations Center in Memphis, Tennessee.**

INTERROGATORY NO. 2:

Please identify all aircraft owned or operated by you that contain any component identified in response to Interrogatory No. 1.

**Supplemental Response to Interrogatory No. 2:**

    **Subject to and without waiving any of the general or specific objections previously stated, Federal Express states that the Avionica system of components, including a MiniQAR and a SecureLINK router, are installed on ninety-two (92) Boeing 727 aircraft, as listed in the document marked FX 86,940-967.**

INTERROGATORY NO. 3:

    Please identify any airport where you own, control or operate ground-based communications equipment used to communicate with or transfer data to or from any aircraft identified in response to Interrogatory No. 2.

**Supplemental Response to Interrogatory No. 3:**

    **Subject to and without waiving any of the general or specific objections previously stated, Federal Express states that it owns, controls, or operates communications equipment used to transfer data from the select Boeing 727 aircraft identified in response to Interrogatory No. 2, at or near the airports listed below. The select Boeing 727 aircraft only travel to airports in North America, and only transfer select data to ground equipment located at or near the following airports in the United States.**

| N | CODE | CITY |
|---|------|------|
| 1 | MEM | Memphis |
| 2 | LAX | Los Angeles |
| 3 | IND | Indianapolis |
| 4 | AFW | Fort Worth |

| N | CODE | CITY |
|---|------|------|
| 5 | ANC | Anchorage |
| 6 | ATL | Atlanta |
| 7 | BOS | Boston |
| 8 | DFW | Dallas, Texas |
| 9 | FLL | Fort Lauderdale |
| 10 | HNL | Honolulu |
| 11 | IAH | Houston |
| 12 | JFK | New York City |
| 13 | LCK | Columbus, Ohio |
| 14 | MSP | Minneapolis |
| 15 | OAK | Oakland, California |
| 16 | ONT | Ontario, California |
| 17 | ORD | Chicago |
| 18 | PDX | Portland, Oregon |
| 19 | PHL | Philadelphia |
| 20 | PHX | Phoenix |
| 21 | SEA | Seattle |
| 22 | SFO | San Francisco |
| 23 | SHV | Shreveport |
| 24 | EWR | Newark, New Jersey |
| 25 | ORF | Norfolk, Virginia |
| 26 | BNA | Nashville, Tennessee |

INTERROGATORY NO. 6:

State the basis for your contention that you do not infringe any of the Patents-in-Suit, including claim charts demonstrating your contention and identify any documents you intend to reply on in support of your contention.

9

**Supplemental Response to Interrogatory No. 6:**

Subject to and without waiving the foregoing objections, Federal Express contends that it does not infringe any claim of the Harris patents for at least the reasons set forth in the claim charts attached hereto as Exhibit 6.  The claim charts in Exhibit 6 detail the basis for Federal Express's contention that the system of Avionica components installed on select Boeing 727 aircraft (the "FedEx B-727 System") do not infringe any claim of the Harris patents.

Federal Express adopts the Expert Report of Albert D. Helfrick, P.E., Ph.D., and states that it does not infringe any claim of the Harris patents for at least the reasons stated in Dr. Helfrick's Expert Report.


INTERROGATORY NO. 7:

If you contend the Patents-in-Suit are invalid under 35 U.S.C. § 102, state the basis for that contention and identify any documents you intend to reply on in support for that contention.

**Supplemental Response to Interrogatory No. 7:**

Subject to and without waiving the foregoing objections, Federal Express contends the claims of the Patents-in-Suit are invalid under Section 102 for at least the reasons stated in the Expert Report of Albert D. Helfrick, P.E., Ph.D.

INTERROGATORY NO. 8:

If you contend the Patents-in-Suit are invalid under 35 U.S.C. § 103, state the

basis for that contention and identify any documents you intend to reply on in support for

that contention.

**Supplemental Response to Interrogatory No. 8:**

**Subject to and without waiving the foregoing objections, Federal Express**

**contends the claims of the Patents-in-Suit are invalid under Section 103 for at least**

**the reasons stated in the Expert Report of Albert D. Helfrick, P.E., Ph.D.**


INTERROGATORY NO. 9:

If you contend the Patents-in-Suit are invalid under 35 U.S.C. § 112, state the

basis for that contention and identify any documents you intend to reply on in support for

that contention.

**Supplemental Response to Interrogatory No. 7:**

**Subject to and without waiving the foregoing objections, Federal Express**

**contends the claims of the Patents-in-Suit are invalid under Section 112 for at least**

**the reasons stated in the Expert Report of Albert D. Helfrick, P.E., Ph.D.**


INTERROGATORY NO. 10:

Please identify the terms of any claims in the Patents-in-Suit that you contend

need court interpretation and provide your proposed interpretation for each term so

identified.

<u>**Supplemental Response to Interrogatory No. 10**</u>:

Federal Express objects to this Interrogatory on the grounds and to the extent that Harris has not yet identified any claim terms in dispute, either in response to Federal Express Corporation's Interrogatory No. 15 or otherwise. More specifically, Federal Express objects to Harris's refusal to identify any claim terms in dispute and to its statement, "... to the extent FedEx's expert provides an unsupported and improper opinion on the plain meaning of certain terms, clarification or rejection of these claim terms may be required." (Harris's Supplemental Response to Interrogatory No. 15; served Feb. 12, 2009). Harris's stated position represents an improper attempt to exercise a right to a supplemental expert report without seeking leave of court.

Subject to and without waiving the foregoing objections, Federal Express identifies at least the following claim terms or phrases needing court interpretation, along with Federal Express's proposed interpretation:

| Claim Term or Phrase | Federal Express's Proposed Interpretation |
|---|---|
| "airport based" | A person of ordinary skill in the art would understand the phrase "airport based" to describe items or equipment based or located inside the secured boundary of an airport. |
| "transmitting the accumulated, stored generated aircraft data" | A person of ordinary skill in the art would understand the quoted phrase to describe the transmitting of all the aircraft data that has been accumulated or stored or generated. |
| "transmitting the stored generated aircraft data" | A person of ordinary skill in the art would understand the quoted phrase to describe the transmitting of all the aircraft data that has been stored or generated. |

| Claim Term or Phrase | Federal Express's Proposed Interpretation |
|---|---|
| "a transmitter that is operative … to download said flight performance data that has been accumulated and stored by said archival data store during flight" | A person of ordinary skill in the art would understand the quoted phrase to describe a transmitter that downloads all the flight performance data that has been accumulated or stored during the entire flight. |
| "spread spectrum receiver" | A person of ordinary skill in the art would understand the term "receiver" to describe a component having only the capacity to receive. |
| "transmitting a probe beacon to the spread spectrum transceiver of the ground data link unit and selecting a sub-band frequency channel based on receipt of the probe beacon" | Federal Express contends this claim step is indefinite.<br><br>To the extent a meaning could possibly be discerned from this claim language, together with the written description in the specification, a person of ordinary skill in the art would understand the quoted phrase to describe the steps of [1] a ground-based component transmitting a probe beacon to the transceiver of a ground data link unit located onboard an aircraft, and [2] the same ground-based component selecting a sub-band frequency channel. |

Respectfully submitted this _13_ day of February, 2009.

Respectfully submitted,

_(signature)_

Lawrence K. Nodine, Trial Counsel
Georgia Bar No. 545250
NodineL@BallardSpahr.com
J. Scott Anderson
Georgia Bar No. 017266
Florida Bar No. 115053 (inactive)
AndersonJS@BallardSpahr.com
Charley F. Brown
Georgia Bar No. 086754
BrownCF@BallardSpahr.com
Robin L. Gentry
Georgia Bar No. 289889
GentryR@BallardSpahr.com
Jeffrey H. Brickman
Georgia Bar No. 080432
BrickmanJ@BallardSpahr.com

13

Sumner C. Rosenberg
Georgia Bar No. 614550
RosenbergS@BallardSpahr.com
**Ballard Spahr Andrews & Ingersoll, LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

Marilyn G. Moran
Florida Bar No. 0163813
mmoran@bakerlaw.com
**Baker & Hostetler, LLP**
P.O. Box 112
Orlando, Florida  32802-0112
Telephone 407-649-4000
Fax 407-841-0168

ATTORNEYS FOR
FEDERAL EXPRESS CORPORATION

895683

**EXHIBIT SIX**

**FEDERAL EXPRESS CORPORATION'S SUPPLEMENTAL NON-INFRINGEMENT POSITIONS**

The non-infringement positions listed in the tables below are supplemental and, as such, are not intended to replace any positions asserted previously in this action.

The term "FedEx B-727 System" refers to the system of components installed on select Federal Express Boeing 727 aircraft, which includes an Avionica MiniQAR recorder and an Avionica SecureLink router.

| Page | Patents | Claims |
|------|---------|--------|
| 2 | U.S. Patent 6,173,159 | 23 |
| 4 | U.S. Patent 6,154,636 | 1 |
| 6 | U.S. Patent 6,308,044 | 1 |
| 7 | U.S. Patent 6,775,545 | 1 |
| 9 | U.S. Patent 6,108,523 | 1 |
| 11 | U.S. Patent 6,990,319 | 1, 3, 4, 6, 8, 9; 11, 13, 14, 16, 18, 19; 21, 23, 24, 26, 28, 29 |
| 22 | U.S. Patent 6,154,637 | 31, 35-40 |
| 26 | U.S. Patent 6,104,914 | 1, 5, 6, 8-11 |
| 30 | U.S. Patent 6,308,045 C1 | 4; 14; 16 |
| 33 | U.S. Patent 6,047,165 | 1-4; 17-20 |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,173,159

| '159 CLAIM ELEMENT | '159 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 23.    A method for updating flight management files and providing a retrievable record of the flight performance of an aircraft having a unique tail number identifier comprising the steps of: | Claim 23 of the '159 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not update "flight management files" and does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| collecting data within a ground data link unit on the flight performance of the aircraft during flight of the aircraft; | |
| accumulating and storing within a data store of the ground data link unit the flight performance data during flight of the aircraft; | |
| after the aircraft lands at an airport at completion of the flight, downloading the flight performance data that has been accumulated and stored during flight over a spread spectrum communication signal to an airport based spread spectrum transceiver; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated, stored generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "downloading the flight performance data that has been accumulated and stored during the flight … to an airport based spread spectrum transceiver" as recited in this claim step. |
| demodulating the received spread spectrum signal to obtain the flight performance data; | Because less than all the accumulated aircraft data is transmitted, since on or about September 26, 2008, the FedEx B-727 System does not perform the step of "demodulating … to obtain the flight performance data" as recited in this claim step. |
| obtaining updated flight management database files based on the identification of the aircraft by its tail number identifier; | The FedEx B-727 System does not perform the step of "obtaining updated flight management database files" as recited in this claim step because the System is not configured to retrieve or obtain "flight management database files" or any other similar files. |

(Page 2)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '159 CLAIM ELEMENT | '159 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| transmitting flight navigation database files from the airport based spread spectrum transceiver to the ground data link unit over a second spread spectrum communication signal; | The FedEx B-727 System does not perform the step of "transmitting flight navigation database files from the airport based spread spectrum transceiver to the ground data link unit over a second spread spectrum communication signal" as recited in this claim step at least because: (1) the System does not retrieve or obtain "flight navigation database files" (or "flight management database files") or any other equivalent files; (2) there is no "second spread spectrum communication signal" for transmitting such files; and, (3) there is no "transmitting" of such files from the ground equipment to any onboard equipment. |
| updating a flight management computer located on board the aircraft by transferring the files from ground data link unit to the flight management computer. | The FedEx B-727 System does not perform the step of "updating a flight management computer located on board the aircraft" as recited in this claim step because there is no "flight management computer" onboard any of the Boeing 727 aircraft. (Depo. of Swanson at p. 90, line 16).

The FedEx B-727 System does not perform the step of "updating a flight management computer located on board the aircraft by transferring the files from ground data link unit to the flight management computer" as recited in this claim step at least because: (1) no "files" are transmitted from the ground equipment to any onboard equipment; and, (2) there is no "transferring ... to the flight management computer" because (a) there is no flight management computer or similar onboard computer, and (b) the System's onboard equipment is not connected to any other onboard computer. (Depo. of Swanson at p. 87, lines 3-4; p. 90, line 16; p. 92, line 9). |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,154,636

| '636 CLAIM ELEMENT | '636 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.     A system of providing a retrievable record of the "Out," "Off," "On," and "In" (OOOI) times of an aircraft comprising: | Claim 1 of the '636 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the "Out," "Off," "On," and "In" (OOOI) times of an aircraft" as recited in this claim. |
| a plurality of sensors located throughout the aircraft for sensing routine aircraft conditions and generating parametric data such as received by a flight data recorder; | |
| a multiplexer connected to the plurality of sensors for receiving the parametric data from the plurality of sensors and multiplexing the parametric data; | |
| a central processing unit positioned within the aircraft and operatively connected to the multiplexer for receiving and demultiplexing a sample of the multiplexed stream of parametric data and demultiplexing the data and calculating the OOOI times of the aircraft; | The FedEx B-727 System does not include "a central processing unit ... for ... calculating the OOOI times of the aircraft" as recited in this claim element.  There is no CPU onboard for calculating OOOI times.  The FedEx B-727 System does not capture OOOI times. (Depo. of Swanson at p. 93, line 11).  The SecureLINK router of the FedEx B-727 System receives a discrete signal from the cabin door (indicating open or closed) and a discrete signal from the aircraft wheels (airborne or on the ground).  These discrete signals do not include any time stamp and are not stored. (Depo. of Swanson at p. 93, lines 15-24). |
| a data store positioned within the aircraft and connected to the central processing unit and operative to accumulate and store the data relating to the calculated OOOI times of the aircraft; | The FedEx B-727 System does not include "a data store ... operative to accumulate and store the data relating to the calculated OOOI times of the aircraft" as recited in this claim element.  The FedEx B-727 System does not accumulate or store data relating to calculated OOOI times. |
| a wideband spread spectrum transceiver coupled to the data store, and comprising a transmitter that is operative to download the data relating to the calculated OOOI times of the aircraft over a wideband spread spectrum communication signal; | The FedEx B-727 System does not include a transceiver "operative to download the data relating to the calculated OOOI times" as recited in this claim element.  The FedEx B-727 System does not accumulate or store data relating to calculated OOOI times. |

(Page 4)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '636 CLAIM ELEMENT | '636 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| an airport based wideband spread spectrum receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the data relating to the calculated OOOI times of the aircraft. | The FedEx B-727 System does not include a receiver that "receives ... and demodulates the signal to obtain the data relating to the calculated OOOI times of the aircraft" as recited in this claim element.  The FedEx B-727 System does not accumulate or store data relating to calculated OOOI times. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,308,044

| '044 CLAIM ELEMENT | '044 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.      A system of providing a retrievable record of the "Out," "Off," "On," and "In" (OOOI) times of an aircraft comprising: | Claim 1 of the '044 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the "Out," "Off," "On," and "In" (OOOI) times of an aircraft" as recited in this claim. |
| a plurality of sensors located throughout the aircraft for sensing routine aircraft conditions and generating parametric data; | |
| a central processing unit positioned within the aircraft for receiving the parametric data and calculating the OOOI times of the aircraft; | The FedEx B-727 System does not include "a central processing unit ... for ... calculating the OOOI times of the aircraft" as recited in this claim element. There is no CPU onboard for calculating OOOI times.  The FedEx B-727 System does not capture OOOI times. (Depo. of Swanson at p. 93, line 11).  The SecureLINK router of the FedEx B-727 System receives a discrete signal from the cabin door (indicating open or closed) and a discrete signal from the aircraft wheels (airborne or on the ground).  These discrete signals do not include any time stamp and are not stored.  (Depo. of Swanson at p. 93, lines 15-24). |
| a data store positioned within the aircraft and connected to the central processing unit and operative to accumulate and store the data relating to the calculated OOOI times of the aircraft; and | The FedEx B-727 System does not include "a data store ... operative to accumulate and store the data relating to the calculated OOOI times of the aircraft" as recited in this claim element.  The FedEx B-727 System does not accumulate or store data relating to calculated OOOI times. |
| a wideband spread spectrum transceiver coupled to the data store and operative to download the data relating to the calculated OOOI times of the aircraft over a wideband spread spectrum communication signal. | The FedEx B-727 System does not include a transceiver "operative to download the data relating to the calculated OOOI times" as recited in this claim element.  The FedEx B-727 System does not accumulate or store data relating to calculated OOOI times. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,775,545

| '545 CLAIM ELEMENT | '545 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.      A method of facilitating compliance with limitations imposed upon wireless communications by governing jurisdictions comprising: | Claim 1 of the '545 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not facilitate "compliance with limitations imposed upon wireless communications by governing jurisdictions" as recited in this claim. |
| transmitting from a fixed wireless router an interrogation beacon on a plurality of preselected radio-frequency (RF) channels containing information representative of communication limitations imposed by a jurisdiction governing the location of the wireless router; | The FedEx B-727 System does not perform the step of "transmitting from a fixed wireless router an interrogation beacon" as recited in this claim step at least because there is no interrogation beacon or equivalent message sent or received by the System in order to make the onboard SecureLINK router adjust or change any of its settings.  (Depo. of Federal Express Corporation (Swanson) at p. 207, lines 6-9). |
| receiving at a mobile RF transceiver unit, upon the mobile RF transceiver unit entering within the transmission range of the wireless router, the interrogation beacon containing the communications limitations information on at least one of said preselected RF channels; | Because there is no interrogation beacon or equivalent message sent, the FedEx B-727 System does not perform the step of "receiving … the interrogation beacon." |
| adjusting at the mobile RF transceiver unit transmission parameters applicable to the transmission of data from the mobile RF transceiver unit to the wireless router; | The FedEx B-727 System does not perform the step of "adjusting at the mobile RF transceiver unit" as recited in this claim step at least because:  (1) there is no interrogation beacon or equivalent message sent or received by the System in order to make the onboard SecureLINK router adjust or change any of its settings (depo. of Federal Express Corporation (Swanson) at p. 207, lines 6-9;) and (2) there is no "adjusting" performed because the select Boeing 727 aircraft only transmit data at select airports within the United States, where no adjustment is required.  (Depo. of Swanson at p. 97, lines 22-24). |

(Page 7)

EXHIBIT SIX:   SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '545 CLAIM ELEMENT | '545 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| and transmitting data from the mobile RF transceiver unit to the wireless router on a selected channel in accordance with communication limitation [*sic*] imposed by the jurisdiction governing the location of the wireless router. | The FedEx B-727 System does not perform the step of "transmitting data" as recited in this claim step at least because:  (1) there is no interrogation beacon or equivalent message sent by the System in order to make the onboard SecureLINK router adjust or change any of its settings (depo. of Federal Express Corporation (Swanson) at p. 207, lines 6-9,) and (2) there is no step of "transmitting ... in accordance with communication limitation[s]" performed because the select Boeing 727 aircraft only transmits data at select airports within the United States, were no adjustment is required.  (Depo. of Swanson at p. 97, lines 22-24). |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,108,523

| '523 CLAIM ELEMENT | '523 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.      A system for providing a retrievable record of the flight performance of an aircraft comprising: | Claim 1 of the '523 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a ground data link unit as recited in this claim because it does not include a transceiver that is operative to download "the flight performance data that is been accumulated and stored by said archival data store during flight." |
| a)     an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and | |
| b)     a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal that comprises a signal in the range of about 2.4 to about 2.5 GHz; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a transceiver as recited in this claim because the System is not operative to download "the flight performance data that has been accumulated and stored by said archival data store during flight." |
| an airport based wideband spread spectrum transceiver comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; | The FedEx B-727 System does not include a "transceiver ... comprising a receiver that receives ... and demodulates the signal to obtain the "flight performance data" as recited in this claim element because the "flight performance data" (as recited above) has not been transmitted. |
| an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores the demodulated flight performance data; | The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates. (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |

(Page 9)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '523 CLAIM ELEMENT | '523 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| an airport based processor coupled to said archival data store for retrieving flight data performance from the airport based archival data store; | The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |
| a remote flight operations control center; and | |
| an airport based communications network operatively connecting said remote flight operations control center and airport based processor to allow the remote flight operations control center to receive and analyze the flight performance data. | The FedEx B-727 System does not include an "airport based communications network" as recited in this claim element at least because: (1) there is not "airport based processor" or equivalent at the airports or ramps where the FedEx B-727 System operates, (depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19;) and (2) the System does not connect to any "airport based communications network" but instead only connects to a proprietary Federal Express network that is separate and distinct from any airport network. |

(Page 10)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,990,319

The following claims were asserted against Federal Express in the report of Harris Corporation's technical expert (McAlexander):  1, 3, 4, 6, 8, 9; 11, 13, 14, 16, 18, 19; and 21, 23, 24, 26, 28, 29.

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| **1.     A method of providing data from an aircraft comprising:** | Claim 1 of the '319 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "data from an aircraft" as recited in this claim. |
| continuously monitoring the flight performance of the aircraft during an entire flight of the aircraft from at least take-off to landing; | |
| generating aircraft data representative of the continuously monitored aircraft flight performance during an entire flight of the aircraft; | |
| accumulating and continuously storing the generated aircraft data within a ground data link unit positioned within the aircraft during the entire flight of the aircraft from at least take-off to landing to create an archival store of such aircraft data; | |
| after the aircraft completes its flight and lands at an airport, transmitting the accumulated, stored generated aircraft data from the ground data link unit over a wideband spread spectrum communications signal to a ground based spread spectrum receiver; and | The FedEx B-727 System does not transmit to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.  A transceiver includes both a transmitter and a receiver.  A receiver alone, as recited, is not capable of both transmitting and receiving, which is required in order to establish a connection with another transceiver. The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated, stored generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated, stored generated aircraft data from the ground data link unit … to a ground based spread spectrum receiver" as recited in this claim step. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| demodulating the received spread spectrum communications signal to obtain the accumulated aircraft data representative of the flight performance of the aircraft during an entire flight of the aircraft from take-off to landing. | Because less than all the accumulated aircraft data is transmitted, since on or about September 26, 2008, the FedEx B-727 System does not perform the step of "demodulating … to obtain the accumulated aircraft data representative of the flight performance of the aircraft during an entire flight of the aircraft from take-off to landing" as recited in this claim step. |
| 2.  A method according to claim 1, and further comprising the step of transmitting the accumulated generated aircraft data over a frequency hopping spread spectrum communications signal. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 3.  A method according to claim 1, and further comprising the step of transmitting the accumulated generated aircraft data over a direct sequence spread spectrum communications signal. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data over any type of signal to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting … over a direct sequence spread spectrum communications signal" as recited in this claim step. |

(Page 12)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 4. A method according to claim 1, and further comprising the step of transmitting the generated aircraft data automatically after the aircraft has landed. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. The FedEx B-727 System does not transmit data automatically or in any way to a ground based spread spectrum receiver, as recited in this claim step. Instead, the System includes a ground-based transceiver. The FedEx B-727 System does not transmit any data automatically. The avSync software instructs the SecureLink router to download selected data stored on the MiniQAR. (Depo. of Swanson at p. 34, lines 10-22). Without explicit instructions from the avSync software, the SecureLink router would not transmit any data at all. The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "transmitting the generated aircraft data" automatically or in any way, as recited in this claim step. |
| 5. A method according to claim 1, and further comprising the step of uploading data to the ground data link unit over a wideband spread spectrum communications signal after the aircraft has landed. | [Not Asserted] This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 6. A method according to claim 1, and further comprising the step of selecting a frequency channel for transmitting the accumulated generated aircraft data from a plurality of available frequency channels. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. The FedEx B-727 System does not transmit data over a selected channel or in any way to a ground based spread spectrum receiver, as recited in this claim step. Instead, the System includes a ground-based transceiver. The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "selecting a frequency channel for transmitting the accumulated generated aircraft data" as recited in this claim step. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 7.  A method according to claim 6, and further comprising the step of selecting a frequency channel based on communication limitations of a governing jurisdiction in which the ground based spread spectrum receiver is located. | [Not Asserted]<br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 8.  A method according to claim 1, and further comprising the step of transmitting the accumulated generated aircraft data from the ground based spread spectrum transceiver to a flight operations center for further processing. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated generated aircraft data … to a flight operations center" as recited in this claim step. |
| 9.  A method according to claim 1, and further comprising the step of storing the generated aircraft data within a memory of the ground data link unit. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 10.  A method according to claim 1, and further comprising the step of transmitting the accumulated generated aircraft data from the ground data link unit to a cellular infrastructure that includes the ground based spread spectrum receiver. | [Not Asserted]<br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 11.    A method of providing data from an aircraft comprising: | Claim 11 of the '319 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "data from an aircraft" as recited in this claim. |
| continuously monitoring the flight performance of the aircraft during an entire flight of the aircraft from at least take-off to landing; | |
| generating aircraft data representative of the continuously monitored aircraft flight performance during an entire flight of the aircraft from at least take-off to landing; | |

(Page 14)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| conveying the generated aircraft data to a ground data link unit positioned within the aircraft; | |
| accumulating and continuously storing the aircraft data within a data store of the ground data link during the entire flight of the aircraft from at least take-off to landing to create an archival store of such aircraft data; | |
| after the aircraft completes its flight and lands at an airport, transmitting the stored generated aircraft data from the ground data link unit over a wideband spread spectrum communications signal to a ground based spread spectrum receiver; and | The FedEx B-727 System does not transmit to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.  A transceiver includes both a transmitter and a receiver, and typically performs both transmit and receive functions in order to establish a connection before any communication can occur.  A receiver alone, as recited, is not capable of both transmitting and receiving, which is required in order to establish a connection with another transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated, stored generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated, stored generated aircraft data from the ground data link unit … to a ground based spread spectrum receiver" as recited in this claim step. |
| demodulating the received wideband spread spectrum communications signal to obtain the accumulated aircraft data representative of the flight performance of the aircraft during an entire flight of the aircraft from take-off to landing. | Because less than all the accumulated aircraft data is transmitted, since on or about September 26, 2008, the FedEx B-727 System does not perform the step of "demodulating … to obtain the accumulated aircraft data representative of the flight performance of the aircraft during an entire flight of the aircraft from take-off to landing" as recited in this claim step. |
| 12.  A method according to claim 11, and further comprising the step of transmitting the generated aircraft data over a frequency hopping spread spectrum communications signal. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 13.  A method according to claim 11, and further comprising the step of transmitting the generated aircraft data over a direct sequence spread spectrum communications signal. | This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data over any type of signal to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting ... over a direct sequence spread spectrum communications signal" as recited in this claim step. |
| 14.  A method according to claim 11, and further comprising the step of transmitting the generated aircraft data automatically after the aircraft has landed. | This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data automatically or in any way to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting the generated aircraft data" automatically or in any way, as recited in this claim step. |
| 15.  A method according to claim 11, and further comprising the step of uploading data to the ground data link unit over a wideband spread spectrum communications signal after the aircraft has landed. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents. |

(Page 16)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 16.  A method according to claim 11, and further comprising the step of selecting a frequency channel for transmitting the generated aircraft data from a plurality of available frequency channels. | This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data over a selected channel or in any way to a ground based spread spectrum receiver, as recited in this claim step. Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "selecting a frequency channel for transmitting the accumulated generated aircraft data" as recited in this claim step. |
| 17.  A method according to claim 16, and further comprising the step of selecting a frequency channel based on communication limitations of a governing jurisdiction in which the ground based spread spectrum receiver is located. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents. |
| 18.  A method according to claim 11, and further comprising the step of transmitting the generated aircraft data from the ground based spread spectrum transceiver to a flight operations center for further processing. | This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated generated aircraft data … to a flight operations center" as recited in this claim step. |
| 19.  A method according to claim 11, and further comprising the step of storing the generated aircraft data within a memory of the ground data link unit. | This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents. |
| 20.  A method according to claim 11, and further comprising the step of transmitting the generated aircraft data from the ground data link unit to a cellular infrastructure that includes the ground based spread spectrum receiver. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 11 is not infringed, either literally or under the doctrine of equivalents. |

(Page 17)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| **21.     A method of providing data from an aircraft comprising:** | Claim 21 of the '319 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "data from an aircraft" as recited in this claim. |
| continuously monitoring the flight performance of the aircraft during at least two entire flights of the aircraft from at least takeoff to landing; | |
| generating aircraft data representative of the continuously monitored aircraft flight performance during the at least two entire flights of the aircraft from at least take-off to landing; | |
| accumulating and continuously storing the generated aircraft data within a ground data link unit positioned within the aircraft during the at least two entire flights of the aircraft from at least take-off to landing to create an archival store of such aircraft data; | |
| after the aircraft completes its at least two flights and lands at an airport, transmitting the accumulated, stored generated aircraft data from the ground data link unit over a wideband spread spectrum communications signal to a ground based spread spectrum receiver; and | The FedEx B-727 System does not transmit to a ground based spread spectrum receiver, as recited in this claim step. Instead, the System includes a ground-based transceiver. A transceiver includes both a transmitter and a receiver, and typically performs both transmit and receive functions in order to establish a connection before any communication can occur. A receiver alone, as recited, is not capable of both transmitting and receiving, which is required in order to establish a connection with another transceiver. The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated, stored generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated, stored generated aircraft data from the ground data link unit … to a ground based spread spectrum receiver" as recited in this claim step. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| demodulating the received spread spectrum communications signal to obtain the accumulated aircraft data representative of the flight performance of the aircraft during the at least two entire flights of the aircraft from take-off to landing. | Because less than all the accumulated aircraft data is transmitted, since on or about September 26, 2008, the FedEx B-727 System does not perform the step of "demodulating … to obtain the accumulated aircraft data representative of the flight performance of the aircraft during at least two entire flights of the aircraft from take-off to landing" as recited in this claim step. |
| 22.  A method according to claim 21, and further comprising the step of transmitting the accumulated generated aircraft data over a frequency hopping spread spectrum communications signal. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents. |
| 23.  A method according to claim 21, and further comprising the step of transmitting the accumulated generated aircraft data over a direct sequence spread spectrum communications signal. | This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data over any type of signal to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting … over a direct sequence spread spectrum communications signal" as recited in this claim step. |
| 24.  A method according to claim 21, and further comprising the step of transmitting the generated aircraft data automatically after the aircraft has landed. | This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data automatically or in any way to a ground based spread spectrum receiver, as recited in this claim step.  Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "transmitting the generated aircraft data" automatically or in any way, as recited in this claim step. |

(Page 19)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 25.  A method according to claim 21, and further comprising the step of uploading data to the ground data link unit over a wideband spread spectrum communications signal after the aircraft has landed. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents. |
| 26.  A method according to claim 21, and further comprising the step of selecting a frequency channel for transmitting the accumulated generated aircraft data from a plurality of available frequency channels. | This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not transmit data over a selected channel or in any way to a ground based spread spectrum receiver, as recited in this claim step. Instead, the System includes a ground-based transceiver.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "selecting a frequency channel for transmitting the accumulated generated aircraft data" as recited in this claim step. |
| 27.  A method according to claim 26, and further comprising the step of selecting a frequency channel based on communication limitations of a governing jurisdiction in which the ground based spread spectrum receiver is located. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents. |
| 28.  A method according to claim 21, and further comprising the step of transmitting the accumulated generated aircraft data from the ground based spread spectrum transceiver to a flight operations center for further processing. | This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not perform the step of "transmitting the accumulated generated aircraft data … to a flight operations center" as recited in this claim step. |
| 29.  A method according to claim 21, and further comprising the step of storing the generated aircraft data within a memory of the ground data link unit. | This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents. |

(Page 20)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '319 CLAIMS | '319 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 30. A method according to claim 21, and further comprising the step of transmitting the accumulated generated aircraft data from the ground data link unit to a cellular infrastructure that includes the ground based spread spectrum receiver. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 21 is not infringed, either literally or under the doctrine of equivalents. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

U.S. PATENT 6,154,637

The following claims were asserted against Federal Express in the report of Harris Corporation's technical expert (McAlexander):  31, and 35-40.

| '637 CLAIMS | '637 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 31.      A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of: | Claim 31 of the '637 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| collecting data within a ground data link unit on the flight performance of the aircraft during flight of the aircraft; | |
| accumulating and storing within an archival memory of the ground data link unit the flight performance data during flight of the aircraft; | |
| after the aircraft lands at an airport at completion of the flight, downloading the flight performance data that has been accumulated and stored during the flight over one of a plurality of sub-band frequency channels of a spread spectrum communication signal to an airport based spread spectrum transceiver; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated, stored generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of "downloading the flight performance data that has been accumulated and stored during the flight … to an airport based spread spectrum transceiver" as recited in this claim step. |
| demodulating within the transceiver the received spread spectrum signal to obtain the flight performance data; | Because less than all the accumulated aircraft data is transmitted, since on or about September 26, 2008, the FedEx B-727 System does not perform the step of "demodulating … to obtain the accumulated aircraft data representative of the flight performance of the aircraft during at least two entire flights of the aircraft from take-off to landing" as recited in this claim step. |

(Page 22)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '637 CLAIMS | '637 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| and transmitting a probe beacon to the spread spectrum transceiver of the ground data link unit and selecting a sub-band frequency channel based on receipt of the probe beacon. | The FedEx B-727 System does not perform any of the steps in this claim element after the select portion of aircraft data has already been downloaded and demodulated.<br><br>The ground-based equipment in the FedEx B-727 System does not perform the step of transmitting a probe beacon to the aircraft unit, as recited in this claim step.  Also, the ground-based equipment in the FedEx B-727 System does not perform the step of selecting a channel, as recited in this claim step.  Finally, the ground-based equipment in the FedEx B-727 System does not perform the step of selecting a channel "based on receipt of the probe beacon" as recited in this claim step because there is no probe beacon or equivalent sent to the ground-based equipment. |
| 32.  A method according to claim 31, wherein the step of transmitting the probe beacon comprises the step of transmitting to the aircraft at the airfield an interrogation signal containing data that is representative of the allowable power limits of a spread spectrum communication signal that can be transmitted at the airfield. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents. |
| 33.  A method according to claim 32, and further comprising the step of increasing transmit power when the spread spectrum communication signal is impaired. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents. |
| 34.  A method according to claim 31, and further comprising the step of selecting a sub-band frequency channel based upon geographic location of the airport. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents. |
| 35.  A method according to claim 31, and further comprising the step of selecting desired sub-band frequency channels and dynamically assigning sub-band frequency channels based upon the quality of available channel links between the spread spectrum transceivers. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents. |

(Page 23)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '637 CLAIMS | '637 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
| --- | --- |
| 36.  A method according to claim 31, and further comprising the step of storing the demodulated flight performance data within an airport based archival data store. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim step.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |
| 37.  A method according to claim 31, and further comprising the step of retrieving the flight performance data via an airport based server for further processing. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not include an "airport based server" as recited in this claim step because there is no processor or server (or equivalent) at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |
| 38.  A method according to claim 31, wherein the spread spectrum communication signal comprises a direct sequence spread spectrum signal. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of downloading over a signal that comprises "a direct sequence spread spectrum signal" as recited in this claim step. |
| 39.  A method according to claim 31, wherein the spread spectrum communication signal comprises a signal within the S band. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of downloading over a signal that comprises "a signal within the S band" as recited in this claim step. |

(Page 24)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '637 CLAIMS | '637 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 40.  A method according to claim 31, wherein the spread spectrum communication signal comprises a signal within the range of about 2.4 to about 2.5 Ghz. | This dependent claim is not infringed because independent claim 31 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not perform the step of downloading over a signal that comprises "a signal within the range of about 2.4 to about 2.5 Ghz" as recited in this claim step. |

(Page 25)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

## U.S. PATENT 6,104,914

The following claims were asserted against Federal Express in the report of Harris Corporation's technical expert (McAlexander): 1, 5, 6, 8-11.

| '914 CLAIM ELEMENT | '914 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.    A system for providing a retrievable record of the flight performance of an aircraft comprising: | Claim 1 of the '914 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a ground data link unit as recited in this claim because it does not include a transceiver that is operative to download "the flight performance data that has been accumulated and stored by said archival data store during flight." |
| a)    an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and | |
| b)    a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download said flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal; and | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a transceiver as recited in this claim because the System is not operative to download "the flight performance data that has been accumulated and stored by said archival data store during flight." |
| an airport based wideband spread spectrum transceiver comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; and | The FedEx B-727 System does not include a "transceiver ... comprising a receiver that receives ... and demodulates the signal to obtain the flight performance data" as recited in this claim element because the "flight performance data" (as recited above) has not been transmitted. |

(Page 26)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '914 CLAIM ELEMENT | '914 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| an adaptive power control unit that varies an emitted power level of the wideband spread spectrum communication signal based upon the geographic location of the airport. | The FedEx B-727 System does not include an "adaptive power control unit" as recited in this claim element.  The power transmission level for the System components is fixed.  "It's a factory default."  (Depo. of Federal Express Corporation (Swanson) at p. 128, lines 9-21).  "[I]n the FedEx configuration there would not be any way for it to change power."  (Depo. of Federal Express Corporation (Swanson) at p. 192, lines 12-18). |
| 2.  A system according to claim 1, wherein said airport includes a transmitter that generates an interrogation signal containing data representative of the allowable power limits of a wideband spread spectrum communication signal that can be transmitted, wherein said wideband spread spectrum transceiver of said ground data link unit is responsive to said interrogation signal. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 3.  A system according to claim 1, wherein said adaptive power control unit is operative to increase the transmit power of said wideband spread spectrum transceiver to compensate for impairment in the quality of the wideband spread spectrum communication signal that is received by said airport based spread spectrum transceiver. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 4.  A system according to claim 1, wherein said airport based spread spectrum transceiver is operative to select desired sub-band channels and dynamically assign such sub-band channels based upon the quality of available channel links between said wideband spread spectrum transceivers. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 5.  A system according to claim 1, and further comprising an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |

(Page 27)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '914 CLAIM ELEMENT | '914 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 6. A system according to claim 1, and further comprising an airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for subsequent delivery and processing. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |
| 7. A system according to claim 1, and further comprising a remote flight operations center operatively coupled to said airport based server for receiving and processing the retrieved flight performance data. | [Not Asserted]<br><br>This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. |
| 8. A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a direct sequence spread spectrum signal" as recited in this claim step. |
| 9. A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal within the S band. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the S band" as recited in this claim step. |

(Page 28)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '914 CLAIM ELEMENT | '914 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 10. A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal within the range of about 2.4 to about 2.5 Ghz. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the range of about 2.4 to about 2.5 Ghz," as recited in this claim step. |
| 11. A system according to claim 1, wherein said airport based wideband spread spectrum transceiver further comprises a wireless router that couples said wideband spread spectrum transceiver to said airport based archival data store. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System does not include an "airport based archival data store" or a "wireless router" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |

(Page 29)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

## U.S. PATENT 6,308,045 C1

| '045 C1 CLAIM ELEMENT<br>(Terms added during reexamination are shown in bold, italics.) | '045 C1 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 4.    A system for providing a retrievable record of the flight performance of an aircraft comprising: | Claim 4 of the '045 C1 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a ground data link unit as recited in this claim because it does not include a "transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during the entire flight." |
| a)    an archival data store operative to accumulate and store flight performance data during *the entire* flight of the aircraft, and | |
| b)    a direct sequence spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during *the entire* flight over a direct sequence spread spectrum communication signal; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a "transmitter that is operative to download the flight performance data that has been accumulated and stored by said archival data store during the entire flight" as recited in this claim. |
| a ground based spread spectrum transceiver comprising a receiver that receives the direct sequence spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; | The FedEx B-727 System does not include a "transceiver ... comprising a receiver that receives ... and demodulates the signal to obtain the flight performance data" as recited in this claim element because the "flight performance data" (as recited above) has not been transmitted. |
| a ground based archival data store coupled to said ground based spread spectrum transceiver that receives and stores said flight performance data; and | The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim element. There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates. (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |

(Page 30)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '045 C1 CLAIM ELEMENT (Terms added during reexamination are shown in bold, italics.) | '045 C1 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| a ground based processor coupled to said archival data store for retrieving flight performance data from the ground based archival data store for further processing, *wherein said direct sequence spread spectrum transceiver is operative to download the flight performance data after the aircraft completes its flight and lands at an airport*. | The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a "transceiver … operative to download the flight performance data" as recited in this claim. |
| 14.    A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of: | Claim 14 of the '045 C1 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| acquiring flight performance data of an aircraft during *the entire* flight of the aircraft; | |
| accumulating and storing within an archival memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft; | |
| downloading the flight performance data that has been accumulated and stored within the archival data store during the *entire* flight over a direct sequence spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not perform the step of "downloading the flight performance data that has been accumulated and stored by said archival data store during the entire flight" as recited in this claim. |
| demodulating the received spread spectrum signal to obtain the flight performance data; | The FedEx B-727 System does not perform the step of "demodulating … to obtain the flight performance data" as recited in this claim because the "flight performance data" (as recited above) has not been transmitted. |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '045 C1 CLAIM ELEMENT (Terms added during reexamination are shown in bold, italics.) | '045 C1 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| storing the demodulated flight performance data within a ground based archival data storage; and | The FedEx B-727 System does not include an "airport based archival data storage" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates. (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |
| retrieving the flight performance data via a ground based processor for further processing. | The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |
| 16.   A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of: | Claim 16 of the '045 C1 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| acquiring flight performance data of an aircraft during *the entire* flight of the aircraft; | |
| accumulating and storing within a memory of a ground data link unit the flight performance data during *the entire* flight of the aircraft; | |
| downloading the flight performance data that has been accumulated and stored within the data store during the flight over a direct sequence spread spectrum communication signal to a ground based spread spectrum receiver *after the aircraft has completed its flight and landed at an airport*; and | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not perform the step of "downloading the flight performance data that has been accumulated and stored by said archival data store during the entire flight" as recited in this claim. |
| demodulating the received spread spectrum signal to obtain the flight performance data. | The FedEx B-727 System does not perform the step of "demodulating … to obtain the flight performance data" as recited in this claim step because the "flight performance data" (as recited above) has not been transmitted. |

(Page 32)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

**U.S. PATENT 6,047,165**

The following claims were asserted against Federal Express in the report of Harris Corporation's technical expert (McAlexander):  1-4, 17-20.

| '165 CLAIM ELEMENT | '165 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 1.     A system for providing a retrievable record of the flight performance of an aircraft comprising: | Claim 1 of the '165 patent is not infringed, either literally or under the doctrine of equivalents, because the FedEx B-727 System does not provide "a retrievable record of the flight performance of an aircraft" as recited in this claim. |
| a ground data link unit that obtains flight performance data representative of aircraft flight performance during flight of the aircraft, said ground data link unit comprising: | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a ground data link unit as recited in this claim because it does not include a "transmitter that is operative ... to download the flight performance data that has been accumulated and stored by said archival data store during flight." |
| a)     an archival data store operative to accumulate and store flight performance data during flight of the aircraft, and | |
| b)     a wideband spread spectrum transceiver coupled to said archival data store, and comprising a transmitter that is operative after the aircraft completes its flight and lands at an airport to download the flight performance data that has been accumulated and stored by said archival data store during flight over a wideband spread spectrum communication signal; | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not include a "transmitter that is operative ... to download the flight performance data that has been accumulated and stored by said archival data store during flight" as recited in this claim. |
| an airport based wideband spread spectrum transceiver comprising a receiver that receives the wideband spread spectrum communication signal from the aircraft and demodulates the signal to obtain the flight performance data; | The FedEx B-727 System does not include a "transceiver ... comprising a receiver that receives ... and demodulates the signal to obtain the flight performance data" as recited in this claim element because the "flight performance data" (as recited above) has not been transmitted. |
| an airport based archival data store coupled to said airport based wideband spread spectrum transceiver that receives and stores said flight performance data; and | The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates. (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |

(Page 33)

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '165 CLAIM ELEMENT | '165 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| an airport based processor coupled to said archival data store for retrieving flight performance data from the airport based archival data store for further processing. | The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |
| 2.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum communication signal. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. <br><br> The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a direct sequence spread spectrum signal" as recited in this claim step. |
| 3.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. <br><br> The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the S band" as recited in this claim step. |
| 4.    A system according to claim 1, wherein the wideband spread spectrum communication signal comprises a signal in the range of about 2.4 to about 2.5 GHz. | This dependent claim is not infringed because independent claim 1 is not infringed, either literally or under the doctrine of equivalents. <br><br> The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment.  Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the range of about 2.4 to about 2.5 Ghz" as recited in this claim step. |
| 17.    A method of providing a retrievable record of the flight performance of an aircraft comprising the steps of: | |

EXHIBIT SIX:  SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '165 CLAIM ELEMENT | '165 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| acquiring flight performance data of an aircraft during flight of the aircraft; | |
| accumulating and storing within an archival memory of a ground data link unit the flight performance data during flight of the aircraft; | |
| after the aircraft lands at an airport at completion of the flight, downloading the flight performance data that has been accumulated and stored within the archival data store during the flight over a wideband spread spectrum communication signal to an airport based spread spectrum receiver; | The FedEx B-727 System does not transmit to an "airport based spread spectrum receiver" as recited in this claim step.  Instead, the System includes a transceiver.  By definition, a transceiver includes both a transmitter and a receiver.  A receiver alone, as recited, is not capable of both transmitting and receiving, which is required in order to establish a connection with another transceiver. |
| | The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not perform the step of "downloading the flight performance data that has been accumulated and stored within the archival data store during the flight" as recited in this claim. |
| demodulating the received spread spectrum signal to obtain the flight performance data; | The FedEx B-727 System does not perform the step of "demodulating … to obtain the flight performance data," as recited in this claim step because the "flight performance data" (as recited above) has not been transmitted. |
| storing the demodulated flight performance data within an airport based archival data storage; and | The FedEx B-727 System does not include an "airport based archival data store" as recited in this claim element.  There is no archival data store or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 15-17). |
| retrieving the flight performance data via an airport based processor for further processing. | The FedEx B-727 System does not include an "airport based processor" as recited in this claim element because there is no processor or equivalent at the airports or ramps where the FedEx B-727 System operates.  (Depo. of Federal Express Corporation (Swanson) at p. 205, lines 18-19). |

(Page 35)

EXHIBIT SIX: SUPPLEMENTAL NON-INFRINGEMENT POSITIONS

| '165 CLAIM ELEMENT | '165 SUPPLEMENTAL NON-INFRINGEMENT POSITION |
|---|---|
| 18.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a direct sequence spread spectrum signal. | This dependent claim is not infringed because independent claim 17 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not download over a signal that comprises "a direct sequence spread spectrum signal" as recited in this claim step. |
| 19.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within an S band. | This dependent claim is not infringed because independent claim 17 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the S band" as recited in this claim step. |
| 20.    A method according to claim 17, wherein the wideband spread spectrum communication signal comprises a signal within a range of about 2.4 to about 2.5 GHz. | This dependent claim is not infringed because independent claim 17 is not infringed, either literally or under the doctrine of equivalents.<br><br>The FedEx B-727 System (using the version of AvSync software installed on or about September 26, 2008) does not transmit all the accumulated generated aircraft data from the aircraft to ground equipment. Accordingly, the FedEx B-727 System does not download over a signal that comprises "a signal within the range of about 2.4 to about 2.5 Ghz" as recited in this claim step. |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February __/3__, 2009, I served a true and correct copy of the foregoing, FEDERAL EXPRESS CORPORATION'S SIXTH SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, by first-class U.S. Mail to:

> Ryan T. Santurri, Esq.
> Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
> P.O. Box 3791
> Orlando, Florida 32802-3791
> Telephone: 407-841-2330
> Fax: 407-841-2343

J. Scott Anderson
**Ballard Spahr Andrews & Ingersoll, LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

ATTORNEYS FOR
FEDERAL EXPRESS CORPORATION

**Exhibit 40**

Harris Corporation, et al. v. Federal Express Corporation, et al.     6:07-CV-1819-28KRS

# Frank Koperda     December 2, 2009

Page 1

IN THE UNITED STATES DISTRICT COURT
THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


HARRIS CORPORATION,        )
                           )
          Plaintiff,       )
                           )   CIVIL ACTION FILE
     vs.                   )
                           )   NO. 6:07-CV-1819-28KRS
FEDERAL EXPRESS            )
CORPORATION,              )
                           )
          Defendant.       )
_ _ _ _ _ _ _ _ _ _ _ _ _ )


FEDERAL EXPRESS            )
CORPORATION,              )
                           )
          Plaintiff in     )
          Counterclaim     )
                           )
     vs.                   )
                           )
HARRIS CORPORATION,        )
                           )
          Defendant in     )
          Counterclaim.    )
_ _ _ _ _ _ _ _ _ _ _ _ _


          Videotaped Deposition of Frank Koperda,

taken on behalf of the Plaintiff and Defendant in

Counterclaim, Harris Corporation, at 999 Peachtree

Street, Suite 1000, Atlanta, Georgia, commencing on

the 2nd day of December 2009, at 9:10 a.m. before

Angela B. Adams, Certified Court Reporter.

REPORTED BY: Angela B. Adams, CCR   www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

c1f092b8-4b77-4744-8456-a036023f0143

Harris Corporation, et al. v. Federal Express Corporation, et al.     6:07-CV-1819-28KRS
Frank Koperda     December 2, 2009

Page 2

1                      A P P E A R A N C E S
2
3     For Harris Corporation:
4             RYAN T. SANTURRI
              CHRISTOPHER F. REGAN
5             Attorneys at Law
              Allen, Dyer, Doppelt, Milbrath
6             & Gilchrist, P.A.
              255 South Orange Avenue
7             Suite 1401
              Orlando, FL  32801
8             (407) 841-2330
              Fax: (407) 841-2343
9             rsanturri@addmg.com
10
11
12    For the Defendant:
13            LAWRENCE K. NODINE
              CHARLEY F. BROWN
14            Attorneys at Law
              Ballard Spahr, LLP
15            999 Peachtree Street
              Suite 1000
16            Atlanta, GA  30309
              (678) 420-9300
17            Fax: (678) 420-9422
              nodinel@ballardspahr.com
18
19
20
21    Also Present:
              DAMON OKORO
22            Videographer
23
24
25

c1f092b8-4b77-4744-8456-a036023f0143

Harris Corporation, et al. v. Federal Express Corporation, et al.    6:07-CV-1819-28KRS
Frank Koperda    December 2, 2009

Page 3

1                            I N D E X

2

3    EXAMINATION OF Frank Koperda                        PAGE

4        By Mr. Santurri                                   4
         By Mr. Nodine                                   222
5        By MR. Santurri                                 224

6

7

8

9

10   PLAINTIFF'S              INITIAL
     EXHIBITS               DESCRIPTION              REFERENCE
11

     No. 80      Non-Infringement Report
12               By Frank Koperda                       17

13   No. 81      Expert Report by

14               Frank Koperda                          61

15   No. 82      US Patent Search Log                   75

16   No. 83      US Patent No. 5,065,321               113

17   No. 84      US Patent No. 4,926,331               114

18   No. 85      US Patent No. 4,188,618               122
     No. 86      Email of 8/9/09
19               from David Koperda                    126

20   No. 87      Email of 10/12/09

21               from Scott Anderson                   126
     No. 88      NextGen Invoice 262
22               dated 8/23/09                         130

23

24

                       *       *       *

25

c1f092b8-4b77-4744-8456-a036023f0143

Frank Koperda      December 2, 2009

Page 4

1              P R O C E E D I N G S

2

3         THE VIDEOGRAPHER:  This is the beginning of

4    Tape Number 1 in the deposition of Frank Koperda

5    in the matter of Harris Corporation versus

6    Federal Express Corporation, Case Number

7    6:07-CV-1819-ORL-28KRS.  Today's date is December

8    2nd, 2009.  The time on the monitor is 9:14 a.m.

9         My name is Damon Okoro, and I am the

10   videographer.  The court reporter is Angela

11   Adams.  We are with Huseby, Incorporated.

12        Counsel, please introduce yourselves after

13   which the court reporter will swear in the

14   witness.

15        MR. SANTURRI:  Ryan Santurri on behalf of

16   Harris Corporation.

17        MR. REGAN:  Chris Regan, Harris.

18        MR. NODINE:  Larry Nodine for FedEx.

19        MR. BROWN:  Charley Brown for Federal

20   Express.

21              FRANK KOPERDA,

22   having been first duly sworn to state the truth, was

23   examined and testified as follows:

24              EXAMINATION

25   BY MR. SANTURRI:

REPORTED BY: Angela B. Adams, CCR  www.huseby.com
HUSEBY, INC. - 555 North Point Center, E., #403, Alpharetta, GA 30022 (404) 875-0400

c1f092b8-4b77-4744-8456-a036023f0143

Harris Corporation, et al. v. Federal Express Corporation, et al.    6:07-CV-1819-28KRS

Frank Koperda          December 2, 2009

Page 96

1   understood the term when you offered your opinions.

2       A.   Airport based is airport based.

3       Q.   Okay.

4       A.   Plain and ordinary meaning.  To say

5   otherwise gives it as an altered meaning.

6       Q.   So you understand the term airport based?

7       A.   Yes.

8       Q.   Do you know what ground based means as it

9   relates to the patents at issue?

10      A.   Ground based means ground based.

11      Q.   You understand that term?

12      A.   Yes.

13      Q.   Well, if I tell you that we have a server at

14  or on airport property, do you think that would meet

15  an element that requires an airport based server?

16      A.   I'm not going to try to come up with a new

17  definition or provide on-the-spot opinions.

18      Q.   Well, I'm not asking for an on-the-spot

19  opinion.

20           You offered an opinion as to the 914 --

21  well, you have offered an opinion as to all the

22  patents but, for example, the 914 patent that we were

23  just referring to.

24      A.   Uh-huh.  Yes.

25      Q.   It includes an element that is an airport

c1f092b8-4b77-4744-8456-a036023f0143

**Exhibit 41**

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO:  6:07-CV-1819-ORL-28 KRS

HARRIS CORPORATION,

          Plaintiff,

vs.

FEDERAL EXPRESS CORPORATION,

          Defendant.

------------------------------------------------------

                              March 2, 2009
                              9:00 a.m.


          The deposition of ALBERT D. HELFRICK, P.E.,

     Ph.D.,taken on behalf of the Plaintiff, at the

     offices of Allen, Dyer, Doppelt, Milbrath &

     Gilchrist, P.A., 1135 East State Road 434, #3001,

     Winter Springs, Florida 32708, before Stacey

     Walters, Court Reporter and Notary Public, in and

     for the State of Florida at Large.

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1    A P P E A R A N C E S:

2

3         BRIAN R. GILCHRIST, ESQUIRE
          RYAN T. SANTURRI, ESQUIRE
4         Allen, Dyer, Doppelt,
          Milbrath & Gilchrist, P.A.
5         255 South Orange Avenue
          Suite 1401
6         Orlando, Florida 32801

7         CHRISTOPHER F. REGAN, ESQUIRE
          Allen, Dyer, Doppelt,
8         Milbrath & Gilchrist, P.A.
          1135 East State Road 434
9         Suite 3001
          Winter Springs, Florida 32708

10

11              Representing the Plaintiff

12

13

14        J. SCOTT ANDERSON, ESQUIRE
          Ballard, Spahr, Andrews & Ingersoll, P.A.
15        999 Peachtree Street
          Suite 1000
16        Atlanta, Georgia 30309

17              Representing the Defendant

18

19

20

21

22

23

24

25

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1                    TABLE OF CONTENTS
2     ALBERT D. HELFRICK, P.E., Ph.D.:              PAGE
      March 2, 2009
3
      Appearances                                     2
4     Exhibits                                        3
      Stipulations                                    4
5
      Testimony of Albert D. Helfrick, P.E., Ph.D.
6
           Direct Examination by Mr. Santurri        5
7
      Jurat                                         202
8     Certificate of Oath                          203
      Certificate of Reporter                      204
9

10

11

12

13                    E X H I B I T S

14    Helfrick Exhibits
      for Identification:
15

16    No. 51    Expert Report Of Albert D. Helfrick      7
      No. 52    Bates Nos. FX0018906 -FX0018915         43
17    No. 53    U.S. Patent No. 6,154,637              78
      No. 54    Deposition of Robert P. Swanson         96
18    No. 55    Airbus Digital Telemetry System Paper  128
      No. 56    U.S. Patent No. 6,104,914             172
19    No. 57    Copy of calendar pages                192

20

21

22

23

24

25

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1

2

3

4

5

6            S T I P U L A T I O N S

7      It is hereby stipulated and agreed by and between

8  counsel present for the respective parties and the

9  deponent that the reading and signing of the

10  deposition is expressly reserved.

11

                         (End of stipulation)

12

13

                    *  *  *  *  *

14

15  Reporter's key to punctuation:

16  --   at the end of question or answer references an
          interruption.

17

    ...  References a trail-off by the speaker.
18       no testimony omitted.

19  "uh-huh"  references an affirmative sound.
    "uh-uh"   references a negative sound.

20

21

22

23

24

25

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1               P R O C E E D I N G S

2                 ALBERT D. HELFRICK,

3       having been first duly sworn by the reporter,

4       thereupon testified upon his oath as follows:

5                 DIRECT EXAMINATION

6   BY MR. SANTURRI:

7       Q.    Can you introduce yourself for the record,

8   please.

9       A.    My name is Albert Helfrick, H-e-l-f-r-i-c-k.

10      Q.    Are you currently employed, Dr. Helfrick?

11      A.    Yes.

12      Q.    Where at?

13      A.    Embry-Riddle Aeronautical University in

14  Daytona Beach.

15      Q.    Do you have a title with Embry-Riddle?

16      A.    Well, a title of professor and I'm also a

17  department chair.

18      Q.    Of what department?

19      A.    Electrical and Systems Engineering

20  Department.

21      Q.    Dr. Helfrick, have you been deposed before?

22      A.    Yes.

23      Q.    How many times?

24      A.    Twice.

25      Q.    Were both in your capacity acting as an

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

1    claims of the 165 patent?

2           MR. ANDERSON:  Object to the form.

3       A.    No.

4       Q.    Okay.  Let's start with Claim 1.  Why

5    doesn't the FedEx system, prior to the September 26,

6    2008 modification, infringe Claim 1 of the 165 patent?

7       A.    Claim 1 talks about an airport-based

8    archival data store.  The server that is the archival

9    data store for the FedEx system is not at an airport

10   proper.

11      Q.    Do you recall from the testimony of Robert

12   Swanson that he testified that the airport-based --

13   that the 727 server is located on property owned by

14   Memphis Airport?

15      A.    It is my understanding that the property is

16   owned by the Memphis Airport.

17      Q.    But you contend that although it's on

18   airport property, it's not an airport-based component?

19      A.    Correct.

20      Q.    Tell me what your definition is for

21   airport-based archival data store?

22      A.    I attempted to find an FAA definition of an

23   airport.  And lacking that, it is my opinion that

24   there is a clear line of demarcation to what is an

25   airport, and that would be signified by fences,

f261ae89-5586-4ea5-8bd5-05bea8c75dd7

Page 48

1   security checks, security cameras, etc., and according

2   to my conversation with those who work in the building

3   where the server is located and the deposition of

4   Swanson, that this server is outside the airport

5   proper.

6        Q.   The FedEx server is within the Air

7   Operations Center?

8        A.   I believe that's what they call it, the Air

9   Operations Center.

10       Q.   And in order to access that area, one has to

11  provide their ID?

12       A.   To get in to access the area beyond the

13  reception area, you have to provide an ID.

14       Q.   I believe you also indicated that

15  individuals that move beyond the reception area of the

16  Air Operations Center may also have an escort with

17  them?

18       A.   That's what I was told.

19       Q.   Are you familiar with any airports in the

20  U.S. that require every one that enters the airport to

21  have an escort?

22       A.   Not in such a sense.  I would imagine that

23  there are certain parts of the airport where you might

24  have to have an escort.

25       Q.   Would you agree that requiring an escort is

**Exhibit 42**

REQUESTOR'S DOCKET NO. 01247.0002U1
EXPRESS MAIL LABEL NO. EV 915331272 US
**PATENT**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

*(stamp)* MAR 30 2007 — PATENT & TRADEMARK OFFICE

64660 U.S. PTO
**90008567**
03/30/07

| | |
|---|---|
| In re Patent of Wright et al. | ) |
| | ) |
| REQUEST FOR REEXAMINATION | ) Control Number: **TBD** |
| of | ) |
| U.S. Patent No.: **6,047,165** | ) Group Art Unit: **TBD** |
| | ) |
| Patent Date: **April 4, 2000** | ) Examiner: **TBD** |
| | ) |
| For:  **"WIRELESS, FREQUENCY-AGILE** | ) Confirmation No.: **TBD** |
| **SPREAD SPECTRUM GROUND** | ) |
| **LINK-BASED AIRCRAFT DATA** | ) |
| **COMMUNICATION SYSTEM"** | ) |

**REQUEST FOR *EX PARTE* REEXAMINATION TRANSMITTAL FORM**

Commissioner for Patents                    NEEDLE & ROSENBERG, P.C.
P.O. Box 1450                               Customer Number 23859
Alexandria, VA  22313-1450

1.  ☒  This is a request for *ex parte* reexamination pursuant to 37 CFR 1.510 of Patent No. 6,047,165 issued on April 4, 2000.  The request is made by:
☐ patent owner.  ☒ third party requester.

2.  ☒  The name and address of the person requesting reexamination is:  Gregory J. Kirsch, Needle & Rosenberg, P.C., 999 Peachtree Street, Suite 1000, Atlanta, Georgia 30309-3915.

3a.  ☐  A check in the amount of  $2,520.00 is enclosed to cover the reexamination fee (37 CFR 1.20(c)(1); or

3b.  ☒  The Commissioner is hereby authorized to charge any deficiency to the Deposit Account No. of 14-0629.

3c.  ☒  Payment by credit card.  Form PTO-2038 is attached.

4.  ☒  Any refund should be made by credit to Deposit Account No. 14-0629. 37 CFR 1.26(c).  If payment is made by credit card, refund must be to credit card account.

5.  ☒  A copy of the patent to be reexamined having a double column format on one side

01 FC:1812                    2520.00 OP

04/06/2007 MSALPANA 00000003 90008567
- Sales Receipt -
United States Patent and Trademark Office

REQUESTOR'S DOCKET NO. 01247.0002U1
EXPRESS MAIL LABEL NO. EV 915331272 US
U.S. PATENT NO.:  6,047,165

of a separate paper is enclosed as **Exhibit 1**.  37 CFR 1.510(b)(4)

6.  ☐   CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
☐ Landscape Table on CD

7.  ☐   Nucleotide and/or Amino Acid Sequence Submission
*If applicable, items a.-c. are required.*

    a. ☐ Computer Readable Form (CRF)
    b. Specification Sequence Listing on:
        i. ☐ CD-ROM (2 copies) or CD-R (2 copies); **or**
        ii. ☐ paper
    c. ☐ Statements verifying identity of above copies

8.  ☐   A copy of any disclaimer, certificate of correction or reexamination certificate
issued in the patent is included.

9.  ☒   Reexamination of claim(s) 1, 8, 17, 23 and 30 is requested.

10.  ☒   A copy of every patent or printed publication relied upon is submitted herewith
including a listing thereof on Form PTO/SB/08, PTO-1449, or equivalent.

11.  ☐   An English language translation of all necessary and pertinent non-English
language patents or printed publications is included.

12.  ☒   The attached detailed request includes at least the following items:

    a.    A statement identifying each substantial new question of patentability
based on prior patents and printed publications.  37 CFR 1.510(b)(1).
    b.    An identification of every claim for which reexamination is requested, and
a detailed explanation of the pertinency and manner of applying the cited
prior art to every claim for which reexamination is requested.  37 CFR
1.510(b)(2).

13.  ☐   A proposed amendment is included (only where the patent owner is the requester).
37 CFR 1.510(e).

14a.  ☒   It is certified that a copy of this request (if filed by other than the patent owner)
has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
The name and address of the party served and the date of service are:
    Richard K. Warther, Esq.; Allen, Dyer, Doppelt, Milbrath, and Gilchrist,
    P.A., P.O. Box 3791; Orlando, FL 32802-3791; (407) 841-2330

Date of Service:  _____March 30, 2007_____ ; or

543945

REQUESTOR'S DOCKET NO. 01247.0002U1
EXPRESS MAIL LABEL NO. EV 915331272 US
U.S. PATENT NO.:  6,047,165

14b.  ☐  A duplicate copy is enclosed since service on patent owner was not possible.

15.  Correspondence Address:  Direct all communication about the reexamination to:
☒ The address associated with Customer No.:  23859
OR
☐
Firm or Individual Name: _____
Address: _____
_____
City: _____ State:_____ Zip:_____
Country: _____
Telephone: _____ Fax: _____

16.  ☐  The patent is currently the subject of the following concurrent proceeding(s):
☐   a. Copending reissue Application No. _____
☐   b. Copending reexamination Control No. _____
☐   c. Copending Intereference No. _____
☐   d. Copending litigation styled:
_____
_____

**WARNING:  Information on this form may become public.  Credit card information
should not be included on this form.  Provide credit card information and authorization
on PTO-2038.**

_____          _30  MARCH  2007_____
Gregory J. Kirsch                                   Date

_____Gregory J. Kirsch_____          __35,572_____
Typed/Printed Name                          Registration No.
                                                        ☐ For Patent Owner Requester
☒ For Third Party Requester

543945

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................1
II.     CLAIMS FOR WHICH REEXAMINATION IS REQUESTED...........1
III.    IDENTIFICATION OF PRIOR ART.............................................1
        i.      The '347 Patent ...............................................................1
        ii.     The '102 Patent ...............................................................2
        iii.    ARINC Specification 632 ..................................................2
        iv.     ARINC Characteristic 751 ................................................2
        v.      ARINC AEEC Letter 91-079/DLK-391 ...............................2
        vi.     ARINC AEEC Future Concepts .........................................2
        vii.    L-1011 ............................................................................2
        viii.   ARINC 591 ......................................................................2
IV.     THE LEGAL STANDARD FOR GRANTING A
        REEXAMINATION REQUEST .....................................................2
V.      THE RELEVANCE OF THE PRESENTED PRIOR ART...................3
VI.     THE REFERENCES PRESENTED QUALIFY AS PRIOR ART .........4
VII.    PROSECUTION HISTORY OF THE '165 PATENT .........................6
VIII.   SUMMARIES OF THE PRIOR ART REFERENCES .........................9
        i.      The '347 Patent ...............................................................9
        ii.     The '102 Patent ...............................................................9
        iii.    ARINC 632 ....................................................................10
        iv.     ARINC 751 ....................................................................12
        v.      ARINC AEEC Letter ......................................................13
        vi.     ARINC FCM-69 .............................................................14
        vii.    L-1011 ..........................................................................15
        viii.   ARINC 591 ....................................................................15
IX.     MOTIVATION TO COMBINE PRESENTED PRIOR ART...............16
        i.      The Presented Prior Art References Are Pertinent To The Claimed
                Invention of the '165 Patent...........................................17
        ii.     There Is Motivation To Combine The Teachings Of The Presented
                Prior Art References .......................................................17
X.      THE PRESENTED PRIOR ART PRESENTS SUBSTANTIAL
        NEW QUESTIONS OF PATENTABILITY ....................................18
        i.      Claims 1, 8, 17, 23, and 30 of the '165 patent are anticipated by
                the '347 patent considered alone or are rendered obvious by the
                '347 patent in combination with L-1011, ARINC 591, or the
                '102 patent ....................................................................18
                a.      The '347 patent alone.............................................18
                b.      The '347 patent in combination with L-1011 ............19
                c.      The '347 patent in combination with ARINC 591 ......20
                d.      The '347 patent in combination with the '102 patent....20
        ii.     Claims 1, 8, 17, 23, and 30 of the '165 patent are anticipated by
                the '102 patent considered alone or are rendered obvious by the
                '102 patent in combination in with the '347 patent, ARINC



FCM-69, ARINC AEEC Letter and ARINC 632, or ARINC
AEEC Letter and ARINC 751 ............................................................21
    a.  The '102 patent alone.................................................21
    b.  The '102 patent in combination with the '347 patent..............22
    c.  The '102 patent in combination with ARINC FCM-
       69.......................................................................23
    d.  The '102 patent in combination with ARINC AEEC
       Letter and ARINC 632..........................................24
    e.  The '102 patent in combination with ARINC AEEC
       Letter and ARINC 751..........................................25
iii. Claims 1, 8, 17, 23, and 30 of the '165 patent are anticipated by
   ARINC 632 considered alone or are rendered obvious by ARINC
   632 in combination with the '347 patent, ARINC AEEC Letter,
   or ARINC FCM-69 ...........................................................26
    a.  ARINC 632 alone.................................................26
    b.  ARINC 632 in combination with the '347 patent................26
    c.  ARINC 632 in combination with ARINC AEEC
       Letter.................................................................27
    d.  ARINC 632 in combination with ARINC FCM-69...............28
iv. Claims 1, 8, 17, 23, and 30 of the '165 patent are anticipated by
   ARINC 751 considered alone or are rendered obvious by ARINC
   751 in combination with the '347 patent, ARINC AEEC Letter,
   or ARINC FCM-69 ...........................................................29
    a.  ARINC 751 alone.................................................29
    b.  ARINC 751 in combination with the '347 patent................29
    c.  ARINC 751 in combination with ARINC AEEC
       Letter.................................................................30
    d.  ARINC 751 in combination with ARINC FCM-69...............31
v. Claims 1, 8, 17, 23, and 30 of the '165 patent are anticipated by
   ARINC FCM-69 considered alone or are rendered obvious by
   ARINC FCM-69 in combination with the '347 patent, the '102
   patent, ARINC 632, or ARINC 751...........................................31
    a.  ARINC FCM-69 alone............................................31
    b.  ARINC FCM-69 in combination with the '347
       patent.................................................................32
    c.  ARINC FCM-69 in combination with the '102
       patent.................................................................33
    d.  ARINC FCM-69 in combination with ARINC 632................33
    e.  ARINC FCM-69 in combination with ARINC 751 ..............34
XI.   CLAIM CHARTS ....................................................................35
   i.  Claim 1................................................................35
   ii. Claim 8................................................................40
   iii. Claim 17...............................................................46
   iv. Claim 23...............................................................51
   v. Claim 30...............................................................58
XII.  ACTION REQUESTED ...............................................................64

**Exhibit 43**

requests on this report should be in the final stages of preparation.

(6) *Requests for Which Determinations Should Have Been Mailed* — This report lists those requests which have been assigned to an examiner and in which no determination has been mailed and the 10th week since their filing is past. Determinations for requests on this report should be mailed immediately.

(7) *Overdue Determinations* — This report lists those requests in which no determination has been mailed and the 3rd month since their filing is past. This report should always be zero.

(8) *Overdue Petitions for Reconsideration of a Denial* — This report lists those requests in which the determination denied reexamination and no petition has been received and 6 weeks have passed since the determination was mailed. Reexamination proceedings< on this report should be concluded.

(9) *Overdue Owner Responses to Determinations* — This report lists those requests in which the determination ordered reexamination and the owner has not filed a response and 10 weeks have passed since the mailing of the determination. These requests should be taken up for immediate *ex parte* action by the examiner.

(10) *Overdue Requester Responses to Statements* — This report lists those requests in which a proper OWNER statement was received and NO requester reply has been received and 10 weeks have passed since the receipt of the owner response. These requests should be taken up for immediate action.

(11) *Overdue First Ex Parte Actions* — This report lists those requests in which reexamination has been ordered and a first action has not been mailed and 6 weeks have passed since the request became available for *ex parte* prosecution. These requests should be taken up for immediate action by the examiner.

(12) *Overdue Action or Examiner's Answer* — This report lists those reexaminations which are up for second or subsequent action by the examiner and no such action has been mailed and 2 months have passed since the filing of an owner response to a previous action.

(13) *Overdue Advisory Action* — This report lists those reexaminations which are up for action by the examiner and no such action has been mailed and 1 month has passed since the filing of an owner response to a previous final action.

(14) *Overdue Owner Response* — This report lists those requests in which there has been an action rendered and 4 months have passed without an owner response.

(15) *Overdue Certificates* — This report lists those requests in which a Notice of Intent to Issue *Ex Parte* Reexamination Certificate has been mailed and 3 months have passed since its mailing and no issue date has been assigned.

(16) *Requests With Prolonged Prosecution* — This report lists pending requests which have not matured into a certificate and 15 months have passed since the date of filing.

*Asterisk items require immediate action and follow-up, if appropriate.

# 2236    Assignment of Reexamination [R-5]

Reexamination requests should normally be assigned to the **>Central Reexamination Unit (CRU) art unit which examines the technology (Chemical, Electrical, Mechanical, etc.)< in which the patent to be reexamined is currently classified as an original. In that art unit, the **>Special Program Examiner (SPRE)< will assign the reexamination request to a primary examiner, other than the examiner who originally examined the patent application (see "Examiner Assignment Policy" below), who is most familiar with the claimed subject matter of the patent. When no such knowledgeable primary examiner is available, the reexamination may be assigned to an assistant examiner. In such an instance **>a primary examiner< must sign all actions and take responsibility for all actions taken.

## I.    EXAMINER ASSIGNMENT POLICY

It is the policy of the Office that the *>the CRU SPRE< will assign the reexamination request to an examiner different from the examiner(s) who examined the patent application. Thus, under normal circumstances, the reexamination request will not be assigned to a * primary examiner or assistant examiner who was involved in any part of the examination of the patent for which reexamination is requested (e.g., by preparing/signing an action), or was so involved in the examination of the parent of the patent. This would preclude assignment of the request

to an examiner who was a conferee in an appeal conference or *>panel< review conference in an earlier concluded examination of the patent (e.g., the application for patent, a reissue, or a prior concluded reexamination proceeding). The conferee is considered to have participated in preparing the Office action which is preceded by the conference.

**Exceptions to this general policy include** cases ** where the original examiner is the only examiner with adequate knowledge of the relevant technology to examine the case. In the unusual case where there is a need to assign the request to the original examiner, the assignment must be approved by the **>CRU< Director, and the fact that such approval was given by the *>CRU< Director must be stated by the examiner in the decision on the request for reexamination.

It should be noted that while an examiner who examined an earlier concluded reexamination proceeding is generally excluded from assignment of a newly filed reexamination, if the earlier reexamination is still ongoing, the same examiner will be assigned the new reexamination.

### *Copending reissue and reexamination proceedings:*

(A) When a reissue application is pending for a patent, and a reexamination request is filed for the same patent, the reexamination request is generally assigned to **>an examiner who did not examine the original patent application< even though the examiner who examined the patent application is handling the reissue application. If the reexamination request is granted and the reissue and reexamination proceedings are >later< merged (see MPEP § 2285), the merged proceeding will be handled **>(upon return of the files from the Office of Patent Legal Administration (OPLA)) by the TC examiner who is handling the reissue application. However, if that examiner was involved in any part of the examination of the patent for which reexamination is requested (e.g., by preparing/signing an action), or was so involved in the examination of the parent application of the patent, a different TC examiner will be assigned. Thus, the reissue application would be transferred (reassigned) from the originally assigned examiner.<

(B) When a reexamination proceeding is pending for a patent, and a reissue application is filed for the same patent:

(1) Where reexamination has already been ordered (granted) in the reexamination proceeding, **>OPLA< should be notified ** as promptly as possible after the reissue application reaches the TC, that the proceedings are ready for consideration of merger. If any of the reexamination file, the reissue application, and the patent file are paper files, they should be hand delivered to OPLA at the time of the * notification to OPLA. If the reissue and reexamination proceedings are merged by OPLA, the reissue >application< will >generally< be assigned in the TC **>having the reissue (upon return of the files from OPLA) to the TC examiner who would ordinarily handle the reissue application. However, if that examiner was involved in any part of the examination of patent for which reexamination is requested (e.g., by preparing/signing an action), or was so involved in the examination of the parent application of the patent, a different TC examiner will be assigned.< If the reissue and reexamination proceedings are not merged by OPLA, the decision will provide guidance as to assignment of the reissue proceeding depending on the individual fact situation.

(2) If reexamination has not yet been ordered (granted) in the reexamination proceeding, the Office of the TC **>SPRE< will ensure that the reissue application is not assigned nor acted on, and the decision on the reexamination request will be made. If reexamination is denied, the reexamination proceeding will be concluded pursuant to MPEP § 2294, and the reissue application assigned in accordance with MPEP § 1440. If reexamination is granted, the Office of the *SPRE will await the filing of any statement under 37 CFR 1.530 and any reply under 37 CFR 1.535, or the expiration of the time for same (see MPEP § 2249 – § 2251), and then the OPLA should be promptly notified ** that the proceedings are ready for consideration of merger. If any of the reexamination file, the reissue application, and the patent file are paper files, they should be hand delivered to OPLA at the time of the * notification to OPLA. >If the reissue and reexamination proceedings are merged by OPLA, the reissue application will generally be assigned in the TC having the reissue (upon return of the files from OPLA) to the TC examiner who ordinarily handle the reissue application. However, if that examiner was involved in any part of the examination of the patent for which reexamination is requested (e.g., by

preparing/signing an action), or was so involved in the examination of the parent application of the patent, a different TC examiner will be assigned.< If the reissue and reexamination proceedings are not merged by OPLA, the decision will provide guidance as to assignment of the reissue proceeding depending on the individual fact situation.

## II.   CONSEQUENCES OF INADVERTENT ASSIGNMENT TO AN "ORIGINAL EXAMINER"

Should a reexamination be inadvertently assigned to an "original examiner" (in a situation where the TC >or CRU< Director's approval is not stated in the decision on the request), the patent owner or the third party requester who objects must promptly file a paper alerting the Office of this fact. Any request challenging the assignment of an examiner to the case must be made within two months of the first Office action or other Office communication indicating the examiner assignment, or reassignment will not be considered. Reassignment of the reexamination to a different examiner will be addressed on a case-by-case basis. In no event will the assignment to the original examiner, by itself, be grounds for vacating any Office decision(s) or action(s) and "restarting" the reexamination.

A situation may arise where a party timely (i.e., within the two months noted above) files a paper alerting the Office to the assignment of a reexamination to the "original examiner," but that paper does not have a right of entry under the rules. An example of this is where a third party requester becomes aware of the assignment to the "original examiner" via that examiner signing the order for reexamination, and the patent owner does not file a statement under 37 CFR 1.530. In that situation, the third party requester cannot file a reply under 37 CFR 1.535, and thus has no way to present the paper directed to the examiner assignment (no right of entry under the rules). In situations where a paper directed to the examiner assignment has no right of entry under the rules, the Office may waive the rules to the extent that the paper directed to the examiner assignment will be entered and considered.

## 2237   Transfer Procedure  [R-5]

Although the number of reexamination requests which must be transferred should be very small, the following procedures have been established for an expeditious resolution of any such problems.

A reexamination request is normally assigned **>a Central Reexamination Unit (CRU)< art unit which examines the **>technology (Chemical, Electrical, Mechanical, etc.)< in which the patent to be reexamined is currently classified as an original. If the **>CRU Special Program Examiner (SPRE) (to whose art unit the reexamination has been assigned)< believes that the reexamination should be assigned to another art unit, he or she must obtain the consent of the *>CRU SPRE< of the art unit to which a transfer is desired. Pursuant to 35 U.S.C. 305, all *ex parte* reexamination proceedings must be conducted with special dispatch within the Office. This applies to the transfer of reexamination proceedings. Accordingly, the *>CRU SPRE< to whose art unit the reexamination has been assigned should expeditiously make any request for transfer of a reexamination proceeding ** to the *>CRU SPRE< of the art unit to which a transfer is desired (the "new" art unit). **>Further, the CRU SPRE< to whose art unit the reexamination has been assigned should * hand-carry any paper patent file for the reexamination proceeding to the *>CRU SPRE< of the art unit to which a transfer is desired. Any conflict which cannot be resolved by the *>SPREs< will be resolved by the **>CRU Director<.

If the "new" art unit accepts assignment of the reexamination request, the "new" *>CRU SPRE assigns the request to an examiner in that unit.<

## 2238   Time Reporting [R-5]

### I.   CLERICAL TIME REPORTING

Both the Program Management System (PMS) and Payroll systems now used to monitor clerical time have been modified to report reexamination activities. Time devoted to processing actual reexamination files in the >Central Reexamination Unit (CRU) or< Technology Centers (TCs) should be reported using the appropriate PMS Code and Project Code. It should be noted that all clerical time consumed by reexamination activities must be reported in the above manner.

provided that no other new ground of rejection is introduced by the examiner based on the new art not cited in the prior art citation. See MPEP § 706.07(a).

## IV.   SIGNATORY AUTHORITY

As with all other Office correspondence on the merits in a reexamination proceeding, the final Office action must be signed by a primary examiner.

# 2271.01   *>Panel< Review * [R-5]

**>A panel review will be conducted at each stage of the examiner's examination in an *ex parte* reexamination proceeding, other than for actions such as notices of informality or incomplete response. Matters requiring decision outside of the examiner's jurisdiction (e.g., decisions on petitions or extensions of time, or Central Reexamination Unit (CRU) support staff notices) will not be reviewed by a panel.

The panel review is carried out for each Office action. The panel reviews the examiner's preliminary decision to reject and/or allow the claims in the reexamination proceeding, prior to the issuance of each Office action.

## I.   MAKE-UP OF THE PANEL

The panel will consist of three members, one of whom will be a manager. The second member will be the examiner in charge of the proceeding. The manager will select the third member. The examiner-conferees will be primary examiners, or examiners who are knowledgeable in the technology of the invention claimed in the patent being reexamined and/or who are experienced in reexamination practice. The majority of those present at the conference will be examiners who were not involved in the examination or issuance of the patent. An "original" examiner (see MPEP § 2236) should be chosen as a conferee only if that examiner is the most knowledgeable in the art, or there is some other specific and justifiable reason to choose an original examiner as a participant in the conference.<

## II.   **>PANEL< PROCESS

The examiner must inform his/her *>manager< of his/her intent to issue **>an Office action. The manager< will then convene a **>panel and the members will confer and< review the patentability of the claim(s). If the conference confirms the examiner's preliminary decision to reject and/or allow the claims, the Office action ** shall be issued and signed by the examiner, with the two other conferees initialing the action (as "conferee") to indicate their participation in the conference. Both conferees will initial, even though one of them may have dissented from the 3-party conference decision as to the patentabiliy of claims. If the conference does not confirm the examiner's preliminary decision, **>examiner will reevaluate and< issue an appropriate Office action **.

Where the examiner in charge of the proceeding is not in agreement with the conference decision, the *>manager< will generally assign the proceeding to another examiner**.

## III.   WHAT THE CONFERENCE IS TO ACCOMPLISH

Each conference will provide a forum to consider all issues of patentability as well as procedural issues having an impact on patentability. Review of the patentability of the claims by more than one primary examiner should diminish the perception that the patent owner can disproportionately influence the examiner in charge of the proceeding. The conferences will also provide greater assurance that all matters will be addressed appropriately. All issues in the proceeding will be viewed from the perspectives of three examiners. What the examiner in charge of the proceeding might have missed, the other two conference members would likely detect. The conference will provide for a comprehensive discussion of, and finding for, each issue.

## IV.   CONSEQUENCES OF FAILURE TO HOLD CONFERENCE

Should the examiner issue **>an Office action without panel review<, the patent owner or the third party requester who wishes to object must promptly file a paper alerting the Office of this fact. (The failure to **>provide panel review< would be noted by the parties where there are no conferees' initials at the end of the ** Office action.) Any challenge of the failure to hold a *>panel< review conference must be made within two *>weeks of receipt< of the Office action issued, or the challenge will not be considered. ** In no event will the failure to hold a >panel< review conference, by itself, be grounds for vacating

any Office decision(s) or action(s) and "restarting" the reexamination proceeding.

## 2272    After Final Practice [R-3]

It is intended that prosecution before the examiner in a reexamination proceeding will be concluded with the final action. Once a final rejection that is not premature has been entered in a reexamination proceeding, the patent owner no longer has any right to unrestricted further prosecution. Consideration of amendments submitted after final rejection >and prior to, or with, the appeal< will be governed by the strict standards of 37 CFR 1.116. >Further, consideration of amendments submitted after appeal will be governed by the strict standards of 37 CFR 41.33.< Both the examiner and the patent owner should recognize that substantial patent rights will be at issue with no opportunity for the patent owner to refile under 37 CFR 1.53(b), >or< 1.53(d), ** and with no opportunity to file a request for continued examination under 37 CFR 1.114. Accordingly, both the examiner and the patent owner should identify and develop all issues prior to the final Office action, including the presentation of evidence under 37 CFR 1.131 and 1.132.

## I.    FINAL REJECTION — TIME FOR RESPONSE

The statutory period for response to a final rejection in a reexamination proceeding will normally be two (2) months. If a response to the final rejection is filed, the time period set in the final rejection continues to run. The time period is automatically extended by 1 month (in accordance with the guidelines set forth in MPEP § 2265) if the response is the first response after the final rejection >and a notice of appeal has not yet been filed<. Any advisory Office action **>using form PTOL-467, *Ex Parte* Reexamination Advisory Action Before the Filing of an Appeal Brief, which is< issued in reply to patent owner's response after final rejection >(and prior to the filing of the notice of appeal)< will inform the patent owner of the automatic 1 month extension of time. It should be noted that the filing of any timely first response to a final rejection (even an informal response or even a response that is not signed) will automatically result in the extension of the shortened statutory period for an additional month. Note further that the patent

owner is entitled to know the examiner's ruling on a timely response filed after final rejection before being required to file a notice of appeal. Notification of the examiner's ruling should reach the patent owner with sufficient time for the patent owner to consider the ruling and act on it. Accordingly, the period for response to the final rejection should be appropriately extended in the examiner's advisory action. See *Theodore Groz & Sohne & Ernst Bechert Nadelfabrik KG v. Quigg*, 10 USPQ2d 1787 (D.D.C. 1988). The period for response may not, however, be extended to run past 6 months from the date of the final rejection.

## II.    ACTION BY EXAMINER

It should be kept in mind that a patent owner cannot, as a matter of right, amend any finally rejected claims, add new claims after a final rejection, or reinstate previously canceled claims. *>For an amendment filed after final rejection and prior to the appeal brief, a< showing under 37 CFR 1.116(b) is required and will be evaluated by the examiner for all proposed amendments after final rejection except where an amendment merely cancels claims, adopts examiner's suggestions, removes issues for appeal, or in some other way requires only a cursory review by the examiner. An amendment filed at any time after final rejection but before an appeal brief is filed, may be entered upon or after filing of an appeal provided **>:

(A) the total effect of the amendment is to cancel claims or comply with any requirement of form expressly set forth in a previous Office action, or present rejected claims in better form for consideration on appeal;

(B) for an amendment touching the merits of the patent under reexamination, the patent owner provides a showing of good and sufficient reasons why the amendment is necessary and was not earlier presented.<

The first proposed amendment after final action in a reexamination proceeding will be given sufficient consideration to determine whether it places all the claims in condition where they are patentable and/or whether the issues on appeal are reduced or simplified. Unless the proposed amendment is entered in its entirety, the examiner will briefly explain the reasons for not entering a proposed amendment. For example, if the claims as amended present a new issue requiring

**Exhibit 44**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HARRIS CORPORATION,

     Plaintiff,

v.

FEDERAL EXPRESS CORPORATION,

     Defendant.

Case No. 6:07-cv-1819-Orl-28 KRS

FEDERAL EXPRESS CORPORATION,

     Counterclaim Plaintiff,

v.

HARRIS CORPORATION,

     Counterclaim Defendant.

## FEDERAL EXPRESS CORPORATION'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 9 AND 10)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff, Federal Express Corporation ("Federal Express"), provides the following supplemental responses to "Plaintiff's First Set of Interrogatories to Defendant" ("Plaintiff's Interrogatories").

## PRELIMINARY STATEMENT

Federal Express has not completed its discovery, investigation, research, and trial preparation. The following responses are based upon information and writings presently

available to and located by Federal Express and its attorneys, and such responses are made based on Federal Express's reasonable interpretation of each interrogatory. The answers herein to the interrogatories are given without prejudice to Federal Express's right to produce evidence of any additional facts. Discovery in this matter is ongoing, and Federal Express reserves the right to amend, revise, correct, supplement or clarify any of the responses based on any facts or information obtained at any time subsequent to this response, or if any inadvertent errors, mistakes or omissions should be found, to amend, revise or correct such errors, mistakes or omissions.

Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and to any and all other objections on any grounds that would require the exclusion of any statements contained herein if such interrogatory were asked of, or statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are Expressly reserved and may be interposed at the time of trial.

Federal Express's responses shall not be deemed to constitute admissions that (a) any particular document or thing exists, is relevant, non-privileged, or admissible into evidence, or (b) any statement or characterization in an interrogatory is accurate or complete.

No incidental or implied admissions are intended by the responses herein. The fact that Federal Express has answered or objected to any interrogatory should not be taken as an admission that Federal Express accepts or admits the existence of any "facts" set forth or assumed by such interrogatory. The fact that Federal Express has answered

part or all of any interrogatory is not intended to be, and shall not be construed to be, a

waiver by Federal Express of any part of any objection to the interrogatory.

### GENERAL OBJECTIONS

1.      Federal Express objects to every one of Plaintiff's Interrogatories,

including but not limited to the "Definitions and Instructions" set forth in Plaintiff's

Interrogatories, to the extent they purport to impose requirements that are different from,

or in addition to, those imposed by the Federal Rules of Civil Procedure or other

applicable rule or statute.  Federal Express further objects to Plaintiff's "Definitions and

Instructions" as being overly broad, vague, and ambiguous.

2.      Federal Express objects to Plaintiff's Interrogatories to the extent that they

seek or call for information protected by the attorney-client privilege and/or protected by

the work-product doctrine, or that are subject to any other applicable privilege.  To the

extent that Plaintiff's Interrogatories seek material reflecting attorney-client

communications and/or material protected by the work-product doctrine, each such

interrogatory is overbroad and seeks information that is beyond the scope of discovery

permitted by the Federal Rules of Civil Procedure.  Federal Express will not divulge

information that is protected from discovery by the attorney-client privilege or by the

work-product doctrine.  Such responses as may hereafter occur shall not include any

information protected by such privileges or doctrines, and any inadvertent disclosure of

the same shall neither be deemed nor constitute a waiver of such privileges.

3.      Federal Express objects to the extent that Plaintiff's Interrogatories seek

information that is confidential, sensitive, proprietary business information, and/or trade

secrets which are specifically excluded from discovery under the applicable Federal Rules of Civil Procedure.  Federal Express shall make responsive information currently in its possession, custody or control available only after a suitable Protective Order or Confidentiality Agreement is in place.

4.     Federal Express objects to the extent that Plaintiff's Interrogatories seek information that is confidential, sensitive, proprietary business information, and/or trade secrets belonging to a third party.  Unless ordered by the Court to do so, Federal Express will not divulge such information to the extent that it is under any obligation to maintain such third-party information in confidence and not to disclose it, unless the third party grants permission to do so.

5.     Federal Express objects to Plaintiff's Interrogatories to the extent that they fail to specify the information they seek with reasonable particularity.

6.     Federal Express objects to Plaintiff's Interrogatories as uncertain, overbroad, and unduly burdensome to the extent that many interrogatories fail to specify any specific time period, and accordingly, are not limited to events relevant to this lawsuit.

7.     Federal Express objects to Plaintiff's Interrogatories to the extent they are compound and actually include multiple interrogatories.

8.     Federal Express will respond to Plaintiff's Interrogatories with information in its possession, custody or control which is reasonably responsive to each interrogatory to the extent not specifically or generally objected to; therefore, Federal Express objects to Plaintiff's Interrogatories to the extent they purport to call for

4

information not in its actual possession, custody or control.  Federal Express objects to Plaintiff's Interrogatories to the extent they purport to require Federal Express to identify and/or otherwise provide information with respect to documents no longer in its possession, custody or control on the grounds that they seek to impose requirements and/or obligations inconsistent with and in addition to the Federal Rules of Civil Procedure which are unduly burdensome and oppressive.

9.     Federal Express objects to each interrogatory to the extent it seeks information that is publicly available and/or as easily obtained by the Federal Express as by the Federal Express, on the grounds that such interrogatories are overly broad and unduly burdensome.

10.     Federal Express objects to each interrogatory to the extent it is premature and seeks information or admissions regarding facts that Federal Express has not yet had an opportunity to investigate through discovery.

11.     Federal Express objects to the definitions of the terms "you" and "your" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories to the extent that such definitions include Federal Express's "predecessor, successor, division, subsidiary, officer, director, shareholder, employee, or principal thereof, and any attorney or other agent acting on its behalf" on the grounds that such definitions are vague and ambiguous, irrelevant to the underlying litigation, contrary to the common everyday definition of such terms, call for a legal conclusion, call for defendants to make determinations without adequate foundation, and render the interrogatories overbroad, unduly burdensome and oppressive.

12.     Federal Express objects to the definition of the term "document" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories to the extent it purports to impose obligations beyond those imposed by law, and to the extent that it seeks information that is not reasonably accessible, or would pose an unreasonable and undue annoyance, burden, or expense on Federal Express.

13.     Federal Express objects to the definitions of the terms "identity" or "identify" contained in the "Definitions and Instructions" section of Plaintiff's Interrogatories on the grounds that such definitions are vague, ambiguous, contrary to the common everyday definition of such terms, and render the interrogatories overbroad, unduly burdensome and oppressive.

The foregoing General Objections are incorporated by reference into each of the following individual Responses, as though fully set forth therein, even though not specifically referred to in such Response.  Subject to and without waiving these General Objections, Federal Express sets forth its specific objections and answers to the numbered interrogatories below.

6

## SPECIFIC OBJECTIONS AND ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

INTERROGATORY NO. 9:

If you contend the Patents-in-Suit are invalid under 35 U.S.C. § 112, state the

basis for that contention and identify any documents you intend to reply on in support for

that contention.

**Supplemental Response to Interrogatory No. 9:**

**Subject to and without waiving the foregoing objections, Federal Express**

**contends that the claims of the Patents-in-Suit that recite an "airport-based"**

**component are invalid for indefiniteness. The claims of the Patents-in-Suit that**

**recite a "ground-based" component are invalid for lack of written description. In**

**the '914 patent, claims 1, 13, and 52, reciting "an adaptive power control unit" are**

**invalid for lack of enablement. Also in the '914 patent, claims 29 and 40, reciting**

**the step of "varying an emitted power level" are invalid for lack of enablement. In**

**the '637 patent, claim 31, reciting the step of "transmitting a probe beacon ... and**

**selecting a sub-band frequency channel" is invalid for lack of written description.**

7

INTERROGATORY NO. 10:

Please identify the terms of any claims in the Patents-in-Suit that you contend need court interpretation and provide your proposed interpretation for each term so identified.

**Supplemental Response to Interrogatory No. 10:**

**Federal Express objects to this Interrogatory on the grounds and to the extent that Harris has not yet identified any claim terms in dispute, either in response to Federal Express Corporation's Interrogatory No. 15 or otherwise.**

**Subject to and without waiving the foregoing objections, Federal Express contends that identifying all the claim terms that may need court interpretation at this stage of the litigation would be premature. Discovery has been re-opened based on the addition of new patents. Federal Express may learn information through discovery that may be relevant to the meaning of certain claim terms. Accordingly, Federal Express reserves its right to identify other claim terms and to amend its proposed interpretations of claim terms as discovery progresses. Subject to this reservation, Federal Express identifies at least the following claim terms that may need court interpretation:**

| Claim Term or Phrase | Federal Express's Proposed Interpretation |
|---|---|
| "airport based" | Federal Express contends this claim term is indefinite. To the extent a meaning could possible be discerned from this claim language, a person of ordinary skill in the art would understand the phrase "airport based" to describe items or equipment based or located inside the secured boundary of an airport. |

8

| Claim Term or Phrase | Federal Express's Proposed Interpretation |
|---|---|
| "transmitting the accumulated, stored generated aircraft data" | A person of ordinary skill in the art would understand the quoted phrase to describe the transmitting of all the aircraft data that has been accumulated or stored or generated. |
| "transmitting the stored generated aircraft data" | A person of ordinary skill in the art would understand the quoted phrase to describe the transmitting of all the aircraft data that has been stored or generated. |
| "a transmitter that is operative ... to download said flight performance data that has been accumulated and stored by said archival data store during flight" | A person of ordinary skill in the art would understand the quoted phrase to describe a transmitter that downloads all the flight performance data that has been accumulated or stored during the entire flight. |
| "spread spectrum receiver" | A person of ordinary skill in the art would understand the term "receiver" to describe a component having only the capacity to receive. |
| "transmitting a probe beacon to the spread spectrum transceiver of the ground data link unit and selecting a sub-band frequency channel based on receipt of the probe beacon" | A person of ordinary skill in the art would understand the quoted phrase to describe the steps of [1] a ground-based component transmitting a probe beacon to the transceiver of a ground data link unit located onboard an aircraft, and [2] the same ground-based component selecting a sub-band frequency channel. |

Respectfully submitted this *31* *ST* day of March, 2009.

Respectfully submitted,

Lawrence K. Nodine, Trial Counsel
Georgia Bar No. 545250
NodineL@BallardSpahr.com
J. Scott Anderson
Georgia Bar No. 017266
Florida Bar No. 115053 (inactive)
AndersonJS@BallardSpahr.com
Charley F. Brown
Georgia Bar No. 086754
BrownCF@BallardSpahr.com

9

Robin L. Gentry
Georgia Bar No. 289889
GentryR@BallardSpahr.com
Jeffrey H. Brickman
Georgia Bar No. 080432
BrickmanJ@BallardSpahr.com
Sumner C. Rosenberg
Georgia Bar No. 614550
RosenbergS@BallardSpahr.com
**Ballard Spahr Andrews & Ingersoll, LLP**
999 Peachtree Street, Suite 1000
Atlanta, Georgia 30309
Telephone 678-420-9300
Fax 678-420-9301

Marilyn G. Moran
Florida Bar No. 0163813
mmoran@bakerlaw.com
**Baker & Hostetler, LLP**
P.O. Box 112
Orlando, Florida  32802-0112
Telephone 407-649-4000
Fax 407-841-0168

ATTORNEYS FOR
FEDERAL EXPRESS CORPORATION

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March __31__, 2009, I served a true and correct

copy of the foregoing, FEDERAL EXPRESS CORPORATION'S SUPPLEMENTAL

RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 9 AND

10), by first-class U.S. Mail to:

> Ryan T. Santurri, Esq.
> Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
> P.O. Box 3791
> Orlando, Florida  32802-3791
> Telephone:  407-841-2330
> Fax:  407-841-2343

> J. Scott Anderson
> **Ballard Spahr Andrews & Ingersoll, LLP**
> 999 Peachtree Street, Suite 1000
> Atlanta, Georgia 30309
> Telephone 678-420-9300
> Fax 678-420-9301
>
> ATTORNEYS FOR
> FEDERAL EXPRESS CORPORATION

11